**JOHN L. BURRIS, ESQ., SBN 69888**
LAW OFFICES OF JOHN L. BURRIS
Airport Corporate Center
7677 Oakport Street, Suite 1120
Oakland, CA 94621
Telephone:  (510) 839-5200
Facsimile:  (510) 839-3882
Email:  John.Burris@johnburrislaw.com

**ADANTE POINTER, ESQ., SBN 236229**
**PATRICK BUELNA, ESQ., SBN 317043**
POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
Wells Fargo Center
1901 Harrison St., Suite 1140,
Oakland, CA 94612
Tel: 510-929-5400
Email: APointer@LawyersFTP.com
Email: PBuelna@LawyersFTP.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.F., et al.,<br><br>        Plaintiffs,<br>v.<br><br>CITY OF VALLEJO, et al.,<br><br>        Defendants. | CASE NO.:  2:18-cv-00673-JAM-CKD<br><br>**PLAINTIFF R.F.'S, BY AND THRU HIS GUARDIAN AD LITEM SHENA BATTEN, NOTICE AND PARTIAL MOTION FOR SUMMARY ADJUDICATION ON HIS FOURTH AMENDMENT CLAIM FOR EXCESSIVE FORCE AGAINST DEFENDANT MCMAHON**<br><br>HON. JOHN A. MENDEZ<br><br>Date:      August 25, 2020<br>Time:     1:30 p.m.<br>Ctrm:    6, 14th Floor |

**PLEASE TAKE NOTICE** that on August 25, 2020 at 1:30 p.m., or as soon as this matter may be heard in front of the Honorable Judge John A. Mendez, in the United State District Court, Eastern Division, Sacramento Courthouse, Courtroom 4, Floor 6, 501 'I' Street, Sacramento, California, Plaintiff R.F., by and through his guardian ad litem SHENA BATTEN, will move for partial summary adjudication against the Defendants as to the liability portion of the Fourth Amendment excessive force claim pursuant to Federal Rules of Civil Procedure, Rule 56.

In accordance with the Court's Scheduling Order, the parties gave notice that they intend to file cross-motions and follow the Scheduling Order in timing the motions, oppositions and replies.

The parties also certify that they met and conferred prior to the filing of the dispositive motions in accordance with the court's scheduling and pretrial order. (Declaration of Patrick Buelna [Buelna Decl.], paragraph 2).

# **TABLE OF CONTENTS**

Table of Contents ....................................................................................................... ii

Table of Authorities ................................................................................................... iii

I. Introduction ............................................................................................................. 1

II. Statement of Facts ................................................................................................. 1

III. Argument............................................................................................................... 10

   A. Legal Standard............................................................................................... 10

   B. The Court Must Use the Video Evidence in Ruling on Plaintiff's Motion,
As the Video Clearly Contradicts Defendant McMahon's Narrative Such
That a Reasonable Jury Could Not Believe Him…………………………………..……… 11

   C. The Court Should Grant Plaintiff's Excessive Force Claim Because the Undisputed Facts
Show Defendant Shot Ronell in the Back and Back of his Head As He Ran Away …………..…. 12

      1. The Government's Intrusion. …………………………………………………  ……... 13

      2. The Government's Interest ……………………………………………………..…… 13

         a.   Immediacy of the Threat ………………………………………….……… 13

         b.   Severity of the Crime…………………………………………….……..…… 14

         c.   Actively Resisting or Evading Arrest……………………………...…… 14

      3.   Balancing the Factors ………………………………..…………………...…… 15

   D. Defendant Repeatedly Used Excessive Force Throughout the Incident Including Tasing
Ronell in the Back and Beating Ronell Over the Head with a Flashlight for Fleeing………..…. 17

   E. Defendant Will Rely on Subjective, Unreasonable Fear That No Reasonable
Jury Would Believe and No Objective Officer Would Act On...………………………………… 17

   F. The Supreme Court and Ninth Circuit Have Found Officers' Use of
Deadly Force Unconstitutional As a Matter of Law In Much More Dangerous Situations
Than This One………………………………………………………………………..……… 19

IV. Conclusion  ……..................................................................................................... 22

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

iii

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)…..………….…...………......….…10,11

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)….…..………………….....……….……10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)…………….…….…10

*Scott v. Harris,* 550 U.S. 372, 380 (2007)…..……………..…………….……...……....….11, 12

*Kollin v. City of Tehachapi*, 2020 U.S. Dist. LEXIS 101995, 28 (E.D. Cal. June 10, 2020).............12

*Graham v. Connor,* 490 U.S. 386, 397 (1989) …...............………………......……12, 13, 17, 18

*Tennessee v. Garner,* 471 U.S. 1, 8 (1985) …..…………..…..……….…..……………12, 13, 16, 19

*Glenn v. Washington Cnty*., 673 F.3d 864, 871 (9th Cir. 2011)……...……...….………12, 13, 15, 18

*Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)……..……….....…...……….12

*Miller v. Clark Cnty*., 340 F.3d 959, 964 (9th Cir. 2003) …...……..………..…………….……….13

*A.K.H. by & through Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016)…...…..…..13,19

