# EXHIBIT 1

```
 1                UNITED STATES DISTRICT
 2            EASTERN DISTRICT OF CALIFORNIA
 3                     ---oOo---
 4   I.F., by and through her guardian
     ad litem SHASTA SKINNER,
 5   individually and
     successor-in-interest to Decedent
 6   RONELL FOSTER; R.F., by and        No.
     through his guardian ad litem   2:18-cv-00673-JAM-CKD
 7   SHENA BATTEN,
     successor-in-interest to Decedent
 8   RONELL FOSTER; PAULA MCGOWAN,
     individually; and RONELL FOSTER,
 9   SR., individually,
10           Plaintiffs,
11   vs.
12   CITY OF VALLEJO, a municipal
     corporation; RYAN MCMAHON,
13   individually and in his official
     capacity as a Police Officer for
14   the CITY OF VALLEJO, and DOES
     1-50, inclusive,
15
             Defendants.
16   _____/
             PORTIONS OF THIS TRANSCRIPT ARE CONFIDENTIAL
17
               VIDEOTAPED DEPOSITION OF RYAN McMAHON
18
                 Taken before MARK CHILDRESS
19                    CSR No. 7773
                    February 27, 2020
20
             Pages 226-236, 251-254, 288-296, 300-304
21           ARE CONFIDENTIAL AND ARE BOUND SEPARATELY
22
               Aiken Welch, a Veritext Company
23               One Kaiser Plaza, Suite 250
                 Oakland, California 94612
24             (510) 451-1580/(877) 451-1580
                   Fax:  (510) 451-3797
25                  www.aikenwelch.com
```

Page 1

1    know?

2           MR. SMYTH:  Yeah, calls for speculation.

3           THE WITNESS:  I believe so.

4    BY MR. HADDAD:

5        Q.  Are you a Taser trainer, by the way?      14:00

6        A.  I am not.

7        Q.  So your department Taser policy is called

8    policy 305, three oh five.  One of the things it

9    says is a verbal warning of the intended use of

10   the Taser should precede its application unless it  14:00

11   would otherwise endanger the safety of officers or

12   when it is not practicable due to the

13   circumstances.  That's what's highlighted there.

14   But you're familiar with that part of the policy,

15   right?                                             14:00

16       A.  Yes.

17       Q.  That applied to you in Vallejo anytime you

18   use a Taser on someone, right?

19       A.  Correct.

20       Q.  And it says the purpose for the warning is 14:01

21   to provide the individual with a reasonable

22   opportunity to comply.  You've been trained that,

23   right?

24       A.  Yes.

25       Q.  And the policy also talks about, according 14:01

Page 71

1    to your department rules, when you're allowed to

2    use a Taser, right?

3         A.   Yes.

4         Q.   So this says, quote, the Taser device may

5    be used in any of the following circumstances when      14:01

6    the circumstances perceived by the officer at the

7    time indicate that such an application is

8    reasonably necessary to control a person.  A, the

9    subject is violent or is physically resisting.  B,

10   the subject has demonstrated by words or actions        14:01

11   an intention to be violent or to physically resist

12   and reasonably appears to present the potential to

13   harm officers, himself or others.

14             That's what it says here, right?

15        A.   Correct.                                       14:02

16        Q.   That applied to you whenever you use a

17   Taser in Vallejo, right?

18        A.   Yes.

19        Q.   And the next thing it says is, quote, mere

20   flight from a pursuing officer without other known      14:02

21   circumstances or factors is not good cause for the

22   use of the Taser device to apprehend an

23   individual.

24             That applied to you, too, right?

25        A.   Yes, sir.                                      14:02

                                              Page 72

1    policy at the time, right?

2         A.  Yes.

3         Q.  What's your understanding of when you were

4    supposed to turn on your body camera?

5         A.  It should be activated in the course of      14:14

6    our duty if we believe that the contact is going

7    to lead into any force or some kind of complaint,

8    also if it's going to help in our investigation.

9         Q.  Your department's policy has some specific

10   situations where they tell you it should be          14:14

11   activated, such as for all enforcement and

12   investigative contacts, including stops and field

13   interview situations.   That's one example, right?

14        A.  Correct.

15        Q.  You're also supposed to turn the camera on  14:14

16   for traffic stops, including, but not limited to,

17   traffic violations, stranded motorist assistance

18   and all crime interdiction stops, right?

19        A.  Should turn it on, yes.

20        Q.  And you also should turn it or for self-     14:15

21   initiated activity in which a member would

22   normally notify the communication center, right?

23        A.  Correct.

24        Q.  And you also should turn the camera on for

25   any other contact that becomes adversarial after     14:15

Page 83

1    the initial contact in a situation that would not

2    otherwise require recording, right?

3        A.   True.

4        Q.   And when your department says should, your

5    department has an expectation that you will turn      14:15

6    it on unless you got a good reason not to, right?

7             MR. SMYTH:   Beyond the scope of this

8    witness.

9    BY MR. HADDAD:

10        Q.   According to your training.              14:15

11        A.   According to my training, it's a general

12    guideline, depending on the officer's experience,

13    when they're going to need the camera, to turn it

14    on, to help on the reports if something is -- you

15    know, some kind of civil complaint or criminal      14:16

16    complaint or coming in contact on traffic stops,

17    you should turn it on, but it's not you shall.

18    It's based on the officer's discretion, based on

19    his training, experience.

20        Q.   Your department has trained you about how  14:16

21    you should interpret the word should when it

22    appears in its policies, right?

23        A.   Yes.

24        Q.   And based on your training, when your

25    department says you should do something, that       14:16

Page 84

1   means your department expects you to do that

2   unless you have a good reason not to do it, right?

3           MR. SMYTH:  That's beyond the scope, but

4   to your understanding, go ahead.

5           THE WITNESS:  It's my understanding that   14:16

6   you should turn on your camera during most

7   contacts.

8   BY MR. HADDAD:

9       Q.  Can you answer my question, though?

10      A.  Can you restate it?                         14:16

11          MR. SMYTH:  Can you restate or read it

12   back?  Yeah.

13              (Record read.)

14          THE WITNESS:  Correct.

15   BY MR. HADDAD:                                     14:17

16      Q.  How do you turn on your body camera, at

17   least the one you had during the Foster situation?

18      A.  There's two different ways.  It's a

19   process.  There's a power button at the top that

20   you have to turn on to turn it into buffer mode.   14:17

21   That activates the camera, the power supply.  And

22   then when you push the center button two times, it

23   activates the camera to record.

24      Q.  So in the Ronell Foster situation you

25   already had it turned on, right; it just wasn't    14:17

                                                   Page 85

1     activated; is that fair to say?

2              MR. SMYTH:  Vague as to time.

3              THE WITNESS:  No.

4     BY MR. HADDAD:

5         Q.  You said there's two parts.  The switch at   14:17

6     the top, the first switch, was already activated;

7     is that true?

8         A.  I did not say that.

9         Q.  I'm asking.

10        A.  At the time when I noticed, when I went to   14:17

11    activate my camera, that switch was not on.  I had

12    to activate that during the process of dealing

13    with Ronell Foster.

14        Q.  So when you activated it, what did that do

15    in terms of the buffering?                          14:18

16        A.  So you have to -- It has to buffer at that

17    point.  It has to power up.  It goes into like a

18    seven-second cycle where it powers up and then it

19    starts buffer mode.

20        Q.  And so if it had already been flipped on,   14:18

21    it would have continually been capturing the

22    previous 30 seconds, right?

23        A.  Yes.

24        Q.  But because your switch wasn't turned on

25    at that time, once you turned it on, it started     14:18

                                                    Page 86

1   buffering from that point forward; is that right?

2       A.   After the seven seconds to power up, yes.

3       Q.   Okay.   So then 37 seconds after you

4   flipped that switch, then you would get not only

5   visual, but also sound; is that correct?            14:18

6       A.   Correct.

7       Q.   And your department's camera policy also

8   says at no time is a member expected to jeopardize

9   his or her safety in order to activate a portable

10  recorder or change the recording media.   However,  14:19

11  the recorder should be activated in situations

12  described above as soon as reasonably practicable.

13          And that was the rule that applied to you,

14  right?

15      A.   Correct.                                    14:19

16      Q.   Your department had two pursuit policies:

17  One for vehicle pursuits and one for foot

18  pursuits, right?

19      A.   Correct.

20      Q.   There was a time when you were pursuing    14:20

21  Ronell Foster where you were in your car and he

22  was on his bicycle.   Which one of those two

23  policies applied at that time?

24      A.   The vehicle pursuit.

25          MR. SMYTH:   And beyond the scope.          14:20

Page 87

1    BY MR. HADDAD:

2        Q.  That's based on your training; is that

3    correct?

4        A.  Yes.

5            MR. HADDAD:  Why don't we take just a      14:20

6    really short break at this point.

7            THE VIDEOGRAPHER:  We're off the record at

8    2:20.

9                (Recess taken.)

10           THE VIDEOGRAPHER:  We're back on the       14:22

11   record at 2:22.

12   BY MR. HADDAD:

13       Q.  Okay.  I'd like to ask you about several

14   things that are in your department vehicle pursuit

15   policy.  We'll kind of go through it from the top.  14:22

16   Your policy starts off by saying vehicle pursuits

17   expose innocent citizens, law enforcement officers

18   and fleeing violators to the risk of serious

19   injury or death.

20           You've been trained about that, right?     14:23

21       A.  Yes.

22       Q.  One of the purposes of this policy is to

23   reduce the potential for pursuit-related

24   collisions.  Vehicular pursuits require officers

25   to exhibit a high degree of common sense and sound  14:23

                                          Page 88

1   judgment.

2          You've been trained that, too, right?

3      A.   Yes.

4      Q.   The policy says officers must remember

5   that the most important factors to the successful   14:23

6   conclusion of a pursuit are proper self-discipline

7   and sound professional judgment.  Officers'

8   conduct during the course of a pursuit must be

9   objectively reasonable; that is, what a reasonable

10  officer would do under the circumstances.            14:23

11         You've been trained in that, right?

12     A.   Yes, sir.

13     Q.   Your department talks about when to

14  initiate a pursuit and it says the following

15  factors individually and collectively shall be      14:23

16  considered in deciding whether to initiate a

17  pursuit.

18         And it has several factors.  Here's the

19  first three:  A, the seriousness of the known or

20  reasonably suspected crime and its relationship to  14:24

21  community safety.

22         That's one thing you're supposed to

23  consider, right?

24     A.   Yes.

25     Q.   B, the importance of protecting the public 14:24

                                            Page 89

1    and balancing the known or reasonably suspected

2    offense and the apparent need for immediate

3    capture against the risk to the officers, innocent

4    motorists and others.

5         That's another factor you're supposed to    14:24

6    think about, right?

7         A.  Correct.

8         Q.  And another factor you're supposed to

9    consider before initiating a vehicle pursuit is

10   the apparent nature of the fleeing suspects; e.g.,    14:24

11   whether the suspects represent a serious threat to

12   public safety, right?

13        A.  Correct.

14        Q.  The foot pursuit policy applied anytime

15   you were pursuing somebody on foot, right?          14:25

16        A.  Correct.

17        Q.  And it starts off by saying the safety of

18   the department members and the public should be

19   the primary consideration when determining whether

20   a foot pursuit should be initiated or continued.    14:25

21   Officers must be mindful that immediate

22   apprehension of a suspect is rarely more important

23   than the safety of the public and department

24   members.

25        You've been trained that, right?             14:25

Page 90

1          A.   Yes.

2          Q.   Your department's policy says mere flight

3    by a person who is not suspected of criminal

4    activity shall not serve as justification for

5    engaging in an extended foot pursuit without the        14:25

6    development of reasonable suspicion regarding the

7    individual's involvement in criminal activity or

8    being wanted by law enforcement.

9               You've been trained that, too, right?

10         A.   Yes.                                          14:26

11         Q.   That was part of the policy you were

12   required to obey as well, right?

13         A.   Yes.

14         Q.   The policy says if circumstances permit,

15   surveillance and containment are generally the          14:26

16   safest tactics for apprehending fleeing persons.

17              You've been trained that, right?

18         A.   Yes.

19         Q.   And your department trains you that you

20   should consider reasonable opportunities to a foot      14:26

21   pursuit, other ways to apprehend or deal with the

22   situation, right?

23              MR. SMYTH:   It's vague.

24              Sorry.   The sirens.   Can we restate it?

25   BY MR. HADDAD:                                           14:26

                                              Page 91

1          Q.  Take a break, let it go by.

2              I'm just trying to paraphrase this policy

3      a little bit for this next part so I don't have to

4      read a long section, but basically the policy

5      tells you you're supposed to consider reasonable      14:27

6      alternatives to a foot pursuit whenever possible,

7      right?

8          A.  Yes.

9          Q.  And in particular, it says when reasonably

10     practicable, officers should consider alternates      14:27

11     to initiating or continuing a foot pursuit when

12     the officer is acting alone.

13             You've been trained that, right?

14         A.  Yes.

15         Q.  You're also supposed to consider something 14:27

16     alternative to a foot pursuit if the officer loses

17     radio contact with the dispatch or with assisting

18     or backup officers, right?

19         A.  Correct.

20             MR. SMYTH:  Beyond the scope, but go          14:27

21     ahead.

22     BY MR. HADDAD:

23         Q.  Or if the suspect enters a building,

24     structure, confined space, isolated area or dense

25     or difficult terrain and there are insufficient       14:27

                                        Page 92

1    officers to provide backup and containment, right?

2        A.   It's a consideration, yes.

3        Q.   That's a situation where you're supposed

4    to consider not engaging in a foot pursuit

5    anymore, right?                                      14:28

6        A.   Yes.

7        Q.   And you're also supposed to consider

8    either not starting or stopping an ongoing foot

9    pursuit if the officer becomes aware of

10   unanticipated or unforeseen circumstances that       14:28

11   reasonably increase the risk to officers or the

12   public, right?

13       A.   Yes.

14       Q.   And you're also supposed to consider

15   terminating a foot pursuit if the officer loses      14:28

16   possession of his or her firearm or other

17   essential equipment, right?

18            MR. SMYTH:   Misstates policy, but --

19   Beyond the scope.   Go ahead.

20            THE WITNESS:   Something similar to those    14:28

21   guidelines, yes.

22   BY MR. HADDAD:

23       Q.   Your foot pursuit policy also talks about

24   responsibilities in foot pursuits and it says the

25   initiating officer.   That would be the officer who   14:29

                                             Page 93

```
 1   starts the foot pursuit, right?
 2        A.  Yes, sir.
 3        Q.  It says when acting alone and when
 4   practicable, the initiating officer should not
 5   attempt to overtake and confront the suspect, but    14:29
 6   should attempt to keep the suspect in sight until
 7   sufficient officers are present to safely
 8   apprehend the suspect.
 9            That's what your department requires of
10   you, right?                                          14:29
11            MR. SMYTH:  Beyond the scope and misstates
12   policy, but --
13            THE WITNESS:  It's not a requirement.
14   It's just a guideline that says --
15   BY MR. HADDAD:                                       14:29
16        Q.  It's another should there like we talked
17   about before, right?
18        A.  A should consider, yes.
19        Q.  Should means your department expects you
20   to do it unless you have a good reason not to,       14:29
21   right?
22        A.  Should consider, yes.
23            MR. SMYTH:  And that goes beyond the
24   scope.
25   BY MR. HADDAD:                                       14:29
```

Page 94

1       Q.  And then your foot pursuit policy requires

2   constant communication with your police radio,

3   right?

4       A.  It's not constant communication.  It's to

5   provide updates to dispatch.                    14:30

6       Q.  They expect you to update dispatch about

7   your location and direction of travel, right?

8       A.  Correct.

9       Q.  To identify who you are by your call sign,

10  right?                                          14:30

11      A.  M-hm.

12      Q.  Yes?

13      A.  Yes.

14      Q.  They expect you to give the reason for the

15  foot pursuit, such as the crime classification, 14:30

16  right?

17          MR. SMYTH:  Vague.

18          THE WITNESS:  Yes.

19  BY MR. HADDAD:

20      Q.  So based on your training, what's the     14:30

21  reason you're supposed to radio in the crime that

22  you're pursuing the person for?

23      A.  What's the reason?

24      Q.  Yeah.

25      A.  To let the sergeant know, like if it's an  14:30

1    infraction, if it's an armed individual, what's

2    the nature of the crime so the sergeant can make a

3    determination whether to let the foot pursuit

4    continue or not or terminate it.

