# EXHIBIT 6

UNITED STATES DISTRICT
EASTERN DISTRICT OF CALIFORNIA
---o0o---

| | | |
|---|---|---|
| I.F., by and through her guardian<br>ad litem SHASTA SKINNER,<br>individually and<br>successor-in-interest to Decedent<br>RONELL FOSTER; R.F.; by and<br>through his guardian ad litem<br>SHENA BATTEN,<br>successor-in-interest to Decedent<br>RONELL FOSTER; PAULA MCGOWAN,<br>individually; and RONELL FOSTER,<br>SR., individually,<br><br>                Plaintiffs,<br><br>        vs.<br><br>CITY OF VALLEJO, a municipal<br>corporation; RYAN MCMAHON,<br>individually and in his official<br>capacity as a Police Officer for<br>the CITY OF VALLEJO, and DOES<br>1-50, inclusive,<br><br>                Defendants. | )<br>)<br>)<br>)<br>No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 2:18-cv-00673-JAM-CKD |

_____

**Expert Report of John J. Ryan**

1.  My name is John Ryan.  I have been actively involved in police practices and law

    enforcement since 1981.  I was an active police officer for twenty years.  In the

    final year of my active career and since my retirement in June of 2002 from police

    services, I have been involved in police and law enforcement practices as a private

    consultant regarding law enforcement issues.  I would note that 80 % to 90 % of

    the police misconduct cases that I have been retained in, I have been retained by

    the defense.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005,

Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement.  This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations.  This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States.  These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and

operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges.  I have provided training in the following areas:

   a. Policy development for public safety agencies.

   b. Legal Issues in police use of force.

   c. Legal Issues in internal affairs investigations.

   d. Police misconduct/civil liability.

   e. Legal/Liability Issues in Narcotics Operations.

   f. Arrest, Search and Seizure, & Interrogation.

   g. Racial profiling.

   h. Legal issues in public schools.

   i. Media relations for public safety agencies.

   j. Constitutional update for law enforcement officers.

   k. Basic training for detectives.

   l. Law enforcement officers' bill of rights/due process in administrative investigations.

   m. Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

   n. Legal and policy Issues for hostage negotiators.

   o. Legal and liability issues for SWAT operations

   p. Legal and liability issues for jails

4

q.  High Risk Critical Tasks/Best Practices in Law Enforcement
Operations.

9.  I am a former police Captain of the Providence Police Department in Providence,
Rhode Island where I served for twenty years before retiring in 2002.  During my
tenure as a police officer I served in the following capacities: patrol officer in both
the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a
sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of
Training; Director of the Department's Office of Public Affairs and; Director of
the Department's Administrative Staff.  During most of my career I also took an
active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police
policy and procedure, arrest, search and seizure, use of force, police pursuits,
dealing with the mentally ill, emotionally disturbed, and suicidal, domestic
violence, law enforcement's response to autism, law and best practices in the
internal affairs process, civil liability for law enforcement agencies, and
specialized courses for narcotics officers, SWAT commanders, and internal
affairs officers.   Participants in these courses have come from thousands of law
enforcement agencies around the United States.  Officers in attendance have come
from departments with under ten sworn officers and departments with sworn
officers numbering in the thousands.  These programs are conducted numerous
times annually throughout the United States and also include on-line courses on
these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement
and includes, inter alia, policy issues relating to use of force; police pursuits;

domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13.  As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill.  In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments. One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program. I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches. I have been published annually in materials from Georgetown Law Center related to this program. The 2011 session was focused

on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program.  My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death.  This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide.  As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association.     The

presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training.  My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law

11

enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation.   I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

 1) Supplemental Videos
 2) Plaintiff's Expert's Videos
 3) Bates 000001.18-1786 file_2 Sgt Darden {Not Confidential}
 4) Bates 000003 AXON Body 2 Video 2018-02-13_1943 {Not Confidential}
 5) Bates 000004 AXON Body 2 Video 2018-02-13_1943 file 2_Blain {Not Confidential}
 6) Bates 000005 AXON Body 2 Video 2018-02-13_1943 file 3 {Not Confidential}
 7) Bates 000006 AXON Body 2 Video 2018-02-13_1943 file 4_Bahou {Not Confidential}
 8) COV 2053.AXON Body 2 Video 2018-2-13_1647 Shasta DV Call
 9) COV 2052.AXON Body 2 Video 2018-2-13_1642 Shasta DV Call
 10) COV 2051.AXON Body 2 Video 2018-2-13_1639 Shasta DV Call
 11) Defendants' Press Release Video
 12) KTVU News Report Video
 13) McMahon Body Camera video
 14) Plaintiff R.F. Press Release Video
 15) 911 Calls_Radio
 16) Jason Bahou Deposition

17) Shena Batten Deposition
18) Steve Darden Deposition
19) Ronell Foster Sr. Deposition
20) Paula McGowan Deposition
21) David McLaughlin Deposition
22) Ryan McLaughlin Deposition
23) Amanda Schwartz Deposition
24) Shasta Skinner Depositiom
25) Bates 7-13 Neighborhood Interviews Axon
26) Bates 232 Interview Robert Wolf 571-1
27) Bates 233 Interview Bahou 618-1
28) Bates 234 Interview Amanda Blain 638-1
29) Bates 235 Interview Erick Angulo 638-2
30) Bates 236 Interview McMahon 680-1
31) Officer McMahon Transcript
32) Officer Bahour Transcript
33) Officer Blain Transcript
34) Paramedic Angulo Transcript
35) Robert Wolfe Transcript
36) PLTF 36 (Photos Taken After Autopsy)
37) PL2160138-PL2160244
38) Autopsy Photos Confidential Bates Nos 50-225
39) Bates 226-231 Confidential Photos of McMahon
40) COV 2054 Image 5997 Shasta Neck Photo
41) COV 2167-2193 Photos Flashlight Weapons
42) COV 2194-2215 Photos Scene
43) Family Photos IF
44) Family Photos RF
45) Loving Tributes
46) Sausalito P.D. Subpoenaed Docs
47) Solano Co. Superior Court Records
48) Child Support Documents
49) Restraining Order Documents
50) Bates 14.49 Confidential McMahon Personnel Files
51) Complaint 1st Am Doc 8
52) COV 2 -5 Press Releases
53) COV 15-119 Vallejo PD Policy
54) COV 120 Radio Codes
55) COV 121-710 Case Reports
56) COV 1142-1454 Vallejo PD Policy
57) COV 1455-2047 Criminal Case Reports
58) COV 2078-2142 Incident Reports
59) COV 2143-2166 Emails between Paula McGowan & Joseph Iacono
60) COV 2216-2219 Fire Department Report
61) COV 2219-2227 Crime Scene Sketch Log
62) COV 2228-2248 Coroner's Reports

63) COV 2249-2275 Taser Download and Suppl Policies
64) COV000784-COV001454.D Response to RPD (COV to RF)
65) I.F. v COV -  Supp RPD 2019.02.08
66) IA Report for Subsequent Incident Field Training Manual
67) McMahon Certificates and Awards
68) Order Minute Protective Order
69) Plaintiffs' Case Summary
70) Protective Order
71) Deposition Transcripts:
72) Jason Bahou
73) Shena Batten
74) Steve Darden
75) Ronell Foster Sr.
76) Paula McGowan
77) David McLaughlin
78) Ryan McLaughlin
79) Ryan McMahon
80) Amanda Schwartz
81) Chief Allio
82) Chief Williams
83) Captain Iacono
84) Shasta Skinner
85) McMahon 022720 Exhibits 1-8
86) McMahon Deposition Videos 1-4
87) Letter and Press release from District Attorney's Office
88) Stutchman Report including frame by frame of video and enhanced videos

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery.

With this in mind I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report occurred on February 13. 2018 near 415 Carolina Street in Vallejo, California. The event began when Officer McMahon of the Vallejo Police Department (VPD), attempted to stop Ronell Foster due to bicycle related traffic infractions whereby McMahon was not going to cite, but instead was going educate Foster on bicycle/traffic safety. When Foster failed to stop, McMahon first pursued Foster with his police vehicle and then pursued Foster on foot. During the foot pursuit for this bicycle related traffic infraction and flight, McMahon used his TASER to prevent the escape of Foster. At the culmination of this pursuit, Foster ended up on the ground at which point McMahon again attempted the use of his TASER and also delivered strikes with his steel flashlight to Foster. McMahon reported that Foster was able to disarm McMahon, raise the flashlight in an attack on McMahon, at which point McMahon shot Foster numerous times.

