# EXHIBIT 18



Phone: 209-636-2822
Fax: 866-402-6875
bennetomalu@bennetomalu.com

Autopsy and Anatomic Pathology
Clinical Pathology and Toxicology
Forensic Pathology

Neuropathology
Epidemiology
Medico-Legal Consultations

Julia Sherwin, Esq                                                         June 20, 2020
Haddad & Sherwin, L.L.P.
505 Seventeenth Street
Oakland, CA 94612

Dear Ms. Sherwin,

    Re:    **RONELL DIANGELO FOSTER, DECEASED**
             **MEDICO-LEGAL REPORT**

**Summary of Education, Training and Experience**
I completed medical school in 1990 at the University of Nigeria, Enugu, Nigeria. Upon graduating from medical school, I completed a one-year clinical housemanship at the University of Nigeria Teaching Hospital in the fields of pediatrics, internal medicine, general surgery, obstetrics, and gynecology. After housemanship, I worked as an emergency room physician at a university hospital in Nigeria for approximately three years. I sat for and passed my United States Medical Licensing Examinations [USMLE] while I worked as an emergency room physician. I came to the United States in 1994 through a World Health Organization scholarship to become a visiting research scholar for eight months at the Department of Epidemiology, Graduate School of Public Health, University of Washington, Seattle, Washington.

In 1995, I proceeded to the College of Physicians and Surgeons of Columbia University, New York, New York, at Harlem Hospital Center, to complete residency training in Anatomic Pathology and Clinical Pathology. In 1999 I proceeded to the University of Pittsburgh, Pittsburgh, Pennsylvania to complete residency training in forensic pathology and neuropathology. I hold four board-certifications in Anatomic Pathology, Clinical Pathology, Forensic Pathology and Neuropathology. I also hold a Masters in Public Health [MPH] degree in Epidemiology from the Graduate School of Public Health, University of Pittsburgh, Pittsburgh, Pennsylvania. I also hold a Masters in Business Administration [MBA] degree from the Tepper School of Business, Carnegie Mellon University, Pittsburgh, Pennsylvania, one of the leading business schools in the world. I am a Certified Physician Executive and an honorary fellow of the American Association of Physician Leadership [AAPL]. I also hold a fifth board-certification in medical management from the AAPL. I am licensed to practice medicine and surgery in four states in the United States namely Hawaii, California, Indiana, and Pennsylvania.

I am currently the President and Medical Director of Bennet Omalu Pathology [BOP], a California medico-legal consulting firm, and a Clinical Professor at the Department of Medical Pathology and Laboratory Medicine, University of California, Davis. In my capacity as the Medical Director of BOP, I am a consulting forensic pathologist and neuropathologist to many hospitals in central California and to several counties in northern California. There are less than

a few dozen practicing forensic pathologists-neuropathologists in the United States who are board-certified in both forensic pathology and neuropathology.

For over nineteen years, I have been involved in over nine thousand death and injury investigations in my career as a forensic pathologist and neuropathologist, which began in 1999. I have personally conducted and performed over eight thousand autopsies and death investigations and examined over nine thousand brain tissue specimens. I also perform trauma pattern analysis in both living patients and deceased patients to determine causes and mechanisms of sustenance of injuries and death. I am also involved in the evaluation of living victims of all types of injuries and trauma, including but not limited to victims of assault, traumatic falls, industrial and accidental injuries, medical complications and misadventures, rape, child abuse and sports-related injuries. I have been consulted and retained as an expert witness in one to two thousand cases involving all types of medico-legal cases across all jurisdictions in the United States including federal, state, county and municipal courts and arbitration panels; in both civil and criminal cases, for the plaintiff, defense, district attorneys and public defenders. I have been involved as an expert witness in complex class action and industrial lawsuits involving thousands of individuals and major corporations.

My areas of interest and focus include brain patho-physiology, brain injuries and brain trauma, in both living and deceased patients. I identified Chronic Traumatic Encephalopathy [CTE] in a retired football player when I performed an autopsy and examined the brain of Mike Webster in 2002. Subsequently, I identified CTE in other high-impact, high-contact sports athletes and in military veterans suffering from Post-Traumatic Stress Disorder [PTSD]. Since 2002 CTE has received international attention from the sports industry, sports medicine, and neuroscience. My work has been featured extensively in all media platforms across the world. My work and life were featured in a major Hollywood film, "Concussion" released in December 2015 by Sony Motion Pictures, in which the renowned actor, Will Smith, played me as Dr. Omalu. Several New York Times best-selling books have also been published on my life and work including "The League of Denial" and "Concussion". I have published several books including my memoir, "Truth Doesn't Have a Side", which was published in August 2017. My latest book, "Brain Damage in Contact Sports" was published in February 2018. I have published extensively in the medical and scientific literature authoring many scientific papers and book chapters.

I have received three honorary PhD degrees from two universities in the United States, and from the Royal College of Surgeons of Ireland in recognition of my work and expertise. I have also received numerous awards from across the world in recognition for my work and expertise in both living and deceased patients. I have received the "Distinguished Service Award" from the American Medical Association [AMA], which is the most prestigious award of the AMA. I have been honored by the United States Congress and I have appeared on multiple occasions before committees of the United States Congress and committees of State Legislatures across the Unites States advising them on matters relating to trauma. In 2019 I was appointed to the Traumatic Brain Injury Board of the State of California to advise the state on matters relating to traumatic brain injuries.

Since 1999 I have testified as an expert witness in matters relating to all types of injuries and deaths in over 500 court proceedings across the United States. I have attached a copy of my curriculum vitae, which enumerates my body of work and experience in greater detail. I have also attached my fee schedule. The cases I have testified in, beginning in 2009, are enumerated at the end of my curriculum vitae.



Pursuant upon your request, I have reviewed the following materials in the case of Ronell Diangelo Foster [Ronell Foster], Deceased:
1. Autopsy and Coroner Reports
2. Toxicology Report
3. Autopsy Pictures
4. Police Reports
5. Fire Service Report
6. Deposition Transcripts
7. Expert reports
8. Tissue histology slides
9. Video clips
10. Defense expert reports[1]

**Summary of Prevailing Forensic Scenario**
At the time of his death at approximately 07:51 p.m. on February 13, 2018, Ronell Foster was a 33-year-old African-American male who was born on November 18, 1984.