*George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) …...…..……………………...……..…….14

*Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005) …...…..…………………………..………….15

*Garlick v. County of Kern*, 167 F.Supp.3d 1117, 1155 (E.D. Cal. 2016)..……...…………..……......15

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001) ……...….…......15

*Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001) …...……………..……………….………16

*Cavanaugh v. Wood Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010)..….………………………17

*Azevedo v. City of Fresno,* 2011 U.S. Dist. LEXIS 10132, 31-31 (E.D. Cal. 2011) …...….………17

*United States v. Di Re,* 332 U.S. 581, 594 (1948) …...………….…………….…………….………17

Scott v. Henrich, 39 F.3d 912, 914 (9th Cir.1994).…...…..…………………....……..……….19

*Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991) …...……...……………....…….......19, 20

*Estate of Lopez v. Gelhaus*, 149 F.Supp.3d 1154 (9th Cir. 2016) …...………...…………….……….20

*Nunez v. Santos*, 427 F.Supp.3d 1165 (Dec. 13, 2019) …...…..…………….…………….……….21

*Duran v. City of Douglas, Ariz.,* 904 F.2d 1372 (1990)…...…..……..…………….....…………….21

**Statutes**

Federal Rule of Civil Procedure 56(a)...…..……………………………………………...…..10

Federal Rule of Civil Procedure 56(e)...……...………………………………………. .….…10

## I.  **INTRODUCTION**

Defendant Ryan McMahon chased down and brutally killed unarmed Ronell Foster, Jr., an African-American father of two, because he wanted to have a conversation with Ronell about bicycle safety. Defendant McMahon cornered Mr. Foster in a dark alley, without turning on his body camera, shoved him down a flight of stairs, sat on top of him, tased him several times, and repeatedly struck him with a flashlight splitting his head open. When Ronell rolled away and turned to run, Defendant McMahon shot him seven times in the back and back of his head.

After Defendant McMahon killed Ronell in cold blood, he turned on his body-camera, which automatically preserved thirty seconds of footage prior to him pressing the record button. Defendant McMahon went on to lie and perjure himself claiming Ronell had attacked him with a flashlight. Fortunately, the video evidence documented Defendant McMahon's and Mr. Foster's actions tragically confirming Defendant McMahon needlessly killed Ronell.

Nevertheless, Defendant McMahon refuses to accept responsibility for his conduct forcing Ronell's minor child, Plaintiff R.F., to file this Motion for Partial Summary Adjudication on his Fourth Amendment excessive force claim.

## II. **STATEMENT OF FACTS**

On February 13, 2018, at 7:40 P.M., Defendant Vallejo Police Officer Ryan McMahon first saw Decedent Ronell Foster, Jr. riding his bicycle in a circle at the intersection of Capitol Street and Sonoma Boulevard in Vallejo, CA. (Declaration of Patrick Buelna [Buelna Decl., **Ex. 1** – Deposition Transcript of Ryan McMahon ["McMahon Depo"], at pp. 107-108). Defendant McMahon decided to briefly stop Ronell and educate him on bicycle safety, but had no plans to arrest him. (McMahon Depo, pp. 110-11). Defendant McMahon activated his lights and siren, then put his spotlight on Ronell, but did not broadcast to dispatch his intent to make a traffic stop. (McMahon Depo, p. 113).

Defendant McMahon could not remember why he did not inform dispatch of the traffic stop. (McMahon Depo, 114).

According to Defendant McMahon, Ronell looked at him and took off northbound on Sonoma Blvd and McMahon activated his full lights and siren. (Id.) Then Ronell got off the street, stopped on the sidewalk and turned around to face Defendant McMahon. (McMahon Depo, 120). Ronell stood with his bike between his legs, in a bladed stance, while looking at the Defendant. (McMahon Depo, 115, 117). Ofc. McMahon claims he stopped his car approximately 15 feet from Ronell. (McMahon Depo, 118).

Defendant McMahon contends he introduced himself, informed Ronell that he had stopped him for "erratic driving patterns…and to come over and sit in front of [his] car." (McMahon Depo, 118-119). Ronell replied, "Man, don't – stop messing with me" and rode away on his bike. (Id.)

In response, Defendant McMahon got back into his car and began chasing Ronell. (McMahon Depo, 122).[1] Defendant informed dispatch for the first time that he was chasing a guy on a bike "just for traffic". (Buelna Decl., **Ex. 2** – Dispatch Radio, at 00:00-00:22). Defendant McMahon gave no further updates to dispatch until after he shot Ronell Foster three times in the back and once in the back of the head, killing him. (Dispatch Radio, at 00:22-01:04; Buelna Decl., **Ex. 3** – Coroner's Report, pp. 3-4).

At deposition, Defendant added that he was chasing Ronell for a Cal. Pen. Code § 148 misdemeanor violation of obstructing and delaying, because Ronell did not come over and sit in front of his car. (McMahon Depo, 123-124).

---

[1] Defendant McMahon did not turn on his body camera when he first encountered Ronell nor did he turn it on when he pursued Ronell in his vehicle. (McMahon Depo, 125). However, Defendant McMahon was trained that he should activate his body camera for traffic stops, traffic violations, when a citizen contact becomes adversarial, or where the contact may lead to a use of force. (McMahon Depo, 83-84).