5         Q.   And those decisions about whether to let        14:30

6    the foot pursuit go on or whether it should be

7    terminated always take into account public safety,

8    officer safety and the subject's safety, right?

9         A.   Yes.

10        Q.   You're also supposed to radio in the            14:31

11   number of suspects and their description and to

12   include their name if it's known, right?

13        A.   In certain situations, yes.

14        Q.   And you're supposed to radio in whether

15   the suspect is known or believed to be armed with     14:31

16   a dangerous weapon, right?

17        A.   If you have time, yes.

18        Q.   Sure.  If you believe the person is armed

19   with a dangerous weapon, officer safety requires

20   that you let other officers know, right?               14:31

21        A.   You should.

22             MR. SMYTH:  Misstates policy.

23   BY MR. HADDAD:

24        Q.   You should, right?

25        A.   You should, yes.                             14:31

                                                   Page 96

```
1        Q.  For officer safety reasons, right?

2        A.  Yes.

3        Q.  Those are important reasons, right?

4            MR. SMYTH:  Overbroad, calls for --

5    Incomplete hypothetical, vague.                    14:31

6            THE WITNESS:  Every situation is

7    different.  Depending on what the situation and

8    the officer, what they're dealing with at the

9    time, to use the radio, it's good to let your

10   partners know what's going on, but at the same    14:32

11   time, when you're confronted with a suspect it's

12   time to deal with the suspect.  If you go on the

13   radio, that could endanger your officer safety.

14   So you need to engage with the suspect, whatever

15   it is.  And when it's safe, or when you feel      14:32

16   appropriate based on your training and experience,

17   you would utilize your radio to give more updates.

18   BY MR. HADDAD:

19       Q.  A person who you have facts to believe is

20   armed with a gun would potentially pose a very     14:32

21   serious threat to involved officers, right?

22       A.  Yes.

23       Q.  And you've been trained throughout your

24   career to let your fellow officers know whenever

25   possible if you have reason to believe someone has 14:32
```

Page 97

1    a gun, right?

2         A.   Yes.

3         Q.   And that's one of the first things you

4    should do upon learning that someone may be armed

5    with a gun, right?                                  14:32

6              MR. SMYTH:   Vague and incomplete

7    hypothetical.

8              THE WITNESS:   It depends on the

9    circumstance.

10   BY MR. HADDAD:                                      14:33

11        Q.   That's what you've been trained, though,

12   isn't it, given the high risk involved?

13        A.   No.   There's different circumstances for

14   everything.   Just because somebody has a gun

15   doesn't mean -- Do they legally have a gun?   Is    14:33

16   the person a known suspect in something?   I mean,

17   people have guns all the time.   Just because they

18   have a gun doesn't mean they're a bad person or

19   you need to get on the radio and update dispatch.

20        Q.   Your department says -- Let me strike     14:33

21   that.

22             You say sometimes there's extenuating

23   circumstances where you're not able to provide all

24   the information your policy talks about to the

25   dispatcher during a foot pursuit, right?            14:33

Page 98

1      A.   Correct.

2      Q.   And your policy talks about those

3  extenuating circumstances, doesn't it?

4      A.   I think to a certain extent.

5      Q.   It says, quote, absent extenuating      14:33

6  circumstances, an officer unable to promptly and

7  effectively broadcast this information should

8  terminate the foot pursuit.

9           That's what your department's policy says,

10  right?                                            14:34

11          MR. SMYTH:   That's a -- The document

12  speaks for itself.   Beyond the scope.

13          THE WITNESS:   If that's what the document

14  says, then yes.

15  BY MR. HADDAD:                                    14:34

16      Q.   Okay.   Let's talk about the incident now.

17  So what day did this happen?   Can you remember the

18  date?

19      A.   February 13.

20      Q.   2019, right?                             14:34

21      A.   2018.

22      Q.   '18.

23          MR. SMYTH:   Yeah, it's '18.

24  BY MR. HADDAD:

25      Q.   What kind of uniform were you wearing that 14:34

                                                    Page 99

1    day?  Was it a regular uniform?

2        A.  Yeah.  Class B uniform, royal blue,

3    patches, gun belt.

4        Q.  You had some less lethal will force on

5    your person at that time?                          14:35

6        A.  Yes, I did.

7        Q.  What did you have?

8        A.  A Taser, baton, OC spray and flashlight.

9        Q.  And you were carrying two guns I believe.

10       A.  Yes, sir.                                   14:35

11       Q.  So what was your primary gun?

12       A.  Glock 21.  It's a .45-caliber.

13       Q.  Was that a personally owned gun or a

14   department-issued gun?

15       A.  Personally owned.                           14:35

16       Q.  Why did you choose to use your own

17   personal gun instead of one the department would

18   give you?

19       A.  Because I've carried that gun since I

20   started in law enforcement.                         14:35

21       Q.  You had a .45-caliber gun?

22       A.  Yes, sir.

23       Q.  What caliber was the gun your department

24   would normally issue to officers?

25           MR. SMYTH:  May call for speculation.  If  14:35

                                              Page 100

1    you know.

2           THE WITNESS:  .9, .357 and .45.

3    BY MR. HADDAD:

4        Q.  Could you request a .45 from your

5    department?  Or how would you get their own issue    14:35

6    of a .45?

7        A.  Yes, I could request one if I wanted one.

8        Q.  Why did you choose to carry a relatively

9    large-caliber gun like a .45?

10       A.  I'm able to shoot well with it.  I like    14:36

11   the way it feels in my hand.

12       Q.  How long have you had that gun?

13       A.  Over ten years.

14       Q.  What was the other gun that you had on

15   your person?                                    14:36

16       A.  Glock 30SF, also a .45-caliber handgun.

17       Q.  Where was that?

18       A.  In my left pocket.

19       Q.  That was kind of a backup gun in case you

20   lost your main gun?                             14:36

21       A.  Or my right side became incapacitated.

22   The magazines are also interchangeable.  So --

23       Q.  Were you wearing a bulletproof vest?

24       A.  Yes.

25       Q.  Did you have any other kind of body armor  14:36

Page 101

1    or padding on your person?

2         A.  Yeah.  I have a rifle -- rifle plates in

3    the front and back.

4         Q.  What are those?

5         A.  Basically an added level of protection,      14:37

6    thin.  So if any rifle threats.  So ballistic vest

7    stops handgun bullets.  Rifle plate stops rifle

8    bullets.

9         Q.  How big is the rifle plate?

10        A.  Seven by nine inches.                          14:37

11        Q.  Where does it go?  Across your upper

12   chest?

13        A.  Just in the center.

14        Q.  The center, okay.  It would also protect

15   you against some sort of impact weapon used           14:37

16   against you, right, if you got struck there?

17        A.  It depends.  You still feel everything.

18   So it depends on the force of what that was.

19        Q.  You had a police radio on your person?

20        A.  I did.                                         14:37

21        Q.  How did that all work, that system?  I

22   believe you had a transmitter and a radio in

23   different places on your body.

24        A.  Yeah.  So a microphone, normally I carry

25   it in the center of my chest and the cord wraps       14:37

Page 102

1    around my lapel so it doesn't come out.  And

2    there's also a bungee cord I use on my microphone

3    so that doesn't get dislodged during a foot

4    pursuit or something of that nature or a fight.

5    The cord wraps around, down my back to my radio.    14:38

6    And it's on my left-hand side, attached to my

7    utility belt.

8         Q.  So are you -- is your radio on in your

9    normal shift?  You can hear the traffic?

10        A.  Yeah.  You normally have an earpiece in.    14:38

11   Or the earpiece comes out of the radio jack.  You

12   can hear the actual sound from the microphone.

13        Q.  So on the day of your shift for the Foster

14   incident, you would have had an earpiece in?

15        A.  Yes, sir.                                   14:38

16        Q.  And if you wanted to make a radio

17   transmission, what did that require of you?

18        A.  To push a button on my microphone.

19        Q.  Can you just pantomime for us for the

20   video what it was like?  So you just reach and you   14:38

21   just press a button and talk?

22        A.  Depending.  There's other considerations.

23   Is there other radio traffic going on?  Is there a

24   signal from where you're at to use your portable

25   radio?  Because it's not as powerful as a car       14:39

Page 103

1    radio's.

2        Q.  And what does -- How is it determined if

3    there's a signal where you're at?  Are there

4    signal towers?

5        A.  Yeah, they're signal towers, yes.  They're    14:39

6    called repeaters.

7        Q.  In the part of town where your foot

8    pursuit happened with Ronell Foster, what's your

9    radio reception like at that place?

10       A.  I believe it was working.                        14:39

11       Q.  I understand that you had been working

12   some overtime in the days leading up to the

13   incident.  Is that right?

14       A.  Yes, sir.

15       Q.  So can you tell us about that?                   14:39

16       A.  Basically the department offers overtime.

17   You can sign up for it if you like.  I signed up

18   for overtime and I came in for a swing shift at

19   4:30 in the afternoon.  And I would work swing

20   shift until my normal shift started at 9:30.  And    14:39

21   then I work all the away from 9:30 to 7:30 in the

22   morning.

23       Q.  That's a 15-hour workday, right?

24       A.  Correct.

25       Q.  Doing some pretty stressful and physical     14:40

Page 104

1    work, right?

2         A.  Yes.

3              MR. SMYTH:  Vague.

4    BY MR. HADDAD:

5         Q.  So you came on duty on the day of the        14:40

6    Foster incident at 4:30 p.m.?

7         A.  Yes, sir.

8         Q.  Having just gotten off work that morning

9    at 7:30 a.m., right?

10        A.  Yes.                                          14:40

11        Q.  Because the previous day you had worked

12   the same shift; is that right?

13        A.  Yes.

14        Q.  And what about the day before that?

15        A.  No.  I believe I was off.                     14:40

16        Q.  Let's say in the prior two weeks, how many

17   15-hour shifts had you worked?

18        A.  I don't know.

19        Q.  Likely you had worked other ones as well,

20   right?                                                 14:40

21        A.  I can't tell you.  I don't know.

22        Q.  Can you recall anything about your work

23   activities on February 13 before you encountered

24   Mr. Foster?

25        A.  Standard day.                                 14:41

                                              Page 105

1        Q.   Just give me an example of a standard so

2    far.

3        A.   I don't know what happened on that day.

4    So much stuff happens in the city I work.  I can't

5    give you a specific what happened.  I know before    14:41

6    contacting Ronell Foster I cleared a call on Marin

7    Street.  What that call was, I don't remember, but

8    I remember I was doing something and cleared a

9    call.

10       Q.   You had a car that you were driving alone   14:41

11   that day, right?

12       A.   Yes, sir.

13       Q.   Did you have a certain area or beat of the

14   city that you were assigned to?

15       A.   I did.                                       14:41

16       Q.   What was that?

17       A.   Beat 1.

18       Q.   What does that encompass?

19       A.   North Vallejo.

20       Q.   How large is that?                          14:41

21       A.   A couple square miles.

22       Q.   Was there any other officer responsible

23   for the same territory?

24           MR. SMYTH:  It's vague as to time.

25           THE WITNESS:  You know, I'm assuming there   14:42

                                              Page 106

1    was a day shift officer assigned to that area as

2    well.

3    BY MR. HADDAD:

4        Q.  I mean during your shift.  Were you the

5    sole officer for that zone or was there another     14:42

6    person?

7        A.  You know, I don't remember if a day shift

8    officer was doing that, because I was a swing

9    shift guy.  So I don't know if the day shift had

10   manned that area or not.                            14:42

11       Q.  Okay.  So about what time of day was it

12   when you first saw Ronell Foster?

13       A.  7:40 at night.

14       Q.  So what was the light --

15           First of all, I'll ask differently.  Where 14:42

16   did you first see him?

17       A.  Capitol Street and Sonoma Boulevard.

18       Q.  What was he doing?

19       A.  He was riding in and out of traffic on his

20   bike.                                               14:42

21       Q.  On Capitol Street?

22       A.  Capitol and Sonoma Boulevard, yes.  He was

23   like in the middle of the intersection of Capitol

24   Street and Sonoma Boulevard riding in the number 2

25   lane and back onto Capitol Street.                  14:43

                                           Page 107

1          Q.  Did it like he was going somewhere?  Or

2     did it look like he was disrupting traffic?  Or

3     what?

4          A.  Disrupting traffic.

5          Q.  Was he driving in circles?  Or was he          14:43

6     driving somewhere?

7          A.  A circle from what I saw.

8          Q.  What was the lighting like in that place?

9          A.  It was dark.

10          Q.  There would have been streetlights in the  14:43

11     intersection, wouldn't there?

12          A.  Not at this intersection, no.  It's a stop

13     sign.  And it's a four-lane highway that's heavily

14     traveled at nighttime and all through the day as

15     well.                                              14:43

16          Q.  So Vallejo has a four-lane highway at an

17     intersection with no streetlights?

18          A.  Are you talking -- You're talking about

19     like red, green and yellow lights or are you

20     talking --                                         14:43

21          Q.  Lights for illumination.

22          A.  You know, I'm not sure of the lighting

23     condition over there.  I just know it was dark.  I

24     think at the top of the stairs it was -- probably

25     had a light there.  Besides that, I don't -- I     14:44

Page 108

1    can't tell you.

2        Q.  What was Mr. Foster wearing?  Can you

3    remember?

4        A.  Dark-colored sweatshirt, light pants.

5        Q.  Did you recognize who he was?          14:44

6        A.  No.

7        Q.  Did he look familiar to you at all?

8        A.  No.

9        Q.  Had you received any information, say

10   earlier in your shift or before your shift, that   14:44

11   you should watch out for someone doing things like

12   him?

13           MR. SMYTH:  It's vague as to --

14           The WITNESS:  Can you be more specific?

15   BY MR. HADDAD:                                  14:44

16       Q.  Yeah.  Had your department told you to be

17   on special alert for people riding their bicycles

18   in the street or anything like that?

19       A.  Yes, because of the pedestrian fatalities

20   that we've had in Vallejo, with bicycles and      14:44

21   pedestrians walking the street, being hit by cars.

22       Q.  When did they tell you that?

23       A.  There was a department email.  Also

24   through me just patrolling and going to actual

25   accidents that are fatalities or listening to my   14:45

                                        Page 109

1   beat partners who handled accidents that are

2   fatalities.  And also in briefings it was brought

3   up because there was a high number of fatalities

4   this particular time.

5       Q.  Okay.  So when you observed him, did you   14:45

6   make any decision about what you were going to do?

7       A.  Yes.

8       Q.  What did you decide to do?

9       A.  I observed, based on the violations of him

10  not having a light during darkness and also the   14:45

11  way that he was entering and exiting the roadway,

12  that I had two different vehicle codes to stop and

13  talk to him to educate him about the danger he

14  posed for himself and also the danger for the

15  citizens within the community.                    14:45

16      Q.  So you decided to make an enforcement

17  stop?

18      A.  Yes, sir.

19      Q.  And rather than give him a citation, you

20  decided to just give him a warning and educate him  14:45

21  about the danger of his conduct?

22      A.  I wasn't sure --

23          MR. SMYTH:  Vague as to time.  Go ahead.

24          THE WITNESS:  I wasn't sure what I was

25  going to do.  I know I was going to make an        14:46

Page 110

1    enforcement stop and it was my goal to talk to

2    him.  But how that stop was going to go, whether

3    he was going to get a citation or further, I

4    didn't know because I hadn't contacted him at that

5    point.                                              14:46

6    BY MR. HADDAD:

7         Q.  What you said in your interview was,

8    quote, with all the recent fatalities with

9    pedestrians- and-vehicle collisions, I felt that,

10   hey, look, this is a good opportunity to educate   14:46

11   the public, and with the actions of this guy it's

12   a safety thing, unquote.

13             Do you recall saying that to your

14   interviewers?

15        A.  I do.                                      14:46

16        Q.  At that point did you have any intent to

17   make a custodial arrest, assuming that he could

18   satisfy you about his own identity and sign any

19   ticket you wanted to give him?

20             MR. SMYTH:  Vague as to at that time.     14:47

21   BY MR. HADDAD:

22        Q.  When you were going to pull him over.

23        A.  No, I didn't plan on making any arrest.

24        Q.  Now, given that you decided to make an

25   enforcement stop, did you turn on your body         14:48

Page 111

Aiken Welch, A Veritext Company
510-451-1580

1    camera?

2         A.  Not at that time, no.

3         Q.  Weren't you supposed to do that when you

4    had an enforcement stop?