<u>Deposition of Officer Ryan McMahon</u>

53. On the date of the incident, Officer McMahon was wearing his Class B uniform. (100). With respect to the less lethal force he was carrying, Officer McMahon had, "A Taser, baton, OC spray, and flashlight." (100). Officer McMahon was

carrying two guns, a Glock 21 .45 caliber and a Glock 30SF .45 caliber. (100).
Officer McMahon was wearing a bulletproof vest. (101). Officer McMahon also
had a police radio on his person. (102).

54. On the date of the incident, Officer McMahon came on duty at 4:30 p.m. (105).
Officer McMahon was in his police car alone and was assigned to Beat 1 which
encompasses North Vallejo. (106).

55. Officer McMahon testified that he first saw Ronell Foster at 7:40 p.m. at Capital
Street and Sonoma Boulevard. (107). Officer McMahon testified that Mr. Foster
was, "riding in and out of traffic on his bike." (107). Officer McMahon testified
that Mr. Foster was riding in a circle and disrupting traffic. (108). Officer
McMahon testified that Mr. Foster was wearing "Dark-colored sweatshirt, light
pants." (109). Officer McMahon testified that he did not recognize Mr. Foster and
Mr. Foster did not look familiar. (109). Officer McMahon testified that Vallejo
PD had told officers to be on alert for people riding bicycles in the street because
of accidents. (109).

56. Officer McMahon then testified as follows: "I observed, based on the violations
of him not having a light during darkness and also the way that he was entering
exiting the roadway, that I had two different vehicle codes to stop and talk to him
to educate him about the danger he posed for himself and also the danger for the
citizens and within the community." (110). Officer McMahon testified that he
decided to make a law enforcement stop of Mr. Foster. (110). Officer McMahon
testified that he was not planning to arrest Mr. Foster. (111).

57. Officer McMahon testified as follows about how he initiated the stop of Mr. Foster, "So I activated my emergency lighting equipment to include a forward facing red light and intermittently hit my siren to get through the traffic for the highway and then put my spotlight on Foster." (113). Officer McMahon testified that Mr. Foster looked at him and then took off northbound on Sonoma and then Officer McMahon activated his lights and went after Mr. Foster. (114).

58. Officer McMahon then testified that "Mr. Foster stopped and bladed his stance behind a van." (115). Officer McMahon further described how Mr. Foster stopped with the following: "He stopped at the rear passenger quarter panel of the van, concealing his right half of the body, but still on his bike, like in a bladed kind of stance." (117). Officer McMahon testified that the bike was still between Mr. Foster's legs at this point. (117). Officer McMahon testified that Mr. Foster was approximately fifteen feet away from him at this point. (118). Officer McMahon had stopped his vehicle and was standing in the door frame. (118).

59. Officer McMahon testified that he said the following to Mr. Foster: "I introduced myself as Officer McMahon from the Vallejo Police Department. I said the reason I had stopped him was for his erratic driving patterns when he was on his bike in and out of traffic, which endangered not only his safety, but the public safety, and to come over and sit in front of my car." (119). Officer McMahon testified that Mr. Foster responded with the following: "He looked at me, then he looked around, which I believe to be preflight indicators and then he said something to the effect of 'Man don't – stop messing with me.' and took off." (119).

17

60. Officer McMahon testified that Mr. Foster then fled on his bicycle in a northbound direction. (122). Officer McMahon then testified that he did the following: "Updated dispatch I had a suspect fleeing from me and turned on my sirens and chased after Mr. Foster." (122-23). Officer McMahon testified that he informed dispatch that Mr. Foster had committed a traffic violation. (123).

61. Officer McMahon testified that he did not observe a gun on Mr. Foster's person and did not see any suspicious bulges where a gun could be concealed. (123-24).

62. Officer McMahon testified that during the pursuit Mr. Foster "was riding in a reckless manner in the oncoming traffic and all throughout the lanes, endangering the safety of the public and the community." (129). Officer McMahon testified that Mr. Foster crashed his bike on Carolina Street. (134). Officer McMahon testified that Mr. Foster just fell off his bike and just wiped out. (135). Officer McMahon was still driving and was fifteen yards away from Mr. Foster at this point. (135).

63. Officer McMahon testified that he stopped his vehicle and got out with his flashlight in his hands. (137). Officer McMahon further testified, "So he crashed. I got out of my car. I ran around to where I believed he was going to be at. At that point he was running the opposite direction of the street." (139).

64. Officer McMahon then testified, "So I saw him running westbound in the street, towards the sidewalk, the southbound sidewalk, and I saw him reaching in his waistband." (139). Officer McMahon further testified, "I saw his hands in the front of his body, where his waistband was at, and he was manipulating

18

something. I don't know what that was." (140). Officer McMahon testified that both of Mr. Foster's hands were in the front of his waistband. (140).

65. Officer McMahon testified that he believed Mr. Foster was armed based on the following: "The way that he bladed his stance behind the vehicle, hiding the right side of his body, the way that he was trying to get away from me. And when he was running, the holding up, having his hands in his waistband area while he was running, that wasn't normal. Based on my training and experience, most people that are armed or concealing a handgun grab their waistband to either check and see if it's there's or also to hold onto it so it doesn't fall out while they're running. Or they use it – they grab their weapon or whatever it is in their waistband so that they can do an assault on an officer. While Mr. Foster was running, not only was he grabbing his waistband, but he was looking back at me, which I believe is to try and triangulate where I was at." (143-44).

66. Officer McMahon stated that he decided to utilize his TASER after he saw Mr. Foster reaching towards the front of his waistband. (144-45). Officer McMahon testified that he was ten to fifteen feet behind Mr. Foster when he decided to use the TASER. (145). Officer McMahon also testified that he had his TASER in his left hand and his flashlight in his right hand. (145). Officer McMahon further testified, "I decided to tase him so I could incapacitate him in case he did have a weapon and safely take him into custody." (145).

67. Officer McMahon testified as follows about the initial deployment of the TASER: "One dart hit him in the back and then the other dart, I don't know what happened with it, but I know the TASER didn't make a good connection just based on the

sound it was making." (146-47). Officer McMahon stated that he was approximately ten to fifteen feet from Mr. Foster when he tased him. (147).

68. Officer McMahon testified that he did not give Mr. Foster any warnings before he tased him. (147).

69. Officer McMahon next testified, "I remember continuing to tell him to stop. I reholstered my Taser. And we both got caught up in the Taser wires." (150).

70. Officer McMahon then testified that he and Mr. Foster kept running and Mr. Foster started travelling in a southbound direction. (150). Officer McMahon testified that "Mr. Foster went down a narrow walkway in between 415 Carolina Street." (151).

71. Officer McMahon testified to the following regarding what objective facts he had to support his belief that Mr. Foster may have possessed a gun: "So based on the totality of the facts from the original stop, when he gave me the look like the deer-in-a-headlight look, oh, something's wrong, immediately took off, that heightened my sense of alertness that, hey, something is not right here. Then when he stopped, bladed his right side – bladed his stance and concealed the right side of his body away from me, that's not typically what you see citizens do. You normally see that when somebody is trying to hide something from you in an interaction. So that didn't say, oh, this guy has a gun at this point, but now we're getting more facts, something is not right here, something is suspicious. Then when I tell him to get in front of my vehicle, he doesn't want to listen to me, tells me to leave him alone or something to that effect, takes off running, or on his bike, and endangers the public as he did, and not only his safety, but everybody's safety involved, for

a traffic violation. That makes me think, okay, something else is going on here. It's my job to evaluate these things as we're going. Now he crashes off his bike, he doesn't stop, he gets up and continues to run despite my several commands. Okay? Now he's not only disobeying my command, but he's running down the street in a neighborhood where there's people out and, you know, it could be possible – I don't know what he's doing at this point. I'm evaluating all these things while in the incident. He's grabbing at his waistband with both hands. I'm telling him to keep his hands away from his waistband. So that gives every indication to me based on my training and experience and life experience that he is possibly armed with a gun or some kind of weapon that is a potential for there – for him to use it. He's looking back at me, trying – I believe maybe trying to triangulate where I'm at so at the correct opportunity, maybe, maybe not, he might pull a weapon. I don't know." (155-56).