According to the police report, Officer McMahon worked for the Vallejo Police Department. He worked during the 09:30 p.m. and 07:30 a.m. shift and on February 13, 2018 he had come in early to begin work on overtime at 04:30 p.m. During his shift on February 13, 2018 he was driving eastbound on Capitol Street and at the intersection between Capitol Street and Sonoma Boulevard he observed a subject riding a bicycle in and out of the roadway in the northbound lanes. He wanted to initiate a stop on the subject for not having a light on his bicycle and moving in and out of the roadway. According to Officer McMahon the subject had a "deer in the headlights look", which he thought was not a normal reaction. Based on the way the person was looking at him, he believed it was not a normal reaction and "something was wrong". The subject then immediately fled northbound on Sonoma Boulevard riding in the lanes of traffic. Officer McMahon activated his emergency lights and siren and pointed his spotlight at the subject. The subject then stopped his bicycle just prior to Florida Street.

The subject stopped on the sidewalk, stood behind, and concealed the right half of his body behind a van, which was parked on the street. Officer McMahon thought this was odd. Officer McMahon then began talking to the subject and told him that his riding pattern was erratic. Officer McMahon than instructed the subject to come over and sit in front of his car. The subject immediately took flight and headed northbound on Sonoma Boulevard. Officer McMahon got back into his patrol vehicle, notified dispatch that a suspect was fleeing from him on a bicycle. The subject was weaving in and out of traffic on his bicycle. Officer McMahon turned on his lights and sirens and caught up with the subject at an intersection. Both Officer McMahon and the subject turned westbound on Carolina Street at which time the subject fell off his bike.

Officer McMahon exited his patrol vehicle went around the back side of the patrol vehicle and initiated a foot pursuit with the suspect. Officer McMahon ordered the subject to stop several times and instructed him that he was under arrest. The subject kept running. Officer McMahon saw him reaching for his waist band and yelled "Don't reach for your waistband. Get your hands away from your waist". Officer McMahon fired his taser at the subject when he was 10 to 15 feet

---

[1] I did not rely on any of the defense expert reports and none of them were authored by a pathologist and did not focus on the medico-legal questions addressed in my report



away from the suspect. One probe struck the subject in the back. The subject was not incapacitated. The subject continued to run. Officer McMahon continued yelling out orders at the subject, but the subject continued to run. According to Officer McMahon, he was unsure if the subject was armed, and he could not get his radio traffic out although he tried.

The subject then turned southbound in between houses and fell, at which time Officer McMahon caught up with him. The subject got up and Officer McMahon pushed him back on the ground and he fell down two or three stairs. Officer McMahon got on top of the subject as the subject tried to get up and "alligator roll" away from him. Officer McMahon utilized his Taser again, which was ineffective. The suspect was yelling "What the fuck"? What are you doing?" Officer McMahon struck the subject several times with his flashlight no more than five times, which were ineffective. According to Officer McMahon the suspect was able to turn and stand up and ripped the flashlight from his hand. According to the police and coroner reports, the subject was charging towards Officer McMahon. Officer McMahon then pulled his gun and fired many times "eliminating the threat" at approximately 07:41 p.m. Officer McMahon did not remember exactly how many times he fired, may be 4 or 5 times. The subject immediately dropped the flashlight and fell into the bushes and was motionless and unresponsive. At this point Officer McMahon was able to get his location out to Dispatch via radio. The subject was later identified to be Ronell Foster. Officer McMahon did not activate his body camera prior to the shooting.

When officers arrived at the scene Ronell Foster was handcuffed while he laid motionless on the ground. Ronell Foster was pulled out of the bushes and life saving measures were initiated. He was confirmed dead at approximately 07:51 p.m. on February 13, 2018. Ronell Foster was searched for weapons and none were found on him. Officer Blain said that she had seen Officer McMahon earlier in the shift and she did not notice anything different about his uniform after the incident with Ronell Foster. The handcuffs were removed before the body was transported to the county morgue for an autopsy.

**Autopsy**
A full autopsy was performed on the body of Ronell Foster on February 15, 2018 by Dr. Arnold Josselson at the Solano County Sheriff-Coroner's Office beginning at approximately 08:24 a.m. The cause of death was stated to be "Multiple Gunshot Wounds".

The autopsy findings were stated as follows:
1.  Fatal gunshot wound of abdomen and right chest
2.  Fatal gunshot wound of left chest
3.  Fatal gunshot wound of left chest and right chest
4.  Fatal gunshot wound of head
5.  Non-fatal gunshot wound of left shoulder
6.  Non-fatal gunshot wound of right back
7.  Non-fatal gunshot wound of left arm
8.  Gunshot wounds of each lung, aorta, liver, kidney, and brain with bilateral hemothoraces and hemoperitoneum

At autopsy Ronell Foster weighed 169 pounds and measured 71 inches.

The body revealed the following evidence of trauma:



I.  Gunshot Wounds of the Head, Trunk and Extremities [x7]

1.  Gunshot Wound of the Left Abdomen and Right Chest [Bullet Recovered]
    a.  Gunshot wound of entrance: There was a 1.2 cm in greatest dimension oblong perforating wound in the lateral caudal left abdomen and pelvis located 49 cm below the level of the top of the head and 16 cm left of the anterior midline. There was a 5 x 3 cm superior abrasion. There were circumferential marginal abrasions accentuated anteriorly and inferiorly without soot deposits or powder stippling.
    b.  Pathway of the bullet: The bullet perforated, contused and lacerated the skin and soft tissues of the left caudal abdomen and lower abdominal quadrant, perforated, contused and lacerated the lower pole of the left kidney, perforated, contused and lacerated the abdominal aorta at the level of the right renal artery, perforated, contused and lacerated the right lobe of the liver, perforated, contused and lacerated the right hemidiaphragm and inferior lower lobe of the right lung before it came to settle in the right pleural cavity.
    c.  Recovery of the bullet: A mushroomed jacketed large caliber bullet was recovered lying freely in the right pleural cavity.
    d.  Trajectory of the bullet: backward, upward, and rightward

2.  Gunshot wound of the Left Mid-Back and Chest [Through and Through]
    a.  Gunshot wound of entrance: There was 1.0 cm in diameter perforating wound in the lateral left mid back located 23 cm below the level of the top of the left shoulder and 15 cm left of the posterior midline. There was a 2 mm in width marginal abrasion accentuated superiorly and laterally without soot deposits or powder stippling.
    b.  Pathway of the bullet: The bulleted perforated, contused and lacerated the skin and soft tissues of the left mid-back and lateral left chest, 5th intercostal space and pleura, perforated and fractured the lateral 5th rib, perforated, contused and lacerated the upper lobe of the left lung, perforated, contused and lacerated the anterior left chest wall, soft tissues and skin to exit.
    c.  Gunshot wound of exit: There was a 1.5 cm in greatest dimension oblong perforating wound in the anterior left chest located 32 cm below the level of the top of the head and 1.5 cm left of the anterior midline.
    d.  Trajectory of the bullet: The direction of the bullet was forward, upward, and rightward.