Defendant McMahon chased Ronell with his car until Ronell crashed his bicycle. (McMahon Depo, 134-135). Defendant stopped his car and got out with his flashlight. (McMahon Depo, 137). Ronell crossed the street running and Defendant claimed to see him reaching for his waistband with both of his hands. (McMahon Depo 139-140). Defendant also added that he was concerned Ronell was armed because he was concealing the right side of his body behind the van earlier. (McMahon Depo, 124).[2]

Defendant McMahon was trained that Vallejo Police Department discourages foot pursuits, espeically when alone and into isolated areas; rather, officers should consider alternatives (such as containment and waiting for back up); and, terminating the foot pursuit altogether if the pursuit increases the safety risk to the officer or public. (McMahon Depo, 90-93). Defendant was also trained that when he enagges in a foot pursuit without a partner or back up, he should not attempt to overtake and confront the suspect; but rather, he should keep the suspect in sight and wait for other officers to arrive. (McMahon Depo, 94). Finally, Defendant was trained that he must provide constant updates to dispatch about the foot pursuit (including location and direction of travel, the reason for the pursuit, the suspected crime, and whether or not the suspect may be armed) so that the on-duty sergeant can make a determination as to whether or not the pursuit should be terminated. (Id.) Defendant McMahon defied each and every part of this training.

Nevertheless, Defendant McMahon chased Ronell down the street without any backup and pulled out his taser. (McMahon Depo, 144). Despite the fact, Defendant was trained that he ***should not use*** his taser against an individual merely for fleeing (McMahon Depo, 72), when Defendant McMahon was 10-15 feet behind Ronell he decided to tase him in the back without any verbal

---

[2] However, immediately after Defendant McMahon shot and killed Ronell, McMahon's fellow officers asked if Ronell had a gun, Defendant McMahon replied, "No." (Buelna Decl., **Ex. 17** – McMahon Body Worn Camera, at 2:40-2:45).

warning. (McMahon Depo, 145-147). Ronell kept running, but turned left. (McMahon Depo, 149-150). Ronell went down a narrow walkway between 415 Carolina Street, and Defendant McMahon followed him. (McMahon Depo, 151). Despite his training, Defendant McMahon failed to update dispatch about the foot pursuit or responding officers of his alleged concern that Ronell was armed. (McMahon Depo, 158).[3]

Defendant McMahon caught up and pushed Ronell down a short flight of stairs in the alley. (McMahon Depo, 158-159). Ronell fell down the stairs into the courtyard area where Defendant McMahon eventually shot him in the back and back of the head killing him. (McMahon Depo, 160-161).

Ronell landed facedown on his chest, and Defendant McMahon straddled Ronell's back. (McMahon Depo, 161-162). Defendant had a flashlight in his hands and told Ronell to stop resisting, that he was under arrest, to put his hands above his head and not reach for his waistband. (McMahon Depo, 162).

Defendant McMahon testified that Ronell was "[t]rying to roll, roll away from me and get up." (McMahon Depo, at 162:8-10). So Defendant put one knee on Ronell's lower back, and drew his taser. (McMahon Depo, 162). Ronell did not try to punch, kick or strike Defendant. (McMahon Depo, 162-163). Up to that point, everything Ronell had done was simply trying to get away from the Defendant. (Id.)

Defendant noticed one of the taser probes from the earlier deployment was lodged in Ronell's back so he attempted to complete the circuit and once again tased Ronell in the back without any

---

[3] Although Defendant McMahon was trained to immediately inform his fellow officers when he suspects someone may be armed, Defendant did not radio dispatch again until he had shot Ronell dead. (McMahon Depo, 97-98).

verbal warning. (McMahon Depo, 163-164). Ronell did not scream or say stop, but continued to simply try to get away from the Defendant. (McMahon Depo, 166).

Defendant McMahon stood up, removed the cartridge from the taser, and began pressing the front end of the taser into Ronell's arm, side and chest repeatedly tasing him in drive stun mode. (McMahon Depo, 166-167). Defendant still did not turn on his body-worn camera, or radio anyone for back up. (McMahon Depo 167).

After being tased several times, Defendant testified that Ronell asked, "What the fuck, man? What are you doing?" (McMahon Depo, 168). Ronell never attempted to punch or threaten the Deefendant even though he was being repeatedly tased and beaten with a flashlight. (McMahon Depo, 168-169).

Defendant admitted that when he decided to beat Ronell with his flashlight, the level of threat Ronell presented did not merit the use of deadly force. (McMahon Depo, 175:2-5). The flashlight Defendant used to beat Ronell was a MagLite, approximately a foot long and made of metal. (McMahon Depo, 175; **Ex 4** – Flashlight Photo).