5              MR. SMYTH:  Goes beyond the scope.        14:48

6              THE WITNESS:  There's a process that

7    officers do that's sometimes different than other

8    officers'.  I have a process of when I turn on my

9    camera and when I turn it off.  I wasn't to that

10   point to turn it on.                               14:48

11   BY MR. HADDAD:

12        Q.  But your department's policy requires a

13   certain process, right?

14             MR. SMYTH:  Goes beyond the scope, vague.

15             MR. HADDAD:  You can answer.             14:48

16             THE WITNESS:  No.  It's like I said, it's

17   a guideline the department has.  When the officer

18   turns it on, at what point, it's up to that

19   officer.

20   BY MR. HADDAD:                                     14:48

21        Q.  How familiar were you with that part of

22   town?

23        A.  Very.

24        Q.  How did you try to do that stop?  Did you

25   turn your light on?  Or how did you do it?         14:49

Page 112

1           MR. SMYTH:  It's vague, but if you

2    understand, go ahead.

3           THE WITNESS:  Yeah.  So I activated my

4    emergency lighting equipment to include a forward-

5    facing red light and intermittently hit my siren      14:49

6    to get through the traffic for the highway and

7    then put my spotlight on Foster.

8    BY MR. HADDAD:

9       Q.  Did you put out any sort of radio

10   broadcast that you were about to make an              14:49

11   enforcement traffic stop?

12      A.  Not at that time.

13      Q.  Aren't you supposed to do that?

14      A.  At a certain time.

15          MR. SMYTH:  Goes beyond the scope.             14:49

16   BY MR. HADDAD:

17      Q.  Given that traffic stops are known to be

18   unpredictable and potentially dangerous for

19   officers, aren't you trained that you should let

20   your dispatcher and fellow officers know whenever     14:50

21   you're going to pull someone over?

22          MR. SMYTH:  It's overbroad, beyond the

23   scope.

24          THE WITNESS:  Every officer has their own

25   process of when they notify dispatch and what's       14:50

                                           Page 113

1    going on.  It just depends on your training,

2    experience.

3    BY MR. HADDAD:

4        Q.  So you're telling me there's no standard

5    for when you're supposed to inform your dispatcher   14:50

6    and other officers that you're going to make an

7    enforcement stop?

8            MR. SMYTH:  Misstates testimony,

9    overbroad.

10           THE WITNESS:  Like I said, it depends on   14:50

11   each situation.

12   BY MR. HADDAD:

13       Q.  Why didn't you tell the dispatcher before

14   stopping Ronell Foster that you were going to make

15   an enforcement traffic stop?                       14:50

16       A.  I can't answer that.

17       Q.  Why can't you?

18       A.  Because it was two years ago.  I don't

19   know what was going through my head at the time.

20       Q.  So what happened next once you turned your 14:51

21   forward red light on?

22       A.  Well, prior to that, Mr. Foster looked at

23   me and immediately took off northbound on Sonoma.

24   That's when I activated my lights and took off

25   after him.                                          14:51

Page 114

```
 1        Q.   How many lanes is Sonoma at that point?

 2        A.   Four.

 3        Q.   So what lane was he riding in when he took

 4   off?

 5        A.   The number 2 lane northbound.          14:51

 6        Q.   What did you do in response to that?

 7        A.   I activated my emergency lights and siren

 8   and spotlight and went across the southbound lane

 9   to the northbound lanes, to the number 2 lane and

10   pointed my spotlight at Mr. Foster.             14:51

11        Q.   What's the next thing that happened?

12             MR. SMYTH:  It's vague.  Go ahead if you

13   can.

14             THE WITNESS:  When you say next thing that

15   happened --                                     14:52

16   BY MR. HADDAD:

17        Q.   What's the next thing that happened that

18   you can recall?

19             MR. SMYTH:  Still vague.

20             THE WITNESS:  Mr. Foster stopped and      14:52

21   bladed his stance behind a van.

22   BY MR. HADDAD:

23        Q.   Up to that point, had you observed him

24   make any sort of movements that you considered to

25   be threatening?                                 14:52
```

Page 115

1        A.   Suspicious and odd, yes.

2        Q.   What were those?

3        A.   Upon watching Mr. Foster riding in and out

4    of traffic, when he saw me he had this look on his

5    face, as soon as he realized I was there, like a      14:52

6    deer in a headlight, like oh my God, something is

7    not right; I need to get out of here right now.

8        Q.   Looked like someone who didn't want to

9    have contact with police?

10       A.   I wouldn't necessarily say that, no.  It      14:52

11   just looked like something was off.  When you

12   contact as many people as I do, you get to --

13   familiar with people's expressions, and it was

14   more of a like oh, shit, there's a police kind of

15   look.                                                  14:53

16       Q.   That's how you interpreted it?

17       A.   That's how I interpreted it.  What he

18   thought, I don't know.

19       Q.   Was there anything else that you saw him

20   do up until he pulled over near that van that you     14:53

21   thought was suspicious or potentially dangerous?

22            MR. SMYTH:  It's compound.

23            THE WITNESS:  So once he stopped and

24   bladed his stance, that was another factor that I

25   took into consideration.                               14:53

Page 116

1    BY MR. HADDAD:

2         Q.  So let me try to understand this, what

3    you're saying.  Where did he stop?

4         A.  He stopped at the rear passenger quarter

5    panel of the van, concealing his right half of the   14:53

6    body, but still on his bike, like in a bladed kind

7    of a stance.

8         Q.  So when you say he's in a bladed stance,

9    he's still sitting on his bike, right?

10        A.  He was standing.                            14:53

11        Q.  Standing with his bike between his legs?

12        A.  Yes.

13        Q.  Looking back at you?

14        A.  He was facing me.

15        Q.  How could -- What do you mean a bladed     14:53

16   stance when he's still got his bike between his

17   legs?

18        A.  One foot was in front of the other.

19        Q.  Okay.  And what is the significance to you

20   if someone stands with one foot in front of the     14:54

21   other while standing over a bike?

22        A.  When you're concealing the right half of

23   your body and you have a -- blading your stance,

24   to me that's like, okay, I can go left or I can go

25   right.  It's a position of advantage you would      14:54

                                        Page 117

1    take.  You're not sitting on a bike.  It's

2    something that I've noticed with suspects when

3    they're going to try to fight with you.  It's also

4    in the literature that I've read that when

5    suspects are going to fight or run that's what      14:54

6    they do, they blade their stance.

7         Q.  But a person can't exactly fight with you

8    or run on foot when they have a bike between their

9    legs, can they?

10         MR. SMYTH:  Argumentative, calls for      14:54

11    speculation, incomplete hypothetical.

12         THE WITNESS:  Yes, they can.

13    BY MR. HADDAD:

14         Q.  So how far away from you was he when he

15    took this bladed stance with his bike between his      14:54

16    legs?

17         A.  Approximately 15 feet.

18         Q.  Was your car still moving?

19         A.  No.  I was stopped and I was in the door

20    frame of my vehicle.      14:55

21         Q.  Did you have anything in your hands?

22         A.  No.

23         Q.  Had you said anything to him at that

24    point?

25         A.  Yes.      14:55

Page 118

1        Q.   What?

2        A.   I introduced myself as Officer McMahon

3    from the Vallejo Police Department.   I said the

4    reason I had stopped him was for his erratic

5    driving patterns when he was on his bike in and          14:55

6    out of traffic, which endangered not only his

7    safety, but the public safety, and to come over

8    and sit in front of my car.

9        Q.   What did he tell you?

10       A.   He looked at me, then he looked around,          14:55

11   which I believe to be a preflight indicators and

12   then he said something to the effect of "Man,

13   don't -- stop messing with me" and took off.

14       Q.   On his bike?

15       A.   Yes.                                             14:56

16       Q.   Now, in your interview after the shooting

17   you said, quote, he kind of concealed his right

18   portion of his body behind a van that was parked

19   on the side of the road, unquote.

20            And that's -- You're describing what he         14:56

21   was doing while he was still standing over his

22   bike, right?

23       A.   On his bike, yes.

24       Q.   Okay.   And then you said you just thought

25   that that was odd; is that correct?                      14:56

                                              Page 119

```
 1        A.  Yes.
 2        Q.  So odd was the way you described it to the
 3   interviewers, correct?
 4        A.  Yes.
 5        Q.  You don't know if he was intending to     14:56
 6   conceal part of his body from you or if he just
 7   happened to be in that position, right?
 8             MR. SMYTH:  Calls for speculation.
 9             THE WITNESS:  All I can tell you is he was
10   concealing his right half of the body from me and   14:56
11   he was failing to obey my commands to come to the
12   front of my vehicle.
13   BY MR. HADDAD:
14        Q.  In the location where he was, he had
15   actually pulled over to the side of the road,       14:57
16   right?
17             MR. SMYTH:  Misstates testimony and
18   assumes facts not in evidence.
19             THE WITNESS:  Yeah.  No.  He went from the
20   street and cut in between the parked cars, onto     14:57
21   the sidewalk and turned around.
22   BY MR. HADDAD:
23        Q.  So he was off the road, and that's what
24   you had wanted him to do, right?
25             MR. SMYTH:  That's vague.               14:57
```

Page 120

```
 1              THE WITNESS:  I wanted him to stop so I
 2     could contact him about the violations that I
 3     observed.
 4     BY MR. HADDAD:
 5         Q.  So when he stopped and you said those      14:57
 6     things to him, that you just wanted to talk with
 7     him about his safety, did he make any sort of
 8     movements with his body that you considered
 9     threatening?
10         A.  The fact --                                14:57
11              MR. SMYTH:  Go ahead.
12              THE WITNESS:  The fact that he concealed
13     his right half of the body was -- alerted me that
14     something else may be going on.
15     BY MR. HADDAD:                                     14:58
16         Q.  But again, you don't know if what you're
17     calling concealment was intentional on his part,
18     do you?
19              MR. SMYTH:  Calls for speculation.
20              THE WITNESS:  I don't.                    14:58
21     BY MR. HADDAD:
22         Q.  Did he say anything to you other than,
23     "Man, stop messing with me"?
24         A.  Not that I recall.
25         Q.  At that point did you recognize who he     14:58
```

                                                Page 121

```
 1   was?

 2        A.   No.

 3        Q.   Throughout the whole rest of the incident,

 4   did you ever know who he was?

 5        A.   No.                                  14:58

 6        Q.   What happened next?

 7             MR. SMYTH:  It's vague.

 8             THE WITNESS:  After he said, "Quit, man,

 9   quit messing with me"?

10   BY MR. HADDAD:                                 14:58

11        Q.   Yeah.

12        A.   He turned around and fled on his bicycle.

13        Q.   In what direction?

14        A.   Northbound.

15        Q.   Was that a different direction than he had 14:58

16   been going down Sonoma?

17        A.   No.

18        Q.   Was he driving on the sidewalk now?

19        A.   He started on the sidewalk and entered the

20   street again.                                  14:59

21        Q.   And what did you do at that point?

22        A.   Got back into my vehicle.

23        Q.   And then what?

24        A.   Updated dispatch I had a suspect fleeing

25   from me and turned on my sirens and chased after 14:59
```

Page 122

1    Mr. Foster.

2          Q.  So you are engaged in a vehicle pursuit

3    now?

4          A.  Yes.

5          Q.  Did you inform dispatch what crime he was    14:59

6    wanted for?

7          A.  I said it was a traffic violation.

8          Q.  And this would have been as you discussed,

9    failing to have a light on his bicycle?

10         A.  And riding in and out of a roadway in an    14:59

11   unsafe manner.

12         Q.  Simple infractions, right, traffic

13   tickets?

14              MR. SMYTH:   Argumentative.

15   BY MR. HADDAD:                                          14:59

16         Q.  They aren't misdemeanors, are they?

17         A.  Well, those two infractions that you

18   mentioned, no.  But the fact that he ran and

19   wouldn't listen to me, that turned into a

20   misdemeanor and the fact that he was continuing    14:59

21   disevading (phonetic) me, that turned into a

22   misdemeanor.  So you have more misdemeanors.

23         Q.  Let's take those one at a time then.  The

24   two infractions, those are lower than misdemeanor

25   crimes, right?                                          15:00

Page 123

1          A.   Correct.

2          Q.   And then what is the misdemeanor that you

3     believe he committed when he fled from you on his

4     bicycle?

5          A.   Obstructing and delaying.                15:00

6          Q.   148?

7          A.   Yes, sir.

8          Q.   That's the only misdemeanor he committed

9     then, right?

10         A.   At that time.                            15:00

11         Q.   So you got a guy fleeing on a bicycle from

12    your attempt to give him traffic tickets or

13    possibly only a warning, right?

14         A.   It's more involved than that.

15              MR. SMYTH:  Misstates testimony.         15:00

16    BY MR. HADDAD:

17         Q.   What am I missing?

18         A.   Just his mannerisms led me to believe that

19    he was concealing the right side of his body,

20    possibly because he was armed as well.            15:00

21         Q.   Had you ever seen anything --

22              First of all, had you ever seen a gun on

23    his person?

24         A.   No.

25         Q.   Did you see any suspicious bulges on his  15:00

Page 124

```
 1    body that looked like they could be an area where
 2    a gun was concealed?
 3              MR. SMYTH:  Vague.
 4              THE WITNESS:  No.
 5    BY MR. HADDAD:                                    15:01
 6         Q.  Why didn't you inform your dispatcher that
 7    he was only wanted for these simple infractions?
 8         A.  I did.
 9         Q.  What did you say specifically?
10         A.  He was warned for traffic violations.    15:01
11         Q.  Did you think that your department's
12    pursuit policy authorized you to do a pursuit for
13    simple infractions like that?
14         A.  Yes.
15              MR. SMYTH:  I'll just say vague and      15:01
16    assumes facts, misstates testimony.
17    BY MR. HADDAD:
18         Q.  Did you turn on your body camera at that
19    point, since you were doing a vehicle pursuit now?
20         A.  No.                                       15:01
21         Q.  Why not?
22         A.  Because there was other things that were
23    going on that were more important.
24         Q.  Like what?
25         A.  Chasing after a suspect.                  15:01
```

Page 125

1      Q.  You were driving, he was riding a bicycle,

2   right?

3      A.  Yes.

4      Q.  And again, it would have required you,

5   while driving, to use your -- one of your hands to   15:02

6   flip on the camera, right?

7      A.  Correct.

8      Q.  And you can't do that while driving?

9          MR. SMYTH:  Argumentative.  Lacks

10  foundation, assumes facts.                           15:02

11         THE WITNESS:  So at the time I was giving

12  dispatch updates, and I normally use my right hand

13  when I do that.  And so if I was going to give

14  updates and activate my sirens and work the

15  P.A. system on top of turning on my camera, I        15:02

16  would have had to take my hands off the steering

17  wheel, which would have been unsafe.

18  BY MR. HADDAD:

19     Q.  I listened to the radio broadcast.  I

20  didn't hear you give any updates until you started   15:02

21  pursuing on foot.  Did you?

22     A.  That's not correct.  I did.

23     Q.  What updates do you remember giving while

24  you were engaged in the vehicle pursuit?

25         MR. SMYTH:  Vague.  In the vehicle pursuit 15:03

Page 126

1    only, correct?

2          THE WITNESS:  Yeah.  Just that I had a

3    subject fleeing from me and we were going

4    westbound on Florida Street.

5    BY MR. HADDAD:                                    15:03

6        Q.  You gave one radio transmission that said

7    that, right?

8        A.  Yes, sir.

9        Q.  What else did you say after that?

10   Anything else?                                    15:03

11         MR. SMYTH:  Vague as to time.

12   BY MR. HADDAD:

13       Q.  While you were still pursuing him in your

14   car.

15       A.  You know, I think I said something about  15:03

16   Carolina or Marin and Florida.  That was my last

17   update.

18       Q.  You were in the car at that point?

19       A.  You know, I don't know if I was in the

20   car.  I was in the car at Marin and Florida        15:03

21   Street, but I don't know if I gave the update when

22   I was in the car or out of the car with my radio.

23       Q.  So you can't recall giving any actual

24   updates after the initial broadcast that you were

25   going to pursue someone while you were in your     15:03

                                          Page 127

1    car, can you?

2           MR. SMYTH:  Misstates testimony.

3           THE WITNESS:  I'm telling you I did give

4    updates.

5    BY MR. HADDAD:                                        15:04

6       Q.  I've asked you to describe them for me,

7    and you said the next update you recall is when

8    you were either out of your car or just about to

9    get out of your car, right?