72. Officer McMahon testified that when Mr. Foster entered the alley he fell down. (158). Officer McMahon stated that he was then able to catch up to Mr. Foster and as Mr. Foster attempted to get up, Officer McMahon pushed him back down. (159). This caused Mr. Foster to fall down some stairs. (159). Officer McMahon testified that after Mr. Foster fell down the stairs he fell into a courtyard area. (160).

73. Officer McMahon testified that he then got on top of Mr. Foster. (161). Officer McMahon testified, "At first I was on his back, telling him to keep his hands away from his waistband." (161). Officer McMahon testified that Mr. Foster was

facedown at this point. (161). Officer McMahon testified that he had his flashlight in his hands. (161).

74. Officer McMahon testified that Mr. Foster was "[tr]ying to roll, roll away from me and get up." (162). Officer McMahon testified that he repositioned himself by putting a knee into Mr. Foster's lower back and then Officer McMahon drew his Taser. (162).

75. Officer McMahon then testified as follows: "You know, we were wrestling. I don't know if he was trying to hit me or not, but I know he was trying to get up. And just in that commotion I don't remember an actual strike." (163).

76. Officer McMahon testified as follows about his renewed attempt to tase Mr. Foster: "With the one probe that was already in his back I attempted to complete the circuit and try to put the Taser against him to try to incapacitate him." (163-64). Officer McMahon testified that he did not warn Mr. Foster about this tasing. (164).  Officer McMahon testified that Mr. Foster did not react to the second tasing and just continued to try to get up. (166). Officer McMahon then testified, "While he was still trying to get up, I was still issuing commands and I put the Taser against his arm and side, chest area." (167).

77. Officer McMahon testified that he then tried to move to a different tactic because the Taser was not effective. (169). Officer McMahon testified that he was going to switch to using his flashlight against Mr. Foster, and "[s]trike him in his clavicle and his arm area to gain compliance." (169).

78. Officer McMahon testified that he struck Mr. Foster with the flashlight, "[b]ecause it was in my hand and we're trained to use it as an improvised impact

weapon if we have that available to us." (170). Officer McMahon testified that the flashlight was in right hand. (170). Officer McMahon testified that his flashlight was an aluminum Maglite and was approximately a foot long. (175).

79. Officer McMahon testified that he then stopped hitting Mr. Foster and issued commands to Mr. Foster to "[s]top resisting, put your hands above your head, and you're under arrest." (181).  Officer McMahon testified that he then went to hit Mr. Foster with his flashlight again and that Mr. Foster caught the flashlight in midair. (182). Officer McMahon testified that he tried to pull the flashlight away from Mr. Foster and that Mr. Foster ripped the flashlight from his hands. (183). Officer McMahon further testified, "At the same time, simultaneously, when he was ripping the flashlight out of my hand, he's getting up off the ground onto his feet." (183).

80. Officer McMahon then testified, "He started to come up with the flashlight. He had a flashlight and he started to come up like in a backhand and he was lifting the light up to like come down and what I believe to have hit me with it." (183). Officer McMahon testified, "When he was coming up with the flashlight, I remember I was like, oh, my God, this guy just took my flashlight. Oh, God, he's going to hit me with it. And then I remember shooting from my hip and punching out. It wasn't like I made a conscious decision, hey, I'm going to shoot this guy. It was happening." (184). Officer McMahon testified as follows about his decision to shoot: "I can't exactly tell you the exact moment, but I can tell you that I assessed in my head, hey, this guy took my light, he's going to hit me with my light. And the next thing I knew, I was shooting." (184).

81. Officer McMahon testified to the following regarding why he thought Mr. Foster was going to hit him with the flashlight, "So I distinctly remember when he got his feet underneath him and he had my flashlight, he was coming up in a boxer type stance with his feet bladed and he's bringing the light up like he's going to come down in a motion to backhand me." (184-85).

82. Officer McMahon testified that there were bushes, a fence, and apartment buildings in his line of fire behind Mr. Foster. (185-86). When asked where his first shot struck Mr. Foster, Officer McMahon testified, "Somewhere in his front. I know because I know we were facing each other." (186). Officer McMahon testified that he fired seven shots. (186). Officer McMahon testified that he fired the seven shots in one continuous burst and did not fire any shots by mistake. (187). Officer McMahon testified that he was at "point blank range" when he shot Mr. Foster and that this was about an arm's length away. (190). Officer McMahon testified that Mr. Foster was facing him when Mr. Foster got in the boxer stance. (192).  Officer McMahon testified that his first shot probably struck Mr. Foster somewhere in the stomach area. (192).

83. With respect to his aim, Officer McMahon testified "I wasn't aiming at that point. I was just shooting. It was point and shoot. It wasn't an aim. It was just pull your gun out and stop the threat." (193).  Officer McMahon testified that he doesn't know Mr. Foster's body position for the second or third shot. (193). Officer McMahon further testified, "I know towards the end of my shooting he was falling to the ground and I remember stopping shooting when he was falling." (193).

84. Officer McMahon testified as follows about his positioning during the shooting: "I believe I was stationery, but I had taken a sidestep. So I don't know when I took my sidestep, it was before I started shooting or during the shooting, I couldn't tell you." (194).  Officer McMahon testified that he thought he fired four or five shots, but later found out that he had actually fired seven shots. (195).

85. Officer McMahon testified that after shooting Mr. Foster, "I updated dispatch of my location and told them that shots had been fired and I needed them to start medical." (209).  Officer McMahon testified that he didn't know if Mr. Foster was still alive after he shot him. (213). Officer McMahon testified that he did not go over to search Mr. Foster for a gun because, "[t]hat's not our tactics, It's not what we do." (213).  Officer McMahon testified that he did not go over to provide aid to Mr. Foster. (213).

86. Officer McMahon testified that he did not pick up his flashlight from the ground because the flashlight was part of the crime scene at that point. (214).

87. Officer McMahon's body camera video confirms that when other officers arrived, before Mr. Foster had been searched by anyone, one of them asked Officer McMahon whether the man he shot has a gun, to which McMahon replied, "no." And then McMahon said, "I didn't search him all the way. We were fighting." (211).

88. Officer McMahon testified that Mr. Foster did not make any verbal threats to him during the course of this incident. (276). Officer McMahon testified that he did not sustain any injuries during the encounter with Mr. Foster. (280-81).

25

<u>Deposition of Sergeant Steve Darden</u>

89. Sergeant Darden was the team Sergeant on the date of shooting of Mr. Foster. (17). Sergeant Darden testified that he heard over the radio that Officer McMahon was in a foot pursuit and then he heard over the radio that shots had been fired. (18).  Sergeant Darden testified that Officer McMahon told him that he fired five or six shots. (29). Sergeant Darden testified that he had known Ronell Foster since Ronell was a kid and has had lots of contacts with him. (33).

90. Sergeant Darden testified that when he first saw Officer McMahon at the scene, Officer McMahon "was standing there while other officers were actively working on Ronell." (41).

<u>Deposition of Officer David McLaughlin</u>

91. Officer David McLaughlin testified that he heard an officer state that he was in foot pursuit. (16). Officer McLaughlin testified that on the way to the scene, he heard Officer McMahon say "shots fired" over the radio. (17).

92. Officer McLaughlin testified as follows about arriving at the shooting scene: "Well, there was other officers in front of me trying to make our way to Officer McMahon. It was very dark, so we were using our flashlights and it hasn't been cleared. So we're trying to be clear, to be safe to make our way to McMahon." (20).

93. Officer McLaughlin testified that he observed the following when he got to Officer McMahon's location: "The subject laying in the bushes, a bush area, and then McMahon standing – I don't remember how close, but standing in the same

general vicinity." (20). Officer McLaughlin stated that he doesn't remember Officer McMahon saying anything. (20).

94. Officer McLaughlin testified that officers didn't know if Mr. Foster was armed so they handcuffed him for safety purposes. (20-21). Officer McLaughlin testified that he did not search Mr. Foster. (21). Officer McLaughlin testified that he did provide medical aid to Mr. Foster. (21). Officer McMahon testified, "I tried to apply a chest seal because I saw there was an apparent gunshot wound to his torso area." (21). Officer McLaughlin testified that he stopped giving medical aid to Mr. Foster when the paramedics arrived. (22).