3.  Gunshot Wound of the Left and Right Chest [Through and Through]
    a.  Gunshot wound of entrance: The gunshot wound of entrance was stated in the autopsy picture to be the same as the gunshot wound of entrance for gunshot wound #2, which is the lateral left mid-back, which has been described above.
    b.  Pathway of the bullet: The bullet perforated the skin and soft tissues of the lateral left mid back and chest wall, perforated, contused and lacerated the lower lobe of the left lung, perforated, contused and lacerated the thoracic aorta just below the great vessels, perforated, contused and lacerated the upper lobe of the right lung, perforated, contused and lacerated the posterolateral upper right chest wall and posterior axillary fold to exit.
    c.  Gunshot wound of exit: There was a 2 cm rectangular perforating wound in the posterolateral upper right chest and posterior axillary fold located 18 cm below the level of the top of the right shoulder and 25 cm right of the anterior midline.



        d. Trajectory of the bullet: The direction of the bullet was forward, upward, and rightward.

4. Gunshot Wound of the Head [Bullet Recovered]
   a. Gunshot wound of entrance: There was a 6 mm in diameter perforating wound in the posterior left parietal scalp located 7.5 cm above the right ear. There were red-pink circumferential marginal abrasions, accentuated posteriorly, without soot deposits or powder stippling.
   b. Pathway of the bullet: The bullet perforated, contused and lacerated the posterior left parietal scalp, perforated and fractured the left calvarium, perforated, contused and lacerated the right and left cerebral hemispheres and meninges, perforated and fractured the right calvarium before it came to settle in the right temple just above the right ear.
   c. Recovery of the bullet: A mushroomed jacketed large caliber bullet was recovered embedded in the soft tissues of the right temple just above the right ear.
   d. Trajectory of the bullet: The direction of the bullet was forward, downward, and rightward.

5. Gunshot Wound of the Posterior Left Shoulder and Back [Bullet Recovered]
   a. Gunshot wound of entrance: There was a 1.5 cm oblong perforating wound of the lateral left posterior shoulder and back located 10 below the level of the top of the shoulder and 23 cm left of the posterior midline. There were circumferential marginal abrasions accentuated laterally, without soot deposits or powder stippling.
   b. Pathway of the bullet: The bullet perforated, contused, and lacerated the skin and soft tissues of the posterior left shoulder and clavicular chest before it came to settle in the soft tissue of the left clavicular chest under the mid left clavicle.
   c. Recovery of the bullet: A mushroomed jacked large caliber bullet was recovered from the soft tissues of the left clavicular chest under the mid left clavicle.
   d. Trajectory of the bullet: The direction of the bullet was forward, upward, and rightward.

6. Gunshot Wound of the Right Back [Through and Through]
   a. Gunshot wound of entrance: There was a 6 mm in diameter perforating wound in the lateral mid right back located 27 cm below the level of the top of the shoulder and 13 cm right of the posterior midline. There were circumferential marginal abrasions accentuated medially and inferiorly where the abrasions measure 1.0 cm in width. There were no soot deposits or powder stippling.
   b. Pathway of the bullet: The bullet perforated the skin and soft tissues of the right back, perforated and fractured the right scapula and perforated the soft tissues and skin of the lower anterior right shoulder to exit.
   c. Gunshot wound of exit: There was a 2 cm rectangular perforating wound in the lateral right and anterior shoulder and proximal arm located 6 cm below the level of the top of the shoulder.
   d. Trajectory of the bullet: The direction of the bullet was forward, upward, and rightward.

7. Gunshot Wound of the Left Forearm [Through and Through]
   a. Gunshot wound of entrance: There was a 2.0 cm oblong perforating wound in the posterior-medial distal left forearm located 30 cm above the level of the fingertips.



    b. Pathway of the bullet: The bullet perforated the skin and soft tissues of the left forearm, perforated, and fractured the left ulna, and perforated the soft tissues and skin of the posterolateral left elbow to exit.
    c. Gunshot wound of exit: There was a 6.0 x 2.5 cm perforating wound of the posterolateral left elbow located 47 cm above the level of the fingertips. There was another 5 cm in diameter round perforating wound in the posterolateral left elbow located 4 cm above the exit wound described above.
    d. Trajectory of the bullet: The direction of the bullet was forward, upward, and leftward.

Three bullets were recovered outside the body from the body bag and from the articles of clothing as follows:
1. A mushroomed jacketed large caliber bullet was recovered from the right sleeve of the sweatshirt.
2. A mushroomed jacketed large caliber bullet was recovered from the right side of the T-shirt.
3. A mushroomed jacketed large caliber bullet was recovered lying freely in the body bag adjacent to the left side of the neck.


II. Blunt Force Trauma of the Head, Face, Trunk and Extremities
1. There was a 2 cm laceration of the right frontal scalp just above the hairline.
2. There was a 5 mm abrasion of the right cheek, 3 cm lateral to the right eye.
3. There was a small abrasion of a distal dorsal left ring finger at the level of the distal interphalangeal joint.[2]
4. There were seven abrasions of the anterior right knee measuring up to 2 cm.
5. There was a 4 cm linear abrasion of the medial mid lower left leg.


The brain weighed 1458 grams. The scalp showed mid-sagittal contusions from the frontal scalp to the vertex. There was a 10 cm contusion of the left occipital scalp. There were large linear fractures extending anteriorly and posteriorly from the perforating defect in the left side of the calvarial vertex. There were linear fractures in the right and left posterior cranial fossae. There was a fracture in the right orbital roof. There was a fracture accompanied by a perforating defect in the lateral right middle cranial fossa. The right pleural cavity contained 100 cc of blood. The left pleural cavity contained 125 cc of blood. The peritoneal cavity contained about 25 cc of blood. The right lung weighed 256 grams. The left lung weighed 242 grams. The lungs were congested. The liver weighed 1422 grams. The right and left kidneys weighed 132 grams and 144 grams, respectively.


Toxicologic analysis of the peripheral blood samples obtained during the autopsy revealed the following:
Methamphetamine:                                702 ng/mL
Amphetamine:                                      57 ng/mL

---

[2] This wound was not described in the autopsy report but was shown in the autopsy pictures of the left fingers. There was no metric rule in the picture, therefore the size cannot be measured.



| | |
|---|---|
| Ethanol: | 0.08 grams% |
| Cannabinoids: | |
| -Tetrahydrocannabinol [THC]: | 12.4 ng/mL |
| -11-hydroxy-THC [11-OH-THC]: | <2.0 ng/mL |
| -11-Nor-THC-9-carboxylic acid [THC-COOH]: | 5.0 ng/mL |

**Histology Tissue Slides**

No tissue histology slides were prepared as part of the autopsy. And no microscopic examination of tissue histology slides were performed during the autopsy although it was meant to be a full autopsy. When I was retained to review this case, I discovered that these were not performed. I requested permission to examine the formalin-fixed autopsy archival tissues in this case in order to take histology tissue sections and prepare Hematoxylin and Eosin [H/E] stained tissue histology slides for microscopic examination.