Defendant McMahon only recalled striking Ronell in the clavicle and arm (McMahon Depo 177:11-14), but the medical examiner and Plaintiff's police practices expert Jack Ryan noted a large wound to the front of Ronell's head – consistent with being struck with a MagLite. (Buelna Decl., Coroner's Report, p. 3; **Ex. 5** – Head Wound Photo; **Ex. 6** – Police Practices Expert Jack Ryan's Rule 26 Report [Ryan Report], p. 50, ¶ 161; **Ex 18** – Forensic Pathologist Dr. Omalu Report, p. 11).

Defendant McMahon repeatedly beat Ronell with the flashlight while he was on the ground. (McMahon Depo, 177-178). Defendant McMahon testified that he intended continue to beat Ronell with his flashlight until he gained compliance and Ronnell allegedly stopped resisting. (McMahon Depo, 179). Defendant failed to warn Ronell that he would continue to beat him with a flashlight

unless he complied. (McMahon Depo, 180). Defendant never made a single call over the radio for backup either. (McMahon Depo, 180-181).

When Defendant McMahon raised the MagLite in the air to strike Ronell again, Ronell defended himself by grasping ahold of the MagLite as it came toward him. (McMahon Depo, 182). Converesely, Defendant McMahon testified Ronell ripped the flashlight from him, then got up off the ground, "and was lifting the light up to like come down and…hit [him] with it." (McMahon Depo, 182-183).

At his deposition, Defendant further clarified that he shot Ronell because Ronnell had the "the flashlight above his head" (McMahon Depo, 188:7-10); and, Ronell "was coming at [him] with the flashlight." (McMahon Depo, 189:18-25). They were "[p]oint blank range," arm's length apart. (McMahon Depo, 190). Defendant McMahon claims in the moments before he fired his fatal shots: "Ronell had a bladed stance. His right foot was in front of his left and he was coming – After he grabbed my light, it was simultaneous, he was coming up and doing this motion…He's starting to come towards me with the flashlight in like a hammer first type motion." (McMahon Depo, 191:10-192:4). At video deposition, Defendant McMahon acted out Ronell's actions that caused him to kill him:

  

(**Ex. 7** – Still Frame Photos from Video Deposition at 31:18, 31:19; 31:20; **Ex. 8** – McMahon Video Deposition 31:15-31:20; Ryan Report, pp. 55-59).

In response, Defendant testified that he pulled out his gun and remembered "shooting from [his] hip and punch[ed] out" with the gun. (McMahon Depo, 184). McMahon recalled that his first shot struck Ronell "[s]omewhere in his front. I know because ***I know we were facing each other.***" (McMahon Depo, 186) (emphasis added). Defendant reaffirmed later, that Ronell was attacking him, face to face, with a flashlight. (McMahon Depo, 201:3-7).  Defendant fired seven shots killing Ronell. (Id.) No gun or any other weapon was ever found on Ronell or in the vicinity. (McMahon Depo, 216:14-16).

### 2. Body Camera Footage Demonstrates That Defendant Perjured Himself And Killed Ronell As He Attempted to Flee

Defendant McMahon did not turn on his body-worn camera until after he shot and killed Ronell, but thankfully the camera captured 30 seconds prior to him pressing record. The video evidence ***clearly contradicts*** Defendant's account and definitively proves that Defendant McMahon killed Ronell, as Ronell attempted to flee, and that Ronell ***never*** attacked Defendant. Indeed, Defendant cowardly shot Ronell in the back and back of his head when he fled Defendant's repeated use of excessive force. (**Ex. 9** – Stutchman Rule 26 Report; **Ex. 10 –** Stutchman Enhanced McMahon BWC, at 00:00-00:30). Defendant's body-worn camera shows Defendant McMahon tasing and beating Ronell with a flashlight splitting open his head, while Ronell laid on his back, on the ground. (McMahon Enhanced BWC, 00:00-00:20).



Then, Defendant McMahon moved to strike Ronell with the flashlight yet again prompting Ronell to try and block the blow by grabbing the flashlight, he then ***rolled away from Defendant McMahon and started to get up to run away.***

(McMahon Enhanced BWC, 00:20-00:30; Ryan Report, 59-68; **Ex. 11 -** Stutchman Still Frames 702-918).



Ronell was on his hands and feet and, Defendant McMahon had his firearm aimed at Ronnell's back. (Id.)



As Ronell stood up to run away, Ronell dropped the flashlight and Defendant McMahon had his firearm aimed at Ronell's back. (Id. )



After Ronell had dropped the flashlight and was *turning and beginning to run away*, Defendant McMahon shot Ronell seven times in his side, back and back of his head. (Id.)

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

Ronell collapsed into the bushes from the seven shots in the direction that he was moving (i.e. away from Defendant McMahon). (Id.)