10      A.  Of my location, yeah.  I mean, this isn't  15:04

11   a conversation.  When you're pursuing somebody,

12   you give minimal updates to get officers to your

13   location.  You're not having a conversation with

14   somebody.

15      Q.  How many seconds went by from your initial 15:04

16   call informing the dispatcher that you were

17   starting a vehicle pursuit until your next

18   transmission?  Which happened, I believe, when he

19   crashed his bike.  Right?

20      A.  I don't know how many seconds.  I can't   15:04

21   tell you.

22      Q.  Could have been a minute or more?

23      A.  It's possible.  I don't know.

24      Q.  In all that time, you didn't have two

25   seconds to turn on your camera?                      15:04

Page 128

1          MR. SMYTH:  That's argumentative and calls

2     for --

3          MR. HADDAD:  I'm asking.

4          THE WITNESS:  Like I said, at the time,

5     there was lots of things going on.  And for        15:04

6     whatever reason, I did not activate my camera at

7     that point.  I can't give you a specific reason,

8     because I don't remember.

9     BY MR. HADDAD:

10       Q.  So is there anything else that you recall  15:05

11    observing of Ronell Foster while he was still on

12    his bicycle that you thought was significant?

13         MR. SMYTH:  Overbroad and vague and --

14         Go ahead.

15         THE WITNESS:  Can you be more specific,    15:05

16    please?

17    BY MR. HADDAD:

18       Q.  Yeah.  Well, what were you seeing as

19    you're pursuing him in your car?  What was he

20    doing?                                             15:05

21       A.  He was riding in a reckless manner in the

22    oncoming traffic and all throughout the lanes,

23    endangering the safety of the public and the

24    community.

25       Q.  Do you think he was doing that because you 15:05

                                          Page 129

1   were pursuing him?

2         MR. SMYTH:  That calls for speculation.

3         THE WITNESS:  I don't know.  I know he was

4   trying to get away from me.  He did not want to

5   stop.  He wasn't listening.                15:06

6   BY MR. HADDAD:

7      Q.  Well, you're making assumptions about him

8   deliberately concealing part of his body.  I'm

9   asking you, do you think that maybe he was riding

10   his bicycle in the way you've described because   15:06

11   you were chasing him in your car?

12         MR. SMYTH:  That still calls for

13   speculation and argumentative and misstates his

14   testimony.

15         THE WITNESS:  I can't tell you why he was  15:06

16   running.  I just know he was running.

17   BY MR. HADDAD:

18      Q.  Do you think maybe your vehicle pursuit of

19   him, just as you were trained, as your

20   department's policy warned you, had actually    15:06

21   escalated the danger, causing him to ride more

22   dangerously?

23         MR. SMYTH:  Vague, argumentative.

24   BY MR. HADDAD:

25      Q.  What do you think?                 15:06

Page 130

```
 1                MR. SMYTH:  Beyond the scope, expert
 2      opinion, legal conclusion and vague as to time.
 3                MR. HADDAD:  You can answer.
 4                MR. SMYTH:  Actually, I don't know if he
 5      can.  I mean --                              15:06
 6                MR. HADDAD:  Why don't you give him a
 7      chance?
 8                THE WITNESS:  I can't answer that.
 9      BY MR. HADDAD:
10         Q.  I'm just going to ask you differently    15:06
11      then.  You know your department's pursuit policy
12      warns you that a vehicle pursuit can increase the
13      danger for everyone, right?
14                MR. SMYTH:  Vague.  It's overbroad.
15      BY MR. HADDAD:                                15:07
16         Q.  Do I need to pull it out again?  Do we
17      have to go through this?  You know it says a
18      vehicle pursuit can increase the danger to
19      everyone, right?
20                MR. SMYTH:  It's overbroad and calls for   15:07
21      the -- Beyond the scope.
22                THE WITNESS:  There's lots of very
23      different variables that you're speaking of.
24      You're asking me to narrow it down to one specific
25      thing.  There's 10 or 15 other things that are    15:07
```

Page 131

1   going on at this point.

2   BY MR. HADDAD:

3       Q.  A vehicle pursuit can cause collisions,

4   right?

5       A.  Yes.                                      15:07

6       Q.  You've been warned that, right?

7       A.  I wouldn't say warned.

8       Q.  Your department's policy says you should

9   consider not having a vehicle pursuit because of

10  the danger for causing collisions, right?      15:07

11          MR. SMYTH:  This is argumentative, asked

12  and answered on the policy.

13          MR. HADDAD:  You can answer.

14          THE WITNESS:  Like I said, it's a

15  guideline.  It's not with a shall.  It's a     15:08

16  guideline that you should consider.

17  BY MR. HADDAD:

18      Q.  I'm asking you about your training.  Just

19  give me a straight answer and we'll get through

20  this.  You've been trained that a vehicle pursuit  15:08

21  can cause collisions, right?

22      A.  That's one factor, yes.

23      Q.  Now, you said during your vehicle pursuit

24  of Ronnel Foster his bicycle riding was dangerous

25  and could cause collisions, right?              15:08

                                            Page 132

1       A.  Yes.

2       Q.  And do you think that his bicycle riding

3   in an evasive manner to try to get away from you

4   could have been caused in some sense by your very

5   pursuit?                                        15:08

6           MR. SMYTH:  Argumentative, assumes facts,

7   and vague, calls for speculation.

8           THE WITNESS:  I don't know.

9   BY MR. HADDAD:

10      Q.  Did you consider that at the time?       15:08

11      A.  Yes.

12      Q.  Did you inform your sergeant, who might

13  have been listening back at the station, that now

14  during your pursuit he was driving his bicycle in

15  a dangerous manner?                             15:09

16      A.  No.

17      Q.  Your sergeant had the authority to order

18  you to terminate the pursuit if he thought it was

19  too dangerous, didn't he?

20          MR. SMYTH:  Calls for speculation.  If   15:09

21  you --

22          THE WITNESS:  He has the authority to

23  cancel or direct me to do whatever he needs to do

24  in his supervisory capacity.

25  BY MR. HADDAD:                                  15:09

                                            Page 133

1          Q.   Is there anything else significant about

2     Mr. Foster that you observed until he at some

3     point got off his bike?

4               MR. SMYTH:   Overbroad, vague.

5               THE WITNESS:   Can you be more specific?   15:10

6               MR. HADDAD:   No, I can't.

7               THE WITNESS:   Then I can't answer that.

8     BY MR. HADDAD:

9          Q.   So you didn't see him do anything other

10    than what you've told me until he got off his   15:10

11    bike?

12              MR. SMYTH:   That's vague and

13    argumentative.

14              THE WITNESS:   He didn't get off his bike.

15    He crashed.                                      15:10

16    BY MR. HADDAD:

17         Q.   Where did he crash?

18         A.   On Carolina Street.

19         Q.   Where were you in relation to him when he

20    crashed?                                         15:10

21         A.   The intersection of Carolina and Marin.

22         Q.   Where was he traveling when he crashed?

23         A.   Westbound Carolina Street.

24         Q.   Was he turning?

25         A.   No.  He was continuing westbound straight   15:11

                                              Page 134

```
 1    through the intersection.
 2        Q.  What caused him to crash?
 3        A.  I don't know.
 4            MR. SMYTH:  Calls for speculation.
 5    BY MR. HADDAD:                                        15:11
 6        Q.  Could you see anything, any apparent cause
 7    of his crash?
 8        A.  No.  He fell off his bike.
 9        Q.  Just wiped out?
10        A.  Just wiped out, yeah.                         15:11
11        Q.  How close was your car to him at that
12    point?
13        A.  Fifteen yards maybe approximately.
14        Q.  How fast were you driving?
15        A.  I don't know.                                 15:11
16        Q.  Just going back a moment, when you started
17    the vehicle pursuit, I think what you said in your
18    interview was at that point you initiated a full
19    pursuit.  What did you mean when you said
20    initiated a full pursuit?                             15:11
21        A.  I initiated.  So I let dispatch know that,
22    hey, I was on a traffic stop and I had a suspect
23    fleeing from me.
24        Q.  By full pursuit what did you mean?
25        A.  You know, I don't know why it says full      15:11
```

Page 135

1    pursuit, but I initiated a pursuit.  But basically

2    means that I'm telling dispatch, hey, I have a

3    person running from me and it's for a traffic

4    violation and this is where we're at.

5         Q.  So at that point you said to him, "You're  15:12

6    under arrest" I believe.  Right?

7              MR. SMYTH:  Vague.

8              THE WITNESS:  At what point?

9    BY MR. HADDAD:

10        Q.  When you initiated the full pursuit.    15:12

11             MR. SMYTH:  Vague.

12   BY MR. HADDAD:

13        Q.  That would have been at the back of the

14   van?

15        A.  No, no, because he took off and ran away.  15:12

16   So I didn't tell him he was under arrest at that

17   point.  I mean, in my mind I knew he was going to

18   be under arrest for running from me at that point.

19   BY MR. HADDAD:

20        Q.  The 148, right?                          15:12

21        A.  Yes, at a minimum.

22        Q.  What else?  When you say "at a minimum,"

23   what else were you going to arrest him for?

24        A.  So you have the traffic violations, right?

25   And for also disobeying my orders.  So, and now    15:12

Page 136

```
 1    he's fleeing from me.  And then now you have more

 2    traffic stuff that he's adding onto it.  So you're

 3    going to stack those charges.

 4         Q.  So disobeying your orders is also a 148,

 5    right?                                          15:12

 6         A.  Yes, sir.

 7         Q.  Same misdemeanor, right?

 8         A.  Same section, different --

 9         Q.  So you were going to arrest him for two

10    violations of 148, one for fleeing and one for not  15:13

11    listening?

12              MR. SMYTH:  Vague, calls for speculation.

13    BY MR. HADDAD:

14         Q.  Is that what you're saying?

15         A.  What I'm saying is I write a report, I    15:13

16    give it to the district attorney, and they make

17    the determination what to charge him with.  I only

18    propose.  They dispose.

19         Q.  What did you do when you saw him wipe out?

20         A.  Stopped my vehicle.                       15:13

21         Q.  And then what?

22         A.  Exited.

23         Q.  Did you have anything in your hands?

24         A.  My flashlight.

25         Q.  Did you inform dispatch of anything at    15:13
```

Page 137

1    that point?

2        A.  I believe I attempted to get on my radio

3    and give them an update.

4        Q.  What do you mean "attempted"?

5        A.  I pushed the button on my radio.        15:13

6        Q.  And then what?

7        A.  And tried to give them an update.  And it

8    made a sound, which means my transmission didn't

9    go through.

10       Q.  So did you try again?                    15:14

11       A.  Not at that point, because I was more

12   focused on Mr. Foster at this point.

13       Q.  And at this point did you have any backup?

14       A.  Officers were on the way to where I was

15   at, yes.                                          15:14

16       Q.  Did they know where you were?

17       A.  They had a general idea.

18           MR. SMYTH:  Calls for speculation.

19   BY MR. HADDAD:

20       Q.  Why do you think they had a general idea   15:14

21   when you're telling me your transmission about

22   your location didn't go through?

23       A.  Because my last transmission of being on

24   Marin and Florida or Marin and Carolina Street

25   went through.                                     15:14

                                        Page 138

1        Q.   So did he get off his bike after he

2   crashed?

3             MR. SMYTH:   It's vague.

4   BY MR. HADDAD:

5        Q.   Did he take off running?   Or what did he      15:14

6   do?

7        A.   Yes.

8        Q.   Did he do anything before starting to run

9   away from you?

10             MR. SMYTH:   It's overbroad.                    15:14

11             THE WITNESS:   So he crashed.   I got out of

12   my car.   I ran around my car to where I believed

13   he was going to be at.   And at that point he was

14   running the opposite direction across the street.

15   BY MR. HADDAD:                                           15:15

16        Q.   And what did that look like?   What did you

17   see?

18        A.   So I saw him running westbound in the

19   street, towards the sidewalk, the southbound

20   sidewalk, and I saw him reaching in his waistband.    15:15

21        Q.   You saw him pulling up his pants, right?

22        A.   No.

23             MR. SMYTH:   It's argumentative and

24   misstates testimony, assumes facts.

25   BY MR. HADDAD:                                           15:15

                                              Page 139

1        Q.   You saw him actually reaching inside his

2    pants?

3            MR. SMYTH:   Same objections, calls for

4    speculation.

5            THE WITNESS:   I saw his hands in the front  15:15

6    of his body, where his waistband was at, and he

7    was manipulating something.   I don't know what

8    that was.

9    BY MR. HADDAD:

10       Q.   His back was to you as he's running away,  15:15

11   right?

12       A.   Yes, sir.

13       Q.   And which one of his hands was in the

14   front of his waistband?

15       A.   Both of them.                              15:15

16       Q.   Now, you've seen young men in Vallejo wear

17   loose, baggy pants that have to be held up, right?

18       A.   Yes.

19       Q.   It was possible that he had pants that

20   were loose and needed to be pulled up in order to  15:16

21   run, right?

22           MR. SMYTH:  Calls for speculation.

23   Incomplete hypothetical.

24   BY MR. HADDAD:

25       Q.   Didn't that go through your mind?          15:16

Page 140

1       A.  No.

2       Q.  Why didn't you think that it's a

3   possibility he's just holding up his pants like

4   you've seen other young men in Vallejo have to do?

5          MR. SMYTH:  Argumentative, calls for        15:16

6   speculation, but go ahead.

7          THE WITNESS:  Based on my training and

8   experience in dealing with people, he didn't look

9   like he was trying to pull up his pants.  He

10  looked like he was reaching for something in his    15:16

11  waistband.

12  BY MR. HADDAD:

13      Q.  Turns out after the fact, when it's all

14  over, you then learned he had nothing in his

15  pants, right?                                       15:16

16      A.  That's not correct.

17          MR. SMYTH:  Overbroad.

18  BY MR. HADDAD:

19      Q.  He had no gun in his pants, did he?

20          MR. SMYTH:  That misstates his testimony    15:16

21  and misstates your question.

22  BY MR. HADDAD:

23      Q.  Was any weapon ever found on him?

24      A.  Near him, yes.

25      Q.  What?                                       15:16

                                        Page 141

1          A.   My flashlight.

2          Q.   Okay.   Was any weapon ever found on his

3     person?

4               MR. SMYTH:   Objection.   Vague as to time.

5     But you can -- I mean, calls for speculation.      15:17

6               THE WITNESS:   I'm not going to speculate

7     on that.

8     BY MR. HADDAD:

9          Q.   Have you ever heard if anybody ever found

10    a weapon on his person?                            15:17

11         A.   Yes, the flashlight.

12         Q.   That wasn't on his person.   That was next

13    to him after he was shot, right?

14         A.   Yes.

15         Q.   As he was running, did you ever see him   15:17

16    drop anything?

17         A.   Yes.

18         Q.   What?

19         A.   The cell phone.

20         Q.   And you realized that was a cell phone at  15:17

21    the time?

22         A.   That was after the fact, when I walked

23    past it again after the whole entire incident had

24    happened.

25         Q.   So you didn't see him drop anything as you 15:17

                                        Page 142

1    were chasing him, did you?

2           MR. SMYTH:  It's vague, misstates his

3    testimony.

4    BY MR. HADDAD:

5       Q.  Did you see him drop anything as you were    15:17

6    chasing him?

7       A.  I didn't testify to that and I don't

8    remember him ever dropping anything.

9       Q.  I'm just asking.

10      A.  I don't remember him dropping anything.    15:18

11      Q.  All right.  So it's your testimony that

12   when he reaches for the front of his pants as he's

13   running away from you that because of that you

14   thought he was armed; is that right?

15      A.  The totality of the circumstances up to    15:18

16   this point, yes.

17      Q.  Well, what else besides that caused you to

18   think he was armed?

19      A.  The way that he bladed his stance behind

20   the vehicle, hiding the right side of his body,    15:18

21   the way that he was trying to get away from me.

22   And when he was running, the holding up, having

23   his hands in his waistband area while he was

24   running, that wasn't normal.  Based on my training

25   and experience, most people that are armed or    15:18

Page 143

```
 1    concealing a handgun grab their waistband to
 2    either check and see if it's there's or also to
 3    hold onto it so it doesn't fall out while they're
 4    running.  Or they use it -- they grab their weapon
 5    or whatever is in their waistband so that they can   15:18
 6    do an assault on an officer.
 7            While Mr. Foster was running, not only was
 8    he grabbing his waistband, but he was looking back
 9    at me, which I believe to try and triangulate
10    where I was at.                                      15:19
11        Q.  It's also common for people that you're
12    chasing to look back at you and see where you are,
13    right?
14            MR. SMYTH:  Incomplete hypothetical.
15            THE WITNESS:  Sometimes.                     15:19
16    BY MR. HADDAD:
17        Q.  Did you do anything differently because
18    you thought he could be armed based on putting his
19    hands towards the front of his waistband?
20        A.  Yes.                                         15:19
21        Q.  What did you do differently because of
22    that?
23        A.  I utilized my Taser.
24        Q.  And when did you pull your Taser out?
25        A.  When we were running down the street.       15:19
```

Page 144

1       Q.  Was that before or after you saw him reach

2   towards the front of his waistband?