95. Officer McLaughlin testified that he and his brother, Officer Ryan McLaughlin took a witness, Mr. Wolfe, back to the police station. (24). Officer McLaughlin testified that he and his brother then went back to the shooting scene and provided scene security. (24-25).

96. Officer McLaughlin testified that he does not remember if Officer McMahon had his firearm out at the time that Officer McLaughlin first saw him. (27).

97. Officer McLaughlin testified that he and his brother responded to the scene Code 3 with lights and siren. (29).

<u>Deposition of Officer Ryan McLaughlin</u>

98. Officer Ryan McLaughlin testified that on the date of the shooting he heard Officer McMahon say over the radio that he had an individual taking off from him on a bicycle. (15-16). Officer McLaughlin testified that just prior to arriving on scene he heard shots fired. (16).

99. Officer McLaughlin testified that he saw the following when he entered the scene: "Like a staircase on the right-hand side I saw. And then I came around, and I don't know why – I didn't see anything there. So I came around. And then I saw a subject in the bushes or the shrubs on the kind of the east side of the yard." (18). Officer McLaughlin testified that the subject in the bushes, "was laying on his right side, his face towards the bushes." (19).

100. Officer McLaughlin testified that the officers placed Mr. Foster in handcuffs for officer safety. (19).

101. Officer McLaughlin then testified that Mr. Foster was removed from the bushes and placed on the cement where officers gave Mr. Foster medical aid. (20). Officer McLaughlin testified that he did administer medical aid by putting a chest seal on the right side of Mr. Foster's chest. (20).

102. Officer McLaughlin testified that he could not tell if Mr. Foster was alive when he was administering the medical aid. (30).

<u>Deposition of Officer Jason Bahou</u>

103. On the date of the incident, Officer Bahou was assigned to patrol and was partnered with Officer Blain. (11-12).

104. Officer Bahou stated that he heard Officer McMahon attempting to stop a bicycle and then heard that there were shots fired. (14).

105. Officer Bahou testified that when he got to scene and exited his vehicle a white male subject directed him through a gate. (15). Officer Bahou then testified, "It led to a courtyard. And then when we walked in the courtyard, that's when I

observed Officer McMahon to my left and a black male subject laying in the bushes in this little shrubbery area in the middle of the courtyard." (15-16).

106.    Officer Bahou testified that Mr. Foster was placed in handcuffs and then officers began rendering aid. (18).

107.    Officer Bahou testified that he recalled picking up a flashlight at the scene of the shooting. (22). Officer Bahou testified to the following about the flashlight's positioning relative to Mr. Foster: "It was right next to him just below the bushes. And I don't know what you call that little retaining wall that holds all the shrubbery. Just below where he was on the cement." (22).

108.    Officer Bahou testified that he used the flashlight to illuminate the area where officers were rendering aid to Mr. Foster. (23). Officer Bahou testified that he subsequently learned that the flashlight belonged to Officer McMahon. (23).

109.    Officer Bahou testified that he was contacted by Detective Greenberg who told him that the flashlight was evidence. (24-25). Officer Bahou testified that he gave the flashlight to Corporal Bothello or Stephanie Daly. (26).

<u>Deposition of Amanda Schwartz</u>

110.    Officer Schwartz (nee Blaine) was partnered with Officer Bahou on the date of the shooting of Mr. Foster. (10).

111.    Officer Schwartz heard over the radio that Officer McMahon attempted to stop a bicycle at Florida and Marin and then heard that there were shots fired and updated location. (12).

112.    Officer Schwartz testified that when she arrived at the location of the shooting there was a fence and a gate and someone let her in through the gate. (13).

113.   Officer Schwartz testified that her and Officer Bahou were riding together and entered the scene together. (14-15). Officer Schwartz was in front of Officer Bahou as they entered the scene. (14-15).

114.   Officer Schwartz stated that Officer McMahon was in close proximity to Mr. Foster, and was less than five feet away. (15). Officer Schwartz testified that Mr. Foster was partially lying face down in the bushes. (16).

115.   Officer Schwartz testified that she handcuffed Mr. Foster while he was still lying in the bushes. (16). Officer Schwartz testified that she believes officers pulled Mr. Foster from the bushes, searched him, and began to render first aid. (17).

116.   Officer Schwartz testified as follows about the search of Mr. Foster: "He had some things in his pockets. I don't recall the exact contents. But I didn't locate any weapons." (20).

117.   Officer Schwartz testified that when she arrived on scene she observed Officer McMahon with his firearm out, and she believed it was still pointed at Mr. Foster. (29).

Memo Chief Allio (Exhibit 1 to Allio Deposition)

118.   Following a determination of the Critical Incident Review Board's finding no policy violations or tactical issues with the way McMahon handled the encounter with Foster, Chief Allio wrote a memo disagreeing with the Critical Incident Review Board Findings.

119.   Chief Allio outlined in his memo that from his review of the events he found violations of the Foot Pursuit Policy with respect to the decision to undertake a

foot pursuit.  Allio pointed out in the memo that "'should' by definition is not to be considered as 'optional' rather by definition it an expectation used to indicate an obligation, or duty."  On McMahon's actions, Allio wrote: "In this incident Officer McMahon failed to recognize his safety and the safety of the suspect Ronnell (sic) Foster outweighed apprehension for a minor traffic/pedestrian violation.  Acting alone without cover increased the danger to both McMahon and Foster."  The Chief also pointed out that McMahon failed to properly notify dispatch of the foot pursuit and failed to tactically reposition himself when the TASER failed to stop Foster.  The Chief, noted in his memo and in deposition testimony that there was a 41 second gap prior to the shooting where dispatch could have been notified. (Allio Deposition 32).

120.   Chief Allio also concluded that the audio/video recording policy had been violated based upon McMahon's failure to activate his body-worn camera until after the shooting.

### Deposition of Chief Joseph Allio

121.   Chief Allio testified that he became the interim chief of the Vallejo Police Department after the shooting of Ronell Foster had occurred.  (11).   Allio acknowledged that as chief, he was responsible for all policies, supervision and training in the Vallejo Police Department. (11).

122.   Chief Allio acknowledged that while the VPD did a critical incident review of officer-involved shootings, they did not conduct an internal affairs review. (13).  Allio described: "They would do a review at the time it occurred.  They didn't do a report, an administrative report when they wrote down their review.  But they

would have a parallel internal affairs investigator present during the criminal investigation. So they would be present. They would review and they would brief the chief of police. But they didn't produce a document from the administrative side of the house other than this critical incident review if that makes sense." (13-14). Allio said that the verbal report for the Foster shooting would have been made to the prior chief. (14).

123.   Chief Allio was presented with policies, including # 425 concerning portable audio/video records; #308 concerning vehicle pursuit, and # 427 concerning foot pursuits and acknowledged that these policies were mandatory for VPD officers to follow. (15/exhibits 2,3,4).

124.   Chief Allio indicated that it was a "great mystery" as to why the Critical Incident Review Board form was delayed for about six months from March 5th, through September 9th before going up the chain of command. (20). Chief Allio acknowledged that a failure of the department to respond in a timely manner with respect to discipline and training issues in officer-involved shootings could lead to other unlawful conduct. (23).

125.   Chief Allio testified that he agreed with the Critical Incident Review Board with respect to McMahon's use of deadly force testifying: "So based on the totality of the reporting and then watching the video, I believed that Foster had at the time of lawful request of arrest chose to grab a flashlight and attempt to assault a police officer with it which could be a deadly weapon, and the officer responded with use of force." (25). When asked about McMahon striking Foster in the head with the flashlight, Chief Allio responded: "I don't recall the location of the

strikes. He did document that he struck him with the flashlight before Foster took it away from him, but I don't recall the location of the strikes." (26). When asked if he had ever seen an enhanced video of the event, Chief Allio responded: "The video I saw was poor quality." (26). Allio described: "The video you could see the ongoing resistance. You could see the attempt of a Taser. You could see the flashlight in his hand at some point and then gone. But it was difficult for me to see it in a non-enhanced version." (27). It is noted that Allio's testimony with respect to how he reached a conclusion of agreement with the Critical Incident Review Board was based in part on "watching the video" which he also described as of "poor quality" and which was difficult for him to see. It is noted that Chief Allio acknowledged that his determination that the force was lawful was, in part, based on the poor quality video. (67).