I visited the Solano County Sheriff-Coroner's Office on June 8, 2020 to examine the stock tissues and take tissue sections beginning at approximately 10:12 a.m. and ending at approximately 10:31 a.m. Eleven H/E stained tissue histology slides were made labeled 18-0159 #1-11.

Examination of the H/E stained tissue histology slides reveal congestive brain swelling, with diffuse cerebral parenchymal edema. There is diffuse perineuronal vacuolation with expansion of the Virchow Robin spaces and neuropil microspongiosis of the gray and white matter. The arachnoidal and penetrating parenchymal blood vessels reveal diffuse congestion with multifocal perivascular microextravasates. There are many scattered pyknotic, amphophilic to eosinophilic neurons in the neocortex, hippocampus, and cerebellar cortex. There are focal neocortical parenchymal contusional hemorrhages. There is acute multivisceral parenchymal congestion. The lungs show acute pulmonary parenchymal congestion and edema with focal acute parenchymal contusional hemorrhages without acute inflammation.



**MEDICO-LEGAL QUESTIONS**

1.  **What were the trajectories of the bullets of the gunshot wounds that Ronell Foster sustained?**
2.  **What was the position of Ronell Foster when he was shot in relation to the position of the officer who fired the bullets?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of injuries and gunshot wounds generated by bullets and mechanisms of sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge.

Medicine and the law establish the board-certified forensic pathologist as the responsible, credentialed and competent specialized physician that reviews deaths following all types of injuries and traumas, performs autopsies, performs trauma pattern analysis and determines causes of death, the mechanisms of death and the manners of death, with a reasonable degree of medical and scientific certainty. Mechanisms of death include modalities and timing of patterns of fatal wounds.

The College of American Pathologists [CAP] describes the specialty of forensic pathology as follows: "Forensic pathology is the subspecialty of pathology that directs its efforts to the examination of living or dead persons in order to provide an opinion concerning the cause, mechanism, and manner of disease, injury or death; the identification of persons; the significance of biological and physical evidence; the correlation and/or reconstruction of wounds, wound patterns, and sequences; and conducting comprehensive medico-legal death investigations. Forensic pathology applies techniques of pathology to the needs and protection of public health, public safety, quality assurance, education in medicine, research, jurisprudence, and the administration of justice. Its highest goal is the development of strategies to prevent injury, disease, and death."

The CAP also describes a forensic pathologist as follows: "A forensic pathologist is a pathologist with special training and experience in forensic pathology who is actively engaged in medico-legal autopsies and death investigations. Forensic pathologists shall be board-certified by the American Board of Pathology or American Osteopathic Board of Pathology after appropriate training and passing a rigorous examination, or a non-USA based pathologist with equivalent certification. The practicing forensic pathologist is licensed in one or more states; he/she is skilled in conducting death investigations, interpreting injuries in both fatal and non-fatal cases, performing medico-legal examinations, determining disease/injury causation to an appropriate degree of medical certainty and determining cause and manner of death."

Following my review of this case, I performed trauma pattern analysis and differential diagnosis. There are five major components of a gunshot wound, viz: gunshot wound of entrance, pathway of the bullet, recovery of the bullet, gunshot wound of exit and trajectory of the bullet inside the body. The prevailing evidentiary findings in this case confirm that Ronell Foster sustained seven gunshot wounds of his body comprising four immediately fatal gunshot wounds and three immediately non-fatal gunshot wounds as follows:



1. A fatal gunshot wound of the lateral caudal abdomen/pelvis. The bullet was recovered from the right pleural cavity. The trajectory of the wound or bullet was backward, upward, and rightward [BUR]. This was a distant shot.
2. A fatal gunshot wound of the lateral left mid back. The gunshot wound of exit was located in the anterior left chest. The trajectory of the wound or bullet was forward, upward, and rightward [FUR]. This was a distant shot.
3. A fatal gunshot wound of the lateral left mid back. The gunshot wound of exit was located in the posterolateral upper right chest and posterior axillary fold. The trajectory of the wound or bullet was forward, upward, and rightward [FUR]. This was a distant shot.
4. A fatal gunshot wound of the posterior left scalp [parietal scalp]. The gunshot wound of exit was located in the right temple. The trajectory of the wound or bullet was forward, downward, and rightward [FDR]. This was a distant shot.
5. A non-fatal gunshot wound of the lateral left posterior shoulder and back. The bullet was recovered embedded in the soft tissues of the left clavicular chest, under the mid left clavicle. The trajectory of the wound or bullet was forward, upward, and rightward [FUR]. This was a distant shot.
6. A non-fatal gunshot wound of the lateral mid right back. The gunshot wound of exit was located in the lateral right and anterior shoulder and proximal arm. The trajectory of the wound or bullet was forward, upward, and rightward [FUR]. This was a distant shot.
7. A non-fatal gunshot wound of the posterior-medial distal left forearm. The gunshot wound of exit was located in the posterolateral left elbow. The trajectory of the wound or bullet was forward, upward, and leftward [FUL]. This was a distant shot.

The global anatomic and patho-physiologic configurations of these wounds confirm that they are all distant shots or distant range gunshot wounds. This means that the gun was not fired within a tight-contact, loose-contact, close or intermediate range. The muzzle that fired the bullets was located at a distance from the body of Ronell Foster. For distant range shots like these, the muzzle of the gun that fired the bullets was located from about 2 to 3 feet away from the body ad infinitum. These patterns of gunshot wounds are not the patterns of gunshot wounds seen when the gun is fired during a physical altercation, contact fight or struggle. With the hand holding the gun in a firing disposition when it was fired, it is even more likely that the officer who fired the bullet was located even further away from Ronell Foster when the bullets were fired.

Another distinctive pattern exhibited by these gunshot wounds is the location of the entrance wounds in the back or posterior surfaces of the body of Ronell Foster. The only entrance wound that was located on the side of his body was that of the left abdomen, which was located in the lateral caudal abdomen and pelvis. The trajectory however was backward, upward, and rightward. The bullet was recovered from the right pleural cavity.