The medical examiner determined that there were seven gunshot wounds: (1) fatal gunshot wound with an entry in the back, left side of Ronell's head, passed through the brain and stopped in his right temple, moved left to right, back to front, which is consistent with being shot while turned away from Defendant and crouched/falling (**Ex. 12 –** Photo of Head); (2) fatal gunshot wound with an entry into Ronell's left mid back and exiting from his chest that moved left to right, back to front and up, which is consistent with being shot while turned away from Defendant and crouched/falling (**Ex. 13** – Photo of Back**);** (3) fatal gunshot wound with an entry in Ronell's left mid back (same entry as prior gunshot wound) and exiting from his chest that moved left right, back to front, and up, which is consistent with being shot while turned away from Defendant and crouched/falling (**Ex. 13**); (4) fatal gunshot wound with an entry into Ronell's left side, that moved left to right and up, stopping his lungs which is consistent with being shot while turned away from Defendant and crouched/falling (**Ex. 14 –** Photo of Side); (5) non-fatal gunshow wound with an entry into the back of Ronell's left

shoulder and stopped in his clavicle that moved back to front and up which is consistent with being shot while turned away from Defendant and crouched/falling (**Ex. 15 –** Photo of Right Back); non fatal gunshot wound with an entry into Ronell's right mid back that exited the right top of his shoulder and moved back to front and up which is consistent with being shot while turned away from Defendant and crouched/falling; finally, a non fatal gun shot wound with an entry into Ronell's left forearm that exited his left elbow and moved right to left, back to front and up which is consistent with being shot while turned away from Defendant and on the ground or crouched/falling (**Ex. 16 –** Phot of Arm**; Ex. 3 -** Coroner's Report, pp. 3-4; **Ex. 18** – Dr. Omalu's Rule 26 Report, pp. 9-11).[4]

### III.   ARGUMENT

#### A.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Alternatively, the moving party can demonstrate that the non-moving party cannot produce evidence to support an essential element upon which it will bear the burden of proof at trial. Id.

Once the moving party meets its initial burden, the burden shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more

---

[4] [4]Plaintiff notes that there was an alleged eyewitness, Robert Wolfe, that clearly lied and did not see the incident, and contradicted both Defendant McMahon and the video evidence. The testimony departed so wildly from the truth that Plaintiff did not take the time to address his testimony here, but will in the reply if the Defendant attempts to use the testimony.

than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of

evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for

the [non-moving party]." *Anderson*, 477 U.S. at 252.

In deciding a summary judgment motion, the court must view the evidence in the light most

favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment...."

*Anderson*, 477 U.S. at 255.

If the non-moving party's version of the facts is ***contradicted by the record to the point that a***

***reasonable jury would not believe it***, the court ***should not adopt the nonmoving party's narrative*** in

ruling on a motion for summary judgment. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (emphasis

added).

### B. THE COURT MUST USE THE VIDEO EVIDENCE IN RULING ON PLAINTIFF'S MOTION, AS THE VIDEO CLEARLY CONTRADICTS DEFENDANT MCMAHON'S NARRATIVE SUCH THAT A REASONABLE JURY COULD NOT BELIEVE HIM

In interpreting the facts in the light most favorable to Defendant, this Court may be tempted to

adopt Defendant McMahon's version of events. In his story, he was face to face with Mr. Foster, Mr.

Foster raised the flashlight over his head in a threatening manner, and was just about to come down

and strike Defendant with it. However, his testimony is clearly perjured and contradicted by the

record in this case. No reasonable jury could watch the footage from Defendant McMahon's body

camera and find that he and Mr. Foster were face to face when he shot him. The video proves Mr.

Foster was crouching, clearly facing away from the officer, and the autopsy report concluded that

every bullet had a back-to-front, and an upward trajectory.

No reasonable jury could believe Mr. Foster raised the flashlight over his head as Defendant described it, because the video plainly showed that he shot Ronell unarmed and running away.




In such a situation, where the non-moving party's version of the facts is contradicted by the record to the point that a reasonable jury would not believe it, the Supreme Court has clearly stated that this Court should not adopt Defendant McMahon's narrative in ruling on a motion for summary judgment: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372 at 380 (2007).

Indeed, a district court in the Eastern District of California recently reaffirmed that "where there is video evidence of the incident giving rise to the excessive force claim, a court must 'view the facts depicted by the videotape.'" *Kollin v. City of Tehachapi*, 2020 U.S. Dist. LEXIS 101995, 28 (E.D. Cal. June 10, 2020) (quoting *Scott, supra*).

## C.  THE COURT SHOULD GRANT PLAINTIFF'S EXCESSIVE FORCE CLAIM BECAUSE THE UNDISPUTED EVIDENCE SHOWS DEFENDANT SHOT RONELL IN THE BACK AND BACK OF HIS HEAD AS HE RAN AWAY

In evaluating a Fourth Amendment claim of excessive force, courts ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham v. Connor,* 490 U.S. 386, 397 (1989).  This inquiry "requires a careful balancing of

'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985)). The Ninth Circuit applies a three-step process to determine reasonableness in use-of-force cases. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).

First, the court must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (quoting *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 532 (9th Cir. 2010)).

Second, the court must evaluate the government's interest in the use of force under the totality of the circumstances. *Glenn, supra*, 673 F.3d at 871 (citing *Graham*, 490 U.S. at 396).

Third, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

## 1.  The Government's Intrusion Was at the Highest Level

"The intrusiveness of a seizure by means of deadly force is ***unmatched***. The use of deadly force implicates the ***highest level*** of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *A.K.H. by & through Landeros v. City of Tustin,* 837 F.3d 1005, 1011 (9th Cir. 2016) quoting *Tennessee v. Garner,* 471 U.S. 1, 8 (1985) (internal quotations omitted) (emphasis added).