3       A.  After.

4       Q.  Did you have anything else in your hand,

5   your other hand?                                        15:19

6       A.  My flashlight.

7       Q.  So you got your --

8           Which hand is your Taser in?

9       A.  My left.

10      Q.  And your flashlight is in your right?    15:19

11      A.  M-hm.

12      Q.  Yes?

13      A.  Yes.

14      Q.  How far behind him were you when you

15   decided to tase him?                                    15:19

16      A.  Ten to 15 feet.

17      Q.  And what kind of surface was he running

18   on?

19      A.  The street.

20      Q.  And you decided to tase him to stop him?   15:19

21      A.  I decided to tase him so I could

22   incapacitate him in case he did have a weapon and

23   safely take him into custody.

24      Q.  Up to that point, you hadn't seen a

25   weapon, had you?                                        15:20

                                            Page 145

```
 1          A.  I had not.

 2          Q.  And you had no information about who he

 3     was to know whether he had ever had a weapon in

 4     his life, right?

 5          A.  I had not.                          15:20

 6          Q.  You didn't know about any crime he might

 7     have committed other than the infractions and

 8     fleeing from you, right?

 9          A.  Infractions and the misdemeanor, yes.

10          Q.  And you speculated that he could possibly  15:20

11     have a gun in his pants or he could be holding up

12     baggy pants, right?

13          A.  I never said he could be holding up baggy

14     pants.

15          Q.  You didn't know which one it was, did you? 15:20

16          A.  I believed he had a weapon based on my

17     training and experience, as I've stated before.

18          Q.  So because he was still running from you

19     and because you believed he had a weapon, you

20     decided to tase him in the back; is that right?      15:21

21          A.  Yes, sir.

22          Q.  So you pulled the trigger and what

23     happened?

24          A.  One dart hit him in the back and then the

25     other dart, I don't know what happened with it,     15:21
```

Page 146

1    but I know the Taser didn't make a good connection

2    just based on the sound that it was making.

3        Q.   Did you give him any warning before

4    shooting him with the Taser?

5        A.   I did not.                                    15:21

6        Q.   Why not?

7        A.   Because he hadn't listened to me up to

8    this point; why is he going to listen if I yell

9    Taser?  And on top of that, if he has a weapon,

10   I'm not going to give him an opportunity to pull    15:21

11   that weapon on me and I have a Taser in my hand.

12       Q.   How far from Ronell were you when you

13   tased him?

14       A.   Approximately 10 to 15 feet.

15       Q.   And he was running on pavement at the       15:21

16   time?

17       A.   Yes, sir.

18       Q.   And if the Taser had worked, had

19   connected, there was a possibility that he could

20   have fallen and sustained serious injuries, right?  15:21

21            MR. SMYTH:  Calls for speculation and

22   vague.

23            THE WITNESS:  Anything is possible.

24   BY MR. HADDAD:

25       Q.   But you've been trained to try to avoid     15:22

Page 147

1    use of a Taser in situations where a person could

2    sustain collateral injuries, right?

3              MR. SMYTH:  It's overbroad.

4              THE WITNESS:  Based on the circumstances

5    in this particular circumstance, the use of a         15:22

6    Taser outweighed any safety.

7    BY MR. HADDAD:

8         Q.  Why?

9              MR. SMYTH:  Go ahead.

10             THE WITNESS:  No.  Go ahead.               15:22

11             MR. SMYTH:  Vague.  Go ahead.

12             THE WITNESS:  You want to be more

13   specific?

14   BY MR. HADDAD:

15        Q.  I'm asking you to explain your answer.      15:22

16        A.  So if somebody has a weapon and they're

17   going to use it to assault me and I try to --

18   instead of going to deadly force, I try to use my

19   verbal commands, that's not working.  I try to

20   tell him he's under arrest and to stop running and   15:22

21   that's not working several times.  And then

22   instead of doing anything else, believing that he

23   has a weapon, instead of shooting him, I use my

24   Taser to try to incapacitate him and take him into

25   custody safely.  If he gets an abrasion or he        15:23

Page 148

1    falls on the ground, that's better than death,

2    correct?

3          Q.  I would think so.

4          A.  Okay.  So I try to do everything in my

5    power to me not get hurt.  And at this point he's      15:23

6    already jeopardized the public in his actions and

7    we're running through a residential neighborhood

8    and this person might be armed.  So I am using

9    everything in my power to try to take him into

10   custody without him getting hurt as bad as            15:23

11   possible, without the community getting hurt and

12   without myself getting hurt based on the

13   circumstances I know at the time.

14         Q.  So as you're -- At the moment when you

15   decided to tase him, you believed he was armed and    15:23

16   he was fleeing from you under all these

17   circumstances, did you think you had the

18   justification to shoot him alternatively?

19         MR. SMYTH:  Calls for speculation.

20   Over -- Incomplete hypothetical.                      15:23

21         THE WITNESS:  Yeah.  No, not at that time,

22   because I hadn't seen a weapon and he hadn't

23   turned and pointed a weapon at me at that time.

24   BY MR. HADDAD:

25         Q.  So did you see him make any reaction when    15:24

Page 149

1    one of the Taser darts struck him?

2         A.   You know, I don't remember.

3         Q.   What's the next thing that happened?

4         A.   I remember continuing to tell him to stop.

5    I reholstered my Taser.  And we both got caught up    15:24

6    in the Taser wires.

7         Q.   And then what?  How did you get out of the

8    wires?

9         A.   Kept running.  They broke.

10        Q.   So then what happened next?                 15:24

11        A.   He changed his direction of travel to a

12   southbound direction at 415 Carolina Street.

13        Q.   Which way had he been going?

14        A.   Westbound.

15        Q.   So he turned left?                          15:24

16        A.   Yes.

17        Q.   And how far behind him were you?

18        A.   Still about 10 or 15 feet.

19        Q.   At this point had you turned on your video

20   recorder?                                             15:24

21        A.   I looked down and I tried to turn it on

22   and noticed it was in the off position.  So I

23   flipped the switch to on.

24        Q.   At that point while you were running?

25        A.   Yes.                                        15:25

1        Q.   Why didn't you turn the other button on?

2        A.   It had to go through a buffer phase.

3        Q.   Weren't you supposed to leave the first

4   lever on during your entire shift so then later on

5   when you needed to turn it on quickly all you had    15:25

6   to do was press a button?

7             MR. SMYTH:   Vague and beyond the scope.

8   Go ahead.

9             THE WITNESS:   Normally that's what

10  happens, but in the course of doing -- either       15:25

11  running or at some point whether my arm went

12  across -- something happened, and it was turned

13  all the way off.   What that was, I don't know.

14  BY MR. HADDAD:

15       Q.   Okay.   So what's the next thing that      15:25

16  happened?

17            MR. SMYTH:   Vague.   From which point?

18  BY MR. HADDAD:

19       Q.   From when you tried to turn on your video

20  camera.                                              15:26

21       A.   Mr. Foster went down a narrow walkway in

22  between 415 Carolina Street.

23       Q.   And then did you follow him there?

24       A.   I did.

25       Q.   Was that potentially a dangerous place for 15:26

                                              Page 151

1    you to follow him?

2         A.  Define dangerous.  Dangerous for who?

3    Dangerous for him?  Dangerous for me?

4         Q.  For you.

5         A.  At the time, I wasn't thing about my        15:26

6    safety or his safety.  I was thinking about the

7    safety of the community and the public just based

8    on everything that was known to me at the time.  I

9    believed he was armed.  There is a residential

10   neighborhood.  I don't know where he's going.  I     15:26

11   don't know who is out.  Is he going to try to take

12   a hostage?  Is he going to try to break into a

13   house to try to get away from me?  There's lots of

14   variables.

15        Q.  But you had no facts to believe he had a     15:26

16   gun, did you?

17        A.  I did.

18            MR. SMYTH:  Objection.  Argumentative.

19   BY MR. HADDAD:

20        Q.  The only thing being that you found -- The   15:26

21   only thing that you're basing that on is you saw

22   him reach in the front of his pants as you were

23   running behind him, right?

24        A.  No.

25        Q.  What else?                                   15:27

                                          Page 152

1          MR. SMYTH:  Already asked and answered.

2          MR. HADDAD:  You're just mumbling.  You're

3    just interrupting with these objections

4    constantly.  Why do you do that?  They're

5    meaningless.                                      15:27

6          MR. SMYTH:  Okay.  Argumentative.  It

7    calls -- Asked and answered.

8    BY MR. HADDAD:

9       Q.  So other than reaching for the front of

10   his waistband while he ran, what other facts did   15:27

11   you have that he was armed with a gun?

12      A.  His fleeing from the scene, his concealing

13   of his body and his mannerisms.

14      Q.  People flee all the time.  It doesn't mean

15   they have a gun, right?                            15:27

16          MR. SMYTH:  It's argumentative.

17          THE WITNESS:  I think it depends on where

18   you're at.

19          MR. SMYTH:  Incomplete hypothetical.

20   BY MR. HADDAD:                                     15:27

21      Q.  Flight alone does not mean someone has a

22   gun, does it?

23      A.  No, it does not.

24      Q.  So tell me specifically, what objective

25   facts do you have to believe he had a gun besides   15:27

                                            Page 153

1    that he reached for the front of his waistband

2    while he was running?

3            MR. SMYTH:  You already asked and answered

4    this question.

5            Don't answer again.                        15:28

6            MR. HADDAD:  No.  I want an answer.  I

7    have not gotten an answer.

8            MR. SMYTH:  You did, you got like three

9    times the same answer from this.

10           MR. HADDAD:  I want to know all the facts. 15:28

11   He's not giving me clear facts.  I want to know.

12           MR. SMYTH:  What are you talking about?

13   The belated -- I mean --

14           MR. HADDAD:  Let him answer.

15           MR. SMYTH:  He already answered.          15:28

16           MR. HADDAD:  We'll get through it more

17   quickly if you just don't interrupt and let him

18   answer.

19           MR. SMYTH:  He's already answered.  I

20   mean, if you want to repeat the same questions,   15:28

21   we're also going to take some time.

22           MR. HADDAD:  I'm going to because now

23   you've interrupted again.

24   BY MR. HADDAD:

25       Q.  Tell me what objective facts you had to    15:28

                                              Page 154

1   believe he had a gun other than that you saw him

2   put his hands in the front of his waistband as he

3   was running.

4         MR. SMYTH:  This is the last time we're

5   answering that question.  Go ahead, last time.    15:28

6         THE WITNESS:  So based on totality of the

7   facts from the original stop, when he gave me the

8   look like the deer-in-a-headlight look, oh,

9   something's wrong, immediately took off, that

10  heightened my sense of alertness that, hey,       15:28

11  something is not right here.

12        Then when he stopped, bladed his right

13  side -- bladed his stance and concealed the right

14  side of his body away from me, that's not

15  typically what you see citizens do.  You normally  15:29

16  see that when somebody is trying to hide something

17  from you in an interaction.  So that didn't say,

18  oh, this guy has a gun at this point, but now

19  we're getting more facts, something is not right

20  here, something is suspicious.                     15:29

21        Then when I tell him to get in front of my

22  vehicle, he doesn't want to listen to me, tells me

23  to leave him alone or something to that effect,

24  takes off running, or on his bike, and endangers

25  the public as he did, and not only his safety, but  15:29

Page 155

1    everybody's safety involved, for a traffic

2    violation.  That makes me think, okay, something

3    else is going on here.  It's my job to evaluate

4    these things as we're going.

5            Now he crashes off his bike, he doesn't      15:29

6    stop, he gets up and he continues to run despite

7    my several commands.  Okay?  Now he's not only

8    disobeying my command, but he's running down the

9    street in a neighborhood where there's people out

10   and, you know, it could be possible -- I don't      15:30

11   know what he's doing at this point.  I'm

12   evaluating all these things while in the incident.

13   He's grabbing at his waistband with both hands.

14   I'm telling him to keep his hands away from his

15   waistband.                                          15:30

16           So that gives every indication to me based

17   on my training and experience and life experience

18   that he is possibly armed with a gun or some kind

19   of weapon that is a potential for there -- for him

20   to use it.  He's looking back at me, trying -- I     15:30

21   believe maybe trying to triangulate where I'm at

22   so at the correct opportunity, maybe, maybe not,

23   he might pull a weapon.  I don't know.

24   BY MR. HADDAD:

25       Q.  Okay.  So given all that, first of all,      15:30

                                        Page 156

1    that's your final answer about why you thought he

2    had a gun at that point, right?

3         A.  Yes.

4         Q.  Now, you're pursuing a guy that you say

5    you believed had a gun, you're going to go into a    15:30

6    narrow, dark alley all by yourself to get this

7    guy?

8         A.  Yes.

9         Q.  And why not wait for backup?

10        A.  The circumstances didn't permit that.  The 15:30

11   risks outweighed -- The apprehending him and

12   keeping the community safe outweighed his safety

13   and my safety.  My job as a police officer is to

14   protect the public.  Something is going on here in

15   this situation where things are evolving rapidly.   15:31

16   There's different things that are going on that

17   are heightening my sense of alertness.  And why is

18   this happening?  So here we are.

19        Q.  Did you let your dispatcher know that

20   you're about to pursue him in a dark alley by       15:31

21   yourself?

22        A.  No.

23        Q.  Why not?

24        A.  As I stated before, when I tried to get on

25   the radio, it was almost like I had a busy signal.  15:31

Page 157

1         Q.  Again?  When you said that before, you

2    were back at your car.

3         A.  Okay.  So I know I tried to update

4    dispatch the one time, when we were -- first

5    initiated the pursuit.  After that I had the Taser   15:31

6    and I had my flashlight and some other things are

7    going on and me believing he was possibly armed.

8    I'm handling the situation that's in front of me.

9    I don't care dispatch gets an update or not.  I'm

10   going to make sure that I'm okay and that --       15:32

11        Q.  Did you let other officers know over the

12   radio of your grave concern he had a gun at this

13   point?

14             MR. SMYTH:  Argumentative and misstates

15   his testimony.                                      15:32

16             THE WITNESS:  No, I did not.

17   BY MR. HADDAD:

18        Q.  What happened once you entered the alley?

19        A.  He fell down.

20        Q.  What caused him to fall?                   15:32

21        A.  I don't know.

22        Q.  Did he just fall on level ground?

23        A.  On the walkway.

24        Q.  How wide was that alley?

25        A.  Three feet maybe.  It was a wooden deck.  15:32

                                        Page 158

1    I don't know.  Maybe three feet.

2         Q.  Do you know where it led to?

3         A.  Not at the time I didn't.

4         Q.  So what happened when he fell?

5         A.  I was able to catch up to him.          15:33

6         Q.  And what did you do?

7         A.  He started to get up and I pushed him back

8    down to the ground.

9         Q.  Is that when he went down some stairs?

10        A.  Yes.                                      15:33

11        Q.  You pushed him down the stairs?

12            MR. SMYTH:  Vague.

13            THE WITNESS:  As a result from pushing him

14   back on the ground, yes, he did fall down some

15   stairs, three stairs to be exact, maybe two.        15:33

16            THE REPORTER:  When you get to an

17   appropriate point, may we take a break?

18            MR. HADDAD:  M-hm.

19   BY MR. HADDAD:

20        Q.  Here's a picture at Bates page 2195 of     15:33

21   some stairs.  Are these the stairs you're talking

22   about?

23        A.  No, those are not the stairs.

24        Q.  Okay.  So how many stairs were they?

25        A.  Two or three.                             15:34

                                          Page 159

Aiken Welch, A Veritext Company
510-451-1580

1      Q.  Did you consider his safety when you

2   pushed him down the stairs --

3           MR. SMYTH:  Vague, overbroad.

4   BY MR. HADDAD:

5      Q.  -- for a misdemeanor?                    15:34

6      A.  At this point, I believe he was armed.

7   And so that did it for more than a misdemeanor.

8   Now it's a felony.

9      Q.  Can you -- Have you ever had experience

10  with any prosecutor who would actually charge    15:34

11  someone with a felony based on the kind of facts

12  you're describing to believe that they were armed?