126.   Chief Allio testified that he was not aware of any efforts by the Vallejo Police Department to enhance the video of this event. (42-43).

127.   Chief Allio, after acknowledging that some members of the Critical Incident Review Board spent 20-25 minutes reviewing the incident, testified that he did not believe that was a sufficient amount of time to review an incident like this one. (45-46).

128.   Chief Allio testified that if Foster fell down during the foot pursuit he would rather a lone officer not attempt to detain him but instead "my preference would be at that particular time he hold his position, radio dispatch of the situation and not go hands-on until he has sufficient help." (51-52).

Deposition of Chief Shawny Williams

129.   Chief Williams testified that the VPD policies are mandatory for officers to follow. (13). In describing the need for an Internal Affairs process, Chief Williams testified: "I mean, we have to have an internal affairs process, but we also want to ensure—we have great responsibility in terms of constitutional policing for citizen rights to protect our community.  So with that responsibility there needs to be accountability." (15).  In describing the difference between Internal Affairs and Critical Incident Review, Chief Williams said: "Well, the Vallejo Police Department has a critical incident review policy.  So when there's a critical incident or use of force, they're obligated to investigate that use of force, to review it… Internal affairs for me, if there's a policy that needs further investigation and we need to make a determination whether or not the individual officer followed the policies of the Vallejo Police Department, they would be the avenue in which we would investigate that.  The critical incident review, the way that it's currently established, they will review the force for different finding to make a determination of whether or not the actions were within policy or if there was some tactical things that need to be—could have been better.  So they make recommendation to the chief, but they analyze the force." (16-17).  Williams noted that the Critical Incident Review Board can make recommendations on training but they cannot make recommendations on discipline. (18).

130.   Chief Williams testified that when he reviews the Critical Incident Review Board findings and determines that further investigation is needed he assigns the case to IA/Professional Standards, as he did with this case. (20).   Williams

described the role of IA investigators in a deadly force case testifying: "if an incident of deadly force occurs will be—will respond to the department to review the shooting or whatever happened.   They will be there with the criminal investigators and the DA's office.   They can submit questions via the detectives that are actually questioning the officer.   So their role will be to conduct an administrative review." (22).

131.   Williams testified during his April 27, 2020 deposition that the internal affairs review being done by VPD's Professional Standards Unit into the Ronell Foster shooting was still not completed. (26-27).   Williams acknowledged that the current investigation was started after he became chief and two years after the shooting. (27).   Williams acknowledged his memo of January 28, 2020, ordering that an investigation be conducted by Professional Standards into the shooting of Ronell Foster. (28).   Williams testified that there was a Professional Standards Investigation into the shooting that began the day the shooting occurred and was still ongoing. (29).   In explaining why the investigation was taking more than two years Chief Williams testified: "When you look at the totality of the investigation, the DA has to conduct their criminal investigation to make a determination whether or not the shooting was lawful.   That took over—I don't know how long it took for the DA to do hers.   I really can't answer that.   After our critical incident review was done, there were some concerns raised in which I ordered a look at the audio and the foot pursuit policy of that critical incident.   As to the length of time that it takes, I really can't answer that.   Depending on staffing, resources and

everything else, all the other time, conditions, there could be many explanations for that." (30).

132.   It is noted that the Chief could not answer whether or not Professional Standards was reviewing the shooting of Ronell Foster or not, and clearly has no clue as to the role of the DA in an officer involved shooting, indicating multiple times that the DA determined that the shooting was consistent with the Fourth Amendment. (See e.g. 22, 24, 31, 41-42, 81, 101).  I would note that the prosecutor made clear that prosecutor was constrained by ethical standards and guidelines directing the prosecutor that the "admissible evidence should be of such convincing force that it would warrant conviction of the crime charged by a reasonable and objective fact-finder after hearing all evidence available to the prosecutor at the time of charging and after hearing the most plausible, reasonably foreseeable defense that could be raised under the evidence present to the prosecutor." (Letter of Paul Sequeira approved by Krishna Abrams).   The prosecutor made clear that the prosecutor's burden in a criminal case is proof beyond a reasonable doubt. (Letter of Paul Sequeira approved by Krishna Abrams).  While the prosecutor stated the elements of Fourth Amendment with respect to the interaction in this case, the letter does not reach a conclusion, nor could it, with respect to whether the actions of McMahon were consistent with the Fourth Amendment as a matter of law.  More importantly, the prosecutor made clear, "The prosecutor does not examine issues such as compliance with the policies and procedures of any law enforcement agency, police training, or issues involving civil liability. This report should not be interpreted as expressing an

opinion on those matters." I would also note that most of the factual findings of the prosecutor in this case were based upon the statement of Officer McMahon and were not corroborated by objective evidence such as BWC video due to his failure to turn his BWC video on until after the shooting. It is beyond my comprehension that a Chief of Police does not understand that the role of the State Prosecutor is to determine if any criminal charges will be brought against an officer under state law. Additionally, the Chief indicates that the DA's finding on the shooting are good enough for the VPD as to whether or not the use of force was proper. Chief Williams testified: "The district attorney has issued a statement regarding whether or not the shooting was lawful and consistent with the Fourth Amendment. I believe that's a pretty strong finding and statement." (31). Thus, while the Chief of Police considered it important to investigate whether the officer violated the foot pursuit policy or the audio/video policy, he apparently did not think it important to investigate the use of deadly force that took the life of Ronell Foster.

133. As to whether or not there was ever an administrative investigation by the VPD into the shooting itself Williams testified multiple ways. At page 29 Chief Williams was asked whether the VPD did a separate investigation of the shooting itself, to which Williams said that there was "a professional standard administrative review occurring and a district attorney review of that shooting." (29). The follow-up question asked when the professional standards review of the shooting itself began, to which Williams responded: "On the day that the shooting occurred." When asked when it finished, Williams responded "It's still

occurring." (29).   When subsequently asked if there would be a VPD Professional Standards report done on the shooting itself, Williams responded: "We have our district attorney that's going to issue a finding whether or not the lethal force is lawful and justified.   That's the first line of review.   If there's something else outside of the that that would lead us to believe that there could be a violation of policy, it's something we will look at." (30-31).    When pressed on whether the department was looking at the shooting itself, Williams responded "Currently our IA division is looking at the body-worn camera policy and the foot pursuit policy. That's what they're currently looking at.   If they discover something else during that investigation, then that will also be documented." (31). When asked if any official findings about whether the shooting was within department policy, Chief Williams responded that the "investigation is not concluded."   Williams said that he was referring to the current investigation by Professional Standards into the Foot Pursuit Policy and Body-Worn Camera policy violations as not being concluded. (32).

134.   Chief Williams was asked: "So your department has never done an administrative investigation of the use of deadly force; is that correct?   Williams responded: "Like I said, when this critical incident begins, they do an administrative review with the criminal investigators at the beginning of that incident." (32).   When asked if there were any findings from that administrative investigation of the deadly force, Williams testified: "Yes.   The district attorney…has made a finding that has shown that shooting to be lawful." (32).   It is abundantly clear from Chief Williams's testimony that he is unfamiliar with the

role or importance of a separate administrative investigation in a deadly force case, nor can he properly articulate the role of the District Attorney.

135.   Chief Williams said that based on the briefing he received from Captain Iacono that "it was clear to me that the suspect had gained control of the flashlight and was going to assault the police officer." (39).  Williams was asked whether he could actually see any of what he was told on the video, to which he responded: "Well, you asked me what Captain Iacono told me, and what I saw on the video was a little blurry for me." (40). Williams was asked whether he could see Foster stand and raise the flashlight to which Williams responded: "Like I said, it was blurry for me, but it appeared that he was making some type of aggressive movement toward the officer." (40).  Williams could not recall whether McMahon shot Foster in the front or the back. (40).

136.   Chief Williams denied that he overruled Chief Allio's finding that McMahon should undergo training noting that instead he sent the matter to Professional Standards "where I believe it was more appropriate for them to make a finding on those two concerns." (45).

137.   Chief Williams was asked whether, based on his review of McMahon's statement and the video of the event, whether he found these two items to be consistent.  In response Chief Williams said: "I was looking for justification." (88).