This means that Officer McMahon was located at the back of Ronell Foster when the bullets were fired. All the bullets traveled in a forward [back to front] trajectory except the bullet that caused gunshot wound #1. This specified pattern is inconsistent with any proposition or allegation that Ronell Foster was charging at the officer with the flashlight when he was shot. Ronell Foster was not facing Officer McMahon when the bullets were fired. The only entrance wound that was not located in the back of Ronell Foster was that of the left lateral caudal abdomen and pelvis. When Ronell Foster sustained this wound, his left side was facing the officer who fired the bullet in order to enable the bullet to enter the body through the lateral side of the body.



Gunshot wounds #1, 2, 3, 5, 6 and 7 exhibited tangential upward trajectories. This specified trajectories, within the prevailing terminal scenarios in this case are consistent with Ronell Foster being shot while he was on the ground or close to the ground. Gunshot wound #1 exhibited a markedly inclined tangential pathway, entering the caudal abdomen and passing to the right lung and pleural cavity; which is also more consistent with Ronell Foster shot in his left side, while he was lying on the ground, and the officer was standing and pointing the gun at him; and the level of the gun was much higher than the level of his pelvis or hip. Gunshot wounds #2, #3, #5 and #6 could have also been sustained, though less likely, while Ronell Foster was running away with his hip joints, pelvis and lumbar spine flexed forward in a fleeing disposition while the officer was behind him firing the bullet at him.

Gunshot wound #4 shows that the gun was behind and above the level of Ronell Foster's head when the bullet was fired for it to travel forward and downward. This is more consistent with Ronell Foster lying close to the ground or on the ground when the bullet was fired from a gun that was being held by another person who was standing above him.

All the wounds, except #7 wound, exhibited a rightward trajectory. This means that the gun and the officer were located to the left of Ronell Foster when the bullets were fired. However, the leftward trajectory of the gunshot wound of the left forearm does not exculpate the location of the officer to the left of Ronell Foster because the forearm, which is part of the upper extremity, is highly mobile and could have been disposed in a unique position at the time the bullet entered the body to create a leftward trajectory since the entrance wound was located in the postero-medial distal forearm. The trajectory of this wound was upward too, therefore it further confirms that Ronell Foster was more likely than not lying close to the ground or on the ground when he sustained this gunshot wound with the gun lying at a higher level than his forearm when he was shot.

3. **Did Ronell Foster exhibit evidence of blunt force trauma of his head and body at autopsy?**

Yes, Ronell Foster suffered multiple abrasions, contusions and lacerations of his body including a laceration of the right frontal scalp, an abrasion of the right cheek, an abrasion of his left ring finger, multiple abrasions of his right knee, an abrasion of his left leg and contusions of his left occipital scalp. These prevailing patterns of trauma are consistent with Officer McMahon's affirmations that he struck Ronell Foster with his flashlight and pushed him to the ground. However, the absence of an abrasion, contusion or laceration of the skin or body does not exculpate blunt force trauma. This means that Ronell Foster could have suffered additional blunt force traumas, which did not cause grossly discernible anatomic abrasions, contusions, or lacerations.



4. **Did Ronell Foster suffer conscious pain and suffering?**
    a. **Did Methamphetamine, Cannabinoids and, or Ethanol prevent or preclude Ronell Foster from experiencing conscious pain and suffering?**
    b. **Did Methamphetamine, Cannabinoids and, or Ethanol contribute to the death of Ronell Foster?**

It is a generally accepted principle and common knowledge in medicine and forensic pathology, that specific traumatic events generate predictable, reproducible, and specific patterns of traumas and injuries. The patterns of injuries generated by blunt force trauma, electroshock trauma and gunshots, and the mechanisms of sustenance of these patterns of injuries are very well-established in the medical literature and are common knowledge.

Ronell Foster experienced conscious pain and suffering when he sustained his fatal and non-fatal traumas on February 13, 2018 based on the generally accepted principles and common knowledge of medicine and science, on the global constellation, configurations and anatomic conformations of the multimodal and multifaceted traumas sustained by Ronell Foster, and on the prevailing terminal forensic scenario.

Conscious pain and suffering are initiated by widespread free nerve endings situated in the skin, soft tissues, and organs. Pain can be elicited by multiple types of stimuli classified into three broad categories: mechanical, thermal, and chemical pain stimuli. Nerve endings for pain sensations generate electrical action potentials following all forms of tissue damage caused by all types of energies including, but not limited to, kinetic and mechanical energy from blunt force impacts, or from projectiles traveling at high velocities; and thermal, electrical and chemical energy from conducted electricity.

Action potentials are the sub-cellular physiologic basis for noxious conscious sensations and originate from voltage gated sodium and potassium electrolyte membrane pumps in the cell membranes of nerve cells, fibers, and synapses. It takes few 10, 000th of a second to generate action potentials. Action potentials are transmitted through nerve fibers to the brain. They are transmitted in peripheral nerves in the Aδ and C fibers for fast and slow pain respectively at impulse rates of 5-30 meters per second and 0.5-2 meters per second, respectively. There is therefore a double pain sensation, a fast-sharp pain, and a slow pain. The sharp pain apprises the person rapidly of imminent danger and prompts the person to react immediately and remove himself from the painful stimulus or imminent danger. The slow pain becomes greater as time passes resulting in continued intolerable pain and suffering prompting the person to continue to try to relieve the cause of the pain and flee from the imminent danger.

At autopsy Ronell Foster measured 71 inches [1.8 meters]. Ronell Foster felt all types of blunt force, penetrating force, electroshock, and ballistics induced pain within milliseconds of contact with an impacting surface, bullet or conducted electricity. One millisecond is one second divided into 1000 parts. For the slowest nervous mechanisms of pain sensation and consciousness, a man like Ronell Foster felt pain in less than 100 milliseconds.

Nerve pathways transmitting pain, terminate in the spinal cord. Secondary pathways transmit the pain from the spinal cord to the brainstem and thalamus, especially to the reticular activating system of the brainstem. From the thalamus tertiary pathways transmit pain to other basal ganglia, limbic cortex, and neocortex of the brain. Pain stimuli are transmitted to the reticular nuclei of the midbrain, pons, and medulla; to the tectal midbrain and the



periaqueductal gray matter. These lower regions of the brain, i.e. brainstem, are vital for the appreciation of suffering from pain.

Animals with their brains sectioned above the midbrain, to block any impulse reaching the neocortex and cerebral hemispheres, still experience suffering from pain caused by all types of trauma. Complete removal of the somatosensory regions of the cerebral hemispheres does not preclude an animal's ability to perceive and experience pain. Pain impulses entering the brainstem and lower centers of the human brain can cause conscious perception of pain. Pain perception is principally a function of the lower centers of the brain; however, the upper centers and cerebral hemispheres are responsible for the interpretation of the quality of pain.