Here, Defendant McMahon's intrusion is shooting Mr. Foster multiple times in the back and back of his head when he was unarmed and attempting to flee. Therefore, Defendant intrusion is the highest level of intrusion conceivable in the analysis for excessive force.

## 2.  The Government Interest for the Intrusion Under the Totality of the Circumstances

Next, the court must consider the government's interest for the intrusion under the totality of the circumstances. In *Graham*, the Supreme Court noted courts should consider such factors as (a) whether the suspect posed an immediate threat to the safety of the officer or others; (a) the severity of the crime at issue; and (c) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

### a.   Immediacy of the threat

The Ninth Circuit has repeatedly stated that "the most important of these factors is whether the suspect posed an immediate threat to the safety of the officer or others." *George v. Morris,* 736 F.3d 829, 838 (9th Cir. 2013) quoting *Bryan MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotations omitted).

Here, the immediacy of the threat Ronell presented was minimal. At the time, Defendant shot Ronell in the back, Ronell had rolled away from Defendant in the process of attempting to flee. Although Ronell had possession of a flashlight, he had only taken the flashlight to keep Defendant from beating him to death with it. Furthermore, Ronell had made no movements that indicated he intended to use the flashlight against Defendant who was armed with a gun. Moreover, Ronell dropped the flashlight as he stood up to run, and Defendant shot him in the back anyhow. Therefore, Defendant shot Ronell unarmed while he attempted to flee and he posed a minimal threat to Defendant – if any.

### b.   Severity of the Crime

Defendant shot and killed Ronell trying to bring him into custody over supposedly recklessly riding his bicycle in the street, and according to him did not even intend to arrest him. Nevertheless, Defendant shot and killed Ronell for fleeing from a bicycle traffic violation and resisting being brought into custody. The reported crime is evading arrest for an alleged bicycle violation.

### c. Actively Resisting or Evading Arrest

Defendant admitted that up to the time he shot Ronell in the back, Ronell had not punched, kicked or even threatened the officer. Video evidence demonstrates that Ronell made no threatening movements with the flashlight, and even dropped it. While it is true that Ronell was evading arrest, his active resistance to arrest was limited to attempting to get away from the Defendant.

Furthermore, once Defendant McMahon struck Ronell in the head with a flashlight, that was a use of deadly force. Deadly force is defined as force that creates a substantial risk of serious bodily harm. *Smith v. City of Hemet*, 394 F.3d 689 (9th Cir. 2005). "The conduct need not have actually caused serious injury or death to be considered lethal force; it is the risk of that result that turns the screw." *Garlick v. County of Kern*, 167 F.Supp.3d 1117, 1155 (E.D. Cal. 2016) (citing *Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (the definition of lethal force "is force that creates a substantial risk of death or serious bodily injury." (Internal citations omitted)). Defendant's use of a metal flash to strike Ronell's head caused a serious laceration and could have caused death.

Use of deadly force in a situation where a person is simply trying to get away from an officer for a bicycle violation is *per se* excessive and far exceeded the reasonable force permitted to take Ronell into custody and gave Ronell the legal right to resist and take the flashlight to keep Defendant from killing him. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir.2001) (an officer's "provocative conduct" can trigger an individual's "limited right to offer reasonable resistance"). Therefore, the limited resistance Ronell executed was within his legal right to protect himself from excessive force, and possibly death, after Defendant used the flashlight to hit him in the head.

### 3. Balancing the Factors

Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Glenn*, 673 F.3d at 871 (quoting *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

As noted above, the intrusion of deadly force is "unmatched" and at the "highest level", where a government actor shoots and kills its own citizens. Furthermore, the court must consider "not only when a seizure is made, but also how it was carried out" because even if an officer has probable cause to seize a suspect, it still may be unconstitutional to do so by using deadly force. *Garner,* at 8, 11. Here, Defendant McMahon carried out a death sentence, a murder, over the petty interest of bringing Foster into custody over a *bicycle violation*. Indeed, Defendant admitted that it was not even his intention to issue Ronell a citation, but simply "educate" him on bicycle safety. When Ronell ran, Defendant chased him down and shot hit him in the back and back of the head because Ronell would not stop to listen to his lecture on bike safety.

Defendant did not even warn Ronell that he was going to shoot him if he did not comply. In addition to the *Graham* factors, the Ninth Circuit considers the availability of less intrusive alternatives to the force employed, whether proper warnings were given, and whether it should have been apparent to officers that the person they used force against was emotionally disturbed, as additional factors in its analysis.  *See, e.g. Deorle v. Rutherford,* 272 F.3d 1272, 1282-83 (2001). Here, Defendant had plenty of less intrusive options to bringing Ronell into custody: he could have allowed Ronell to flee and called for back-up to create a perimeter; he could have held Ronell at gunpoint and ordered him to stop; he could have continued to follow Ronell while calling for back up to assist in bringing Ronell into custody. Importantly, Defendant still had other less-lethal options available to him. Defendant was carrying a baton and pepper spray as well. (McMahon Depo, 100:4-8).  Instead, Defendant executed the father of two.