13     A.  Yes.

14          MR. SMYTH:  Calls for speculation.

15          MR. HADDAD:  Okay.  Let's take a break.  15:34

16          THE VIDEOGRAPHER:  We're off the record at

17  3:34.

18                (Recess taken.)

19          THE VIDEOGRAPHER:  We're back on the

20  record at 3:46.                                 15:46

21  BY MR. HADDAD:

22     Q.  What's the next thing that happened after

23  Ronell fell down the stairs?

24     A.  He fell down into the courtyard area.

25     Q.  Is that the courtyard where the shooting  15:46

                                          Page 160

1    ultimately took place?

2         A.   Yes, sir.

3         Q.   And what did you do after he fell down?

4         A.   Got on top of him.

5         Q.   So what were your body positions?        15:46

6              MR. SMYTH:   Vague, but go ahead.

7              THE WITNESS:   At first I was on his back,

8    telling him to keep his hands away from his

9    waistband.

10   BY MR. HADDAD:                                     15:46

11        Q.   He was facedown?

12        A.   Yes.

13        Q.   And how were you on his back?

14        A.   Straddling him with my knees on the

15   ground.                                            15:46

16        Q.   Did you have anything in your hands?

17        A.   My flashlight.

18        Q.   Anything else?

19        A.   Not at that time.

20        Q.   And so when he fell, it's typical for a  15:47

21   person to try to break the fall with their body by

22   putting their hands in front of them.   Did you see

23   him do that?

24        A.   I don't remember.

25        Q.   And he landed on top of his hands?       15:47

1        A.   He landed on his chest area.

2        Q.   So what happened once you got on top of

3   him?

4        A.   I continued to issue commands for him to

5   stop resisting, told him he was under arrest, told    15:47

6   him to put his hands above his head and not reach

7   for his waistband.

8        Q.   Okay.  And what was he doing?

9        A.   Trying to roll, roll away from me and get

10  up.                                                    15:47

11       Q.   Trying to turn over?

12       A.   Yes.

13       Q.   Were you able to keep him on his stomach?

14       A.   I was able to keep him down, but I had to

15  reposition myself.                                     15:47

16       Q.   In what way?

17       A.   I put one knee into his back area and then

18  drew my Taser.

19       Q.   So where on his back did you put a knee?

20       A.   Lower back.                                  15:48

21       Q.   Did you put weight on it?

22       A.   Yes.

23       Q.   You were trying to hold him down, right?

24       A.   Yes.

25       Q.   At that point had he tried to strike you    15:48

1    at all?

2         A.  You know, we were wrestling.  I don't know

3    if he was trying to hit me or not, but I know he

4    was trying to get up.  And just in that commotion

5    I don't remember an actual strike.                15:48

6         Q.  It seems like he was trying to get away

7    from you rather than attack you at that point,

8    right?

9         A.  No.  It seemed like he was trying to get

10   up.  I don't know what he was trying to do, but he  15:48

11   was definitely not listening to my commands and

12   trying to get up.

13        Q.  Everything up to that point had been him

14   trying to get away from you, right?

15        A.  Yes.                                      15:48

16        MR. SMYTH:  I was going to say calls for

17   speculation.

18   BY MR. HADDAD:

19        Q.  So you repositioned with one knee on his

20   lower back with some weight on it and pulled the    15:48

21   Taser out with your left hand; is that right?

22        A.  Yes.

23        Q.  Then what happened?

24        A.  With the one probe that was already in his

25   back I attempted to complete the circuit and try    15:49

1     to put the Taser against him to try to

2     incapacitate him.

3          Q.  Do you think that the Taser wire was still

4     connected to the probe?

5          A.  I think it was.  I had no reason not to      15:49

6     believe.  But I was trying to do what I could.

7          Q.  How long are those Taser wires?

8          A.  Twenty-five feet.

9          Q.  You had an X26P?

10         A.  Yes.                                          15:49

11         Q.  Did you give him a warning before you were

12    going to drive stun him?

13         A.  No.

14         Q.  And why didn't you warn him that you were

15    going to drive stun him?                              15:49

16         A.  We were physically wrestling and he was

17    trying to get up.  It didn't seem appropriate.  I

18    was telling him other things, stop resisting, keep

19    your hands above your head, you're under arrest.

20         Q.  You could have said stop resisting or I'll 15:50

21    tase you again, right?

22         A.  I could have.

23              MR. SMYTH:  Calls for speculation.

24    BY MR. HADDAD:

25         Q.  What did you say?                            15:50

1        A.   I said I could have.

2        Q.   So tasing him in drive-stun mode requires

3    you to press the muzzle of the Taser into his

4    body, right?

5        A.   Yes.                                    15:50

6        Q.   And that's the one that causes pain,

7    right?

8        A.   Well, the first time, it would have been

9    connecting the circuit, because I believe the

10   probe was still connected, and that would have    15:50

11   completed the circuit where neuromuscular would

12   have locked up and he wouldn't be able to wrestle

13   anymore.  That was ineffective.

14       Q.   When you pressed it into his back you

15   mean?                                            15:50

16       A.   Yes, that was ineffective.  It didn't

17   work.

18       Q.   I just want to be clear.  Are you talking

19   about when you shot him with it or when you

20   pressed it into his back?                        15:50

21       A.   When I pressed it into his back.  So two

22   different situations.

23       Q.   Got it.  So let's talk just about that.

24       A.   Okay.

25       Q.   So you're kneeling on him with one knee?  15:51

                                          Page 165

```
 1        A.  Yes.

 2        Q.  And then you press it into his back to

 3   drive stun him.  And how long did you activate it

 4   at that time?

 5        A.  I pulled the trigger, but he was actively  15:51

 6   trying to get up.  So I don't know if it made

 7   it -- how long the connection was for.  I don't

 8   know.

 9        Q.  When you pull the trigger it automatically

10   cycles for five seconds, right?                       15:51

11        A.  Correct.

12        Q.  And that should have sent electricity into

13   him, right?

14        A.  Yes.

15        Q.  And how did he react to that?                15:51

16        A.  He did not.  He didn't scream or say stop.

17   It was more he just kept continuing, tried to get

18   up.

19        Q.  Then did you -- What happened next after

20   that?                                                 15:51

21        A.  I got up and stood off to the side of him

22   and I pulled the cartridge off the Taser to try to

23   get more of an electrical arc onto him instead of

24   using the probes, because I figured that it wasn't

25   working at that point.                                15:51
```

Page 166

1       Q.  Okay.  And then what?

2       A.  While he was still trying to get up, I was

3 still issuing commands and I put the Taser against

4 his arm and side, chest area.

5       Q.  And how long did you hold it against him  15:52

6 at that point?

7       A.  You know, he kept knocking the Taser away

8 while he was trying to get up.  So I can't give

9 you a specific time.  I just know it wasn't

10 effective.                      15:52

11     Q.  You've been trained that because the Taser

12 used in that way is painful a person will try to

13 move it away if possible, right?

14      MR. SMYTH:  Incomplete hypothetical.

15      THE WITNESS:  I think different people do  15:52

16 different things.  That's one possibility.

17 BY MR. HADDAD:

18      Q.  Now, by that time, did you try to radio

19 for help?

20      A.  No.                        15:52

21      Q.  Did you try to turn your camera on?

22      A.  No.

23     Q.  So do you know how long you tased him that

24 second time on the ground?

25     A.  I don't.  I don't know if I made contact.  15:52

Page 167

1           Q.   And what happened next?

2           A.   I noticed that it was ineffective and I

3      went to utilize a different impact weapon, or a

4      different -- try to take him into custody a

5      different way.                                    15:53

6           Q.   Now, right after you tased him while he

7      was on the ground, is that when he said to you

8      something like, "What the fuck, man?  What are you

9      doing?"

10               MR. SMYTH:   It misstates testimony.    15:53

11               THE WITNESS:   He said something.  During

12     my interview I believe I said that, what you just

13     stated, but I also stated that I wasn't exactly

14     sure what he said.  But he was upset.

15     BY MR. HADDAD:                                    15:53

16          Q.   But that was your best recollection --

17          A.   Correct.

18          Q.   -- several hours later, when you were

19     interviewed, that's what he said, right?

20          A.   Yes, sir.                               15:53

21          Q.   Did he say anything to you at that moment

22     that was threatening to you?

23          A.   No.

24          Q.   He just asked what you were doing, right?

25          A.   No.  It was more his demeanor and actions  15:53

                                                Page 168

```
 1   at that time that were threatening.
 2       Q.  Okay.  And he didn't try to punch you at
 3   that point when you were tasing him on his front
 4   side, were you?
 5       A.  Not that I recall, no.                    15:54
 6       Q.  So you said you decided to escalate from
 7   Taser to another weapon?
 8       A.  Not escalate.
 9           MR. SMYTH:  Misstates testimony.  Go
10   ahead.                                            15:54
11           THE WITNESS:  I'm not saying escalate.
12   I'm trying to say I used a different tactic
13   because that wasn't -- clearly it wasn't working.
14   So I tried to use something else.
15   BY MR. HADDAD:                                    15:54
16       Q.  What was that?
17       A.  My flashlight.
18       Q.  And what were you going to try to do with
19   your flashlight?
20       A.  Strike him in his clavicle and his arm   15:54
21   area to gain compliance.
22       Q.  How many times did you strike him?
23       A.  You know, I don't know specifically how
24   many times, but I know it wasn't more than five.
25       Q.  Why do you think it was not more than    15:54
```

Page 169

1    five?

2        A.  Just from me -- the motion that I was

3    doing, that's what I remember.

4        Q.  So that's based on your memory?

5        A.  Yes.                                15:54

6        Q.  Why did you strike him with your

7    flashlight?

8        A.  Because it was --

9            MR. SMYTH:  Vague.  You can go.

10           THE WITNESS:  Because it was in my hand    15:55

11   and we're trained to use it as an improvised

12   impact weapon if we have that available to us.

13   BY MR. HADDAD:

14       Q.  Are you left- or right-handed?

15       A.  Right-handed.                         15:55

16       Q.  Was it in your right hand?

17       A.  Yes.

18       Q.  At that point is it accurate to say that

19   you feared the potential threat he posed because

20   he could have been armed?                     15:55

21       A.  Yes, and he was resisting.

22       Q.  He was trying to get away from you, right?

23           MR. SMYTH:  Misstates his testimony,

24   but --

25           THE WITNESS:  At that point, I didn't take 15:55

Page 170

```
 1   it as trying to get away.  It was more resisting.
 2   I'm trying to make a lawful arrest, and he's
 3   trying to get up, push me away, and nothing I've
 4   done has worked up to this point to take him into
 5   custody.                                        15:56
 6       Q.  Up to this point, he had never
 7   belligerently attacked you, had he?
 8       A.  Like said fuck you or something of that
 9   nature?
10       Q.  Right.                                  15:56
11       A.  No.
12       Q.  And he never physically attacked you up to
13   this point, had he?
14       A.  When we are on the ground, it's my
15   perspective that, yes, he was pushing on me or    15:56
16   doing something to get me off of him.  Whether
17   that was pushing or punching, I can't tell you
18   what that was because I don't remember.  But he
19   was actively not submitting to a lawful arrest,
20   which is resisting, attack on an officer.  That's  15:56
21   how I look at it.
22       Q.  I'm not asking for some legalistic thing.
23   Was he attacking you to try to harm you?
24          MR. SMYTH:  Well, it calls for
25   speculation.                                    15:56
```

Page 171

```
1    BY MR. HADDAD:

2         Q.  Or was he just trying to get away?  What

3    do you think?

4         A.  You know, I can't answer that.  I just

5    know that we were pushing and wrestling and doing   15:56

6    stuff on the ground.

7         Q.  You had just been trying to inflict pain

8    on him and he's trying to push you off of him,

9    right?

10        A.  No, that's not correct.                    15:57

11        Q.  The Taser is intended to inflict pain,

12   right?

13        A.  No.  It's to incapacitate somebody to gain

14   compliance and take him into custody.  It's not to

15   inflict pain.                                        15:57

16        Q.  But you were doing it in the drive stun

17   mode, right?

18        A.  At that point, yes.

19        Q.  Which is pain compliance, right?

20        A.  Yes.                                        15:57

21        Q.  It's meant to inflict pain, right?

22        A.  Well, the way that you're stating, it's

23   not correct.

24        Q.  What?

25        A.  Well, you're making it sound like I'm       15:57
```

Page 172

1    trying to torture him or do something.  In all

2    actually I'm trying to make him stop what his

3    action is based on the training that I have.

4         Q.  I'll just say it again.  You're attempting

5    to use pain compliance on him and he's trying to      15:57

6    push you away?

7         A.  Yes, sir, yes, sir.

8         Q.  Now, even though at the time that you

9    decided to strike him with your flashlight you had

10   a fear of him, that he could be potentially armed,     15:58

11   you still didn't pull your gun out to shoot him,

12   correct?

13        A.  Correct.

14        Q.  Why is that?

15        A.  Because I didn't feel that it had arised      15:58

16   to that level yet.

17        Q.  He was not an immediate threat at that

18   time, right?

19        A.  No, that's not true.  He was a threat.

20        Q.  An immediate threat is what I said.         15:58

21        A.  Yeah.

22             MR. SMYTH:  It's vague, overbroad.

23   BY MR. HADDAD:

24        Q.  So when he was on his back and you were

25   striking him with your flashlight, did he pose an      15:58

1    immediate threat to you of death or serious

2    injury?

3         A.  Yes.

4         Q.  How?

5         A.  Because we're wrestling and fighting on    15:58

6    the ground.

7         Q.  You say fighting, but you haven't

8    described him doing anything aggressive towards

9    you, have you?

10         MR. SMYTH:  It's overstating, misstates    15:58

11    testimony.

12         THE WITNESS:  I mentioned before, I can't

13    give you specifics on if he was punching or

14    pushing me, but we were on the ground wrestling

15    and he was pushing off of me and he was trying to    15:59

16    actively get up and resist arrest.  That's violent

17    in itself.

18    BY MR. HADDAD:

19         Q.  Were you justified to kill him while you

20    were striking him with your flashlight?              15:59

21         MR. SMYTH:  That's argumentative and calls

22    for a legal conclusion, expert opinion, misstates

23    his testimony, lacks foundation.

24         THE WITNESS:  I didn't believe at that

25    point the level of force had arose to that.         15:59

Page 174

```
 1   BY MR. HADDAD:

 2        Q.  So you did not believe that deadly force

 3   was justified while you were striking him with

 4   your flashlight; is that fair to say?

 5        A.  Yes.                                    15:59

 6        Q.  Can you describe your flashlight that you

 7   were using?

 8        A.  Yes.  It's a Maglite.  It's made of

 9   aluminum.  It had three cell.

10        Q.  How long is it?                          16:00

11        A.  Maybe a foot long approximately.

12        Q.  Let me just show you some evidence

13   pictures of your flashlight and just ask you if

14   these are accurate.  Okay?  Just a legal thing I

15   have to do.  So take a look at Bates pages 2167 to  16:00

16   2173.  Are those all pictures of your Maglite that

17   you were using at that time?  They go on the front

18   and the back, too.

19        A.  That looks similar to what I was carrying,

20   yes.                                             16:00

21        Q.  And the investigators who took these

22   pictures in connection with this officer-involved

23   shooting put a measuring tape next to it which

24   indicates it's a little over 13 inches long.  Does

25   that look accurate?                               16:00
```

                                        Page 175

1        A.   It does.

2        Q.   How much do you think that weighs?

3        A.   Maybe a pound.

4        Q.   It's made of metal, right?

5        A.   Aluminum, yes.                          16:01

6        Q.   Have you ever been struck with that thing?

7        A.   Yes.

8        Q.   When?

9        A.   During training.

10        Q.   Where were you struck?                   16:01

11        A.   In my arm.

12        Q.   Did you have any sort of padding on it?

13        A.   No.

14        Q.   Did it leave a bruise?

15        A.   I don't remember if it did or not.       16:01

16        Q.   Which end of the flashlight were you

17   holding while you were striking him?

18        A.   The light end.

19        Q.   The bulbed end?

20        A.   Yes, sir.                                16:01

21        Q.   And you struck him in the head, didn't

22   you?

23             MR. SMYTH:  Lacks foundation, calls for

24   speculation and assumes facts not in evidence.