Deposition Captain Joseph Iacono

138.   Captain Iacono described the Critical Incident Review Board testifying: "The critical incident review board is to review critical incidents for—primarily for

purposes of the way the department training.  It's kind of like a lessons learned situation." (8-9).  Captain Iacono testified that in his opinion, the VPD relies on the Internal Affairs process to determine whether an officer-involved shooting was in policy. (9).  Iacono noted: "the critical incident review board is looking at an incident with the scope of training and curriculum development." (9).  Iacono described that once the Critical Incident Review Board writes their report, the report is "passed amongst the bureau captains and the professional standards division and ultimately the chief of police for disposition." (10).

139.   In describing how the Critical Incident Review Board helps the VPD, Iacono testified: "So take any use of force you want to take, if you want to use deadly force, use deadly force.  We would examine the range training issues associated with the particular incident, perhaps the decision making of the particular incident.  If you want to use supervision, I could say—if you could say supervision if that was an issue, if radio communication was an issue, so all the factors associate with the use of force, it could be built into a training module for the benefit of the whole department.  We are not an internal affairs branch.  We don't investigate individual officers for policy violations." (14).

140.   Captain Iacono noted that he was the investigations division commander when the Foster shooting occurred so he was part of the criminal investigation from the start and because he is a use-of-force expert he reviews use of force as part of the critical incident review process. (15).

141. Captain Iacono reported that he observed an enhanced video "contemporaneous to the incident" which he described as a slowed-down version

where he could see Ronell Foster "raise the flashlight, starting to raise the flashlight up over his head towards McMahon." (16-17).  Iacono said that Foster was facing Officer McMahon and moving toward McMahon at the time Foster raised the flashlight. (17).  Iacono agreed that if Foster was able to grab McMahon's flashlight but was not attacking with the flashlight, then deadly force would not have been reasonable. (19).  Iacono acknowledged that the Critical Incident Review Board's report indicated that Foster fought with Officer McMahon while on the ground. (27-28).  In defining "fought" Iacono said: "It's a broad definition.  I would consider "fought" with not complying with the arrest process." (28).

142.  Captain Iacono agreed that head strikes with a metal flashlight would cause serious bodily harm or death. (30).  In describing what he understood Foster to be doing at the time that Officer McMahon was deploying the TASER and flashlight strikes, Iacono testified that Foster "Put hands up and trying to stand up to avoid being arrested. (31).  Iacono could not recall where the bullets struck Foster. (31-32).  Similarly, Iacono, who chaired the Critical Incident Review Board for this shooting, could not recall if he ever watched McMahon's interview where he acted out what Foster was doing at the time of the shooting to compare it to the wounds that Foster received, and did not know whether such a review would be helpful. (32-33).  It is noted that Iacono, who testified that he is a use of force expert and testified that there are human factors regarding action and reaction that may impact bullet strike locations (39-40), did not recall where the bullets hit Foster. (31-32).  Iacono stated that he has never testified as a human factors expert

and he has never conducted experiments into human factors or perception/reaction time. (40).  Iacono did not know why there was a six-month lag time between the Critical Incident Review Boards review and the time the CIRB report went up the chain of command. (40).

143.   Iacono described decision-making training on deadly force that includes the Virtra training system, a 320-degree simulator for scenario training.   (36-37).  Iacono indicated that this system was in place before the Foster shooting in 2018 but noted that the training became "more robust afterwards." (38).  Iacono said that VPD officers are trained to stop shooting when they see the threat stop. (38).  Iacono agreed that officers are supposed to continually assess the threat as they are shooting. (38-39).

144.   Captain Iacono testified that he disagreed with Chief Allio's findings with respect to the Chief's disagreement with the findings of the CIRB which Iacono chaired, and he voiced that disagreement to Chief Williams when Williams took over, prompting Williams to assign the matter for an investigation by Professional Standards.  (45-46).   It is noted that although Iacono was a captain with the VPD and the chief of police issued a directive with respect to re-training of McMahon, Iacono, in a paramilitary organization believed that he was "an equal stakeholder" "in this process." (42).   Notwithstanding the fact, that the Chief of Police had already disagreed with the findings of the board that Iacono was the chairperson of, Iacono noted: "I have more training and experience and expertise than he does. And I believe that in a manner of rational human beings, he would have probably come around to my point of view." (42).   If Iacono, a captain on the VPD, believes

that he is an equal stakeholder with the Chief of Police in a paramilitary organization and as such he can debate a clear written directive by the Chief of Police then the Vallejo Police Department lacks any supervisory structure that would resemble a law enforcement agency.

145.  In describing the process for an Internal Affairs investigation into an officer involved shooting, Iacono testified: "The process looks like this: The date of the incident there's two parallel investigations occurring simultaneously.  One is administrative run by professional standards slash internal affairs of the Vallejo Police Department and one is the Solano County fatal incident protocol which is the criminal investigation.  They run simultaneously.  The internal affairs slash professional standards division investigation shadows along with the criminal investigation.  And if they see no potential problems, that's a verbal given to the chief of police.  There is no report.  There would be no report.  That—that decision on deadly use of force, that ultimately is the district attorney's through Solano County fatal incident protocol." (48-49).  When asked of this was the process followed in the Foster case, Iacono responded: "I guess." I would note that the lack of reporting in the Internal Affairs/ Professional Standards investigation done by the Vallejo Police Department is contrary to law enforcement practices nationwide.  In my review of hundreds of officer-involved shootings and in my audits of law enforcement agencies nationwide, I know of no other agency that would consider this process adequate or consistent with the industry standard. The entire process as described by Captain Iacono, a use of force expert, is

contrary to generally accepted policies, practices, training, the industry standard

and my experience.[1]


# OPINIONS

146.   I would note that I have offered law enforcement practices commentary on

various actions employed by the officers in the fact section of this report. I would

note that I incorporate by reference all of these opinions/commentary on the law

enforcement practices as they relate to the officers' actions to this opinion section

of the report.

147.   It is my opinion, based upon my specialized background, education, training,

and experience as well as my continued research, authoring, auditing, consulting

and training on law enforcement practices nationwide that the foot pursuit

undertaken by Officer McMahon was inconsistent with best practices and training

in law enforcement as well as the policy of the Vallejo Police Department.[2]

---

[1] "Officer Involved Shootings A Guide for Law Enforcement Leaders" United States Department of Justice/International Association of Chiefs of Police 2016 "Departments must ensure that administrative and criminal investigations occur separately from each other. The internal affairs authority normally conducts the administrative investigation, while criminal investigators conduct the criminal investigation; the investigations are not comingled."

[2] "Foot Pursuits" Concepts and Issues Paper, International Association of Chiefs of Police: "The decision to pursue a fleeing suspect should not be regarded as a required or even prudent action in all instances. The safety of the pursuing officer(s), fellow officers who may respond, and the public is the primary concern. It may be preferable for a suspect to escape than an officer take unnecessary risks that could pose unreasonable danger to officers and others. However, the decision to pursue depends in part on the seriousness of the offense and the potential for harm should the suspect be allowed to flee. Because of the inherent and demonstrated dangers involved in foot pursuits, it is recommended that officers be provided with discretion to decide not to engage in or to terminate a foot pursuit. Even though the decision to pursue must normally be made quickly, officers should consider a number of factors, such as alternatives to foot pursuit and an assessment of unreasonable dangers and risks. Officers should continue to assess and reevaluate the propriety of the foot pursuit as it progresses."

148.   Law enforcement has recognized the danger involved in foot pursuits to officers as well as the suspects being pursued. Some large departments, such as Chicago have collected data and determined that a third of all officer involved shootings stemmed from a foot pursuit.  As a result, law enforcement agencies throughout the United States, like the VPD, have instituted foot pursuit policies. It is well known in law enforcement that where the written policy is not enforced, operational policy will take over.   The fact that the Critical Incident Review Team failed to make any finding on the foot pursuit policy in this case is evidence that policy violations within the VPD are simply disregarded.

149.   It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that the use of the TASER by Officer McMahon in the first instance while pursuing Foster was contrary to generally accepted policies, practices, training and legal mandates trained to officers for application in field operations.

150.   I would note that use of force concepts apply consistently to each use of force and are outlined here but are applicable to each use of force opined on in this case and thus will not be restated for each of McMahon's use of force in the interest of brevity and avoiding repetition.