Blunt force, electroshock and ballistics pain elicit both the fast and slow pain types. Fast pain is felt within milliseconds while slow pain is felt within about one second. Following tissue damages, biochemical tissue reactants like bradykinin, serotonin, histamine, prostaglandins, leukotrienes, potassium ions, substance P, acetylcholine, acids and proteolytic enzymes are expressed to elicit sustained secondary chemical pain in addition to the primary fast pain directly caused by tissue damages. The chemical pain elicited by these chemical reactants is a slow type of suffering pain. The intensity of pain is closely correlated with the rate of tissue damage from energy.

The brain is responsible for and sustains consciousness in human beings. The region of the brain responsible for consciousness is the brainstem. The center in the brainstem, which is responsible for consciousness, is the reticular activating system, which is deeply located in the central regions of the brainstem. As long as the reticular activating system remains anatomically and electrochemically intact, an individual like Ronell Foster will remain conscious and will feel pain and experience suffering. The sensation of pain induces conscious suffering since pain is a noxious sensation, which stimulates the neocortex, limbic cortex, and forebrain to cause mental pain, suffering and anguish, and adrenergic fright and fear. All these neural processes occur in 1000th's of a second [milliseconds]. The human nervous system is one of the most efficient, effective, and optimal operating systems ever known to mankind. After centuries of empirical research mankind has not been able to fully decipher and reproduce the operating systems of the human brain and nervous system.

Ronell Foster's conscious pain and suffering began when he was accosted and chased by Officer McMahon. His frontal cortex, pre-frontal cortex, basal forebrain, limbic cortex, and brainstem nuclei initiated, within milliseconds, the primitive human reflexes of fear, flight, and fright. Unfortunately, there are many segments and individuals in our society who fear the police and would become afraid if a police officer confronts them spontaneously as Officer McMahon confronted Ronell Foster. This perceived imminent threat, initiated the nor-adrenergic and adrenergic biochemical neural responses of fear, flight, and fright, when the locus ceruleus of the brainstem released large amounts of nor-adrenalin to the cerebral hemispheres. This fear and fright response caused high levels of chemical mental pain, suffering and anguish. He exhibited a certain facies, which the officer correctly identified but misinterpreted. His heart started pumping faster [chronotropic effect] and stronger [ionotrophic effect] due to the nor-adrenergic/adrenergic response. His respiratory rate and general muscle tonicity increased as well due to the nor-adrenergic/adrenergic response. All these patho-physiologic processes culminated in high levels of conscious somatic and mental pain, suffering and anguish.



As he fled and ran from Officer McMahon, Ronell Foster suffered high levels of mental anguish, mental pain and suffering, fright, and fear, accompanied by high levels of chemical and somatic physical pain and suffering. He fell to the ground several times and was electroshocked with a Taser at least twice as has been reported by Officer McMahon. At this time, Ronell Foster was fully conscious and aware of his surroundings. His reticular activating center was completely intact and functional. As a 33-year-old male he had the mental capacity to continue to understand a perceived and increasingly imminent danger and threat to his life.

Every blunt force contact and impact he made with unyielding road surfaces and other surfaces while he ran and fell transferred kinetic and mechanical energy to different regions and tissues of his body to cause mechanical tissue disruptions, damages, and injuries. Every electroshock he received transferred electrical, electrothermal and chemical energy to different regions and tissues of his body to cause electroshock and chemical tissue disruptions, damages, and injuries. Ronell Foster sustained serious composite injuries of different regions and tissues of his body. Every tissue damage and electroshock generated action potentials within 10,000th of a second, which were transmitted to the spinal cord and to the brain to precipitate cumulative conscious somatic and mental pain, suffering and anguish. The multimodal nature of the noxious stimuli resulted in synergistic and cumulative conscious experience of very high levels of combined somatic and mental pain, suffering and anguish. The primary injuries initiated secondary tissue injuries, systemic and tissue reactive responses, which elicited novel chemical pain and accentuated the conscious somatic and mental pain, suffering and anguish.

As Ronell Foster was in this state of high-scale conscious somatic and mental pain, suffering and anguish, he received more trauma. Officer McMahon forcefully pushed him to the ground and began hitting him on the head, face and body with his flashlight causing blunt force trauma. Every tissue impact and damage activated nerve endings all over his body, tissues and organs and elicited millions of pain action potentials, which were transmitted to the spinal cord and brain to cause even higher levels of conscious somatic and mental pain, suffering and anguish, which synergized with the existing somatic and mental pain, suffering and anguish, and even caused increasingly higher levels of conscious pain and suffering. Such high levels of conscious somatic and mental pain, suffering and anguish can impair the functioning of the limbic system and autonomic system of the brain and nervous system to cause an acute confusional and/or delirious state. Officer McMahon stated that Ronell Foster at this point was yelling "What the fuck! What are you doing?"

Ronell Foster received even more trauma. He suffered multiple gunshot wounds of his body, which have been described above. The bullets perforated, contused, lacerated, and fractured his skin, soft tissues, organs and bones, brain, and skull. Each and every tissue disruption and damage caused by the each and every bullet in turn activated nerve endings in his skin, soft tissues and viscerae, elicited millions of pain action potentials, which were transmitted to the spinal cord and brain to cause even higher levels of conscious somatic and mental pain, suffering and anguish, which synergized with the existing somatic and mental pain, suffering and anguish, and even caused increasingly higher and extreme levels of conscious somatic and mental pain, suffering and anguish. As he suffered his fatal and non-fatal gunshot wounds, he fell to the ground, suffered additional blunt force impacts, which elicited further conscious somatic pain and suffering. At the moment Ronell Foster was shot, he was fully conscious.

Ronell Foster continued to experience increasingly higher and extreme levels of somatic and mental pain, suffering and anguish induced by all his multimodal traumas. His gunshot wounds



did not cause instantaneous loss of consciousness or death. After he was shot, his fatal wounds instigated the patho-physiological mechanisms and cascades of traumatic shock and death. Death is a physiological process which takes time to occur. He began to lose consciousness progressively. Loss of consciousness is also a physiological process, which also takes time to occur. Consciousness is a continuum with varying levels of consciousness and depths of unconsciousness, which Ronell Foster passed through before he went into traumatic shock and coma and died.

Since loss of consciousness is a spectrum, there are no clear-cut demarcations and distinctions for when a person exactly loses consciousness. However, Ronell Foster was mentally aware that he was dying, which instigated extreme levels of primitive adrenergic fear-fright responses, which caused extreme levels of chemical, mental, and somatic pain, suffering and anguish. There may not be many other hyper-acute types of pain and suffering that can be more severe than the fear of imminent sudden and traumatic death. This is confirmed by the high levels of adrenalin and nor-adrenalin in individuals who experience such deaths and who manifest the catecholamine effect at autopsy.