Balancing this intrusion and the way it was carried out against the countervailing government interests at stake, confirms that no reasonable jury could find for Defendant. Defendant's interest and use of deadly force to keep Ronell from escaping a traffic violation undermines the very fabric of a person's constitutional right to be free from excessive force.

Each and every step of the way, Defendant repeatedly violated his own training, and departed from the standard of a reasonable officer.

### D. Defendant Repeatedly Used Excessive Force Throughout the Incident Including Tasing Ronell in the Back and Beating Ronell Over the Head with a Flashlight for Fleeing

As Mr. Foster was running on the sidewalk, Defendant McMahon deployed his taser from approximately 15 feet away. Using a taser in such a situation, where Mr. Foster was not threatening him and simply attempting to flee, was Defendant McMahon's first use of unreasonably excessive force in the pursuit. *See, e.g., Cavanaugh v. Wood Cross City*, 625 F.3d 661, 665-66 (10th Cir. 2010) (holding the *Graham* factors did not justify an officer tasering an unarmed woman in the back as she attempted to briskly walk into her house)*; Azevedo v. City of Fresno,* 2011 U.S. Dist. LEXIS 10132, 31-31 (E.D. Cal. 2011) (where an officer tasering a man suspected of misdemeanors as he ran full speed on the street could constitute unconstitutional excessive force). Mr. Foster did not pose an imminent threat to Defendant McMahon by exercising his right to resist an unlawful arrest following Defendant McMahon's first instance of unconstitutional use of force. *See Di Re,* 322 U.S. at 594.

Then Defendant McMahon shoved Ronell down a flight of stairs, began tasing him in the back and front, and beating him over the head with a flashlight. Defendant McMahon will likely contend that by physically resisting arrest, Mr. Foster became an imminent threat to the officer. Yet Mr. Foster maintained an "undoubted right to resist an unlawful arrest" throughout the pursuit. *See United States v. Di Re,* 332 U.S. 581, 594 (1948). Here, the arrest transitioned into an unlawful arrest when Defendant used excessive force which permitted Ronell to use a limited amount of force to resist

POINTER & BUELNA, LLP
LAWYERS FOR THE PEOPLE
1901 Harrison St., Ste. 1140,
Oakland, CA 94612
Tel: (510) 929 - 5400

Defendant's efforts to use additional excessive for against him. By Defendant's own admissions, Ronell's limited resistance amounted to running, wrestling and struggling to get away – none of which merited deadly force.

### E. Defendant Will Rely on Subjective, Unreasonable Fear That No Reasonable Jury Would Believe and No Objective Officer Would Act On

In applying this test, the court must keep in mind the perspective of a reasonable officer on the scene and recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  The Supreme Court has cautioned against use of the "20/20 vision of hindsight" in evaluating the circumstances facing the officer at the time of the shooting.  *Id.* at 396. However, the Ninth Circuit has also cautioned that "the prohibition against evaluating officers' actions 'with 20/20 vision of hindsight' cuts both ways" and that in evaluating those circumstances facing an officer, they cannot rely on evidence that the officers were not then aware.  *Glenn*, 673 F.3d at 873, fn. 8.

Defendant McMahon testified that he feared Ronell was armed because he was reaching for his waistband and looking back as he ran. However, he never mentioned that fear when he fired seven shots into Ronell's side, back and the back of his head. Furthermore, his contemporaneous reply to officers that asked if Ronell had a gun seconds after the incident was, "No." No reasonable jury is going to believe Defendant shot Ronell because he feared Ronell was armed with a gun.

Indeed, he testified that the basis of his fear was that Ronell was attacking him face to face with a flashlight. (McMahon Depo, 201:3-7). Therefore, no reasonable jury or officer would rely on this testimony of an abstract fear that did not even exist, nor would a reasonable jury believe that Ronell had turned to face Defendant McMahon at arms-length, raised a flashlight above his head and was about to strike Defendant.

Instead, the evidence a reasonable jury, and by which the reasonable officer, and this court must use to evaluate whether to find Defendant used excessive force as a matter of law, is the video evidence that objectively captured Defendant McMahon shooting Ronell in the side, back and back of the head several times as he turned to run away and continued to shoot him as he collapsed on the ground – which was confirmed by the medical examiner's report. It is under these facts that the Court must determine excessive force, and should GRANT Plaintiffs' motion to find excessive force.

**F. The Supreme Court and Ninth Circuit Have Found Officers' Use of Deadly Force Unconstitutional As a Matter of Law In Much More Dangerous Situations Than This One**

The law has been clearly established for over 35 years that a police officer may not use deadly force where the suspect poses no "immediate" threat to the officer or others.  See *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.").  "The most important" factor is "whether the suspect posed an immediate threat to the safety of the officers or others." *A.K.H. v. City of Tustin*, 837 F.3d 1005 (9th Cir. 2016).

Using this standard, both the Supreme Court and Ninth Circuit have made findings of constitutional violations of excessive force as a matter of law under sets of facts much more dangerous than those presented here.