25             THE WITNESS:  Not that I'm aware of.     16:01

Page 176

```
 1    BY MR. HADDAD:

 2         Q.  Aren't you aware that you caused him to

 3    have a skull fracture?

 4              MR. SMYTH:  That's very vague, very --

 5    Calls for speculation, assumes facts not in          16:01

 6    evidence, lacks foundation.

 7              THE WITNESS:  I know that he was shot one

 8    time in the head and I don't know if that was a

 9    cause of the skull fracture.

10    BY MR. HADDAD:                                        16:02

11         Q.  Where else did you strike him besides the

12    clavicle and the arm?

13         A.  That's the only places that I remember

14    striking him.

15         Q.  Will you point to the clavicle on your      16:02

16    body, please.  Okay.  That's pretty close to the

17    neck, right?

18         A.  Yes.

19         Q.  And while you were striking him he was on

20    the ground, on his back, right?                      16:02

21              MR. SMYTH:  Misstates testimony.

22              THE WITNESS:  He was trying to actively

23    get up at that time.

24    BY MR. HADDAD:

25         Q.  That's answering a different question.      16:02
```

Page 177

1   He's actively trying to get up from where?

2        A.   The ground.

3        Q.   Okay.   So he's on the ground on his back,

4   right?

5        A.   No.   He has his left hand down and he's      16:02

6   pushing himself up.

7        Q.   What's his right arm doing?

8        A.   I don't know what his right arm is doing

9   at that time.

10       Q.   Which arm were you trying to hit?          16:02

11       A.   His right arm.

12       Q.   You were aiming for his right arm?

13       A.   It's off to the side somewhere.

14       Q.   Was he using his arm to try to protect his

15   face from your blows?                              16:03

16            MR. SMYTH:   Calls for speculation.

17            THE WITNESS:   Yeah, I don't know.   I don't

18   know.

19   BY MR. HADDAD:

20       Q.   Weren't you looking where you were aiming? 16:03

21       A.   I had a zone that I was aiming for while

22   he was moving.

23       Q.   So you don't know where else you struck

24   him besides his clavicle and his arm?

25       A.   I believe that's the only places I struck  16:03

Page 178

```
 1     him at.
 2         Q.  How many more times were you planning to
 3     strike him with your metal flashlight?
 4             MR. SMYTH:  Calls for speculation, assumes
 5     facts, lacks foundation.                          16:03
 6             THE WITNESS:  It was my objective at that
 7     time to gain compliance by using my impact weapon
 8     to get him to stop resisting.
 9     BY MR. HADDAD:
10         Q.  When you say "gain compliance," were you    16:03
11     trying to use your flashlight to beat him into
12     submission?
13         A.  No.
14             MR. SMYTH:  That's argumentative,
15     misstates his testimony.                          16:03
16     BY MR. HADDAD:
17         Q.  How is gaining compliance by hitting him
18     with your flashlight different than beating him
19     into submission?
20             MR. SMYTH:  Argumentative.                16:04
21     BY MR. HADDAD:
22         Q.  I know you don't like those words, but
23     objectively using the English language, how is it
24     different?
25             MR. SMYTH:  Calls for diction scholar.    16:04
```

                                            Page 179

```
 1              THE WITNESS:  So I'm trying to use pain
 2     compliance at this point, action versus reaction.
 3     If I -- If he's getting up and I'm telling him not
 4     to and he's not, using my flashlight to knock him
 5     off balance or say, hey, if you continue to do      16:04
 6     that, this is what's going to happen and it hurts.
 7     So stop doing that.  And it's a tactic, pain
 8     compliance tactic.  It's not to beat anybody into
 9     submission.  That would be the wrong words because
10     we never try to do that.                            16:04
11     BY MR. HADDAD:
12         Q.  But you never used actual words to warn
13     him that you would use additional painful or
14     injurious force unless he complied, did you?
15         A.  I did not.                                   16:05
16         Q.  Around the time that you were striking him
17     or just after, did you inform dispatch of what was
18     happening?
19         A.  I did not.
20         Q.  Did you ask for backup?                      16:05
21         A.  I did not.
22         Q.  What's the radio call 1199?
23         A.  Officer needs assistance now, something
24     has happened, I'm in trouble, I'm down on the
25     ground, I'm fighting for my life.                    16:05
```

Page 180

1      Q.  Did you ever put that radio call out?

2      A.  No.

3      Q.  So after hitting him several times with a

4  flashlight, what happened next?

5      A.  I continued -- I stopped hitting him and I   16:05

6  issued commands so that he can comply with my

7  orders.

8      Q.  What were your commands?

9      A.  Stop resisting, put your hands above your

10 head and you're under arrest.                          16:05

11     Q.  Then what happened?

12     A.  He looked at me.  He had this grin on his

13 face when he looked at me.  And he started to get

14 up again.

15     Q.  By the way, was there more than one way     16:06

16 out of the alley or was the only way out the way

17 you came?

18     A.  There was another way out of the alley.

19     Q.  So you say he looked at you and smiled or

20 grinned?                                                16:06

21     A.  Yes.

22     Q.  Sure that wasn't a grimace?

23     A.  You know --

24         MR. SMYTH:  Calls for speculation.

25         THE WITNESS:  It looked like a grin to me   16:06

Page 181

1    and a smile.

2    BY MR. HADDAD:

3        Q.   So there's enough light for you to see

4    that?

5        A.   At that time, yes.                        16:06

6        Q.   So what happened next as he was trying to

7    get up?

8        A.   I went to go strike him again with my

9    flashlight.

10       Q.   Where were you going to strike him this   16:06

11   time?

12       A.   In his arm again.

13       Q.   What happened?

14       A.   He caught -- When I was swinging down, he

15   caught my flashlight midair.                        16:07

16       Q.   He was using his hand to either try to

17   deflect it or catch it and he caught it, right?

18       A.   He caught it, yes.

19       Q.   What end of it did he catch?

20       A.   The shaft end of it.                       16:07

21       Q.   The straight handle end?

22       A.   Yes, sir.

23       Q.   Did you already have your gun out at that

24   point?

25       A.   No.                                        16:07

1          Q.   What did you do when he grabbed the end of

2     your flashlight?

3          A.   Tried to pull it away from him.

4          Q.   And then what happened?

5          A.   He ripped it out of my hand.                16:07

6          Q.   What happened next?

7          A.   At the same time, simultaneously, when he

8     was ripping the flashlight out of my hand, he's

9     getting up off the ground onto his feet.

10          Q.   Okay.  And then what?                        16:07

11          A.   He started to come up with the flashlight.

12     He had a flashlight and he started to come up like

13     in a backhand and he was lifting the light up to

14     like come down and what I believe to have hit me

15     with it.                                               16:07

16          Q.   Where were you?  Were you standing?

17          A.   Yes.

18          Q.   So you're on both feet?

19          A.   Yes.

20          Q.   What's behind you?                           16:08

21              MR. SMYTH:  Calls for speculation.

22              THE WITNESS:  I don't know.  I think

23     there's mailbox behind me.  I think there's a

24     fence and a walkway.

25     BY MR. HADDAD:                                         16:08

                                           Page 183

1      Q.  But how much space is behind you?

2      A.  I don't know.

3      Q.  Did you have your gun out yet?

4          MR. SMYTH:  Vague as to time.

5          THE WITNESS:  Yeah.  When he was coming up 16:08

6  with the flashlight, I remember I was like, oh, my

7  God, this guy just took my flashlight.  Oh, God,

8  he's going to hit me with it.  And then I remember

9  from shooting from my hip and punching out.  It

10  wasn't like I made a conscious decision, hey, I'm   16:08

11  going to shoot this guy.  It was happening.

12  BY MR. HADDAD:

13      Q.  So exactly when did you decide to shoot?

14          MR. SMYTH:  Assumes facts.

15          THE WITNESS:  I can't exactly tell you the 16:09

16  exact moment, but I can tell you that I assessed

17  in my head, hey, this guy took my light, he's

18  going to hit me with my light.  And the next thing

19  I knew, I was shooting.

20  BY MR. HADDAD:                                      16:09

21      Q.  And why did you think he was going to hit

22  you with it?

23      A.  So I distinctly remember when he got his

24  feet underneath him and he had my flashlight, he

25  was coming up in a boxer type stance with his feet  16:09

                                              Page 184

1    bladed and he's bringing the light up like he's

2    going to come down in a motion to backhand me.

3        Q.  In your statement to the investigators

4    later that evening you wrote, quote, without

5    even -- You didn't write this.  You said this.      16:10

6    Quote, without even thinking about it, I had my

7    firearm out, and when the subject was coming

8    upwards I discharged my firearm, eliminating the

9    threat, unquote.

10        Does that sound accurate?                      16:10

11        A.  Yes.

12        Q.  Now, he was still in the process of

13   getting up off the ground when you shot him; is

14   that correct?

15        MR. SMYTH:  Calls for speculation.             16:10

16        THE WITNESS:  Yeah.  No.  He was already

17   standing and coming upwards with the flashlight.

18   BY MR. HADDAD:

19        Q.  What was in your line of fire behind him?

20        A.  There was --                               16:10

21        MR. SMYTH:  That calls for speculation,

22   but --

23        THE WITNESS:  Bushes and a fence.

24   BY MR. HADDAD:

25        Q.  Were there houses there?                   16:10

                                        Page 185

1        A.   Apartment buildings.

2        Q.   Windows behind that fence?  Do you know?

3        A.   I don't know.

4        Q.   Possibly people?

5             MR. SMYTH:  Calls for speculation.        16:11

6             THE WITNESS:  I don't know.  It's

7   possible.

8   BY MR. HADDAD:

9        Q.   Where did your first shot strike him?

10       A.   Somewhere in his front.  I know because I   16:11

11   know we were facing each other.

12       Q.   Have you reviewed the autopsy report?

13       A.   I briefly glanced at it.

14       Q.   How many shots did you fire?

15       A.   Seven.                                     16:11

16       Q.   Why did you fire seven shots?

17            MR. SMYTH:  That calls for speculation,

18   expert opinion.

19   BY MR. HADDAD:

20       Q.   Does that call for speculation?            16:11

21       A.   Yeah, it does.

22       Q.   You don't know why you fired seven shots?

23       A.   I was in fear for my life.  I can tell you

24   that.

25       Q.   Do you know why you fired seven as opposed  16:11

                                            Page 186

```
 1    to two or nine?

 2         A.  I can't tell you that.

 3         Q.  Did you fire your shots in one continuous

 4    burst?

 5         A.  I did.                              16:11

 6         Q.  Did you fire any of those shots by

 7    mistake?

 8         A.  No.

 9             MR. SMYTH:  Vague.

10    BY MR. HADDAD:                               16:12

11         Q.  They were all intentional shots directed

12    at Ronell Foster?

13         A.  Yes.

14             MR. SMYTH:  Argumentative.

15    BY MR. HADDAD:                               16:12

16         Q.  Now, the whole time up to the time you

17    started shooting him, Ronell had never struck you,

18    had he?

19             MR. SMYTH:  Misstates testimony.

20             THE WITNESS:  When we were on the ground  16:12

21    wrestling or he was pushing on me, I don't know if

22    those were strikes or pushes, I can't tell you,

23    but we were on the ground and he was resisting

24    arrest.

25    BY MR. HADDAD:                               16:12
```

Page 187

```
 1          Q.  He never made a movement that looked like

 2     a swing to try to punch you, did he?

 3          A.  At what time?

 4          Q.  Anytime up to the time you were shooting

 5     him.                                               16:12

 6          A.  Yes, he did.

 7          Q.  What was that?

 8          A.  When he had my flashlight and he's coming

 9     up with the flashlight above his head and like

10     he's coming down.                                  16:12

11          Q.  Okay.  I just want to ask you about some

12     parts in your interview for a second.  In your

13     interview you described the fear you were feeling

14     at the moment you were pulling the trigger.  This

15     is a part of your interview.  I have a transcript.  16:13

16     It has you say the following:

17          Quote:  You were asked:  What do you think

18     would have happened if you didn't fire your

19     weapon?

20          Quote:  That he was going to kill me.  I      16:13

21     thought, the whole thought was, oh, shit, this guy

22     just took my life from me.  We're fighting.

23     Nothing I've used is working.  He's going to smack

24     me in the head, he's going to take my gun and he's

25     going to shoot me with it or he's going to beat me  16:13
```

Page 188

```
1    down with my flashlight, and there's nobody here
2    to -- Nobody knows where I'm at.  I couldn't get
3    it out on the radio.  It's dark.
4          Does that sound accurate about how you
5    were feeling?                                    16:14
6        A.  Similar, yeah.
7        Q.  Later in your interview you talk some more
8    about how you were feeling in that moment and you
9    said, quote:  I had an oh, shit moment.  I was
10   like, oh, my God, this dude just took my          16:14
11   flashlight from me.  He's going to use it against
12   me.  And I was like, he's going to hit me in the
13   head.  Something is going to happen.  I was
14   scared.
15         Does that sound like what you told the     16:14
16   investigators?
17       A.  It does.
18       Q.  Now, isn't it true that Ronell never took
19   a step toward you?
20           MR. SMYTH:  Vague.                       16:14
21           THE WITNESS:  Yeah.  No.  He was clearly
22   coming up and coming at me with the flashlight.
23   Whether he took a step or not, I can't tell you
24   that.  I know he was coming up and coming at me
25   with the flashlight.                             16:15
```

Page 189

```
 1    BY MR. HADDAD:

 2        Q.  Why didn't you just try to move out of the

 3    way, move sideways, move backwards?

 4        A.  I did, I sidestepped.

 5        Q.  So how far away from him did you move by    16:15

 6    sidestepping?

 7        A.  Just to the opposite side of him.

 8    Approximately.  I don't know for sure.

 9        Q.  How far away from him were you when you

10    fired your first shot?                              16:15

11        A.  Point blank range.

12        Q.  What is that?  About arm's length?

13        A.  Approximately.

14        Q.  At the moment you decided to shoot him,

15    did you consider what other options you had?        16:15

16            MR. SMYTH:  Misstates his testimony.

17            THE WITNESS:  Everything up to that point

18    hadn't worked.  I had no other options.

19    BY MR. HADDAD:

20        Q.  Didn't you have the option to just try to   16:16

21    get out of his way and let him go?

22            MR. SMYTH:  Calls for speculation.

23            THE WITNESS:  I didn't think so at that

24    point.  I thought that I was direct under attack

25    and I was going to die if I got hit by him.         16:16
```

Page 190

```
 1    BY MR. HADDAD:

 2        Q.  But why didn't you think you could

 3    continue your evasive movements to get away?

 4        A.  I don't know what -- I'd just be

 5    speculating at this time if I gave you an answer    16:16

 6    for that.

 7        Q.  Did you give him a warning before shooting

 8    your gun?

 9        A.  No.

10        Q.  So you tried to describe Ronell's position 16:16

11    when you first fired your first shot.  Would you

12    mind standing up and trying to show us as you did

13    in your interview what his body position was when

14    you fired the first shot.  And the camera will be

15    you and you'll try to show us what Ronell's body    16:17

16    position was when you shot.

17        A.  So I was closer than what the camera is.

18        Q.  Okay.

19        A.  Ronell had a bladed stance.  His right

20    foot was in front of his left and he was coming --   16:17

21    After he grabbed my light, it was simultaneous, he

22    was coming up and he was doing this motion.

23        Q.  So he was fully standing up like you are?

24        A.  He was coming up.  I'm not going to stay

25    in this position.  He's coming up and he's going    16:17
```

Page 191

1    like this.  So it's one fluid motion.  The ripping

2    of my flashlight.  He's coming up.  He's starting

3    to come towards me with the flashlight in like a

4    hammer first type motion.

5         Q.  Okay.  Thanks.  How much time went by        16:17

6    between when you decided to shoot and when you

7    pulled the trigger?  Was it pretty much

8    instantaneous?

9         A.  Yeah.  I can't give you a definite amount

10   of time, because my gun was out and I was firing.    16:18

11   It was milliseconds.

12        Q.  Now, in this boxer stance that you've

13   described him having, he was facing you?

14        A.  Yes.

15        Q.  And you said that your first shot went       16:18

16   somewhere into the front of his body?

17        A.  Yes.

18        Q.  What part of him do you think it went in?

19        MR. SMYTH:  Calls for speculation.

20        THE WITNESS:  Yeah, it calls for               16:18

21   speculation.  But if I had to assume, I'm drawing

22   from my hip and my gun's to my side because that's

23   the way we're trained and I would fire from there,

24   coming up into a stance, a shooter's stance.