151.   Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification.  The first of these formulas is a three-part test that parallels the mandates announced by the United States

Supreme Court in *Graham v. Connor.*[3]  The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally whether the subject is actively resisting or attempting to evade arrest by flight.

152.   It is recognized that when considering the seriousness of the offense; that such consideration includes the offense the officer suspects at the time the control tactic is used and not just the original offense or other justification which led the officer to contact the individual at the outset.

153.   When viewing the seriousness of the offense in this case, Officer McMahon was pursuing Foster for traffic infractions on a bicycle and flight from a traffic infraction on a bicycle.  With respect to any physical threat, if McMahon simply stopped pursuing Foster for these minor offenses there would be no physical threat to McMahon.  That said McMahon, while testifying that he saw no suspicious bulges that could be a weapon, Foster's initial bladed stance when he stopped by the van; Foster's hands holding up his waistband as he ran; and Foster's looking back at him led him to believe that Foster was armed.  McMahon testified that he deployed his TASER in the probe mode as Foster was running in order to apprehend him safely.  McMahon said: "I decided to tase him so I could incapacitate him in case he did have a weapon and safely take him into custody." (McMahon 145).  All officers are trained that a use of force is not justified based on the infinite world of possibilities.  Instead officers must consider the

---

[3] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States.  See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

seriousness of the offense, fleeing and bicycle infractions; the physical threat presented, reaching near waistband while running away; and whether the subject was actively resisting arrest or evading arrest by flight.  Since McMahon had previously decided he was not going to arrest for the bicycle infractions, it is unclear how McMahon could articulate actively resisting arrest or attempting to evade arrest by flight at the point that he deployed his TASER.

154.  The second formula was commonly referred to as the "Use of Force Continuum."  While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusion, such as officer presence and verbal commands, to the highest level, which is deadly force. It should be recognized that even in those agencies that still use a force continuum, the continuum is not a ladder that must be climbed step by step.  Instead it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."  It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision-making model.

155.  I would note that when conducting training for officers who work under the jurisdiction of the United States Court of Appeals for the 9th Circuit, I make clear that the TASER is a significant intermediate force option and as such cannot be used to apprehend an individual for a minor offense.  I also train thousands of

officers annually on the danger of deploying TASER in the probe mode on an individual who is running away due to the fact that a successful deployment will cause the subject to have an uncontrolled fall.  Law enforcement has experienced numerous cases where the uncontrolled fall has led to catastrophic injuries, thus leading to universal training that such a deployment should be limited to flight in cases of serious offenses.

156.   The VPD policy on Conducted Energy Devices states: "The TASER device may be used in any of the following circumstances, when the circumstances perceived by the officer at the time indicate that such application is reasonably necessary to control a person:  (a) The subject is violent or physically resisting. (b) The subject has demonstrated, by words or actions, an intention to be violent or to physically resist, and reasonably appears to present the potential to harm officers, him/herself or others.  Mere flight from a pursuing officer, without other known circumstances or factors, is not good cause for the use of the TASER device to apprehend an individual."   In accord with Officer McMahon's testimony: "I decided to tase him so I could incapacitate him in case he did have a weapon and safely take him into custody" (McMahon 145), there was no articulation of the facts that would justify a deployment of the TASER under the VPD policy.  It is clear from the materials presented that at the point the TASER was deployed in the first instance McMahon was pursuing Foster for bicycle related traffic infractions and for the flight itself.  While McMahon has reported that he also observed some movements that he felt may be indicative of weapons possession, he did not articulate any observations that Foster, by words or actions,

demonstrated an intention to be violent or to physically resist and that Foster appeared to present the potential harm to the officer, himself or others.

157.   Similarly, it is clear from the video to the point that Foster was subjected to the second TASER deployment that he was trying to flee from McMahon.  As such, he still did not meet the factors set forth in the VPD policy and he did not meet the criteria set under generally accepted policies, practices or training to be subjected to a deployment of a significant intermediate weapon when trying to flee from a minor traffic infraction.

158.   It is noted that there are two types of TASER deployments.  The first type in which darts are shot into the subject causes complete neuromuscular disruption when successfully deployed.  It is noted that if one dart successfully connects with the individual, neuromuscular disruption may be accomplished by moving in and touching the individual with the TASER while the single probe/dart is connected. The second type, referred to as the drive-stun or touch-stun is where the cartridge with the darts are removed and the front of the TASER touches the person.  It is noted that law enforcement and the courts have recognized that the drive-stun is a less significant use of force since it does not cause an uncontrolled fall, causes localized pain only and does not cause neuromuscular disruption.

159.   I would note that officers throughout the United States are trained that when dealing with an armed individual, a TASER, particularly when the officer is alone, is not tactically sound due to the fact that the subject could present a deadly threat with the weapon before the officer would be able to transition and respond to the lethal threat.  Thus, if McMahon had reasonable belief that Foster was armed with

a firearm, which is the concern he reported, then the use of the TASER would not have been consistent with generally accepted policies, practices, and training.

160.   It is my opinion, based upon my specialized background, education, training and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide that Officer McMahon's deployment of multiple strikes with an impact weapon (steel flashlight) were contrary to generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

161.   I would note that the autopsy report noted a deep laceration on the right frontal scalp. (COV 002233).   This laceration was also documented with photographs.  I would note that throughout my years of experience as an officer I have viewed head injuries of persons struck with impact weapons, including flashlights by officers.   I would note that in my experience, the injury I see in the photograph is consistent with my experience in reviewing or being involved in a head strike with a flashlight.



162.

163.   Use of force training and policy, which is common to law enforcement throughout the United States, includes provisions indicating to officers that head strikes are prohibited unless deadly force would be justified.  This type of training and policy provision exemplifies the recognition by law enforcement that blunt strikes or force applied to the head is both capable and likely to cause serious bodily harm or death.  There is no indication in the testimony of Officer McMahon that at the time he began striking Foster with his flashlight that deadly force would have been justified.

164.   I would also note that officers are trained that a person may resist unreasonable force particularly where such force may cause serious bodily harm or death.  Thus, if Foster grabbed the flashlight while being struck in the head with it, there would be no justification under law enforcement's generally accepted policies, practices, training, or legal mandates that would support the use of deadly force.  As agreed to by Captain Iacono, in his testimony, if Foster simply took possession of the flashlight there would be no deadly force justification.  (Iacono 19).

165.   It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting, and training on law enforcement practices nationwide, that the use of deadly force by Officer McMahon on Ronell Foster was contrary to generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

166.   A fundamental principle of officer survival training and use of force is the commonly taught concept that action,  carried out successfully, beats reaction every time.[4]  Common defensive tactics programs offered to law enforcement as well as law enforcement related texts indicate that a subject running from an officer can turn and fire two shots before the officer would be able to react.[5]  It is well known in law enforcement that the physical lag time between an officer's perception of a threat and the response to the threat in many cases will put the suspect in a different position.  Where the officer is in an ongoing engagement

---

[4] See e.g. <u>Deadly Force Constitutional Standards, Federal Policy Guidelines, and Officer Survival,</u>  John Michael Callahan, Jr. Looseleaf Publications, Flushing, N.Y. 2001
[5] Id.

with an individual, that the officer has already perceived as a threat, the lag time is greatly diminished or eliminated by the officer's state of readiness. For example, an officer who walks up to a traffic violator who suddenly produces a gun will take longer to respond than an officer who suspects that a subject has a gun and is taking action i.e. pulling out their own gun or other force option to stop the potential threat. Here, in accord with Officer McMahon's testimony, he was fearful that Foster was armed from early in the event and before the foot pursuit based on Foster initially stopping but blading his body in such a way that McMahon thought he may be hiding a weapon; and by reaching into his waistband during the foot pursuit. I would note that there is a significant amount of law enforcement training and literature on the fact that fleeing suspects, due to baggy fashion styles, are forced to hold up their pants while being pursued. At any rate, Officer McMahon's subjective beliefs related to weapons put him on notice of a potential threat, thus, any lag time upon being confronted with a threat would be greatly diminished if not eliminated. I would also note that McMahon's actions were inconsistent with an officer's belief that a subject may be armed. The deployment of a TASER (one hand), while holding a flashlight in the other hand would make it impossible for an officer to immediately respond with deadly force if the subject, who the officer believed to be armed, produced the weapon.