When he fell to the ground after he was shot, and as his primary and secondary injuries progressed within seconds, more nerve endings in his body, soft tissues and viscerae were recruited, many more action potentials were elicited and caused increasingly higher levels of somatic pain and suffering, still accompanied by extremely high levels of mental pain, suffering and anguish. While he laid on the ground after he was shot, he slowly progressed to death. He remained immobile and physically unresponsive from traumatic shock and eventually died.

Based on the patterns of trauma suffered by Ronell Foster, on the prevailing forensic scenario, and on the generally accepted principles and common knowledge of medicine and science, it is more likely than not that Ronell Foster remained conscious and continued to experience high levels of conscious somatic and mental pain, suffering and anguish until he became unconscious after he sustained the gunshot wounds of his body. He did not lose consciousness and die instantaneously after he sustained the gunshot wounds. He did not suffer catastrophic injuries of his brain and brainstem that would have precipitated instantaneous loss of consciousness and death.

Loss of consciousness and death in this instance could not have been instantaneous since the human brain has an intrinsic ability to survive for a mean of about three to five minutes before suffering irreversible brain damage and brain death from any cause. The brain also has a metabolic reserve of about 5-10 seconds after suffering complete lack of oxygen and glucose before loss of consciousness ensues. Microscopic examination of the H/E stained sections of the brain and lungs confirm that Ronell Foster had enough time after he was shot for his tissues to develop patho-physiological responses to his gunshot wounds before he died. Ronell Foster stopped experiencing conscious pain and suffering when he became unconscious after he sustained the multiple gunshot wounds, which precipitated death.

Although death is frequently immediate, it is rarely instantaneous since death is a process that involves a cascade of patho-physiologic events. The adjective "immediate", within a forensic context, and within the prevailing forensic scenario, in this case, should be interpreted as death occurring as a result of gunshot wounds without the intervention of another object, cause, or factor. It should not be forensically construed as instantaneous.



In summary, Ronell Foster experienced high and progressively extreme levels of somatic and mental pain, suffering and anguish on February 13, 2018 during his fatal trauma event, which began when Officer McMahon accosted him and ended after Officer McMahon shot him. The evidentiary medical and forensic circumstances and findings in this case, the generally accepted principles and common knowledge of medicine and science, confirm that Ronell Foster suffered high to extreme levels of conscious somatic and mental pain, suffering and anguish before he became unconscious and eventually died as a result of his gunshot wounds. He experienced conscious pain and suffering for a total composite median duration[3] of less than 5 minutes before he became unconscious and eventually died[4].

No, Methamphetamine, Cannabinoids and, or Ethanol did not prevent or preclude Ronell Foster from experiencing conscious pain and suffering. The presence of Methamphetamine, Amphetamine, Cannabinoids and Ethanol in Ronell Foster's blood, at the time he sustained his fatal trauma, is of no significant forensic consequence in the differential diagnosis of his conscious pain and suffering.

No, Methamphetamine, Cannabinoids and, or Ethanol did not cause or contribute to the death of Ronell Foster. The presence and levels of Methamphetamine, Amphetamine and Ethanol in the autopsy blood sample of Ronell Foster are of no significant forensic consequence in relation to the underlying cause of his death and the mechanisms and manner of his death.

Toxicologic analysis of Ronell Foster's blood drawn during the autopsy revealed the presence of Methamphetamine [702 ng/mL] and Amphetamine [57 ng/mL]. THC, 11-OH-THC and THC-COOH were also detected in the blood at the following respective levels: 12.4 ng/ml, <2.0 ng/mL and 5.0 ng/mL. Ethanol was also detected at a level of 0.08 grams%.

Amphetamine is a metabolite of Methamphetamine. Methamphetamine or Amphetamine does not stimulate or inhibit naked nerve endings, which are the receptors that generate action potentials for pain sensation. Methamphetamine does not affect the conduction of action potentials in the central nervous system, to and from the spinal medulla and brain and does not modulate the experience of consciousness pain in any clinically useful manner. Methamphetamine or Amphetamine does not have analgesic properties and is not used as an analgesic drug to reduce or control pain.

Cannabinoids are derived from the cannabis plant and are psychoactive drugs, which act on the central nervous system through the cannabinoid receptors in the human brain. Cannabinoids exhibit behavioral and psychoactive effects, producing mood changes, changes in perception, elation, and increased motivation with a primary high and mellowing out effect. Other effects may include impairment of cognitive functioning, changes in reaction time, impairment of learning and memory, impairment of coordination and tracking behavior. Certain Cannabinoids

---

[3] Medicine is not an absolute science and these estimated ranges should not be interpreted as absolute quantitative estimations of time. Quantitative ranges of any measurable index are common practice and are the standard of practice in pathology and medicine.

[4] Officer McMahon, in his deposition testimony [page 109 of transcript], stated that he first encountered Ronell Foster at about 07:40 p.m. He fired the shots at about 07:41 p.m. This would mean that the entire chase, encounter, and shooting occurred in less than one minute. This time schedule seems to be less probable.



have been used as therapeutic agents for the antinausea effects, muscle relaxing effects, anticonvulsant effects and reduction of intraocular pressure. Cannabinoids are not used as analgesics that can reduce a patient's sensation of pain and suffering.

Ethanol is primarily a depressant of the central nervous system. Ingestion of moderate amounts can have antianxiety actions and behavioral disinhibition. Individual signs of intoxication depend on the levels in the blood and tissues and on the person's genetic dispositions and history of chronic use and tolerance. However only a minority of Ethanol users [about 10%] exhibit levels of consumption that are physically and socially detrimental. More severe intoxication exhibit general impairment of CNS function with a condition of general anesthesia, however there is a little margin between anesthetic actions and lethal effects from respiratory depression. Ethanol produces its effects by acting on a number of cellular sites by simultaneously altering the functioning of a number of proteins that affect neuronal excitability including ion channels, kinases and signaling enzymes. Systemic ingestion of Ethanol is not indicated or used for any form of analgesia or for treating any form of pain[5]. A blood Ethanol level of 0.08 grams% may not produce any noticeable or significant behavioral changes or effects in a chronic user of alcohol due to drug tolerance. In someone who drinks alcohol occasionally or who is a naïve user, a level of 0.08 grams% may produce a broad variety of effects ranging from no effect at all, to mild euphoria to decreased inhibitions, increased self-confidence, decreased attention span, to alteration of judgment as related to time and distance[6,7].