In *Tennessee v. Garner*, plainly stated "that the use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Tennessee v. Garner*, 471 U.S. at 11. In *Garner*, the officer had probable cause to believe Garner had just broken into a that night to commit felony burglary (Id. at 21); when the officer cornered Garner he began to climb over a fence and the officer shot and killed him (Id. at 4). The Supreme Court determined that these set of facts were a constitutional violation. Here, Ronell was only a *misdemeanor* suspect that was fleeing

from Defendant's attempt to stop and talk to him about bicycle safety, and shot and killed Ronell as he turned to flee.

In *Curnow v. Ridgecrest Police*, the Ninth Circuit found a constitutional violation of excessive force using the statement of a witness where officers were responding to a domestic violence suspect that was armed with a submachine gun. *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991). In *Curnow*, the Ninth Circuit noted that, under the witnesses set of facts, the following occurred, Curnow was shot by police as he was holding the woman the police saw him slapping earlier, then Curnow got up, picked up his submachine gun and was running out of the house when the officers shot again and killed him. (Id. at 323). The Ninth Circuit court explained "the police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time." (Id. at 325).

Here, the video demonstrates that, at best, when Ronell turned to run he was holding a flashlight that Defendant had used to beat him with several times and delivered at least one blow to his head. Even with the facts and reasonable inferences drawn in Defendants' favor, Defendant McMahon used excessive force, as a matter of law, because absolutely no reasonable jury could *reasonably* believe that Ronell was an immediate threat of serious bodily harm to Defendant when he *turned to run away with a flashlight.*

Again, in *Estate of Lopez v. Gelhaus*, the Ninth Circuit found a constitutional violation of excessive force in a *much more* dangerous situation where a deputy was confronted with an AK-47 assault rifle and shot the young man as he turned around with the barrel slightly raised. *Estate of Lopez v. Gelhaus*, 149 F.Supp.3d 1154 (9th Cir. 2016) (cert. denied). In *Lopez*, deputies noticed a young man standing in a park with an AK-47 assault rifle in his hand. (Id. at 1156). Deputies

activated their sirens and emergency lights and parked about 35-40 feet from Lopez. (Id. at 1156). Deputy Gelhaus gave the command, "Drop the gun!" (Id.) Both parties agreed that Lopez turned around with the gun in his hand. (Id. at 1162). But the Ninth Circuit taking the facts in the light most favorable to the nonmoving party found "the court can conclude only that the rifle barrel was beginning to rise; and given that it started in a position where it was pointed down at the ground, it could have been raised to a slightly-higher level without posing any threat to the officers." Based on this set of facts, the Ninth Circuit concluded that it was a constitutional violation of excessive force for Deputy Gelhaus to have shot Lopez in these sets of facts.

Again, here Ronell was not armed with a firearm at all. Taking the facts in a light most favorable to Defendant, Ronell was *turning away* from Defendant with a flashlight in his right hand and Defendant shot Ronell seven times in the back. No reasonable juror could conclude that Ronell was posing a serious threat of physical harm as he was getting up and turning away from Defendant with a flashlight in his hand.

Plaintiffs understand that the aforementioned Supreme Court and Ninth Circuits cases were focused on finding a set of facts, based on the proffered evidence, from which a reasonable jury could conclude excessive force occurred as a matter of law, and overturning qualified immunity.

Here, Plaintiffs are requesting summary judgment in their favor, but the analysis stands. If the best set of facts for Defendants (nonmoving party) still indicate a constitutional violation of excessive force as a matter of law, as exemplified by the set of facts under *Garner, Curnow* and *Lopez*, then judgment should be entered in Plaintiffs' favor on the Fourth Amendment claim. *See also Nunez v. Santos*, 427 F.Supp.3d 1165 (Dec. 13, 2019) (affirming the jury verdict in plaintiffs' favor that found excessive force where officers shot and killed Anthony Nunez when he stepped out onto his front porch holding a gun, after repeatedly refusing to drop the gun). Here, even Defendant McMahon

agreed that if Ronell was turning to run away from him that using deadly force would have been unlawful based on his training. (McMahon Depo, 206:19-207:3).

Therefore, Plaintiffs respectfully request this Court GRANT Plaintiffs' motion for partial summary adjudication on Plaintiff R.F.'s Fourth Amendment claim for excessive force liability, and leave only the issue of damages for a jury to decide. *See Duran v. City of Douglas, Ariz.,* 904 F.2d 1372 (1990) (affirming the grant of partial summary judgment on Plaintiff's Fourth Amendment claim in his favor against an officer for liability and sending damages to jury trial).

## IV.   <u>CONCLUSION</u>

Plaintiff R.F. respectfully requests this Court GRANT Plaintiff's motion for summary adjudication as to the liability portion of his claim and allow only the damages portion to go to jury trial.


Date: June 26, 2020                             Respectfully submitted,


                                                **POINTER & BUELNA, LLP**
                                                **LAWYERS FOR THE PEOPLE**


                                                /s/ Patrick Buelna
                                                PATRICK M. BUELNA
                                                COUNSEL FOR PLAINTIFFS