25   BY MR. HADDAD:                                        16:19

1          Q.  Right.  So what part of his body do you

2     think you struck?

3          A.  Probably his lower --

4               MR. SMYTH:  Calls for speculation, but --

5               THE WITNESS:  Probably his lower body,    16:19

6     like stomach, stomach area.

7     BY MR. HADDAD:

8          Q.  Okay.  What were you aiming for?

9          A.  I wasn't aiming at that point.  I was just

10    shooting.  It was point and shoot.  It wasn't an    16:19

11    aim.  It was just pull your gun out and stop the

12    threat.

13         Q.  What was his body position for your second

14    shot?

15         A.  I don't know.  All this is instantaneous.  16:19

16    Everything happened in less than a half a second.

17    So --

18         Q.  What was his body position for your third

19    shot?

20         A.  Same as -- Same answer as last time.    16:19

21         Q.  For your fourth through seventh shots?

22         A.  I know towards the end of my shooting he

23    was falling to the ground and I remember stopping

24    shooting when he was falling.

25         Q.  When did he stop coming towards you?    16:19

                                        Page 193

1      A.   That would be speculation.  I don't know.

2      Q.   When in your shooting did he drop the

3   flashlight?

4      A.   After he had fallen on the ground he

5   dropped the flashlight.                              16:20

6      Q.   Can you describe how he landed?

7      A.   He landed in the planter bush area box, I

8   believe on his right side.

9      Q.   Were you moving while you were firing

10  those seven shots, moving your feet?              16:20

11     A.   I believe I was stationary, but I had

12  taken a sidestep.  So I don't know when I took my

13  sidestep, it was before I started shooting or

14  during the shooting, I couldn't tell you.

15     Q.   How far away from you was his body when    16:20

16  you stopped firing?

17     A.   Three feet maybe approximately.

18     Q.   Only three feet?

19     A.   I don't know.  Approximately.  I'm giving

20  you an approximate.  I didn't measure it.  I don't  16:20

21  know.

22     Q.   When he fell, he fell into some bushes,

23  right?

24     A.   Yes.

25     Q.   And the bottoms of his feet were facing    16:21

                                              Page 194

```
1    you at that point, right?

2        A.  I believe so.

3        Q.  And his head was further away from you

4    than his feet were, right?

5        A.  Correct.                              16:21

6        Q.  He was moving away from you while you were

7    shooting, wasn't he?

8            MR. SMYTH:  Calls for speculation.

9            THE WITNESS:  I don't know.

10   BY MR. HADDAD:                                16:21

11       Q.  How many shots did you think you fired?

12       A.  Four or five.

13       Q.  But it turns out that in fact you fired

14   seven, right?

15       A.  Correct.                              16:21

16       Q.  And how did you determine that?

17       A.  Later on at the police department I did a

18   round count.

19       Q.  So you know how many you normally keep in

20   your gun and you saw how many were left over and  16:21

21   you figured the difference was shot, right?

22       A.  Yes, sir.

23       Q.  So you thought you fired four or five, but

24   you fired seven, right?

25       A.  Yes.                                  16:21
```

Page 195

1      Q.  So you lost track of your own gunshots in

2   the course of the shooting, right?

3      A.  I wasn't counting.

4      Q.  Why was it that you didn't know how many

5   shots you fired?  Were you panicked?              16:22

6          MR. SMYTH:  That calls for speculation,

7   expert opinion.

8          THE WITNESS:  During our training --

9          Do you want me to answer that?

10         MR. SMYTH:  If you can, yeah, go ahead.   16:22

11         THE WITNESS:  During our training we tell

12  officers you're not going to be able to count your

13  shots.  There's just too much going on.  It's

14  impossible.  And if you can, then kudos to you.

15  But you'll have an approximate how much.          16:22

16  BY MR. HADDAD:

17     Q.  Were you afraid the whole time that you

18  were shooting?

19     A.  Yes.

20     Q.  Can you describe your gun's ejection       16:22

21  pattern?  Where did the empty shell casings go?

22         MR. SMYTH:  Calls for speculation.

23  BY MR. HADDAD:

24     Q.  Typically?

25     A.  Well, typically -- My port is on the       16:22

Page 196

 1    right-hand side.  So they would have gone back and
 2    to the right.
 3        Q.  And were you holding your gun in a normal
 4    upright orientation, not sideways or anything?
 5            MR. SMYTH:  Vague as to time.            16:23
 6    BY MR. HADDAD:
 7        Q.  When you were shooting him.
 8        A.  At which point?  Because I was coming up
 9    with my firearm.  And I told you the first time I
10    believe I began firing from my hip area, working    16:23
11    my way up.  So if I'm from my hip area, my gun is
12    canted.  That's just from my training experience.
13    I don't know on that particular night how my gun
14    was, because I wasn't looking at my gun.
15    BY MR. HADDAD:                                      16:23
16        Q.  Why didn't you fire more shots?
17            MR. SMYTH:  Calls for speculation, expert
18    opinion.
19            THE WITNESS:  At the time, I believed that
20    the threat was no more.  So I stopped shooting.    16:23
21    BY MR. HADDAD:
22        Q.  But what caused you to believe that the
23    threat had stopped after seven shots?
24        A.  Reassessing the situation, he was no
25    longer in my face.  We weren't fighting anymore.   16:23

                                        Page 197

1    He was on the ground.

2         Q.  Why didn't you reassess after one or two

3    shots?

4              MR. SMYTH:  Calls for speculation, expert

5    opinion.                                        16:24

6              THE WITNESS:  I can't tell you.  I don't

7    have an answer for that.

8    BY MR. HADDAD:

9         Q.  Is it fair to say that you feared for your

10   life because once he grabbed the flashlight away   16:24

11   from you he could potentially harm you with it?

12        A.  And the totality of everything else that

13   had happened to that point not working, yes.

14        Q.  You never actually saw any sort of gun on

15   him, did you?                                   16:24

16        A.  I did not.

17        Q.  Were you aiming for any particular part of

18   his body for any of your shots?

19        A.  No.

20        Q.  Where are you trained to shoot a person?   16:24

21        A.  Center mass, upper chest area.

22        Q.  Were you looking at what he was doing for

23   all of your shots?

24        A.  No.

25        Q.  Now, in your mind, at that moment, the     16:25

                                           Page 198

1    flashlight was the threat, right?

2              MR. SMYTH:  Vague, ambiguous.

3              THE WITNESS:  No.  Ronell Foster was the

4    threat with the weapon in his hand.

5    BY MR. HADDAD:                                          16:25

6         Q.  But the weapon was the flashlight, right?

7         A.  Yes.

8         Q.  Were you keeping your eye on the weapon

9    while you were shooting him?

10        A.  I don't remember.                              16:25

11        Q.  Now, was there anything blocking your view

12   of him while you were shooting him?

13        A.  No.  We were face to face.

14        Q.  And if you're face to face, all your shots

15   should have gone into his front, right?               16:25

16        A.  No.

17        Q.  Why?

18             MR. SMYTH:  Calls for speculation, expert

19   opinion.

20             THE WITNESS:  I know that when somebody is 16:25

21   shot their body moves in different ways.  So

22   during the shooting I don't know what way his body

23   moved, but it's possible his body moved.

24   BY MR. HADDAD:

25        Q.  Would you have been justified to shoot     16:26

                                            Page 199

1    Ronell if he was not threatening you with your own

2    flashlight, if he didn't have your flashlight in

3    his hand?

4          MR. SMYTH:  Incomplete hypothetical.

5          THE WITNESS:  It really would depend on     16:26

6    the circumstance.

7    BY MR. HADDAD:

8       Q.  Would there have been any need to shoot

9    him if his back was to you?

10          MR. SMYTH:  Calls for speculation.  And     16:26

11    vague.

12          THE WITNESS:  Can you rephrase it a

13    different way?

14    BY MR. HADDAD:

15       Q.  Yeah.  Under all the same circumstances,   16:26

16    would there have been any need to shoot him if his

17    back was to you?

18          MR. SMYTH:  That's still an incomplete

19    hypothetical and calls for speculation.

20          THE WITNESS:  I can't answer that.          16:26

21    BY MR. HADDAD:

22       Q.  Why?

23       A.  Well, because it involves speculation, you

24    know, coming up with a scenario, and that's not

25    what happened.  I'm here to talk about what        16:27

Page 200

1    happened.  I can't -- We can do all day long the

2    what-ifs.  I can't give you that answer.

3         Q.  Okay.  You weren't shooting him because

4    his back was to you; you were shooting him because

5    in your mind he was attacking you face to face        16:27

6    with your flashlight, right?

7         A.  Yes, sir.

8         Q.  Okay.  But under all the same facts, if he

9    wasn't face to face, instead his back was to you,

10   even if he had your flashlight, would you have        16:27

11   been justified to shoot him?

12             MR. SMYTH:  Still -- Hold on for the

13   sirens.  Still incomplete hypothetical and calls

14   for speculation, expert opinion.

15             THE WITNESS:  Yeah.  It would be dependent 16:27

16   on what he was doing.

17   BY MR. HADDAD:

18        Q.  It would be dependent on what he was

19   doing?

20        A.  Yes, what he's doing.  Is he trying to --   16:27

21   Like a hypothetical, you know, if that's what you

22   want.  You want me to give you a hypothetical

23   situation?

24        Q.  How could he be a threat justifying deadly

25   force if his back was to you?                         16:28

                                            Page 201

1      A.   If he was going to do a roundhouse swing

2   with the flashlight and he was winding up.

3      Q.   Did ever see him do that?

4      A.   You asked a hypothetical.  I gave you one.

5   So that's why I can't answer these questions,        16:28

6   because you're going to ask more hypotheticals.

7   We can continue like this all day long.

8      Q.   Did you ever see him try to do some

9   roundhouse swing while his back was to you?

10     A.   No.                                            16:28

11     Q.   Did you shoot him in the back?

12          MR. SMYTH:  Calls for speculation.  Vague.

13          THE WITNESS:  Based on the autopsy report,

14   I believe there was two holes on his side, back

15   side.                                                 16:28

16   BY MR. HADDAD:

17     Q.   On his back, right?

18     A.   Back side, not center mass, but on his

19   back side, however you want to -- I don't know

20   what your definition of the back is.                  16:28

21     Q.   Did you shoot him in the back of his head?

22     A.   I believe --

23          MR. SMYTH:  Same objections, but if you

24   know.

25          THE WITNESS:  I believe I shot him in the  16:28

                                                   Page 202

1    side of the head.  It wasn't the back.  It was the

2    side.

3    BY MR. HADDAD:

4        Q.  Now, given that your purported reason for

5    shooting him was that he was facing you and about    16:29

6    to come down on you with your own flashlight,

7    would you have been justified to shoot him if he

8    was turning away from you?

9            MR. SMYTH:  It's an incomplete

10   hypothetical, calls for speculation, calls for    16:29

11   expert opinion.

12           THE WITNESS:  I'm going to have the same

13   response as last time.

14   BY MR. HADDAD:

15       Q.  What?                                      16:29

16       A.  What I told you before.

17           Can you repeat the question for him,

18   please?

19       Q.  No, I don't need that.  I need your

20   answer.  Would you have been justified to shoot    16:29

21   him if he was turning away from you?

22           MR. SMYTH:  Same objections.

23           THE WITNESS:  Same thing I said before.

24   I'm just repeating myself now again.  It depends

25   on what the situation was.  If he still appeared    16:29

Aiken Welch, A Veritext Company
510-451-1580

1    to be a threat, then yes, depending on what he was

2    doing at the time.

3    BY MR. HADDAD:

4         Q.  If you were wrong in your perception that

5    he was facing you and about to strike you, but in    16:29

6    realty he was turning away from you to get away,

7    would you have been justified to shoot him?

8              MR. SMYTH:  Calls for legal conclusion,

9    expert opinion and vague, incomplete hypothetical.

10             THE WITNESS:  Can you answer that          16:30

11   question?  I don't -- I can't answer that

12   question.

13   BY MR. HADDAD:

14        Q.  Would there have been any need to shoot

15   him if he was moving away from you rather than       16:30

16   about to strike you with your own flashlight?

17             MR. SMYTH:  That still calls for expert

18   opinion, calls for speculation, incomplete

19   hypothetical, expert opinion, legal conclusion.

20             THE WITNESS:  My answer is going to stay   16:30

21   the same.

22   BY MR. HADDAD:

23        Q.  What?  What's your answer?

24        A.  It depends on the circumstances.

25        Q.  Did you shoot him while he was moving away  16:30

Page 204

1   from you?

2          MR. SMYTH:  Vague.

3          THE WITNESS:  I fired my rounds when we

4   were face to face.  What his body did after that,

5   I don't know.                                    16:31

6   BY MR. HADDAD:

7      Q.  How long does it take your bullet to leave

8   your gun and hit him?

9          MR. SMYTH:  That calls for expert opinion

10  and speculation.                                 16:31

11  BY MR. HADDAD:

12     Q.  Do you know?

13     A.  I don't know.  I'm sure it's very fast.

14     Q.  Obviously faster than you could even see,

15  right?                                           16:31

16     A.  Probably.

17     Q.  Probably.  How long does it take you to

18  fire seven shots?

19         MR. SMYTH:  Calls for speculation.

20  BY MR. HADDAD:                                   16:31

21     Q.  Have you ever tested that?

22     A.  I've done some testing during training,

23  and I don't remember the exact time, but you can

24  do it very quickly.

25     Q.  Right.  It would take maybe up to two     16:31

Page 205

1    seconds to fire seven shots, maybe even more,

2    right?

3        A.  No, that's not correct.

4        Q.  How fast can you fire seven shots?  Do you

5    know?                                              16:32

6        A.  On this particular incident, I think it

7    was, I don't know, a half a second or a second.  I

8    don't know.  That's speculation.  That's all

9    speculation.

10       Q.  Were you legally justified to shoot him    16:32

11   just so he would not get away from you, if that

12   was your only reason?

13       A.  No.

14       Q.  Why not?

15       A.  Well --                                     16:32

16           MR. SMYTH:  Calls for legal conclusion,

17   expert opinion.

18   BY MR. HADDAD:

19       Q.  Based on your training and experience.  Go

20   ahead.                                              16:32

21       A.  So based on my training and experience,

22   I'm only allowed to use deadly force to protect

23   myself from imminent threat, protect the public.

24   So if he was just running from me, no, I couldn't.

25   Unless I had other articulable circumstances, as    16:32

                                              Page 206

1    he was a murderer and he was armed and he was

2    going to hurt somebody else, that would be the

3    only reason.

4    BY MR. HADDAD:

5        Q.  If in fact Ronell got shot multiple times  16:32

6    in his back, do you have any explanation for how

7    that happened?

8            MR. SMYTH:  Calls for expert opinion,

9    speculation.

10           THE WITNESS:  No, because when I          16:33

11   originally started shooting we were face to face.

12   BY MR. HADDAD:

13       Q.  You just failed to reassess after that

14   first decision to shoot, right --

15       A.  Yeah.                                      16:33

16           MR. SMYTH:  That's incomplete.

17   BY MR. HADDAD:

18       Q.  -- until you fired seven shots?

19           MR. SMYTH:  Misstates testimony, calls for

20   expert opinion, legal conclusion.                  16:33

21   BY MR. HADDAD:

22       Q.  Is that right?

23       A.  No, it's not right.

24       Q.  So you reassessed in between shot number

25   one and shot number seven?                         16:33

Page 207

1        Q.   Why did you say that?

2        A.   Because I was just involved in a shooting.

3    That's very stressful, all the events that

4    transpired.

5        Q.   What flashlight were you using at that        16:41

6    point?  Did you have a backup flashlight?

7        A.   I did.

8        Q.   How big was that one?

9        A.   Six inches maybe.

10        Q.   Now, you're aware that when officers came   16:42

11    they searched him, right?

12        A.   I wasn't there for all that.  I was

13    talking to the sergeant at that point.

14        Q.   Did you ever hear that anyone ever found a

15    gun?                                                   16:42

16        A.   I did not.

17        Q.   What was Ronell doing during first aid?

18    Was he making any sounds?

19            MR. SMYTH:  Calls for speculation.

20            THE WITNESS:  I don't know.  I was talking    16:42

21    to the sergeant at that point.

22    BY MR. HADDAD:

23        Q.   How long were you talking to the sergeant?

24        A.   You know, I can't give a definite time.

25    It was brief, before I got sequestered to the         16:42

                                            Page  216

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.