167.    Officers throughout the United States are trained that when confronted with an immediate threat of serious bodily harm or death, the officer may respond with deadly force. Thus, if Ronell Foster, grabbed Officer McMahon's flashlight in an effort to assault McMahon and was about to carry out such a threat then the use

of deadly force would be justified. I would note that my review of the objective evidence, the video from McMahon's body-worn camera is inconsistent with any such action by Ronell Foster.   Thus, where there is no threat of serious bodily harm or death, the use of deadly force by McMahon would be inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

168.   A review of the video shows that Ronell Foster was standing and turning away from McMahon.   Consistent with the autopsy and wound patterns, Foster is turning clockwise thus presenting his left side first.   The placement of Foster's feet makes Foster's movement clear.



169.

170.   I would note that Officer McMahon in his videotaped deposition demonstrated his reported movements of Foster which he said that Foster in one fluid motion stood up, pulled the flashlight from McMahon and toward Foster.   McMahon continued the demonstration that Foster moved his arm in a backswing.

171.  McMahon demonstrating how Foster pulled the flashlight from him.



172.

173.  McMahon demonstrating how the flashlight was pulled from him and toward

Foster.



174.

175.  McMahon demonstrating how Foster cocked his arm back across his own body

while continuing to rise up.



176.



177.

178. McMahon demonstrating the swinging of the flashlight by Foster



179.

180.   In using a software, Camtasia, that I regularly use for developing training or
for reviewing video for law enforcement agencies, I added colorization from the
software in order to get more detail with respect to movements.  I did not adjust
the colorization but allowed the software to set the colorization at its normal 100
percent.  I then did a frame by frame analysis in the same manner I would do for
a law enforcement agency to determine the actual movements of the individuals
depicted.  In doing so, I then simply captured frames in progression as screen
captures.

181.   In the first two photos at 03:41:13 the relationship and distance between Foster
and the flashlight can be clearly seen.



182.



183.

184.   At 03:41:14 several frames capture Foster's movements as he twists away from

McMahon in a clockwise movement, exposing his left side.



185.



186.

187.   Foster can then be seen using his hands in front of him toward an upright

position at 03:41:15



188.

189.   In a subsequent frame still at 03:41:15 Foster can be seen in an upright position

and beginning to step away, with his left side remaining exposed and no frontal

movement toward McMahon.



190.

191.   In a subsequent frame at 03:41:15, Foster's turn away from McMahon is becoming more pronounced.



192.

193.   In the next series of frames beginning at 03:41:15 Foster's Legs begin to buckle.



194.



195.

196.   Even as Foster's Legs are buckling he never turns frontally, in any manner

toward McMahon.

197. 

198. 

199.   At 03:41:16 it is clear that Foster is going to the ground with the sole of his

right sneaker completely exposed.



200.



201.



202.

203.   At 03:41:17 it is clear that Foster is completely on the ground and that

McMahon's gun is pointed at Foster.



204.

205.   Based upon the objective video, no reasonable and well trained officer would

conclude that Ronell Foster posed a threat of serious bodily harm or death to

67

Officer McMahon or that a use of deadly force would be consistent with generally accepted policies, practices, training or legal mandates trained to officers for application in field operations. A frame by frame analysis of the video, which is routine in professional law enforcement investigations and any professional analysis of use of force, makes clear that Mr. Foster never turned toward Officer McMahon from the time he was on the ground and the flashlight was in McMahon's possession until the time he was shot multiple times and went back to the ground. The video blatantly contradicts the demonstration by Officer McMahon at his sworn deposition of Foster's actions that justified the use of deadly force.

206.    It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices that the supervision and discipline of the Vallejo Police Department is contrary to generally accepted policies, practices, training, and legal mandates trained to law enforcement executives for application in agency operations.

207.    I would note that the VPD has a written policy covering the procedure to be followed in an officer-involved shooting. The written policy requires that an administrative investigation be conducted to ensure compliance with policy by the involved officers. It is clear from the testimony of both Chief Williams and Captain Iacono that no such investigation has ever been done or concluded with respect to the shooting itself. Under the VPD Policy: "Regardless of whether the use of force is an issue in this case, the completed administrative investigation

shall be submitted to the Use of Force Review Board, which will restrict its findings as to whether there was compliance with the Use of Force Policy." (COV 001447). I would note that based on the testimony of Chief Allio, Chief Willliams and Captain Iacono, the VPD did not follow this policy. There is no indication that the agency has a Use of Force Review Board which restricts its findings to whether there was compliance with the use of force policy. Based on the testimony of all three it appears that they are unfamiliar with the policy required by their own department. Neither the testimony of Captain Iacono, a use of force expert and chairman of the Critical Incident Review Board, Chief Williams, nor Chief Allio described a review process by the VPD that was consistent with this policy.

208. I would note that even the initial scene investigation was deficient and not properly documented on important evidentiary issues. As noted, McMahon's reported justification is Foster grabbing the flashlight and preparing to violently assault McMahon with the flashlight. McMahon is the only witness to this event. Thus, objective evidence such as the video and the flashlight are essential to examining McMahon's report. The flashlight could have been tested for Foster's DNA and fingerprints including where on the flashlight that evidence was recovered that may be indicative both of possession and of the manner of grip. There is nothing in the materials to suggest that the VPD ever sought to have such testing done. Contrary to all crime scene mandates and training, Officer Bahou reported that he entered the scene of an officer-involved shooting and picked up the flashlight near the body of Foster and used it for illumination. If that wasn't

bad enough, he then could not remember who he gave the flashlight to afterward. Bahou testified that after driving back to the station he was contacted by Detective Greenberg who told him that the flashlight was evidence. (24-25). Officer Bahou testified that he gave the flashlight to Corporal Bothello or Stephanie Daly. (26). Thus, in an officer-involved shooting case where it is alleged that the weapon produced by the decedent that caused the officer to shoot was a flashlight, which an officer who recognized the magnitude of the event (Bahou 22), picked up and used for illumination was subsequently turned over to someone.  The next evidentiary mistake is incomprehensible with respect to a valid law enforcement investigation: the only name on the chain of custody for an untested piece of material evidence was Officer Bahou, thus the chain of custody was broken on the date of the incident, though the date and time that Bahou turned over this piece of material evidence is not documented on the pre-printed form either.



COV 002172

209.

210.   It is well known in law enforcement that a lack of accountability and a lack of professional administrative investigations, leads to continued or additional misconduct.  All supervisors are trained that investigations into allegations of officer misconduct or uses of force should not be allowed to linger.  Here, the current Chief of Police clearly indicated that the agency still has not concluded an administrative investigation into this matter and was not currently investigating the propriety of the shooting.  As noted in the body of the report, the VPD current supervisory practices with respect to officer-involved shootings is inconsistent with generally accepted supervisory practices and their own Officer-Involved shooting policy.

211.   It is well known in law enforcement that accountability and discipline must be swift and certain.[6]  Here, it is clear that more than two years have passed and the VPD has not undertaken any administrative investigation on the use of deadly force by Officer McMahon and has failed to conclude its investigation with respect to foot pursuits and body-worn cameras.  Based on the testimony of the chiefs as well as Captain Iacono, the use of deadly force was consistent with the VPD policy, though it was acknowledged that they were unaware of any steps taken to try and enhance the video and acknowledged that one could not tell what was going on from the video.  Instead, they relied totally on the reports of McMahon, the shooter in this case to determine that the use of deadly force was proper.  The Chiefs and the Critical Incident Review Board chaired by Captain Iacono found no issues with the deadly force thereby ratifying McMahon's conduct.  It is well known that when a law enforcement agency ratifies the conduct of an officer, the message to all officers is that the conduct at issue is consistent with the agencies expectations and therefore okay to replicate.  The finding that the use of deadly force by McMahon was consistent with agency policy without an administrative investigation and a use of force review focused on the individual officer and the agency policy, as required by the VPD policy is a systemic failure. It is well known in law enforcement that such failures lead to a further breakdown in accountability and further issues with respect to excessive force and deadly force.

---

[6] Supervision of Police Personnel, Seventh Edition, 2009 Pearson, Prentice Hall 2009 Upper Saddle River, N.J. Chapter 11. Pages 189-190

212.    At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

213.    At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

214.    My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 10th day of May 2020, in Greenville, R.I.


_____*s/John J. Ryan*_____
John J. Ryan