The effects of Methamphetamine, Cannabinoids and Ethanol may oppose one another and may result in a balancing neutralization effect in the person who consumes these drugs contemporaneously.

The receptors for pain are the free nerve endings. So, the receptors for the mechanisms of generation and sensation of pain and suffering are different from the receptors and cellular sites for the mechanisms of action of Methamphetamine, Amphetamine, Cannabinoids and Ethanol. The generation and sensation of pain and suffering are complex mechanisms, which involve many different ions, peptides, and enzymes, including but not limited to bradykinin, histamine, potassium ions, acids, serotonin, acetylcholine, proteolytic enzymes, prostaglandins, and substance P.

The toxic effects of a drug cannot be only or fully deciphered solely based on the level of the drug in the blood. This is outside the generally accepted guidelines and standards of practice of clinical pathology and interpretative toxicologic analysis for the determination of cause of death[8]. The toxic effects of a drug are multifactorial and are determined by many independent and sometimes mutually exclusive factors. However, the level of Amphetamine in Ronell Foster's blood was stated to be 0.057 mg/L, very much lower than the expected toxic levels of

---

[5] Hardman JG, Limbard LE, eds. Goodman & Gilman's The Pharmacological Basis of Therapeutics. 10th edition, McGraw-Hill, New York, 2001.
[6] Spitz WU ed. Spitz and Fisher's Medicolegal Investigation of Death. 3rd edition, Charles C Thomas, Springfield, Illinois, 1993.
[7] Baselt RC, Disposition of Toxic Drugs and Chemicals in Man, 11th edition, Biomedical Publications, Seal Beach, California, 2017.
[8] Ferner RE. Post-mortem clinical pharmacology. British Journal of Clinical Pharmacology, 2008;66(4):430-443.



0.20 mg/L[9,10]. The level of Methamphetamine in the blood of Ronell Foster was 0.7 mg/L, which was higher than the toxic level of Methamphetamine which is 0.15 mg/L[11,12]. This is why a determination of the cause of death of any individual should not be based on only the level of a drug in the blood.

The toxic levels and effects of drugs that physicians use and apply to case management and analysis are typically related to therapeutic drug levels and toxicities. However, the National Highway Traffic Safety Administration reports a non-toxic range of 0.01 to 2.5 mg/L[13] in individuals who use Methamphetamine for recreational purposes. This further confirms that the level of Methamphetamine detected in the blood of Ronell Foster was of no significant forensic consequence.

Chronic use of Methamphetamine results in psychologic dependence and tolerance, therefore, the effects of Methamphetamine may be modulated by the drug use history of each individual. Chronic use and exposure result in chronic drug tolerance and resistance. Ronell Foster was a chronic drug user, and people who use Methamphetamine chronically develop drug tolerance and habituation and as time passes would use and need higher levels of drugs to achieve the same effects. Moreover, following death, high tissue levels of drugs migrate/diffuse into the blood, especially in chronic consumers of the drugs, and create artifactually and markedly elevated levels of drugs in the blood when measured at autopsy. Methamphetamine exhibits a post-mortem tissue redistribution of 0.9 – 2.4 heart/femoral ratios[14]. This means that the post-mortem levels of Methamphetamine reported in the autopsy blood sample of Ronell Foster were actually much higher than the pre-mortem levels prior to him being shot. These ratios may be higher in chronic users who have accumulated the drug in their tissues over time.

Therefore, a level of 0.7 mg/L of Methamphetamine may not be of such a significant forensic consequence as it would have been for an individual who has not used Methamphetamine or who has not attained the level of drug tolerance Ronell Foster had attained. This is exemplified by some cases reported on page 1320 of the textbook: "Disposition of Toxic Drugs and Chemicals in Man", eleventh edition, by Randall C. Baselt, PhD. This page states that "Two women found by police asleep in a car had blood Methamphetamine concentrations of 1.7 mg/L and 2.1 mg/L, as well as substantial levels of Diazepam. Methamphetamine blood concentrations of 1.4 – 13 mg/L [average 5.1 mg/L] were found post-mortem in nine drug abusers who died of traumatic injury by violent means. Blood Methamphetamine concentrations of <0.05 – 2.6 mg/L were observed in 27 persons arrested for erratic driving."

---

[9] Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
[10] Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.
[11] Schulz M et al. Therapeutic and toxic blood concentrations of nearly 1000 drugs and other xenobiotics. Critical Care, 2012;16:R136.
[12] Regenthal R et al. Drug levels: therapeutic and toxic serum/plasma concentrations of common drugs. Journal of Clinical Monitoring and Computing, 1999, 15:529-544.
[13] National Highway Traffic Safety Administration. Drugs and Human Performance Fact Sheets. U.S. Department of Transportation- Methamphetamine [and Amphetamine] www.nhtsa.dot.gov
[14] Baselt RC, Disposition of Toxic Drugs and Chemicals in Man, 11th edition, Biomedical Publications, Seal Beach, California, 2017.



On February 13, 2018 Ronell Foster was not dying and was not expected to die either from a natural disease or from drug toxicity when he was riding his bicycle. Every human being who consumes Methamphetamine, Cannabinoids and/ or Ethanol, even on habitual basis, does not die from drug overdose. Majority of human beings who consume these drugs do not die from them. For example, statistical estimates indicate that about 13 million people, 12 years and older, in the United States have reported using Methamphetamine. Only about 100 thousand people [0.77%] visit the ED for Methamphetamine toxicity annually, and only about 3 thousand people [0.02%] die from Methamphetamine toxicity annually[15].

If Ronell Foster was not chased and shot by Officer McMahon, he would not have died on February 13, 2018 at the very young age of 33-years-old. Autopsy did not reveal any natural disease that was killing him or was expected to kill him. He was a healthy individual. The sole and exclusive cause of death of Ronell Foster was the fatal gunshot wounds he suffered when he was shot on February 13, 2018.

I have provided all my opinions and conclusions with a reasonable degree of medical certainty.

I reserve the right to amend, supplement, revise and/or modify my opinions and report, up and to the time of trial, should additional information become available.


Thank you.


Very truly

*[signature]*

Bennet I. Omalu, MD, MBA, MPH, CPE, DABP-AP,CP,FP,NP
Clinical Pathologist, Anatomic Pathologist, Forensic Pathologist, Neuropathologist, Epidemiologist
President and Medical Director, Bennet Omalu Pathology
Clinical Professor of Medical Pathology and Laboratory Medicine, University of California, Davis

---

[15] https://drugabuse.com/library/methamphetamine-history-and-statistics/#how-dangerous-is-methamphetamine-

