1   **RANDY J. RISNER**
    Interim City Attorney, SBN 172552
2   CITY OF VALLEJO, City Hall
    555 Santa Clara Street, 3rd Floor
3   Vallejo, CA  94590
    Tel:     (707) 648-4545
4   Fax:     (707) 648-4687

5   **DALE L. ALLEN, JR.**, State Bar No. 145279
    dallen@aghwlaw.com
6   **JOHN B. ROBINSON**, State Bar No. 297065
    jrobinson@aghwlaw.com
7   ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
    180 Montgomery Street, Suite 1200
8   San Francisco, CA  94104
    Telephone:     (415) 697-2000
9   Facsimile:     (415) 813-2045

10  Attorneys for Defendant
    CITY OF VALLEJO
11

12                  UNITED STATES DISTRICT COURT

13                  EASTERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| 15   I.F., by and through her Next Friend SHASTA SKINNER, individually and as successor-in-interest to Decedent RONELL FOSTER; R.F., by and through his guardian ad litem SHENA BATTEN, individually and as successor-in-interest to Decedent RONELL FOSTER; PAULA MCGOWAN, individually; and RONELL FOSTER, SR., individually, | Case No. 2:18-cv-00673-JAM-CKD **DECLARATION BY JOHN ROBINSON IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ADJUDICATION** Hon. John A. Mendez |
| 20                              Plaintiffs, | Date:     August 25, 2020 Time:     1:30 p.m. Ctrm:     6 (14th Floor) |
| 21        v. | Trial:     December 7, 2020 |
| 22   CITY OF VALLEJO, a municipal corporation; RYAN MCMAHON, individually as a Police Officer for the CITY OF VALLEJO; and DOES 1-50, inclusive, jointly and severally. | |
| 25                              Defendants. | |

26

27  ///

28  ///

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

364113.1

I, JOHN B. ROBINSON, DECLARE AS FOLLOWS:

I am an associate attorney duly licensed to practice law in the State of California and before the Eastern District Court of the United States. I am counsel of record for the defendant City of Vallejo in the above captioned lawsuit, and would and could competently testify, if asked, to the matters set forth below:

1.     Attached as Exhibit "A" in support of defendant's motion for summary judgment is a true, correct, and authentic copy of the relevant portions of the deposition of Shawny Williams.

2.     Attached as Exhibit "B" in support of defendant's motion for summary judgment is a true, correct, and authentic copy of the relevant portions of the deposition of Joseph Iacono

3.     Attached as Exhibit "C" in support of defendant's motion for summary judgment is a true, correct, and authentic copy of the relevant portions of the deposition of Joseph Allio.

4.     Before filing this motion, on June 12, 2020, I spoke with plaintiffs' counsel (Patrick Buelna and Michael Haddad) via telephone to determine whether plaintiffs intended to dismiss allegations against all "DOE" defendants. I advised counsel that defendant City of Vallejo would bring a dispositive motion to dismiss all DOE defendants. We also discussed the Monell allegations and punitive damages. Based on our conversation, I informed counsel of my intention to file a motion for summary adjudication on those particular issues. Mr. Buelna informed me that he intended to file a motion for summary adjudication on the Fourth Amendment Excessive Force claim, and perhaps the issue of Qualified Immunity.

I swear under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my personal knowledge. Signed on this 9th day of July, 2020 in the City of San Francisco, California.

/s/ *John B. Robinson*
John B. Robinson

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

DECLARATION OF JOHN B. ROBINSON
2:18-CV-00673-JAM-CKD

364113.1

# EXHIBIT "A"

```
 1                   UNITED STATES DISTRICT
 2               EASTERN DISTRICT OF CALIFORNIA
 3                        ---o0o---
 4   I.F., by and through her guardian
     ad litem SHASTA SKINNER,
 5   individually and
     successor-in-interest to Decedent
 6   RONELL FOSTER; R.F., by and      No.
     through his guardian ad litem   2:18-cv-00673-JAM-CKD
 7   SHENA BATTEN,
     successor-in-interest to Decedent
 8   RONELL FOSTER; PAULA MCGOWAN,
     individually; and RONELL FOSTER,
 9   SR., individually,
          Plaintiffs,
10   vs.
     CITY OF VALLEJO, a municipal
11   corporation; RYAN MCMAHON,
     individually and in his official
12   capacity as a Police Officer for
     the CITY OF VALLEJO, and DOES
13   1-50, inclusive,
          Defendants.
14   _____/
          A PORTION OF THIS TRANSCRIPT IS CONFIDENTIAL
15
16         DEPOSITION OF CHIEF SHAWNY K. WILLIAMS
17                    PMK City of Vallejo
18
19      Taken before Catherine M. Meyer, RPR, CSR
20                   CSR No. 11596
21                   April 27, 2020
22   Pages 48-58 ARE CONFIDENTIAL AND ARE BOUND SEPARATELY
23
24
25
                                           Page  1
```

1           I N D E X
2                    PAGE
3  EXAMINATION BY MR. HADDAD        5
4  EXAMINATION BY MR. POINTER      82
5
6
7
8
9
10           E X H I B I T S
11        (None marked.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

---

1  DEPOSITION OF CHIEF SHAWNY K. WILLIAMS
2
3     BE IT REMEMBERED, that pursuant to Notice, and on
4  the 27th day of April 2020, commencing at the hour of
5  2:36 p.m., via Zoom virtual meeting, California, before
6  me, Catherine M. Meyer, a Certified Shorthand Reporter,
7  appeared CHIEF SHAWNY K. WILLIAMS, produced as a witness
8  in said action, and being by me first duly sworn, was
9  thereupon examined as a witness in said cause.
10
11        ---o0o---
12  APPEARANCES:
13  For the Plaintiff I.F., by and through her guardian ad
     litem Shasta Skinner, individually and
14  successor-in-interest to Decedent Ronell Foster:
15        MICHAEL J. HADDAD, ESQ.
            Haddad & Sherwin, LLP
16        505 17th Street, Third Floor
            Oakland, California 94612
17        (510) 452-5500
            michael.julia@haddadsherwin.com
18
     For the Plaintiffs R.F., by and through his guardian ad
19  litem Shena Batten, successor-in-interest to Decedent
     Ronell Foster, Paula McGowan, individually; and Ronell
20  Foster, Sr., individually:
21        ADANTE D. POINTER, ESQ.
            PATRICK BUELNA, ESQ.
22        Law Offices of John L. Burris
            7677 Oakport Street, Suite 1120
23        Oakland, California 94621
            (510) 839-5200
24        adante.pointer@johnburrislaw.com
            patrick.buelna@johnburrislaw.com
25

Page 3

---

1  For the Defendant City of Vallejo:
2        DALE ALLEN, ESQ.
            Allen, Glaessner, Hazelwood & Werth
3        180 Montgomery Street, Suite 1200
            San Francisco, California 94104
4        (415) 697-3456
            dallen@aghwlaw.com
5
     For the Defendant Ryan McMahon:
6
            BRUCE KILDAY, ESQ.
7        DERICK KONZ, ESQ.
            Angelo, Kilday & Kilduff, LLP
8        601 University Avenue, Suite 150
            Sacramento, California 95825
9        (916) 564-6100
            bkilday@akk-law.com
10        dkonz@akk-law.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

---

1        MR. HADDAD:  Adante, the court reporter would
2  like you to make the same stipulation about her swearing
3  in the witness remotely.
4        MR. POINTER:  Yes, we can stipulate.  Thank
5  you.
6        MR. ALLEN:  This is Dale Allen.  I stipulate.
7        MR. KONZ:  Derick Konz.  I stipulate.
8        MR. KILDAY:  And Bruce Kilday stipulates.
9        MR. BUELNA:  Patrick Buelna stipulates.
10        CHIEF SHAWNY K. WILLIAMS,
11           sworn as a witness,
12           testified as follows:
13  EXAMINATION BY MR. HADDAD:
14     Q.  Chief, first of all, I want to thank you for
15  enduring this process with us and apologize for having
16  you wait in our virtual waiting room for so long.
17     A.  That's okay.  I'm in my office.  I'm fine.
18     Q.  Is it possible for you to move your computer or
19  camera a little further away from you so we can see a
20  little bit of your desk and get a view?
21     A.  To see the desk?
22     Q.  Yeah.
23     A.  Not really.  It's a pretty big monitor and it's
24  at the end of the desk.
25     Q.  All right.  I just have to ask you on your

Page 5

---

2 (Pages 2 - 5)

1  honor not to review your cell phone or extraneous
2  information in answering questions.  We're going off
3  your best memory.  And if you're going to review
4  something else, we're all entitled to know what that is
5  while you're giving your answer.  Okay?
6      A.  Yeah, that's fine.  I've only been here for
7  five months, so I don't have a lot to review.
8      Q.  All right.  Good.  Maybe this'll be easy.
9      Okay.  Have you been deposed before?
10     A.  No.
11     Q.  So deposition testimony is just like court
12  testimony because you're under oath and it's official
13  testimony.  So this -- the transcript of this could be
14  used in a court proceeding just as if you were live in
15  court.  Do you understand?
16     A.  That's fine.
17     Q.  All right.  If you don't understand a question,
18  just let the questioning attorney know and he'll try to
19  clarify for you.  Okay?
20     A.  Sure.
21     Q.  Have you reviewed anything for this deposition?
22     A.  Just the internal affairs packet that I
23  received.
24     Q.  And what's that?  Is that something that I sent
25  to your attorney for you or is that something different?

Page 6

1      A.  There was a critical incident review that I
2  reviewed, that I looked at, also the DA's finding on
3  this matter that I looked at.  And that's about all that
4  I can recall.  That's about it.
5      Q.  I assume you would have reviewed Chief Allio's
6  three-page memo about the critical incident review, too?
7      A.  Yes.  That's part of that critical incident
8  review, yes.
9      Q.  So do you understand that you're being produced
10  as a witness at this time not only in your personal
11  capacity as the chief but also as the Defendant City of
12  Vallejo's Federal Rule 30B6 designee of the person most
13  knowledgeable regarding the status, investigation,
14  findings, recommendations, approvals and disposition of
15  any and all administrative and/or internal affairs
16  investigations concerning or connected with Ronell
17  Foster's incident on February 13th, 2018, including but
18  not limited to concerning Defendant Ryan McMahon's
19  conduct before the shooting.  So you understand that
20  you're also that person?
21     A.  Yes.
22     Q.  Okay.  Let me start by just asking you to take
23  us through your law enforcement history.  When did you
24  first go to a POST academy?
25     A.  1993.

Page 7

1      Q.  And where did you first work?
2      A.  City of San Jose.
3      Q.  When did that start?
4      A.  March 8th of 1993.
5      Q.  And will you just take us through the different
6  ranks and major assignments that you've had over your
7  career?
8      A.  Sure.  You have to graduate the police academy.
9  From the academy you go into the training program.  You
10  have to pass that.  So I worked patrol for three years,
11  worked violent crime enforcement which is a specialized
12  assignment dealing with gang enforcement.  I was a field
13  training officer after that.  From there I went to the
14  gang investigation unit for three years.  Left the gang
15  investigation unit, went back to patrol.  I was promoted
16  to sergeant I think with about ten years on.  I worked
17  street patrol as a sergeant.  I became what they call a
18  night detective.  That's a detective that responds to
19  all major crimes in San Jose.  So I did that for a few
20  years.  I worked homicide.  From homicide I went to
21  internal affairs.  I was promoted to lieutenant.  As a
22  lieutenant I worked patrol.  From there I went and
23  worked investigations.  I was in charge of juvenile,
24  missing persons and assault.  Was promoted out of there.
25  Well, actually I was an acting captain for a little

Page 8

1  while, was promoted to captain.  And I worked personnel
2  for about three and a half years in charge of
3  recruitment, background, training, a bit of finance
4  stuff.  I was promoted out of -- or went to patrol for
5  about a year and a half.  I was promoted to deputy
6  chief.  And as a deputy chief I was in charge of all
7  major crimes for the City of San Jose for almost five
8  years.
9      Q.  When did you leave San Jose?
10     A.  In November.  So on November 12th I was sworn
11  in as chief of police in Vallejo.
12     Q.  2019?
13     A.  Yes.
14     Q.  That little stint in internal affairs for
15  San Jose, how long was that and when was it?
16     A.  Well, I can't remember the exact year.  It was
17  '07, maybe '08.  I can't remember.  I don't want to give
18  you the wrong year.  And that was for about eight
19  months.
20     Q.  What did you do for that?
21     A.  Internal affairs investigation.
22     Q.  You were the investigator?
23     A.  Yes.
24     Q.  How did you get hired to be the Vallejo chief
25  of police?

Page 9

3 (Pages 6 - 9)

1 compliance with the policy. So an internal affair
2 investigation would need to be fair, thorough and
3 objective and to look at whether or not the employee's
4 action was consistent with our policies and procedures.
5    Q. What's the basic procedure for how those
6 investigations are done?
7    A. Do you mean how they're referred to internal
8 affairs or how they can come in? What are you looking
9 for?
10   Q. Well, internal affairs opens an investigation.
11 How is it handled by your department from internal
12 affairs up to you?
13   A. Well, we have a sergeant that'll conduct a
14 review of that complaint or whatever the matter is.
15 They will do an investigation and make a determination
16 and analysis of what the information that they're given,
17 the facts, and make a determination whether or not it's
18 consistent with our policies and procedures.
19   Q. And then what happens after? Does the sergeant
20 write a report?
21   A. Yes. They will write a report, and that report
22 will be forwarded up the chain to -- to me for review,
23 for final review.
24   Q. And what is your obligation as the chief to do
25 in that final review?

1    A. My obligation would be to see -- to make the
2 determination whether or not those -- the actions --
3 well, I'm going to look at the write-up to make sure
4 that write-up is consistent, logically consistent, fair
5 and objective to see if the actions were consistent with
6 our policies and procedures.
7    Q. So is it your duty as the chief to decide
8 whether to make out any retraining or discipline to an
9 officer?
10   A. Yes, that would be the final recommendation.
11 It would be based -- to make a determination of
12 discipline, yes.
13   Q. So what's the reason why your department even
14 has this internal affairs process?
15   A. It's -- well, it's the law. I mean, we have to
16 have an internal affairs process, but we also want to
17 ensure -- we have a great responsibility in terms of
18 constitutional policing for citizen rights to protect
19 our community. So with that responsibility there needs
20 to be accountability.
21   Q. So the reason for internal affairs
22 investigations is so that your department can have
23 accountability?
24   A. Yes, yes, we have to have accountability. But
25 there needs to be a fair, thorough and objective

1 process, right, because employees have due process
2 rights, too. So we need to ensure that we're following
3 and protecting their rights as well as our community's
4 right to have good 21st century policing. So we want to
5 make sure that we're doing both of those things.
6    Q. I think you also said something along the lines
7 that internal affairs investigations are a way that your
8 department can try to protect constitutional rights; is
9 that accurate?
10   A. That's accurate, yes.
11   Q. Now, as opposed to an internal affairs
12 investigation, what is a critical incident review board
13 investigation?
14   A. Well, the Vallejo Police Department has a
15 critical incident review policy. So when there's a
16 critical incident or use of force, they're obligated to
17 investigate that use of force, to review it.
18   Q. How is that different than what internal
19 affairs issues?
20   A. Internal affairs for me, if there's a policy
21 that needs further investigation and we need to make a
22 determination on whether or not the individual officer
23 followed the policies of the Vallejo Police Department,
24 they would be the avenue in which we would investigate
25 that. The critical incident review, the way that it's

1 currently established, they will review the force for
2 different findings to make a determination of whether or
3 not the actions were within policy or if there was some
4 tactical things that need to be -- could have been
5 better. So they make recommendations to the chief, but
6 they analyze the force.
7    Q. Does the critical incident review board also
8 recommend additional training for involved officers?
9    A. They can, yes.
10   Q. And can they also recommend discipline where
11 it's appropriate?
12   A. No.
13      MR. KONZ: Michael, it looks like Dale may have
14 dropped out. He's the chief's attorney. So...
15      MR. HADDAD: Okay. Thanks.
16      MR. KILDAY: Michael, I'm not sure. Dale just
17 called me and said that he's having some problems. So
18 he's going to reboot and try to get right back in.
19      MR. HADDAD: Okay.
20      (Pause in the proceedings from 2:56 p.m. to
21 3:00 p.m.)
22      MR. HADDAD: Let's go back on now.
23 BY MR. HADDAD:
24   Q. So Chief, it sounds like what you were telling
25 me is that there's some overlap in the purposes of the

1  internal affairs review and critical incident review; is
2  that right?
3      A.  No.  The -- you had asked a question if the
4  critical review can make discipline or recommend
5  discipline I believe, and I said no, it can't.
6      Q.  Right.  But they could both recommend training;
7  is that right?
8      A.  Yes.
9      Q.  And they both look for whether there were
10 policy violations or whether the officers acted
11 appropriately?
12     A.  Well, I misspoke.  You're asking me IA can
13 recommend discipline -- I mean training?
14     Q.  Yes.
15     A.  IA will make a finding on what they're
16 investigating.  So...
17     Q.  Right.
18     A.  And then that's forwarded up the chain of
19 command to me.  So the final personnel to make a
20 recommendation will be the chief in terms of discipline.
21     Q.  You've explained that.  But one of your options
22 for an internal affairs findings is in addition to
23 discipline or instead of it you could recommend
24 training, right?
25     A.  Well, the findings for -- are different for IA,

Page 18

1      Q.  And ultimately the chief could also recommend
2  training as a result of a critical incident review
3  investigation, right?
4      A.  Well, when I look at the critical incident
5  review after I had received that, if there's something
6  that needed further investigation, I would send that, as
7  I did in this case, to IA or professional standards so
8  that they could conduct a further investigation.
9      Q.  Why would you do that?  Because doesn't that
10 just kind of make whatever the CIR did useless?
11     A.  No.  First of all, I wouldn't prejudge a matter
12 because that's not for me to do without all the facts.
13 So in my opinion professional opinion, having worked
14 internal affairs, that's the place where if there's a
15 finding of -- if something is not consistent with our
16 policy, it should be investigated thoroughly and
17 objectively and fairly.  Now, if there's something that
18 is obviously apparent that needs to be trained, we can
19 always do training with officers.  We do that daily.  So
20 there's nothing that precludes us from training someone.
21 But in terms of disciplining someone, that should go
22 through the professional standards process.
23     Q.  How does the Vallejo Police Department use the
24 critical incident review process?
25     A.  Well, it can be used in many different ways.

Page 20

1  correct?  So you can exonerate, right, or there could be
2  no finding or there could be a sustained finding.  If
3  there's a sustained finding, then it would go -- either
4  way it's going to come to the chief for the final
5  review.
6      Q.  My questions are addressed more to the purposes
7  behind those two different reviews.  So let's just take
8  it one by one.  In an internal affairs investigation if
9  there's a sustained finding, you, as chief, could
10 recommend that the officer receive some additional
11 training and/or discipline, right?
12     A.  Yeah, which is different than the IA
13 investigator recommending that.  So I think if I
14 understood your question correctly, that's what you were
15 asking.
16     Q.  No, I wasn't asking about what the
17 investigator.  I was talking about the overall
18 investigation could result in some training if that's
19 what you order as the chief?
20     A.  Correct.
21     Q.  And so a critical incident review would also
22 look to whether the officer's actions and decisions in a
23 critical use of force were consistent with policy,
24 right?
25     A.  Yes.

Page 19

1  But one thing that we can always look at is what we can
2  do better.  We can always improve.  So you can use that
3  process to uncover things that we need to improve on,
4  whether it be policy or training decisions.
5      Q.  Just so I understand, discipline cannot be a
6  result of a critical incident review process; is that
7  correct?
8      A.  The -- the process, currently the policy does
9  not allow for the board, the critical incident review
10 board to make a determination of discipline.
11     Q.  But training could be a result of a critical
12 incident review investigation; is that right?
13     A.  I believe that the intent or one of the intents
14 is to improve the organization.  So if there's things
15 that we could do better, yes, the training commander or
16 sergeant is part of that process.
17     Q.  And are there situations where a critical
18 incident review board and internal affairs could both
19 review the same conduct?
20     A.  Well, during a critical incident, the IA
21 investigators are part of that process from the
22 beginning.  They come in that night to review the
23 matter.  And so is it possible that both -- yes.  Well,
24 you know, the one thing that the critical incident
25 review board won't have is the knowledge to be there

Page 21

6 (Pages 18 - 21)

1 that night to listen to the actual interviews. But they
2 are -- could both be reviewing the same matter, yes.
3    Q. Does the critical incident review board have
4 the opportunity to actually ask questions in the
5 interviews of officers in a shooting incident?
6    A. No.
7    Q. What are the Vallejo PD's -- what are the
8 Vallejo's PD procedures to review the appropriateness of
9 an officer's use of deadly force?
10    A. Well, like I said, professional standards, if
11 an incident of deadly force occurs will be -- will
12 respond to the department to review the shooting or
13 whatever happened. They will be there with the criminal
14 investigators and the DA's office. They can submit
15 questions via the detectives that are actually
16 questioning the officer. So their role will be to
17 conduct an administrative review.
18    Q. But the criminal investigation is really only
19 reviewing whether crimes may have been committed that
20 the DA may act on, right?
21    A. They're going to review thoroughly the entire
22 process and ultimately the DA is going to issue a
23 finding on whether or not the use of lethal force was
24 lawful and consistent with the Fourth Amendment.
25    Q. The criminal investigation doesn't review a

Page 22

1 shooting to see whether civil rights were violated; does
2 it?
3    A. Well, I believe --
4    MR. ALLEN: Can I ask a clarification? Are you
5 asking about the citizen -- sorry, the civilian critical
6 incident review or are you talking about the DA
7 investigation?
8    MR. HADDAD: The homicide investigation. I
9 said criminal investigation. That's what I'm talking
10 about.
11    MR. ALLEN: You're talking about the DA?
12    MR. HADDAD: Yeah.
13    MR. ALLEN: I just wanted to clarify, Michael.
14 I'm not objecting.
15    MR. HADDAD: I know. I'm just trying to
16 clarify for Chief Williams. I don't think I'm asking
17 anything controversial. Just to clarify for the record.
18    MR. ALLEN: I conflated the two and I wanted to
19 clarify.
20 BY MR. HADDAD:
21    Q. What I'm getting at, Chief, and asking you to
22 agree is that the criminal investigation only lists to
23 whether or not crimes may have been committed not
24 whether civil rights violations may have been committed;
25 is that accurate?

Page 23

1    A. Well, if a civil right violation, say a Fourth
2 Amendment right, if you consider that a civil right,
3 that would be a crime. Any excepted use of force could
4 be a violation of a civil right which would be a crime
5 also.
6    Q. But it's not the kind of crime that the local
7 district attorney enforces; is it?
8    A. No. What I'm saying is they're going to look
9 at it to see whether or not those actions were
10 consistent with or a violation of the Fourth Amendment.
11    Q. Who would?
12    A. The district attorney, and ultimately issue a
13 finding on whether or not the actions, the use of force
14 was lawful or not.
15    Q. Many district attorneys will write a report
16 about their decision and explicitly state I'm only
17 deciding whether or not to bring criminal charges beyond
18 a reasonable doubt. I'm not making any statement about
19 civil claims or whether the officers acted in a
20 reasonable manner. Is that your understanding of a
21 typical criminal investigation in an officer-involved
22 shooting?
23    MR. ALLEN: Objection. Lacks foundation, calls
24 for speculation. You can go ahead and answer unless I
25 tell you not to.

Page 24

1    THE WITNESS: Okay. What was the question
2 again?
3 BY MR. HADDAD:
4    Q. Are you aware that many prosecutors, after
5 reviewing an officer-involved shooting, will just make a
6 decision about whether or not to bring criminal charges
7 and will explicitly say in their report I'm not making
8 any opinion about whether there could be civil claims or
9 whether the officer acted negligently or unreasonably?
10 Are you familiar with that kind of a report from the DA?
11    A. Well, I believe the Solano County DA puts some
12 language like that in her writing, yes.
13    Q. So do you agree that at least the Solano County
14 DA is reviewing an officer-involved shooting homicide
15 investigation for whether or not to bring criminal
16 charges?
17    A. Yes.
18    Q. So what mechanism does the Vallejo Police
19 Department have to investigate an officer-involved
20 shooting to determine whether the officer may have
21 violated the Fourth Amendment, for example?
22    A. When we investigate, our professional standards
23 is going to look at and make a determination on whether
24 or not the actions were consistent with our policy.
25    Q. The office of professional standards you said?

Page 25

7 (Pages 22 - 25)

1   A.  Yes.
2   Q.  So is that --
3   A.  It also has -- excuse me.  I'm sorry.
4   Q.  Is that an IA investigation or a critical
5  incident review or what kind of investigation is that?
6   A.  Well, that's one.  The professional standards,
7  which it's not called IA but that's the internal affairs
8  process, but the professional standards unit will
9  conduct an administrative review.  Also we have a
10  critical incident review board that will also look at
11  the use of force.
12   Q.  All right.  So when we've been talking about
13  internal affairs, is that the same thing as the
14  professional standards review?
15   A.  Yes.
16   Q.  Was there ever any Vallejo PD review about
17  whether Officer McMahon violated Ronell Foster's civil
18  rights when he shot him?
19   A.  So we have a professional standards review and
20  we have the critical incident review that was done.  Now
21  you're framing it in terms of a civil rights language.
22  But what I'm saying is there was two reviews that were
23  done.
24   Q.  Is the internal affairs review investigation of
25  the shooting itself completed?

Page 26

1   A.  No.
2   Q.  When was it started?
3   A.  I don't have the exact date in front of me, but
4  I ordered that that be done.
5   Q.  So that wasn't started until after you joined
6  the police department as the chief?
7   A.  Yes.
8   Q.  Did you ever look to try to find out why no
9  administrative investigation of this officer-involved
10  shooting happened for over two years until you became
11  the chief?
12   A.  Like I said before, I can't change what
13  happened in the past, but there was a professional
14  administrative review that's started anytime there's a
15  critical incident like this.  So IA was part of that
16  investigation from the beginning or professional
17  standards.
18   Q.  Right.  But you just told me that the
19  investigation didn't formally begin until you started
20  it; is that right?
21   A.  That's a different level of investigation.  So
22  there are department-initiated investigations in which a
23  chief can say I want you specifically to look at this.
24  So based upon the critical incident review and the
25  opinion that came from Chief Allio at the time, I

Page 27

1  recommended that an internal affairs look at the
2  concerns that were raised.
3   Q.  So let's take a look at Exhibit 1, the first
4  page which is your letter dated January 28, 2020.  Do
5  you have that in front of you?
6   A.  No.
7   Q.  You're familiar with your very short letter
8  from that date though, right?
9   A.  Yes.
10   Q.  Maybe it's actually a memo.  But you wrote "I
11  have concluded my review of this file.  Based upon the
12  issues raised by Interim Chief Joe Allio, I am ordering
13  the Office of Professional Standards to conduct an
14  internal investigation as to whether the Mobile Audio
15  Video Policy and Foot Pursuit Policy were violated by
16  Officer McMahon during this incident," and you signed it
17  as chief of police.  Do you recall that being your memo?
18   A.  Yes.
19   Q.  So the only thing that -- the only internal
20  affairs investigations you started were concerning the
21  audio/video policy and the foot pursuit policy, right?
22   A.  That's correct.
23   Q.  Did you also start an internal affairs
24  investigation to be made about the lawfulness of the
25  shooting itself?

Page 28

1   A.  The -- I had -- no.  The district attorney was
2  conducting an investigation on the lawfulness of the
3  shooting.
4   Q.  A shooting can be unlawful but not be criminal;
5  would you agree?
6   MR. ALLEN:  Objection.  Calls for speculation,
7  argumentative.
8  BY MR. HADDAD:
9   Q.  Do you agree, sir?
10   A.  No.
11   Q.  Did you start a separate investigation of the
12  shooting itself?
13   MR. ALLEN:  Objection.  Vague, overbroad.
14  BY MR. HADDAD:
15   Q.  You can answer.
16   A.  No.  There's already a professional standard
17  administrative review occurring and a district attorney
18  review of that shooting.
19   Q.  That's what I wanted to ask you about.  And I
20  asked you this already.  I asked you when did the
21  professional standards review of the shooting itself
22  begin?
23   A.  On the day that the shooting occurred.
24   Q.  When did it finish?
25   A.  It's still occurring.

Page 29

8 (Pages 26 - 29)

1   Q.  Why does it take over two years?
2   A.  For an administrative review?
3   Q.  Yeah.
4   A.  Okay.  When you look at the totality of the
5   investigation, the DA has to conduct their criminal
6   investigation to make a determination whether or not
7   that shooting was lawful.  That took over -- I don't
8   know how long it took for the DA to do hers.  I really
9   can't answer that.  After our critical incident review
10  was done, there were some concerns raised in which I
11  ordered a look at the audio and the foot pursuit policy
12  of that critical incident.  As to the length of time
13  that it takes, I really can't answer that.  Depending on
14  staffing, resources and everything else, all the other
15  time, conditions, there could be many explanations for
16  that.
17  Q.  Some day in the future can we expect a written
18  report from the professional standards office of your
19  department saying whether or not they conclude that this
20  shooting was consistent with department policies and an
21  appropriate use of deadly force?
22  A.  We have our district attorney that's going to
23  issue a finding whether or not the use of lethal force
24  is lawful and justified.  That's the first line of
25  review.  If there's something else outside of that that

Page 30

1   would lead us to believe that there could be a violation
2   of policy, it's something that we will look at.
3   Q.  I can't get a straight answer from you, Chief.
4   I'm sorry.  Are you looking at it or not?
5   A.  I'm sorry.  Is that a question?
6   Q.  Yeah.  Is your department currently looking at
7   whether this shooting was within policy?
8   A.  The district attorney has issued a statement
9   regarding whether or not this shooting was lawful and
10  consistent with the Fourth Amendment.  I believe that's
11  a pretty strong finding and statement.
12  Q.  Will you answer my question?  Is the
13  professional standards office of your department
14  currently investigating whether the shooting of Ronell
15  Foster was within your department's policy?
16  A.  I don't know how many times I can answer that
17  question for you, but I think I was pretty clear.
18  Q.  No, you haven't answered it.  Are they
19  currently investigating that or not, yes or no?
20  A.  Currently our IA division is looking at the
21  body-worn camera policy and the foot pursuit policy.
22  That's what they're currently looking at.  If they
23  discover something else during that investigation, then
24  that will be documented.
25  Q.  Did they ever write any official findings about

Page 31

1   whether the shooting itself was within department
2   policy?
3   A.  The investigation is not concluded.
4   Q.  What investigation?
5   A.  The current investigation by professional
6   standards.
7   Q.  Into what?  The investigation of what?
8   A.  They are looking at the body-worn camera, the
9   audio/video policy.  They're also looking at the foot
10  pursuit policy.  If there's something else that's
11  uncovered during that investigation, it will be
12  documented.
13  Q.  So your department has never done an
14  administrative investigation of the use of deadly force;
15  is that correct?
16  A.  Like I said, when this critical incident
17  begins, they do an administrative review with the
18  criminal investigators at the beginning of that
19  incident.
20  Q.  Were there any findings from that
21  administrative investigation of the deadly force review?
22  A.  Yes.  The district attorney --
23  Q.  What are they?
24  A.  -- has made a finding that has shown that
25  shooting to be lawful.

Page 32

1   Q.  The district attorney is not your office of
2   professional standards; is it?
3   A.  No.
4   Q.  Has your office of professional standards ever
5   issued any findings about whether the use of deadly
6   force against Ronell Foster was within department
7   policy?
8   A.  The office of professional standards is
9   currently conducting, like I said, an investigation into
10  the audio and video and also the foot pursuit policy.
11  If they uncover anything else, that will be documented.
12  Q.  All right.  So let's just be clear about this.
13  What you're telling me is that the Office of
14  Professional Standards has never issued any findings
15  about whether the shooting itself, the use of deadly
16  force against Ronell Foster, was within policy; is that
17  correct, sir?
18  A.  Well, the critical incident review board issued
19  a finding regarding whether or not that was -- the
20  shooting was within policy, and they saw that it was
21  within policy.
22  Q.  Will you answer my question?
23  MR. ALLEN:  Michael, he did answer your
24  question.
25  MR. HADDAD:  No.

Page 33

9 (Pages 30 - 33)

1 BY MR. HADDAD:
2    Q. Why won't you answer my question? You won't
3 tell me the answer for Office of Professional Standards.
4 Why not?
5        MR. ALLEN: Now you're badgering the witness
6 and you're arguing with him. He has given you the
7 answer.
8        MR. HADDAD: I'm going to keep asking.
9        MR. ALLEN: You don't like the answer, but
10 that's the answer. He's answered your question as he
11 understands it.
12       MR. HADDAD: I'm going to keep asking this
13 question.
14       MR. ALLEN: You're not because if you do, then
15 I'm going to take -- we'll either call -- who do we
16 have? We'll call Judge Mendez and we'll find if the
17 fact that you don't like what he's answering it doesn't
18 work for you. Look, like I said, I'm not objecting to
19 any of this, but he's answered it over and over again.
20 Do you want to take a five-minute break and I will talk
21 to my client and see if there's something he doesn't
22 understand?
23       MR. HADDAD: No. It's a very simple question.
24 It's a yes or no question.
25       MR. ALLEN: He apparently doesn't think it's a

Page 34

1    A. Yes.
2    Q. Policy 300 I believe, right?
3    A. We have policies. We have California law. We
4 have constitutional law, yes.
5    Q. Has the Office of Administrative Standards
6 reached any conclusions about whether the shooting
7 itself, not merely the video recordings or the foot
8 pursuit, were within policy?
9    A. We also have the critical incident review
10 board.
11   Q. I'm not asking you about that right now.
12 Professional standards.
13   A. What I'm explaining to you is that that is an
14 avenue for us if there is a violation of policy, but in
15 this case they found that it was consistent with our
16 policy and use of force policy. If there were, then the
17 avenue would be to refer to IA for further
18 investigation.
19   Q. So given that your Office of Professional
20 Standards, the only office that can recommend discipline
21 of an officer, has never made a determination in this
22 shooting about whether this shooting was consistent or
23 inconsistent with Vallejo's policy and now that you're
24 chief, why don't you start an internal affairs
25 investigation about whether the shooting itself was

Page 36

1 yes or no question. He's answered it over and over
2 again.
3        MR. HADDAD: I'll try it again.
4 BY MR. HADDAD:
5    Q. Chief Williams, you've explained to me the
6 Office of Professional Standards is different from a
7 critical review board, right?
8    A. Yes.
9    Q. It's different from what the DA does, right?
10   A. Yes.
11   Q. Has Vallejo's Office of Professional Standards
12 ever written any conclusions about whether Officer
13 McMahon's use of deadly force against Ronell Foster was
14 within department policy, yes or no?
15   A. The Vallejo Professional Standards is currently
16 conducting an investigation into the foot pursuit policy
17 as well as the audio/video policy to make a
18 determination whether or not those are consistent with
19 our policies, his behavior or actions in that case were
20 consistent. So they're doing that. If there's anything
21 else that they uncover during the course and scope of
22 that investigation, they will document it. But that
23 investigation is not completed.
24   Q. Your department has policies about use of
25 deadly force itself, right?

Page 35

1 within policy?
2        MR. ALLEN: I'm going to object that that's a
3 compound question and assumes facts not in evidence.
4 There's been testimony by Chief Allio that he reviewed
5 this critical incident review and he found that the
6 shooting was within policy.
7 BY MR. HADDAD:
8    Q. Go ahead, sir.
9    A. That's correct.
10   Q. What? What's correct?
11   A. First of all, there was a critical incident
12 review that found that this shooting was within policy.
13 The district attorney made a finding that the shooting
14 was lawful. If I believed that there was a violation of
15 policy, the avenue, the professional standards unit
16 would investigate this to make that determination.
17   Q. What have you done to educate yourself about
18 the facts surrounding this shooting so you could even
19 make such a determination?
20   A. Well, I have almost 28 years of law enforcement
21 experience, I worked homicide, I worked internal
22 affairs, I've looked at the facts of this case, and I
23 agree with the district attorney.
24   Q. Specifically tell me what facts you looked at.
25 What did you review?

Page 37

10 (Pages 34 - 37)

**Page 46**

1  at that moment in time?

2     A.  I'm not making a determination on Chief Allio,

3  on his judgment or his decision making.  I'm just

4  informing you of my judgment and decision making to send

5  it to professional standards.

6     Q.  Without having any training being given to

7  Officer McMahon as recommended by Chief Allio, right?

8     A.  No, that's not accurate.

9     Q.  Well, then why hasn't McMahon gotten that

10  training?

11     A.  Like I said, it's a personnel issue.  He's been

12  on administrative leave since these recommendations

13  occurred.

14     Q.  When is that?

15     A.  Excuse me?

16     Q.  When did his administrative leave start

17  specifically?

18     A.  Before I arrived.

19     Q.  Do you know when?

20     A.  Before I arrived.

21     Q.  What caused him to be on administrative leave?

22     A.  Well, that's a personnel matter.

23     Q.  Well, you have to answer it anyways.  This is a

24  federal civil rights case.

25     MR. KONZ:  The privacy rights of McMahon are in

**Page 47**

1  place still unknowing.

2     MR. HADDAD:  If you want to make this portion

3  of the transcript confidential, we can do that.

4     MR. ALLEN:  I have no objection to McMahon's

5  counsel.  I think that's the safest way to proceed with

6  this.  If we're going to -- I think we're going to be

7  talking about what you reviewed with him.  I will object

8  if it's going into the McCoy case in any way, shape or

9  form because there's a lawsuit on that.

10     MR. KONZ:  Label it confidential.

11     MR. HADDAD:  Okay.  So we're going

12  confidential?

13     MR. ALLEN:  Derick, do you have an objection to

14  it going confidential?

15     MR. KONZ:  No.  That's fine.  We'll do it

16  confidential though.  That's good.

17     MR. HADDAD:  So this portion of the transcript

18  will be confidential.

19

20     (The following portion of the deposition of

21  CHIEF SHAWNY WILLIAMS is confidential, attorney's eyes

22  only.)

23

24

25

**Page 48**

1           UNITED STATES DISTRICT

2        EASTERN DISTRICT OF CALIFORNIA

3           ---o0o---

4  I.F., by and through her guardian

    ad litem SHASTA SKINNER,

5  individually and

    successor-in-interest to Decedent

6  RONELL FOSTER; R.F., by and    No.

    through his guardian ad litem  2:18-cv-00673-JAM-CKD

7  SHENA BATTEN,

    successor-in-interest to Decedent

8  RONELL FOSTER; PAULA MCGOWAN,

    individually; and RONELL FOSTER,

9  SR., individually,

        Plaintiffs,

10  vs.

    CITY OF VALLEJO, a municipal

11  corporation; RYAN MCMAHON,

    individually and in his official

12  capacity as a Police Officer for

    the CITY OF VALLEJO, and DOES

13  1-50, inclusive,

        Defendants.

14                  /

      THIS TRANSCRIPT IS CONFIDENTIAL

15

16    DEPOSITION OF CHIEF SHAWNY K. WILLIAMS

17        PMK City of Vallejo

18

19    Taken before Catherine M. Meyer, RPR, CSR

20         CSR No. 11596

21        April 27, 2020

22        Pages 48-57

23

24

25

**Page 49**

1          I N D E X

2              PAGE

3  EXAMINATION BY MR. HADDAD        52

4

5

6

7

8

9        E X H I B I T S

10      (None marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    MR. ALLEN:  Do you understand the question,
2  Chief?
3    THE WITNESS:  Yes.  So like I said before, if
4  Chief Allio is using a definition from the Lexipol
5  policy, if it's the same as what you read, then I
6  wouldn't be -- I don't have a personal opinion as to
7  that.  If that's the definition that he's using, it's
8  clearly defined within the Lexipol policy, then I'm in
9  agreement with it.
10  BY MR. HADDAD:
11    Q.  You're ultimately in charge of the Lexipol
12  policies, right, for your department?
13    A.  Yes.
14    Q.  Do you know if there is a Lexipol definition of
15  the word "should" in their policies for Vallejo?
16    A.  Do I know?  Have I read that?  I can't recall
17  if I've actually read the definition for "should."
18    Q.  Do you agree with Chief Allio's finding in his
19  memo that Officer McMahon violated your department's
20  body-worn camera policy at the time?
21    A.  I think I've answered this question, but I will
22  repeat it again.  Based upon the concerns that Chief
23  Allio made, I ordered a professional standards
24  investigation specifically to do an investigation and to
25  look at those concerns.  When that investigation comes

Page 66

1  back to me with a finding, then I'll make a final
2  determination regarding that matter.
3    Q.  Can you tell me now whether you agree with
4  those findings or not?
5    MR. KONZ:  That's argumentative.
6    THE WITNESS:  Like I said before, I can't --
7  it's not my position to prejudge this incident or the
8  actions of Ryan McMahon.  We have the professional
9  standards unit that does that, and so that's why this
10  investigation or these concerns were forwarded to the
11  professional standards unit.
12  BY MR. HADDAD:
13    Q.  You also have the critical incident review
14  board, right?
15    A.  That's correct.
16    Q.  And that review board process was complete when
17  it went to Chief Allio and Chief Allio made his
18  disposition, right?
19    A.  Depends on how you define complete.  He made
20  a -- he cited his -- his concerns.  I reviewed that
21  incident and sent it over to professional standards.
22    Q.  When will professional standards be done with
23  this investigation into the foot pursuit policy and the
24  body-worn camera policy that you asked them to start?
25    A.  That's complicated.  I can't determine when

Page 67

1  they're going to be.  They have a lot of different
2  investigations that they do.  But it could be soon
3  within -- maybe within the month.
4    Q.  Well, you're the person most knowledgeable for
5  the whole department about this issue.  So when do you
6  think they will finish their investigation?
7    A.  Like I said.
8    MR. ALLEN:  You can give a best estimate.
9  They're entitled to your best estimate.
10    THE WITNESS:  Okay.  Well, my best estimate is
11  within 30 days, maybe 60 days.
12  BY MR. HADDAD:
13    Q.  And what kind of paper do you expect will be
14  generated at the time that this happens in 30 or
15  60 days?
16    A.  What type of paper?
17    Q.  Yeah.
18    MR. ALLEN:  Objection.  Vague, calls for
19  speculation.
20  BY MR. HADDAD:
21    Q.  When you say it'll be done, what do you mean by
22  that?
23    A.  The investigation.  They will generate a
24  report, professional standards report with findings.
25  They will forward those findings to me.

Page 68

1    Q.  Will it go up the chain of command?
2    A.  Yes.
3    Q.  Do you expect that there will be a nine-month
4  or a six-month lag in getting that up the chain of
5  command as there was after the critical incident review
6  board of this incident?
7    A.  No, sir, not with me here, no.
8    Q.  And then once it goes to you, what will your
9  role be in this internal affairs process?
10    A.  I'll make a determination on discipline if
11  necessary.  I don't know what's going to come back in
12  the finding.
13    Q.  So it's very possible the internal affairs
14  findings on the foot pursuit policy issue and the video
15  recording issue could be different than Chief Allio's
16  findings that he made at the end of the critical
17  incident review process; is that correct?
18    MR. KONZ:  Speculation.
19    MR. ALLEN:  Argumentative.  You can answer,
20  Chief.
21    THE WITNESS:  Yeah, I mean, I can't -- I'm not
22  going to speculate on what I'm going to ultimately do,
23  so I can't really answer that for you.
24  BY MR. HADDAD:
25    Q.  You might find that McMahon was completely

Page 69

18 (Pages 66 - 69)

1 that the shooting was lawful, and my professional
2 standards division is currently conducting an
3 investigation. When they come back with their findings,
4 I'll make a final determination.
5 BY MR. HADDAD:
6    Q. What's your -- but that department is not
7 currently investigating whether the pulling of the
8 trigger was consistent with your policies; is it?
9       MR. KONZ: Same objection to that.
10      THE WITNESS: I think that I've explained this.
11 Our professional standards is conducting an
12 investigation. I don't know how many ways I can
13 continue to explain it in the same way.
14      MR. ALLEN: At this point, Counsel, I'm going
15 to cut off the jam on this. You're going to have to
16 take a motion if you believe you don't have your answer.
17 We're not going to keep doing this for the next two
18 hours if every time you phrase it however you want you
19 get the same answer. If you think he's not answering
20 you properly, we need to get -- if we can get Delaney
21 involved in this and we'll try to deal with it, but it's
22 not going anywhere.
23 BY MR. HADDAD:
24    Q. As the chief of police, do you approve of the
25 way that your department of professional standards is

Page 82

1 handling its investigation of this shooting?
2       MR. KONZ: Vague.
3       MR. ALLEN: Objection. Calls for speculation,
4 vague, overbroad.
5       THE WITNESS: Hopefully in the 30 to 60 days
6 I'll have a copy of the report, the investigation with
7 the finding. I'll make a final determination. But I'm
8 not going to make a prejudgment on facts in the case
9 until it comes to me.
10      MR. HADDAD: I'll turn this over to Adante.
11      MR. POINTER: Thank you.
12 EXAMINATION BY MR. POINTER:
13    Q. Good afternoon, Chief.
14    A. Good afternoon.
15    Q. I have a few questions here. I may skip around
16 a little bit so we don't try to cover some of the
17 ground. But I have been silent for previous portions of
18 this deposition, so there may be areas that I'm unclear
19 that I want to go back over again to see if we can get
20 some clarity.
21       I'm going to start with the -- I understand you
22 testified earlier that you reviewed I believe you said
23 hours of video concerning this incident, correct?
24    A. The entire investigation, yes.
25    Q. But you specifically in the course of your

Page 83

1 review of the shooting death of Ronell Foster, you
2 reviewed hours of videotape capturing portions of the
3 shooting, correct?
4    A. What do you mean by hours?
5    Q. I thought that's what you said. But if it
6 weren't hours, let me ask you this way: How much time
7 did you spend reviewing videotape of this incident?
8    A. I can't tell you how many hours I spent
9 watching the tape. Between reading the reports, looking
10 at the tapes, reading and reviewing the critical
11 incident, yes, a substantial amount of time, yes.
12    Q. Can you give us your best estimate, please?
13    A. No, I can't.
14    Q. So you're not sure whether it was more than ten
15 hours, less than ten hours?
16    A. No.
17    Q. It may have been a matter of minutes?
18    A. No. You know, if I had the actual review in
19 front of me, I may have documented the time, but I can't
20 tell you that.
21    Q. Is that your practice to document the time you
22 spend when you review incidents like this?
23    A. There is a portion in the critical incident
24 review where you may document that. I'm not sure if I
25 did it in this case or not. But it's standard practice

Page 84

1 for the critical incident review, also in some of the
2 internal affair packets that's on there to document the
3 time.
4    Q. So there's a number of different procedures
5 which -- or I shouldn't say procedures. There's a
6 number of different divisions, bureaus, departments
7 within Vallejo PD that clearly you may be very familiar
8 with. And I am not so forgive me if I'm asking some
9 elementary stuff, but I am trying to get some clarity
10 here. So I understand there's a critical incident
11 review board and they took a look at the Ronell Foster
12 shooting, correct?
13    A. Yes.
14    Q. And that review board, I believe you said you
15 reviewed their work, correct?
16    A. Yes.
17    Q. So what I'm trying to figure out is what of
18 their work did you review? Did they give you a report?
19    A. Yes.
20    Q. Did they give you some type of briefing? Both?
21 Can you explain that to me?
22    A. It's a report.
23    Q. Okay.
24    A. It's a report.
25    Q. And do you recall how many pages that report

Page 85

1 was! Like did it have a narrative?  Was it conclusions
2 and findings?  Can you be any more descriptive?
3     A.  I can get the report.  I can't recall the exact
4 number of pages, but it does have a narrative.  I
5 believe it does have a conclusion or finding and then it
6 had Chief Allio's opinions, thoughts.
7     Q.  And in addition to reviewing the report, I
8 believe you said you reviewed Defendant McMahon's
9 statement that he gave to homicide the night of the
10 incident.
11     A.  Yes.
12     Q.  And did you compare the statement he gave to
13 what you saw there on the videotape of the shooting
14 itself?
15     A.  Yes.
16     Q.  Did you find what he said in his statement to
17 the homicide investigators to be consistent with what
18 you saw on the videotape of this incident?
19         MR. KONZ:  I'm going to object.  I don't know
20 if it was a homicide investigator that we're getting
21 into now.
22 BY MR. POINTER:
23     Q.  You can still answer my question, Chief.
24     A.  The finding into that matter is something that
25 IA does.  What I'm waiting for is the final conclusion

Page 86

1 that they're going to come back with in terms of their
2 finding so that I can make a determination.  The
3 district attorney has also come back with her finding
4 into that matter, and she said that the use of force,
5 the lethal use of force is lawful.
6     Q.  I understand that.  And my question is a little
7 different.  But were you finished before I --
8     A.  Yes, I'm done.
9     Q.  What I'm trying to figure out, not
10 necessarily -- I'm not asking your conclusion in terms
11 of whether or not you thought the shooting was lawful or
12 not.  I'm asking as the chief of police, someone who you
13 said you listened to Defendant McMahon's statement and
14 you looked at the videotape, did you find those two to
15 be consistent?
16         MR. KONZ:  Vague.
17         THE WITNESS:  So these are two different facts.
18 One is the videotape, one is a statement.  If you're
19 asking me if his statement was consistent with the
20 videotape, you are asking me to determine whether or not
21 his statement is truthful.  I don't know.  I can
22 interpret that in many different ways.  But the fact is
23 I have a finding that came back from the district
24 attorney.  I have a critical incident review.  We
25 currently have a professional standards IA review

Page 87

1 occurring.  And like I've said before, I'm waiting for
2 that investigation to be complete so I can make a
3 determination.
4 BY MR. POINTER:
5     Q.  I understand that you're waiting on all those
6 procedures and you considered the district attorney's,
7 you considered the critical incident review board,
8 sounds like there's another ongoing investigation.  But
9 what I'm asking you is different.  I'm not asking you to
10 make a determination as it relates to truthfulness or
11 anything.  I'm just saying based upon your review of the
12 underlying materials which you've already testified to,
13 you looked at or reviewed Defendant McMahon's statement
14 and you spent time reviewing the video, did you find the
15 two to be consistent?
16     A.  Consistent with what?
17     Q.  Did you find consistency between what Officer
18 McMahon said took place and then when you reviewed the
19 video, did the two appear to be consistent?
20         MR. KONZ:  I'm going to object to the form of
21 this question.  It's overbroad and vague.
22         MR. ALLEN:  Join.
23 BY MR. POINTER:
24     Q.  You can still answer.
25     A.  I was looking for justification.

Page 88

1     Q.  Understood.  And Officer McMahon, in his
2 statement to investigators from your department, he gave
3 a statement as it relates to what took place, correct?
4     A.  Yes.
5     Q.  And that statement included the justification
6 for his use of deadly force, correct?
7         MR. KONZ:  Objection.  It's a vague question
8 also.
9         THE WITNESS:  Well, I can only tell you this.
10 The district attorney has rendered a finding, our
11 critical incident review board found his actions to be
12 in policy, and currently there's an ongoing professional
13 standards investigation.  Once that comes back, then
14 I'll make a determination regarding that investigation
15 and any other matters of concern that may come up during
16 the course and scope of that professional standard
17 investigation.
18 BY MR. POINTER:
19     Q.  So when you reviewed the video and you had
20 reviewed Defendant McMahon's statements which included
21 the justification for his use of deadly force, are you
22 telling us here today that you didn't arrive at an
23 opinion as it relates to what he said was consistent
24 with what you saw in the video of the incident?
25     A.  What I'm saying is --

Page 89

23 (Pages 86 - 89)

1 use of deadly force was within policy?
2      MR. KONZ:  Objection.  Move to strike.
3      THE WITNESS:  I didn't say that.  And it
4 actually does misstate what I just said.
5 BY MR. HADDAD:
6   Q.  All I'm asking for is a straight answer yes or
7 no.  When you were reviewing the videotape and you had
8 already reviewed Defendant McMahon's statement, were you
9 reviewing the videotape and the statement to determine
10 whether or not Defendant McMahon's use of force was
11 within policy?
12   A.  You misstated what I said several times.
13   Q.  I apologize.
14   A.  Let me answer.
15   Q.  I withdraw my question, Chief.  I'll withdraw
16 my question because I don't want to get bogged down in
17 misstatements.  If I did that, I apologize.
18      My simple question is when you were reviewing
19 the videotape, when you were reviewing Defendant
20 McMahon's statement about what took place up to and
21 including the time he used deadly force against
22 Mr. Foster, were you reviewing that with the idea in
23 mind that you were seeing whether or not that use of
24 deadly force was within policy?
25   A.  You know, like I said, as a new chief one of

Page 94

1   A.  When professional standards conducts an
2 investigation, they're looking at the entirety of the
3 incident.
4   Q.  I understand that.
5   A.  Specifically have been directed to look at
6 those two issues, yes.  But the way that professional
7 standards works is they do a thorough, objective, fair
8 investigation.  So they're going to look at those two
9 issues, and if there's any other issues that come out of
10 that, it will be documented.
11   Q.  But you did not specifically instruct the
12 professional standards division to evaluate the use of
13 deadly force, correct?
14   A.  The professional standards unit is called out
15 when a use of deadly force happens and they begin an
16 administrative review on that day.  So they were there
17 that day.  They were part of the investigation that day,
18 so which means they're already conducting an
19 administrative review into the incident.
20   Q.  Right.  And yet they had been there that day
21 and they were already conducting an investigation into
22 this incident, but you felt the need to direct them to
23 re-evaluate or to continue their investigation into this
24 incident on two regards, on two policy points, right,
25 one is the foot pursuit and the other one was the body

Page 96

1 the things that I need to be familiar with is how
2 internally things are working within the Vallejo Police
3 Department, also with current investigations that are
4 ongoing.  So after reviewing the critical incident
5 review, this investigation, I made a determination based
6 upon the concerns that were raised that professional
7 standards should conduct an investigation and render a
8 finding, and that's currently happening.  So if you look
9 at those policy violations concerns that were raised,
10 and they're going to come back with a finding so that I
11 can take another look at this packet.
12   Q.  So you directed the Department of Professional
13 Standards to investigate the shooting of Ronell Foster
14 specifically along two lines; one is the body camera and
15 the foot pursuit policy, correct?
16   A.  They're going to look at those policies.  If
17 there's any other issues that come up, they will
18 document those as well.
19   Q.  I understand.  But as the chief I'm trying to
20 figure out what you directed them to do.  And it sounds
21 like what you just testified to is to evaluate this
22 incident based upon those two policies.  If they by
23 chance come up with something else, then that's just in
24 addition to what you specifically directed them to do;
25 is that correct?

Page 95

1 camera, correct?
2   A.  That's correct.
3   Q.  But you did not direct them to evaluate this on
4 to find out whether or not the use of deadly force was
5 within policy, correct?
6   A.  I directed them to conduct an investigation
7 into the body-worn camera and the foot pursuit policy.
8   Q.  Thank you.
9      And those are the only two policy points that
10 you specifically directed the professional standard
11 division to evaluate, correct?
12   A.  I don't know how many times I can --
13      MR. ALLEN:  Asked and answered.
14      MR. POINTER:  All we're just looking for is a
15 yes or no.  If he just says yes or no, then we're done.
16      MR. ALLEN:  I can't answer for him, but --
17      MR. POINTER:  I'm not asking you to.
18      MR. ALLEN:  -- I believe he's answered the
19 question the only way he can answer it.  I can't go over
20 his answer --
21      MR. POINTER:  You know we've done this for
22 years.  We could dance all night.  All I'm looking for
23 is a confirmation as to what he did or didn't do.  I
24 want to move on.
25      THE WITNESS:  I do, too.

Page 97

25 (Pages 94 - 97)

```
 1          REPORTER'S CERTIFICATE
 2
 3
 4      I, CATHERINE M. MEYER, a Shorthand Reporter,
 5  State of California, do hereby certify:
 6      That CHIEF SHAWNY K. WILLIAMS, in the foregoing
 7  deposition named, was present via Zoom virtual meeting,
 8  and by me sworn as a witness in the above-entitled
 9  action at the time and place therein specified;
10      That said deposition was taken before me at said
11  time and place, and was taken down in shorthand by me, a
12  Certified Shorthand Reporter of the State of California,
13  and was thereafter transcribed into typewriting, and
14  that the foregoing transcript constitutes a full, true
15  and correct report of said deposition and of the
16  proceedings that took place;
17       That before completion of the proceedings,
18  review of the transcript [ ] was [ X ] was not requested.
19       IN WITNESS WHEREOF, I have hereunder subscribed
20  my hand this 29th day of April 2020.
21
22      Cathe M. Meyer
             CATHERINE M. MEYER, CSR NO. 11596
23      State of California
24
25
                                       Page 106
```

# EXHIBIT "B"

```
 1                  UNITED STATES DISTRICT
 2               EASTERN DISTRICT OF CALIFORNIA
 3                        ---o0o---
 4   I.F., by and through her guardian
     ad litem SHASTA SKINNER,
 5   individually and
     successor-in-interest to Decedent
 6   RONELL FOSTER; R.F., by and      No.
     through his guardian ad litem   2:18-cv-00673-JAM-CKD
 7   SHENA BATTEN,
     successor-in-interest to Decedent
 8   RONELL FOSTER; PAULA MCGOWAN,
     individually; and RONELL FOSTER,
 9   SR., individually,
            Plaintiffs,
10   vs.
     CITY OF VALLEJO, a municipal
11   corporation; RYAN MCMAHON,
     individually and in his official
12   capacity as a Police Officer for
     the CITY OF VALLEJO, and DOES
13   1-50, inclusive,
            Defendants.
14   _____/
15
16            DEPOSITION OF CAPTAIN JOSEPH IACONO
17
18
19        Taken before Catherine M. Meyer, RPR, CSR
20                   CSR No. 11596
21                  April 27, 2020
22
23
24
25

                                              Page  1
```

I N D E X

|  | PAGE |
|---|---|
| EXAMINATION BY MR. HADDAD | 5, 57 |
| EXAMINATION BY MR. KONZ | 50 |

E X H I B I T S

(None marked.)

Page 2

For the Defendant City of Vallejo:

DALE ALLEN, ESQ.
Allen, Glaessner, Hazelwood & Werth
180 Montgomery Street, Suite 1200
San Francisco, California 94104
(415) 697-3456
dallen@aghwlaw.com

For the Defendant Ryan McMahon:

BRUCE KILDAY, ESQ.
DERICK KONZ, ESQ.
Angelo, Kilday & Kilduff, LLP
601 University Avenue, Suite 150
Sacramento, California 95825
(916) 564-6100
bkilday@akk-law.com
dkonz@akk-law.com

Page 4

DEPOSITION OF CAPTAIN JOSEPH IACONO

BE IT REMEMBERED, that pursuant to Notice, and on the 27th day of April 2020, commencing at the hour of 5:14 p.m., via Zoom virtual meeting, before me, Catherine M. Meyer, a Certified Shorthand Reporter, appeared CAPTAIN JOSEPH IACONO, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---o0o---

APPEARANCES:

For the Plaintiff I.F., by and through her guardian ad litem Shasta Skinner, individually and successor-in-interest to Decedent Ronell Foster:

MICHAEL J. HADDAD, ESQ.
Haddad & Sherwin, LLP
505 17th Street, Third Floor
Oakland, California 94612
(510) 452-5500
michael.julia@haddadsherwin.com

For the Plaintiffs R.F., by and through his guardian ad litem Shena Batten, successor-in-interest to Decedent Ronell Foster, Paula McGowan, individually; and Ronell Foster, Sr., individually:

ADANTE D. POINTER, ESQ.
PATRICK BUELNA, ESQ.
Law Offices of John L. Burris
7677 Oakport Street, Suite 1120
Oakland, California 94621
(510) 839-5200
adante.pointer@johnburrislaw.com
patrick.buelna@johnburrislaw.com

Page 3

1   MR. HADDAD:  So this is Michael Haddad.  I
2  represent one of the plaintiffs, one of the minors,
3  I.F., and I agree that the court reporter can swear in
4  the witness from a remote location.
5   MR. KONZ:  This is Derick Konz for Defendant
6  McMahon.  I stipulate.
7   MR. ALLEN:  Dale Allen for the defendant.
8  Stipulate.
9   MR. POINTER:  Adante Pointer for the
10  plaintiffs.  So stipulate.
11       CAPTAIN JOSEPH IACONO,
12        sworn as a witness,
13        testified as follows:
14  EXAMINATION BY MR. HADDAD:
15   Q.  Good afternoon is it Captain Iacono?
16   A.  Yes, sir.
17   Q.  Did I pronounce your last name right, Iacono?
18   A.  You did, sir.
19   Q.  Thank you.
20      Okay.  Have you been deposed before?
21   A.  Yes, sir.
22   Q.  How many times?
23   A.  A dozen.
24   Q.  All right.  So we're just going to ask you some
25  questions.  You're under oath.  And this testimony

Page 5

2 (Pages 2 - 5)

1  you're about to give is just like court testimony. Do
2  you understand that?
3      A.  Did you ask me if I understand that?
4      Q.  I did.
5      A.  I do.
6      Q.  So this is a Zoom deposition. And even if your
7  attorney or some other attorney objects to a question,
8  you still have to answer the question unless your
9  lawyer, who is Mr. Allen, tells you not to. Okay?
10     A.  Okay.
11     Q.  Have you reviewed anything in preparation for
12 this deposition?
13     A.  I have.
14     Q.  What have you reviewed?
15     A.  Written documents.
16     Q.  Which ones?
17     A.  Vallejo police case report regarding this
18 matter. I don't know the case number off the top of my
19 head. I reviewed an incident review report and a memo
20 to a file, to this file from an Interim Chief Allio and
21 current Chief Williams.
22     Q.  What was the case report subject matter that
23 you read about?
24     A.  Mr. Foster's shooting.
25     Q.  Have you reviewed any video recently?

Page 6

1      A.  Recently, no, sir.
2      Q.  Did you have a chance to look at the three
3  policies that we sent over before the deposition?
4      A.  Yes.
5      Q.  Let me just start with those policies. We
6  marked them already. They're Exhibit 2, 3 and 4.
7  They're the Vallejo PD's policies about foot pursuits,
8  vehicle pursuits and video and audio recorders. Is it
9  your understanding that those policies were mandatory
10 for officers to follow when you were in place?
11     A.  It's a strange question. I don't understand.
12     Q.  Are the Vallejo PD policies, the Lexipol
13 policies, mandatory for officers to follow?
14     A.  No.
15     Q.  Are officers free to disregard those policies
16 at will?
17     A.  No.
18     Q.  Can officers be disciplined or even terminated
19 if they fail to obey those policies?
20     A.  I suppose so.
21     Q.  Would you agree that officers are required to
22 follow your department's policies?
23     A.  As a general statement, yes.
24     Q.  Are there any specific situations you're aware
25 of where Vallejo officers are allowed to ignore the

Page 7

1  requirements of a Vallejo Police Department policy?
2      A.  Your question is kind of strange to me. Can
3  you reword it? I could tell you where I'm driving at
4  from my end if you like.
5      Q.  Why don't you do that.
6      A.  Why don't I do that?
7      Q.  Yeah.
8      A.  Okay. Again, the policies are a guideline to
9  do our job to serve us with some, you know, policies and
10 practice. And each one of them individually often
11 states it understands and not every foreseen
12 circumstance can be written down in the policy;
13 therefore, a common sense, reasonable, training and
14 experience have to come into play.
15     Q.  Officers are still expected to follow the
16 policies wherever possible; aren't they?
17     A.  Again, I think that's a general statement I'll
18 say yes to.
19     Q.  Now, you served on the critical incident review
20 board for the Foster shooting, correct?
21     A.  Yes.
22     Q.  Can you explain the purpose of a critical
23 incident review board?
24     A.  Yes. The critical incident review board is to
25 review critical incidents for -- primarily for purposes

Page 8

1  of the way the department training. It's kind of like a
2  lessons learned situation.
3      Q.  Is it the purpose of the critical incident
4  review board to make a determination on behalf of the
5  department about whether or not a particular use of
6  deadly force was within departmental policy?
7      A.  Yes, in a broad sense. It's not the final say
8  obviously, but yeah.
9      Q.  Does the internal affairs review actually
10 have -- strike that.
11        Does your department rely more importantly on
12 an internal affairs review after an officer-involved
13 shooting to determine whether that shooting was within
14 policy?
15     A.  My opinion would be yes.
16     Q.  And why is it that you believe your department
17 would rely more heavily on an internal affairs review of
18 an officer-involved shooting to determine if it was
19 within policy than your department would rely on
20 whatever findings the critical incident review board
21 came up with?
22     A.  Again, the critical incident review board is
23 looking at an incident within the scope of a training
24 and curriculum development.
25     Q.  So they're not focused so much on whether

Page 9

3 (Pages 6 - 9)

Aiken Welch, A Veritext Company
510-451-1580

1 that.  It's got a lot of parts to it.
2 BY MR. HADDAD:
3     Q.  Why don't you tell me.  How does the critical
4 incident review board process help the department to
5 properly supervise its officers in their deadly force
6 decisions?
7     A.  So now we're talking hypotheticals now, sir?
8     Q.  Yeah.
9     A.  Okay.  So take any use of force you want to
10 take, if you want to use deadly force, use deadly force.
11 We would examine the range training issues associated
12 with that particular incident, perhaps the decision
13 making of that particular incident.  If you want to use
14 supervision, I could say -- if you could say supervision
15 if that was an issue, if radio communication was an
16 issue, so all the factors associated with the use of
17 force, it could be built into a training module for the
18 benefit of the whole department.  We are not an internal
19 affairs branch.  We don't investigate individual
20 officers for policy violations.
21 BY MR. HADDAD:
22     Q.  Can you explain that last part of your answer
23 where you said you're not an internal affairs branch,
24 you don't investigate individual officers for policy
25 violations?  What do you mean by that?

Page 14

1 at some point?
2     A.  I have.
3     Q.  Did you ever review any sort of enhanced or
4 slowed down versions of that video?
5     A.  I have.
6     Q.  When did you look at those?
7     A.  Contemporaneous to the incident.
8     Q.  Can you describe how those portions of the
9 video were enhanced or slowed down for you?  How were
10 they made different from the original?
11     A.  They were just slowed down I believe.  I don't
12 know the exact process.
13     Q.  Even the slowed down version that you saw, were
14 you able to determine whether Ronell Foster was able to
15 threaten Officer McMahon with McMahon's flashlight at
16 the moment McMahon fired his first shot?
17     A.  Yes, sir, I was.  I understand.
18     Q.  You could tell from the video?
19     A.  Yes, I could.
20     Q.  And could you tell me what did you see on the
21 video that caused you to believe that Foster was
22 threatening McMahon with the flashlight at the moment of
23 the shot?
24     A.  I could see him raise the flashlight, starting
25 to raise the flashlight up over his head towards

Page 16

1     A.  You can just actually have it read back.  We
2 are not an internal affairs branch, an arm of internal
3 affairs.  We are not looking at the individual officers
4 for policy violations.  We're looking for policy
5 violations on a broad scope that we could change through
6 training.  So we're not here to discipline individual
7 officers.  That's internal affairs' lane, if you will.
8     Q.  Where does your knowledge of the Ronell Foster
9 shooting come from?
10     A.  Many sources.
11     Q.  Why don't you tell me what they are.
12     A.  ==I was the investigations division commander==
13 ==when the situation occurred,== so I was part of it from
14 the criminal aspect the night it happened.  I am a
15 use-of-force expert and I review use of force in part of
16 the critical incident review board, so I definitely look
17 at it from that angle.  And I think that answers your
18 question.
19     Q.  So as part of the homicide investigation as a
20 use of force expert and also as someone on the critical
21 incident review board, those are all three ways in which
22 you became familiar with the facts of this shooting;
23 fair to say?
24     A.  Fair to say.
25     Q.  So I take it you reviewed this shooting video

Page 15

1 McMahon.
2     Q.  And what was Foster's body posture with respect
3 to Officer McMahon at that moment?
4     A.  He was -- as I recall, he was I don't want to
5 say lunging forward but certainly moving forward.  He
6 wasn't going backwards.
7     Q.  So he was facing Officer McMahon?
8     A.  I'm sorry.  Yes, he was facing Officer McMahon,
9 yes.
10     Q.  So the front of Foster's body was facing
11 Officer McMahon at the moment of the shot as far as you
12 could tell?
13     A.  He's not 100 percent facing him.  He was
14 certainly in a forward facing manner, yes.
15     Q.  And it looked like to you that Officer --
16 strike that.
17         To you it looked like Ronell Foster's body
18 momentum was moving in the direction of Officer McMahon
19 when McMahon fired?
20     A.  That's my recollection, yes.
21     Q.  And that's why you believe based on what you're
22 describing right now that that use of deadly force was
23 appropriate; is that fair to say?
24     A.  That's part of it, of course.
25     Q.  If this were a different scenario where you

Page 17

5 (Pages 14 - 17)

1 like me to flip to it?
2 Q. Yeah.
3 A. I have it.
4 Q. It's at page 2 of Allio's memo about in the
5 middle.
6 A. Yeah, I see it.
7 Q. Allio writes "Should" by definition is not
8 considered as optional. Rather by definition it is an
9 expectation used to indicate an obligation or duty." Do
10 you have any reason to disagree with that definition of
11 the term "should" throughout the Lexipol policies?
12 A. I actually do.
13 Q. So why do you disagree with it?
14 A. Because he left out the other part of the
15 equation. It's all good as it's written except for the
16 last part would be minus an extenuating circumstance.
17 Q. If an officer does fail to do something that
18 the policy says he should do, would you agree that an
19 officer better have a very good reason for deviating
20 from that "should" part of the policy?
21 MR. ALLEN: Objection. Calls for speculation.
22 It's argumentative.
23 THE WITNESS: You said a very good reason or a
24 reason?
25 BY MR. HADDAD:

Page 34

1 Q. A good reason.
2 A. A good reason?
3 Q. Yeah.
4 A. Yeah. That's what I said earlier, an
5 extenuating circumstance or reason. Some -- some reason
6 why it didn't happen, yes.
7 Q. But absent some specific reason that shows
8 whether the situation is different than what the policy
9 contemplates, officers are expected to do what the
10 policy says when it says they should do it?
11 A. Minus an extenuating, yes.
12 Q. So your board recommended certain training
13 things at the very last page of this report. The first
14 recommendation was that the Vallejo PD will continue to
15 develop and reinforce early and often body camera usage.
16 Do you recall that?
17 A. I do.
18 Q. And was the reason for that recommendation
19 because McMahon failed to activate his body camera
20 throughout his vehicle pursuit and throughout his foot
21 pursuit up through the use of deadly force?
22 A. Well, again, like I said earlier, we are trying
23 to look at this in the context for the whole
24 department's training. So in a simple sense the answer
25 is yes, but in a broader sense everybody in the

Page 35

1 department needs to have that message reinforced to
2 them.
3 Q. The second recommendation was to update and
4 focus on realistic scenario-based interaction utilizing
5 tactical decision making and shoot/don't shoot/don't
6 shoot. That's all the use of force, deadly force
7 training, right?
8 A. Yes.
9 Q. Before the Foster shooting, how were officers
10 in the Vallejo PD trained to assess whether a particular
11 situation required deadly force?
12 A. Totality of the circumstances based on
13 Graham-Connor decision.
14 Q. And in terms of teaching officers how to make
15 those decisions in the field in very short amounts of
16 time, that's where the scenario training and the
17 shoot/don't shoot training came in, right?
18 A. Correct. So you asked me what's the modality
19 for that training?
20 Q. Yeah.
21 A. Okay. So we have a variety of ways of doing
22 that. We can start with the -- at the range itself, you
23 know, deadly force threatening targets, non-deadly force
24 threatening targets. We have a VirTra system in our
25 possession if you're familiar with that training system,

Page 36

1 sir.
2 Q. Yes.
3 A. So we have that VirTra training system. And
4 then as part of the advanced officer training on a
5 quarterly basis throughout the year, we include a
6 scenario-based tactical decision making, whether it's
7 family car stops man with a gun, family car stops man
8 threatening with a gun, family car stops man with no
9 gun.
10 I'm sorry. I was going kind of fast there,
11 ma'am.
12 Q. Just briefly can you explain how that VirTra
13 training works?
14 A. Yes. I'll go slower. So the VirTra training
15 platform is a 320-degree screen system, so not 360 but
16 almost 360. It has real-life scenarios that have
17 occurred in the world of law enforcement somewhere.
18 They play the scenario. I'm sorry. They give you the
19 information on the scenarios, put you into the
20 scenarios. And then as you're interacting with the
21 scenarios, there's instructors at the control board that
22 have the ability to branch the scenario based on what
23 the officer who is being trained is doing. So if he's
24 using let's just say proper command presence with some
25 verbal de-escalation skills or verbal commands and

Page 37

1 they're convincing, we could have a person drop a knife,
2 put a brick down, whatever it is. Is that helpful?
3   Q. Yes. So these are some of the ways that VPD
4 trained its officers in how to decide whether or not to
5 use deadly force in particular scenarios, right?
6   A. Correct.
7   Q. And all of those were in place before the
8 Foster shooting in 2018?
9   A. Yes. That's become more robust afterwards.
10   Q. Okay. Before the Foster shooting were officers
11 trained to just fire off seven or eight shots, whatever
12 they decided to use deadly force?
13       MR. ALLEN: Objection. It's vague, overbroad,
14 argumentative.
15       THE WITNESS: The question is are the officers
16 shot -- trained to shoot seven or eight rounds?
17 BY MR. HADDAD:
18   Q. Yes, every time that they want to use deadly
19 force.
20   A. Officers -- officers are taught to shoot until
21 there's no longer a threat.
22   Q. So how are they trained to determine in the
23 course of shooting when the threat stops?
24   A. When they see the threat stop, stop shooting.
25   Q. Are they supposed to continually assess the
                                                    Page 38

1 threat as they're shooting?
2   A. Of course. The threat assessment is built into
3 their diagnostic platform.
4   Q. Okay. Let's say hypothetically an officer is
5 facing what he reasonably perceives as a deadly force
6 situation and he fires off one shot and then two shots.
7 He's supposed to be still assessing to decide whether he
8 should fire three or four more shots, right?
9   A. I think that's a reasonable statement, yes.
10 The reassessment is built into the process.
11   Q. So if the threat is stopped by one gunshot,
12 then the officer is trained not to fire additional
13 gunshots; is that fair to say?
14   A. The officer is trained to assess the lack of
15 threat and stop using deadly force.
16   Q. And in any particular situation hypothetically
17 if the threat is a suspect moving towards the officer
18 with a weapon and after one shot, it should be apparent
19 that the person is now moving away from the officer and
20 his back is turned from the officer, that would be a
21 situation where the officer should stop shooting and
22 reassess, right?
23   A. For the conversation we're having here in this
24 hypothetical, yes. But I would ask in your hypothetical
25 are you going to include human factors of
                                                    Page 39

1 action/reaction for an assessment or are you talking
2 just in general terms?
3   Q. Well, let me ask you about that. Do you
4 consider yourself an expert in human factors?
5   A. I've never testified as an expert in human
6 factors, so I guess not.
7   Q. Have you done any experiments or testing in
8 human factors or perception/reaction time? Your answer
9 is no?
10   A. No.
11   Q. And Chief Allio noted there was about a
12 six-month lag time between the end of the critical
13 incident review board report and going up the chain of
14 command. What was the reason for that?
15   A. I have no idea. Where are you looking at that?
16 For reasons unknown?
17   Q. Yeah, he says for reasons unknown. And then
18 the next page after his report is the investigation
19 approval form, and you can see what he was referring to.
20   A. Yeah, I have no insight into that whatsoever.
21   Q. Did you discuss with Chief Allio Chief Allio's
22 memo where he disagreed with certain findings of your
23 committee?
24   A. Yeah, I recall talking to him about that.
25   Q. And did you come around to his point of view on
                                                    Page 40

1 any of those issues?
2   A. Quite the opposite.
3   Q. Can you explain, please?
4   A. I did not agree with him.
5   Q. But I guess as the chief at the time, Chief
6 Allio had the right to make that decision; is that fair
7 to say?
8   A. He had the right to send it forward to an
9 internal affairs investigation?
10   Q. Well, Chief Allio didn't send it for an
11 internal affairs investigation; did he?
12   A. I don't know. Did he? He did not?
13   Q. No, he didn't. He just disagreed with the
14 board's findings and replaced them with his findings on
15 those two issues.
16   A. That I guess I hear what you're saying, yeah.
17 So you asked me if he had the right to do that? Was
18 that the question?
19   Q. As the chief he has the power to do that;
20 didn't he?
21   A. All I can speculate is that he did it, so I
22 guess so.
23   Q. At the end Chief Allio made certain training
24 recommendations which he made clear to us here today.
25 He expected -- were actually requirements that he
                                                    Page 41

Aiken Welch, A Veritext Company
510-451-1580

1 the new chief came in, I told him that Chief Allio was
2 wrong and this needs to be looked at. That's when he
3 took it. I'm sure that was part of the decision-making
4 process of him taking it.
5 BY MR. HADDAD:
6 Q. And did the new chief, Shawny Williams, agree
7 with you?
8 A. I don't know.
9 Q. So you did -- you did what you recommended,
10 that is, create a situation where you wouldn't have to
11 do this training that Chief Allio had said you had to
12 do, right?
13 A. Well, I think that's a fair statement.
14 Q. And Chief Williams basically had the process
15 start over again with the professional standards unit
16 doing an internal affairs investigation; is that fair to
17 say?
18 A. It's not fair to say actually.
19 Q. What's not fair about that?
20 A. Because the process didn't start over again.
21 The process went down a different avenue. So it's not a
22 critical incident review board looking at training for
23 the department. It's an internal affairs investigation
24 looking at an individual for policy violations. Does
25 that make sense?

Page 46

1 Q. Okay. Is there anything in writing that says
2 the chief can't order training for an individual officer
3 as a result of a critical incident review decision?
4 A. I believe there's not.
5 Q. When did you start working with the Vallejo PD?
6 A. January 4th, 2000.
7 Q. Have you worked at any other law enforcement
8 agency in your career?
9 A. I have.
10 Q. Where did you work before that?
11 A. The Vacaville Police Department.
12 Q. And what time did you work there?
13 A. I started there in 1993 to 2000.
14 Q. So you would have attended a POST academy in
15 '93 or so?
16 A. My first job was at the U.C. Davis Police
17 Department in 1990. That's 30 years.
18 Q. Yes. So you came to Vallejo in 2000 and you've
19 worked your way up to captain?
20 A. Correct.
21 Q. And what are your training responsibilities for
22 the department? Let's say what were they in 2019?
23 A. I am the manager for the force options program
24 of western control detail in 2019. Depending on when
25 this was in 2019 actually.

Page 47

1 Q. That's exactly the subject matter of the
2 training that Chief Allio told you to get Officer
3 McMahon; is that correct?
4 A. That's correct.
5 Q. Was there ever to your knowledge an internal
6 affairs investigation as to whether the use of deadly
7 force by Officer McMahon was within department policy?
8 A. Yes.
9 Q. When did that internal affairs investigation
10 into the propriety of the use of deadly force start?
11 A. So you want the process?
12 Q. Yeah.
13 A. So --
14 Q. I'm asking because I've never seen any paper on
15 it from internal affairs, and I'm trying to figure out
16 if they ever looked into it, what went into it.
17 A. That's the question then.
18 Q. So first tell me what's your awareness of a
19 specific internal affairs investigation into whether the
20 use of deadly force itself here was within department
21 policy.
22 A. The process looks like this: The date of the
23 incident there's two parallel investigations occurring
24 simultaneously. One is administrative run by
25 professional standards slash internal affairs of the

Page 48

1 Vallejo Police Department and one is the Solano County
2 fatal incident protocol which is the criminal
3 investigation. They run simultaneously. The internal
4 affairs slash professional standards division
5 investigation shadows along with the criminal
6 investigation. And if they see no potential problems,
7 that's a verbal given to the chief of police. There is
8 no report. There would be no report. That -- that
9 decision on deadly use of force, that ultimately is the
10 district attorney's through Solano County fatal incident
11 protocol.
12 Q. So is that what happened here?
13 A. I guess.
14 Q. Who on behalf of the professional standards
15 unit would have briefed the chief at the time that they
16 thought no concerns for internal affairs issues?
17 A. I don't know. You would have to look back and
18 see who was the command structure of professional
19 standards at the time. I just don't recall.
20 Q. And as far as you know, is that how the Vallejo
21 PD has handled internal affairs investigations of
22 officer-involved shootings going back for many years?
23 A. Yes.
24 Q. Going back as far as ten years even?
25 A. Seems reasonable.

Page 49

13 (Pages 46 - 49)

1    MR. POINTER:  Adante Pointer.  I'm an attorney
2  here.  I represent three of the plaintiffs.  Nice to
3  meet you.
4  BY MR. KONZ:
5    Q.  So Captain, I'll ask you.  The bottom line is
6  when an officer is deciding whether to initiate or
7  continue a foot pursuit, he is supposed to take into
8  account the danger to the public, correct?
9    A.  Correct.
10    Q.  And one thing he's supposed to take into
11  account is the severity of the crime, right?
12    A.  Correct.
13    Q.  But that's not the only thing, that's just part
14  of the equation, right?
15    A.  Yes.
16    Q.  There are other observations that officers make
17  that can also be indicative of someone that is more
18  dangerous to the public, right?
19    A.  I believe that's a true statement.
20    Q.  Okay.  And you've reviewed Officer McMahon's
21  OIS interview on this, right?
22    A.  Yes.
23    Q.  And he relayed some of those observations in
24  the interview; did he not?
25    A.  You said he relayed them?

Page 54

1    Q.  Yeah.  He stated those in the interview?
2    A.  Best of my recollection, yes.
3    Q.  Captain, on the Exhibit 1, I think you have
4  that in front of you, it's the critical incident review
5  board report.  Do you have that in front of you?
6    A.  I do.
7    Q.  And if you look at the page right before that,
8  there's a bunch of signatures on it and it lists the
9  approval page.
10    A.  Yes.
11    Q.  Do you see that?  And your name is on there.
12  You see Captain Iacono?
13    A.  Yes, sir.
14    Q.  And then review time 20 minutes.  Do you see
15  that?
16    A.  I do.
17    Q.  Is 20 minutes how long you spent reviewing this
18  entire case, all the material and everything?
19    A.  So this report comes to me in a blue folder, if
20  you will, you know, like this big (indicating).  And it
21  took me 20 minutes to read through it.  But I have
22  several hours of time into reviewing the case obviously.
23    Q.  Okay.
24    A.  To read the written the complete report took
25  about 20 minutes.

Page 55

1    Q.  You saw no violation of policy in regards to
2  McMahon's use of force in this case; is that right?
3    A.  That's correct.
4    Q.  And you saw no violation in terms of policy in
5  regards to McMahon pre-shooting tactics in this case,
6  correct?
7    A.  So just to reiterate, this critical incident
8  review board is not an internal affairs board.  It's a
9  training review board.  I saw no violations of
10  training -- sorry, no violations of policy that reached
11  the level of a training -- I lost my word --
12  interdiction for training.
13    Q.  I understand.  I get your point.  So what I'm
14  trying to say is at the end of the critical incident
15  review report there are some recommendations that are
16  departmental training, right?
17    A.  Yes.
18    Q.  And those recommendations weren't made because
19  you guys found that McMahon violated a department
20  policy, right?
21    A.  That's exactly what I'm saying.
22    Q.  Right.  And that recommended -- is it fair to
23  say that that training was recommended to the department
24  because this incident provided somewhat of a unique
25  example of a tense and rapidly evolving situation that

Page 56

1  your officers sometimes face and it provided a training
2  opportunity?
3    MR. POINTER:  Objection.  Compound.
4    THE WITNESS:  Well, that's what I was trying to
5  express earlier.  So yes, I understand it.
6    MR. KONZ:  Adante, do you have questions?
7    MR. POINTER:  No.  I was just finishing my
8  objection.  But I was saying compound and vague and
9  ambiguous.  My apologies.
10    MR. KONZ:  Thank you, Captain.  That's all I
11  have.
12    MR. HADDAD:  Just a little follow-up.
13  EXAMINATION BY MR. HADDAD:
14    Q.  Do I understand you right, Captain, that the
15  critical incident review board didn't decide whether or
16  not this particular officer, Officer McMahon, violated
17  any policies?
18    A.  Are you asking me did the critical review board
19  look at policy violations for McMahon?
20    Q.  Right.
21    A.  Correct.
22    Q.  Did you or not?  I don't follow you.
23    A.  So if the critical incident review board found
24  policy violations, they would roll back to internal
25  affairs for an internal affairs investigation which is

Page 57

15 (Pages 54 - 57)

1　　　MR. HADDAD:  Okay.  That's all I got.  Are we
2　done?
3　　　MR. ALLEN:  That's cool.
4　　　MR. HADDAD:  We're done.
5　　　MR. ALLEN:  All done.
6　　　(Whereupon, the deposition was concluded at
7　　　6:36 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 62

1　　　　REPORTER'S CERTIFICATE
2
3
4　　　I, CATHERINE M. MEYER, a Shorthand Reporter,
5　State of California, do hereby certify:
6　　　That CAPTAIN JOSEPH IACONO, in the foregoing
7　deposition named, was present via Zoom virtual meeting
8　and by me sworn as a witness in the above-entitled
9　action at the time and place therein specified;
10　　　That said deposition was taken before me at said
11　time and place, and was taken down in shorthand by me, a
12　Certified Shorthand Reporter of the State of California,
13　and was thereafter transcribed into typewriting, and
14　that the foregoing transcript constitutes a full, true
15　and correct report of said deposition and of the
16　proceedings that took place;
17　　　That before completion of the proceedings,
18　review of the transcript [ ] was [ X ] was not
19　requested.
20　　　IN WITNESS WHEREOF, I have hereunder subscribed
21　my hand this 29th day of April 2020.
22
23　　　*Cathe M. Meyer*
　　　　CATHERINE M. MEYER, CSR NO. 11596
24　　　　State of California
25

Page 63

17 (Pages 62 - 63)

# EXHIBIT "C"

```
 1                    UNITED STATES DISTRICT
 2              EASTERN DISTRICT OF CALIFORNIA
 3                       ---o0o---
 4   I.F., by and through her guardian
     ad litem SHASTA SKINNER,
 5   individually and
     successor-in-interest to Decedent
 6   RONELL FOSTER; R.F., by and      No.
     through his guardian ad litem   2:18-cv-00673-JAM-CKD
 7   SHENA BATTEN,
     successor-in-interest to Decedent
 8   RONELL FOSTER; PAULA MCGOWAN,
     individually; and RONELL FOSTER,
 9   SR., individually,
            Plaintiffs,
10   vs.
     CITY OF VALLEJO, a municipal
11   corporation; RYAN MCMAHON,
     individually and in his official
12   capacity as a Police Officer for
     the CITY OF VALLEJO, and DOES
13   1-50, inclusive,
            Defendants.
14   _____/
15
16            DEPOSITION OF CHIEF JOSEPH F. ALLIO
17
18
19        Taken before Catherine M. Meyer, RPR, CSR
20                  CSR No. 11596
21                  April 27, 2020
22
23
24
25
```

Aiken Welch, A Veritext Company
510-451-1580

```
 1                I N D E X
 2                              PAGE
 3 EXAMINATION BY MR. HADDAD        6, 63
 4 EXAMINATION BY MR. POINTER       42, 65
 5 EXAMINATION BY MR. KILDAY        47
 6
 7
 8
 9
10
11            E X H I B I T S
12 PLAINTIFFS'                    PAGE
13 Exhibit 1   Memo dated 1-28-2020 and     5
              attachments
14
   Exhibit 2   Policy 425, Portable         5
15            Audio/Video Recorders,
              Bates stamp Nos. COV000080
16            through COV000086
17 Exhibit 3   Policy 308, Vehicle Pursuits, 5
              Bates stamp Nos. COV002264
18            Through COV002275
19 Exhibit 4   Policy 427, Foot Pursuits,    5
              Bates stamp Nos. COV002249
20            through COV002253
21
22
23
24
25
                                    Page 2
```

```
 1 For the Defendant City of Vallejo:
 2     DALE ALLEN, ESQ.
       Allen, Glaessner, Hazelwood & Werth
 3     180 Montgomery Street, Suite 1200
       San Francisco, California 94104
 4     (415) 697-3456
       dallen@aghwlaw.com
 5
   For the Defendant Ryan McMahon:
 6
       BRUCE KILDAY, ESQ.
 7     DERICK KONZ, ESQ.
       Angelo, Kilday & Kilduff, LLP
 8     601 University Avenue, Suite 150
       Sacramento, California 95825
 9     (916) 564-6100
       bkilday@akk-law.com
10     dkonz@akk-law.com
11 For Chief Joseph F. Allio:
12     RICHARD OSMAN, ESQ.
       Bertrand, Fox, Elliot, Osman & Wenzel
13     2749 Hyde Street
       San Francisco, California 94109
14     (415) 353-0999
       rosman@bfesf.com
15
16
17
18
19
20
21
22
23
24
25
                                    Page 4
```

```
 1        DEPOSITION OF CHIEF JOSEPH F. ALLIO
 2
 3      BE IT REMEMBERED, that pursuant to Notice, and on
 4 the 27th day of April 2020, commencing at the hour of
 5 1:00 p.m., before me, Catherine M. Meyer, a Certified
 6 Shorthand Reporter, via Zoom virtual meeting appeared
 7 CHIEF JOSEPH F. ALLIO, produced as a witness in said
 8 action, and being by me first duly sworn, was thereupon
 9 examined as a witness in said cause.
10
11            ---o0o---
12 APPEARANCES:
13 For the Plaintiff I.F., by and through her guardian ad
   litem Shasta Skinner, individually and
14 successor-in-interest to Decedent Ronell Foster:
15     MICHAEL J. HADDAD, ESQ.
       Haddad & Sherwin, LLP
16     505 17th Street, Third Floor
       Oakland, California 94612
17     (510) 452-5500
       michael.julia@haddadsherwin.com
18
   For the Plaintiffs R.F., by and through his guardian ad
19 litem Shena Batten, successor-in-interest to Decedent
   Ronell Foster, Paula McGowan, individually; and Ronell
20 Foster, Sr., individually:
21     ADANTE D. POINTER, ESQ.
       PATRICK BUELNA, ESQ.
22     Law Offices of John L. Burris
       7677 Oakport Street, Suite 1120
23     Oakland, California 94621
       (510) 839-5200
24     adante.pointer@johnburrislaw.com
       patrick.buelna@johnburrislaw.com
25
                                    Page 3
```

```
 1        (Plaintiffs' Exhibits 1, 2, 3, 4 premarked for
 2        Identification.)
 3        MR. HADDAD:  Okay.  So I suggest everybody
 4 introduce themselves and who they represent and then
 5 agree to the stipulation that the court reporter can
 6 record this deposition even though she's in a different
 7 physical location from the witness.  This is Michael
 8 Haddad.  I'm the noticing attorney, and I represent one
 9 of the plaintiffs, I.F., and I agree to the stipulation.
10        MR. ALLEN:  This is Dale Allen representing the
11 City of -- oh, I'm sorry.  Adante, the way I'm looking
12 at this gallery, I was next.  Do you want to go?
13        MR. POINTER:  Go ahead.  You already started.
14        MR. ALLEN:  Dale Allen representing the City of
15 Vallejo.
16        MR. POINTER:  Adante Pointer.  I represent the
17 other remaining plaintiffs, the two parents and one of
18 the minor children.
19        MR. BUELNA:  Patrick Buelna.  I also represent
20 the minor child R.F. and as well as the two parent
21 plaintiffs, and I agree to the stipulation.
22        MR. OSMAN:  This is Rich Osman.  I represent
23 Joseph Allio, the former chief of police, and I
24 stipulate to have the witness sworn in out of the
25 presence of the reporter.
                                    Page 5
```

2 (Pages 2 - 5)

1     MR. KONZ:  This is Derick Konz for Defendant
2 Officer McMahon.  I also stipulate.
3     MR. HADDAD:  Dale and Adante, I don't think you
4 stipulated yet.
5     MR. ALLEN:  And I'll stipulate.  I failed to
6 say so.
7     MR. POINTER:  I stipulate as well, Counsel.
8     MR. HADDAD:  So everybody stipulated now.
9 Thank you for bearing with us during these times.
10         CHIEF JOSEPH F. ALLIO,
11         sworn as a witness,
12         testified as follows:
13 EXAMINATION BY MR. HADDAD:
14     Q.  Good afternoon, Chief.  Thank you for appearing
15 today by videoconference.
16     A.  Sure.
17     Q.  Could I ask you to move your screen back a
18 little bit so we can see not only you but a little of
19 the table in front of you?
20     A.  Does that work?
21     Q.  A little bit more.
22     A.  (Witness complies.)
23     Q.  Can you tilt the screen down a little bit?
24     A.  (Witness complies.)
25     Q.  Okay.  That's fantastic.

Page 6

1     All right.  So I have to ask you, Chief Allio,
2 if you would agree to refrain from texting or
3 communicating electronically with your counsel or anyone
4 during the deposition unless we're on an official break.
5 Can we agree to that?
6     A.  Yes.  Agree.
7     Q.  Thank you.
8     So this should proceed just like a regular
9 deposition.  I'm going to ask you questions now that
10 you're under oath and your testimony is going to be just
11 like court testimony.  Do you understand that, sir?
12     A.  Yes.
13     Q.  If you don't understand a question, let me know
14 and we'll try to come to an understanding.  Okay?
15     A.  Sure.
16     MR. KONZ:  Michael, real quick.  Bruce said
17 he's on -- he's got a screen that says he's waiting for
18 the meeting host to let him in.
19     MR. HADDAD:  Yeah, I see now.
20     Hello, Bruce.
21     MR. KILDAY:  Hello.
22     MR. HADDAD:  Welcome.
23     MR. KILDAY:  Thank you very much.
24     MR. HADDAD:  So we swore in the witness.  All
25 counsel stipulated that the court reporter can swear in

Page 7

1 this witness even though she's at a physically different
2 location.  Derick already agreed to that stipulation on
3 behalf of your client but I assume you would, too?
4     MR. KILDAY:  Absolutely.
5     MR. HADDAD:  Thank you.
6     So I'm just going over some of the deposition
7 ground rules.  So far we're about to start.
8 BY MR. HADDAD:
9     Q.  Chief Allio, have you reviewed anything in
10 preparation for this deposition?
11     A.  Yes.
12     Q.  What did you review, sir?
13     A.  So I reviewed the memo that I completed and
14 referenced to the critical incident review.  I reviewed
15 the police report at some level, not all of it but
16 scanned it.  And then the documents that you sent in the
17 e-mail with policy, I reviewed those.
18     Q.  Okay.  Did you review any video?
19     A.  Not in preparation for this.
20     Q.  Okay.  Have you seen the body camera video that
21 depicts some of the shooting at any time?
22     A.  Yes.  When I prepared this memo in reference to
23 the critical incident review and disagreed with the
24 finding, I looked at the body-worn camera of Officer
25 McMahon at that point.

Page 8

1     Q.  And did you have an opportunity then to review
2 that video having been modified by anybody such as being
3 slowed down or cleaned up so you could see it better?
4     A.  That's a good question.  I honestly don't know.
5 I got it.  I had a hard time accessing it at the police
6 department.  And someone there in their IT division
7 assisted me in getting it on my computer screen at work
8 and I watched it a number of times.  But I don't know if
9 it was modified.
10     Q.  All right.  Can you briefly take me through
11 your law enforcement career from when you started until
12 now?
13     A.  Sure.  I started in 1984 South San Francisco
14 Police Department and worked there until 1987 as a
15 patrol officer.  I came to Fairfield in 1987.  I
16 remained there for 30 years retiring in 2017 and worked
17 a variety of assignments through the patrol and
18 investigations through the chain of command.  Then I was
19 retired a couple of years when I was asked to come down
20 to Vallejo for a few months when they had their gap
21 between two chiefs.
22     Q.  What was the highest rank you achieved in
23 Fairfield?
24     A.  Chief of police.
25     Q.  And how long were you chief?

Page 9

3 (Pages 6 - 9)

1    A.  Two years.

2       (The reporter speaks.)

3    THE WITNESS:  Two years.

4  BY MR. HADDAD:

5    Q.  What was the month in 2017 where you came to

6  Vallejo?

7    A.  In 2019?

8    Q.  End of 2019.

9    A.  To Vallejo?

10    Q.  Yeah.

11    A.  Yes.  I came to Vallejo in July of 2019.

12    Q.  Were you working professionally between when

13  you retired from Fairfield and when you started with

14  Vallejo?

15    A.  No.

16    Q.  So when you joined Vallejo, you joined as

17  chief?

18    A.  Yes.

19    Q.  And when did you end your tenure as chief of

20  police for Vallejo?

21    A.  November 12th of 2019.

22    Q.  So when you took the job as the chief with

23  Vallejo, was it anticipated -- did you anticipate at the

24  beginning that this was going to be a temporary

25  position?

Page 10

1    A.  Yes.  It was specifically an interim position

2  while they did a search for a permanent chief.

3    Q.  And while you were the interim chief of

4  Vallejo, were you the highest ranking officer in the

5  Vallejo Police Department?

6    A.  Yes.

7    Q.  While you were chief, were you also ultimately

8  responsible for all of the policies of that department?

9    A.  Yes.

10    Q.  And ultimately responsible for all of the

11  training of the department?

12    A.  Yes.

13    Q.  Also for supervision?

14    A.  Yes.

15    Q.  So you came on after the Ronell Foster

16  shooting, correct?

17    A.  Correct.

18    Q.  Did you know anything about that incident by

19  the time you joined?

20    A.  I likely saw some news reports.  I don't

21  recall.

22    Q.  When was the first time --

23    A.  I'm sorry.

24    Q.  I'm sorry.

25    A.  I still live in the county, so I read or see in

Page 11

1  the news law enforcement-related items.

2    Q.  When was the first time that you were briefed

3  about the Ronell Foster shooting when you were chief for

4  Vallejo?

5    A.  Oh, in the first -- first one or two weeks I

6  had a conversation with the city manager about some of

7  the conflicts in the community and what was related to

8  officer-involved shootings.  So I went back and looked

9  at some of those at that point.

10    Q.  So what did you do to go back and review the

11  Foster shooting?

12    A.  At that point just looked at what was in the

13  newspaper and on television news.  We had a city council

14  meeting that was shut down by a protest in my first

15  council meeting I attended, so it caught my attention.

16    Q.  And did you attempt to determine the status of

17  any sort of internal review that was going on of that

18  shooting?

19    A.  Yes.  Somewhere in the first month I asked

20  about how the department -- I looked at their critical

21  review policy and asked if this case and other recent

22  cases had already been examined.  And so I learned that

23  it had.  And so I asked if it had been completed, and it

24  wasn't.  It was still in process.  So that was in my

25  first month.

Page 12

1    Q.  What review did you determine had been ongoing?

2  What kind of review?

3    A.  The critical incident review process had

4  already occurred.

5    Q.  What about an internal affairs review; was

6  there ever any that done of the Ronell Foster

7  shooting as far as you know?

8    A.  Not that I'm aware of.

9    Q.  Was it normal procedure in Vallejo to only do a

10  critical incident review of an officer-involved shooting

11  and to not do an internal affairs review in addition?

12    A.  That's correct.

13    Q.  Do you know why Vallejo handled

14  officer-involved shootings in that way?

15    A.  I do not.

16    Q.  Was this to confirm your understanding is that

17  for any officer-involved shooting the Vallejo PD would

18  only do a critical incident review and not an internal

19  affairs review; is that accurate?

20    A.  They would do a review at the time it occurred.

21  They didn't do a report, an administrative report when

22  they wrote down their review.  But they would have a

23  parallel internal affairs investigator present during

24  the criminal investigation.  So they would be present.

25  They would review and they would brief the chief of

Page 13

4 (Pages 10 - 13)

1 is a memo from Chief Shawny Williams dated January 28th,
2 2020. The next three pages are a memo that Chief Allio
3 wrote dated October 21, 2019. The next page is critical
4 incident board of review investigation approval form
5 originally dated March 5th, 2019, and then after that is
6 the critical incident board of review report dated
7 January 17, 2019. The last two pages are a press
8 release from the Vallejo PD apparently dated
9 February 14th, 2018. So just directing you to the
10 second page where your memo starts, Chief.
11    A. Yes.
12    Q. By the time that you wrote this memo on
13 October 21, 2019, what had you done to learn about the
14 shooting of Ronell Foster and any investigation of the
15    A. So I obviously reviewed the critical incident
16 group's report first, then I read the police report,
17 then looked at body-worn camera video, then I went into
18 the policy manual and reviewed policy related
19 specifically to foot pursuits and body-worn cameras and
20 noted that in this memo.
21    Q. Now, these policies that you were reviewing at
22 that time, they were relatively -- were they relatively
23 new policies to you given how recent you had joined the
24 Vallejo PD?
25    A. From the Vallejo perspective, yes.

Page 18

1    Q. So I notice that they're policies. When you
2 worked for Fairfield, did Fairfield use Lexipol
3 policies, too?
4    A. Yes, we did.
5    Q. Now, not every police department has the same
6 Lexipol policies; is that your understanding?
7    A. Yes.
8    Q. I would like to kind of go through your memo a
9 little bit. But before I do that, did you have any
10 conversations with anybody in the Vallejo PD about the
11 Foster shooting before drafting this memo?
12    A. Just in general about the shooting or specific
13 to this memo?
14    Q. Well, in general about the shooting first.
15    A. Sure. At some point with the command executive
16 staff when I asked about how critical incident reviews
17 are done, how officer-involved shootings are done, we
18 discussed this case at some level.
19    Q. Did you speak with Officer McMahon at all about
20 the shooting before writing your memo?
21    A. No.
22    Q. So in the first paragraph about the third line
23 you wrote for unknown -- excuse me. You wrote, quote,
24 "For reasons unknown, the review was not forwarded
25 through the chain of command until September 9, 2019."

Page 19

1 What did you mean by that statement?
2    A. I didn't know why it was delayed.
3    Q. What was your understanding of how quickly it
4 should have been sent up the chain from when the review
5 board completed its work?
6    A. Well, I noted it had a date originally of
7 March 5th. So I wanted to make sure I noted the fact
8 that there was a gap between March 5th and
9 September 9th, but I didn't -- I couldn't determine a
10 reason.
11    Q. Did you think that there was some sort of
12 problem that this particular approval form was delayed
13 by six months or so from the end of the critical
14 incident board?
15    A. I didn't know if there was a problem, but I
16 knew there was a gap. So I wanted to identify that I
17 recognized the gap.
18    Q. Right. Did you ever find out why there was
19 that gap in time?
20    A. No. It was a great mystery.
21    Q. Did you ask anybody about it?
22    A. Yeah. I asked Captain Lee Horton. He was over
23 the administrative side of the department. And I never
24 got an answer that was clear. And I wanted to complete
25 this memo, so I left it as gray as it was to me.

Page 20

1    Q. Yeah. Well, did you think that was a good
2 procedure for a department to have a six-month lag
3 between completing a critical incident review of an
4 officer-involved shooting and sending it up for you up
5 the chain?
6       MR. OSMAN: I'm going to object. I think
7 you're assuming facts not in evidence and I think the
8 question is also vague.
9 BY MR. HADDAD:
10    Q. Chief, you're allowed to answer the question.
11 In fact, you still have to answer the question unless
12 your attorney tells you not to. Okay?
13       So the question was did you think that was a
14 good or appropriate procedure for a police department to
15 follow to have a six-month delay to send a finding of a
16 critical incident review board up the chain of command?
17    A. So it's difficult to have an answer because I
18 have no idea why there was a gap. My preference would
19 be that it would be shorter in time.
20    Q. And why would that be your preference?
21    A. So that we could get to the issues. If there
22 were any training issues, we could get to those training
23 issues because if there was any discipline issues, we
24 could get to those discipline issues in a timely
25 fashion.

Page 21

6 (Pages 18 - 21)

1      Q.  What's the importance of training and
2  disciplinary issues related to an officer-involved
3  shooting in a timely manner?
4      A.  The professionalism of the police department is
5  often determined by those two factors, good training and
6  appropriate discipline when necessary.
7      Q.  And good training and appropriate discipline
8  where necessary can also be important for officer safety
9  as well; is that right?
10      A.  Absolutely.
11      Q.  And for public safety?
12      A.  All under the umbrella of professionalism, yes.
13      Q.  And for a department to take appropriate
14  disciplinary action where it's called for in relation to
15  an officer-involved shooting, that can also -- strike
16  that.  I'll ask it differently.
17         If a department fails to take timely and
18  appropriate disciplinary action after investigating an
19  officer-involved shooting, that has the potential to
20  lead to other unlawful conduct by the department or by
21  officers; isn't that right?
22      MR. ALLEN:  Objection.  Overbroad, calls for
23  speculation.
24  BY MR. HADDAD:
25      Q.  You can answer, sir.

Page 22

1  the board determined that there were any violations of
2  policy, procedure or law in connection with an
3  officer-involved shooting, then it was incumbent on the
4  department to take appropriate action to try to prevent
5  those kind of problems from recurring, right?
6      A.  Yes.
7      Q.  And your options for how to prevent any
8  problems that you might have found from recurring would
9  be either training or discipline, right, or both?
10      A.  Yes.
11      Q.  Now, before this report of a critical incident
12  review board reached your desk, it had gone through as
13  far as I can tell at least five other command staff
14  officers; is that right?
15      A.  Let's see.  One, two, three, four.  So what I'm
16  considering is lieutenant and there's four of them on
17  the document.
18      Q.  Okay.
19      A.  And then a sergeant.
20      Q.  So we have Sergeant Ramrakha, Lieutenant
21  Ramsay, Captain Horton, Captain Park and Captain Iacono,
22  all of whom approved the findings of a critical incident
23  review board before that report reached your desk; is
24  that right?
25      A.  That's correct.

Page 24

1      A.  Yeah, you're asking me to speculate on -- on --
2  or how this not coming to me with that behavior, and I
3  don't know the answer.
4      Q.  I'm not asking you about this in particular or
5  narrowing it down to this.  I'm asking you more
6  generally about the concept of having a department
7  engage in timely training and timely discipline where
8  that's appropriate after an officer-involved shooting.
9  If a department in general fails to have a timely
10  response to an officer-involved shooting, especially
11  concerning training issues or discipline, the danger of
12  that is that it could lead to other unlawful conduct by
13  police, right?
14      MR. OSMAN:  Still calls for speculation.  Go
15  ahead.
16  BY MR. HADDAD:
17      Q.  I could see that you answered but I couldn't
18  hear what you said, Chief.
19      A.  Yeah, I would agree.  I would say yes to that.
20      Q.  Based on what you knew with the Vallejo PD,
21  what was the purpose of the critical incident review
22  board review of the OIS?
23      A.  To determine whether the actions of those
24  involved were consistent with policy, procedure and law.
25      Q.  And if the board and the chain of command after

Page 23

1      Q.  Why did you write your memo dated October 21,
2  2019?
3      A.  I saw two areas that I believed were violations
4  of policy, and I referred it back for action related to
5  training of the officer involved.
6      Q.  Now, the critical incident review board also
7  reviewed the appropriateness of use of force by Officer
8  McMahon against Ronell Foster.  Did you have enough
9  information to either agree or disagree with that
10  finding?
11      A.  Yes.
12      Q.  And what did you conclude about that finding?
13      A.  I did not disagree with their finding.
14      Q.  So why was it your opinion that the use of
15  force by Officer McMahon was consistent with Vallejo's
16  policies at the time?
17      A.  So based on the totality of the reporting and
18  then watching the video, I believed that Foster had at
19  the time of lawful request of arrest chose to grab a
20  flashlight and attempt to assault a police officer with
21  it which could be a deadly weapon, and the officer
22  responded with use of force.
23      Q.  Do you have any understanding from the facts
24  about whether Officer McMahon had been striking Ronell
25  Foster in the head with that flashlight just before

Page 25

7 (Pages 22 - 25)

1 Mr. Foster allegedly grabbed it?
2    A. I don't recall the location of the strikes.  He
3 did document that he struck him with the flashlight
4 before Foster took it away from him, but I don't recall
5 the location of the strikes.
6    Q. Officers are generally trained that to strike
7 somebody in the head with a heavy metal flashlight would
8 be a use of deadly force; isn't that true?
9    A. It isn't a location for a strike.  It's not a
10 recommended location for a strike zone.
11    Q. It's a location that could cause severe bodily
12 injury or death, right?
13    A. Our training is specific to where you would
14 strike someone.  The medical side of what hitting
15 somebody in the head can do or not I'm not comfortable
16 talking about.
17    Q. Did you ever see an enhanced version of the
18 video so you could see more detail about exactly what
19 was happening when the officer decided to shoot?
20       MR. OSMAN: Objection.  Asked and answered.  Go
21 ahead.
22       THE WITNESS: The video I saw was poor quality.
23 BY MR. HADDAD:
24    Q. Could you see anything definitive in the video
25 either way?

                                                   Page 26

1    A. The video you could see the ongoing resistance.
2 You could see the attempt of a Taser.  You could see the
3 flashlight in his hand at some point and then gone.  But
4 it was difficult for me to see it in a non-enhanced
5 version.
6    Q. Okay.  Did you ever find out the location of
7 the gunshot wounds on Ronell Foster's body?
8    A. It's in the police report.  I don't recall
9 where he was struck.
10    Q. Let's go through your memo a little bit more.
11 This is still on page 1.  About two-thirds down you
12 wrote "After careful review of the facts of this
13 incident I disagree with this finding.  An
14 Administrative Approval requires a finding that
15 includes; There are no concerns surrounding the tactics
16 employed, and there are no policy violations, including
17 those not related to the application of force.  I find
18 the following policy violations not related to the use
19 of force."  That's what you wrote, right?
20    A. Yes.
21    Q. So the first policy violation that you
22 documented in your report was violation of the foot
23 pursuit policy; is that right?
24    A. Correct.
25    Q. And you pointed out that that policy says,

                                                   Page 27

1 among other things, that officers must be mindful that
2 immediate apprehension of a suspect is rarely more
3 important than the safety of the public and department
4 members, correct?
5    A. Correct.
6    Q. You pointed out the policy goes on to say "If
7 circumstances permit, surveillance and containment are
8 generally the safest tactics for apprehending fleeing
9 felons.  In deciding whether to initiate or continue a
10 foot pursuit, an officer should continuously consider
11 reasonable alternatives to a foot pursuit.  You pointed
12 that out as well, right?
13    A. Yes.
14    Q. And what's the reason, basically your
15 understanding of why your department's policy at the
16 time required officers to consider reasonable
17 alternatives to any foot pursuit?
18    A. Well, it's stated in the policy itself.  It
19 says generally the safest tactic is not apprehending a
20 fleeing suspect.  So the safest way to do so.
21    Q. They prefer officers and safer for the person
22 that's being chased and for the public, right?
23    A. Correct.
24    Q. And you pointed out that the portion of that
25 policy suggests particular alternatives.  Excuse me.  It

                                                   Page 28

1 suggests when officers should consider alternatives
2 given certain situations, right?
3    A. Yes.
4    Q. And one of those specific case you point out is
5 if the officer is acting alone, right?
6    A. Correct.
7    Q. Which we know that Officer McMahon was acting
8 alone in his incident with Mr. Foster, right?
9    A. Yes.
10    Q. You also pointed out that an officer should
11 consider an alternative to a foot pursuit if the officer
12 ever loses radio contact with the dispatcher or other
13 officers, right?
14    A. Correct.
15    Q. And an officer should consider alternatives to
16 a foot pursuit if there's any unanticipated or
17 unforeseen circumstances that unreasonably increased the
18 risk to the officers or the public, correct?
19    A. Correct.
20    Q. And there you pointed out that something that
21 was unforeseen and unreasonably increased the risk to
22 officers or the public was when Officer McMahon tried to
23 use a Taser and it didn't work as intended, right?
24    A. Correct.
25    Q. You explained where the policy used the word

                                                   Page 29

Aiken Welch, A Veritext Company
510-451-1580

1 confirmed "should," S-H-O-U-L-D, that, quote, "Should by
2 definition is not to be considered as "optional" rather
3 by definition it is an" exception -- "it is an
4 expectation used to indicate an obligation, or duty,"
5 unquote. That's what you wrote, right?
6    A. Yes.
7    Q. And you pointed out that "In this incident
8 Officer McMahon failed to recognize the safety and the
9 safety of the suspect Ronell Foster outweighed
10 apprehension for a minor traffic/pedestrian violation."
11 And that "Acting alone without" cover -- "without a
12 cover officer increased the danger to both McMahon and
13 Foster." That was your conclusion, right?
14    A. Yes.
15    Q. What was the significance that McMahon was
16 simply trying to apprehend Foster for a minor traffic or
17 pedestrian violation?
18    A. I don't understand the question.
19    Q. What's the significance of the fact that the
20 violation at issue was minor?
21    A. Actually to me minor or major isn't the issue.
22 The issue is being alone in a foot pursuit without radio
23 contact and the unanticipated lack of Taser, all those
24 minor or major in the event is not the issue that I see.
25    Q. Okay. Given that there's inherent -- strike

Page 30

1 that.
2       Are there inherent risks in any foot pursuit?
3    A. Yes.
4    Q. So given those inherent risks, doesn't it make
5 sense for officers to be extra careful about before
6 deciding to engage in a foot pursuit if the crime is a
7 simple traffic or pedestrian infraction?
8       MR. KILDAY: Objection. Vague and ambiguous as
9 to "extra careful."
10 BY MR. HADDAD:
11    Q. You can answer, sir.
12    A. So the initiation of a foot pursuit for minor
13 or major violations are fine. It's the continuing
14 evaluation of what's occurring that should determine how
15 the officer responds. You don't know. The minor is not
16 the issue.
17    Q. You went on to point out that McMahon failed to
18 notify dispatch of his foot pursuit. What was the
19 problem with that?
20    A. It didn't allow for other officers to respond,
21 set a perimeter and assist in the apprehension of
22 Foster.
23    Q. And then you pointed out that the critical
24 incident review board minimized this critical error
25 directing blame to the reception issues with the radio

Page 31

1 system and officers talking over each other. Did you
2 determine that that minimization of that critical error
3 by the review board was inappropriate?
4    A. Yes.
5    Q. Why?
6    A. There's 41 seconds as noted in the memo
7 where -- or between the foot pursuit and the report of
8 the shooting and the radio traffic only consisted of
9 McMahon being asked for an update. There really wasn't
10 any other issues with radio traffic. So just to blame
11 it on the radio system is inappropriate in this case.
12    Q. So you found that after reviewing the radio
13 logs, Officer McMahon had an opportunity to notify
14 dispatch and other officers of his foot pursuit but
15 simply failed to do so, right?
16    A. Yes. Well, it's not under the log. It's just
17 listening to the radio recording.
18    Q. You next pointed out that Officer McMahon faced
19 an unanticipated circumstance when his Taser failed to
20 stop Foster. And you wrote that "McMahon should have
21 tactically repositioned himself at that point, notified
22 dispatch and attempted to set a perimeter," correct?
23    A. Correct.
24    Q. What did you mean by he should have tactically
25 repositioned himself?

Page 32

1    A. Rather than continuing after Foster, he should
2 have found a safe place to position himself, report the
3 direction Foster was last seen and try to set a
4 perimeter to locate him within.
5    Q. And what's your understanding of the crime that
6 McMahon was trying to apprehend Foster for at that
7 point?
8    A. A traffic violation.
9    Q. What, riding his bike or swerving it into
10 traffic?
11    A. Yes.
12    Q. Did you understand that Officer McMahon had
13 explained in his after-shooting interview that his
14 original intent was not even to give a ticket to
15 Mr. Foster but simply give him a warning that this was
16 dangerous?
17    A. Yes.
18    Q. As the chief, would you have encouraged
19 officers to involve other officers in a foot pursuit and
20 use resources to set up a perimeter to catch somebody
21 who had been riding his bike dangerously in traffic?
22       MR. OSMAN: Object. I think that question is
23 vague. I had a little trouble understanding it.
24 BY MR. HADDAD:

Page 33

9 (Pages 30 - 33)

1   Q. If you understood it, fine.

2   A. Yes. As I said, yes.

3   Q. I couldn't hear you.

4   A. Sorry. Yes, I would encourage officers to set

5 a perimeter on this exact situation as described.

6   Q. You concluded this section of your memo by

7 saying "McMahon continuing the foot pursuit after the

8 Taser failure is a clear violation of policy." Is that

9 still your opinion?

10   A. Yes.

11   Q. Taser failure you're referring to, is that the

12 one when he shot Mr. Foster in pro mode while Foster was

13 still running?

14   A. Yes.

15   Q. In your memo you were also critical of Officer

16 McMahon's failure to activated his portable video

17 recorder, correct?

18   A. Yes.

19   Q. You pointed out that the recorder was -- should

20 have been activated in any enforcement or investigative

21 contact situation, right?

22   A. Yes.

23   Q. And if we look at the policy, Exhibit 2, and

24 about the third page, the policy also said that officers

25 should activate their body-worn cameras for traffic

Page 34

1   A. Recording the entire event gives us more

2 investigative facts as we determine the appropriateness

3 of the officer's actions.

4   Q. Was one purpose for having officers wear

5 body-worn cameras so that department management staff

6 could better supervise officers?

7   A. Yes.

8   Q. And so that department management could take

9 appropriate actions if officers behaved unlawfully?

10   A. Yes.

11   Q. And the body camera that did result from the

12 shooting didn't have any audio through the entire

13 shooting, correct?

14   A. Correct.

15   Q. And that was because the camera wasn't turned

16 on until after the shooting was done, right?

17   A. Correct.

18   Q. You recommended certain actions be taken, so

19 your recommendations are documented on page 3 of your

20 memo. The first one was that Captain Iacono will review

21 the noted violated VPD policy with Officer McMahon,

22 McMahon will sign a training document to be placed in

23 his training file documenting his understanding of these

24 policies, and the second one was Officer McMahon will be

25 assigned to attend a one- to three-day course on officer

Page 36

1 stops. Does that sound familiar?

2   A. It does. It's in the policy. Sorry. I was

3 reading my -- yes.

4   Q. And officers also should activate their

5 body-worn cameras for any sort of self-initiated

6 activity in which the member would normally notify the

7 communications center, right?

8   A. Yes.

9   Q. Which, of course, includes the foot pursuit.

10 He's supposed to notify the communication center for any

11 foot pursuit, right?

12   A. Yes.

13   Q. And the video policy also says that officers

14 should turn their camera on if they have any other

15 contact that becomes adversarial after the initial

16 contact in a situation that would not otherwise require

17 recording. That would certainly -- could apply at

18 various points along this pursuit and interaction

19 between the officer and Mr. Foster, right?

20   A. Yes.

21   Q. You concluded that Officer McMahon violated the

22 department's body-worn camera policy, correct?

23   A. Correct.

24   Q. What was the significance of that policy

25 violation to you as the chief?

Page 35

1 safety and tactics focusing on critical incidents at

2 in-progress crimes; is that right?

3   A. Correct.

4   Q. Why did you recommend those, those things to

5 happen?

6   A. Well, based on the two policy violations that I

7 noted, first I needed to make sure that McMahon had a

8 clear understanding of them and that the captain of his

9 division would provide him verbal training. So that was

10 the first paragraph. And then I wanted him to get

11 additional training because of the failure of these two

12 policy violations in the course of safety and tactics,

13 three, reinforce the academic training he would get from

14 Captain Iacono.

15   Q. If Officer McMahon had called off his foot

16 pursuit as you state he should have done, that likely

17 would have eliminated this shooting; is that correct?

18   MR. OSMAN: Objection. Calls for speculation.

19   MR. ALLEN: Join. Argumentative.

20   MR. KILDAY: I'll join the objections.

21 BY MR. HADDAD:

22   Q. You can answer.

23   A. I have no idea.

24   Q. If he hadn't pursued Ronell Foster into that

25 dark alley all by himself, is there any specific facts

Page 37

10 (Pages 34 - 37)

1 that you have that suggest the shooting still would have
2 happened?
3      MR. ALLEN:  Objection.  Calls for speculation.
4      MR. KILDAY:  Join in the objection.
5      MR. OSMAN:  Join.
6      THE WITNESS:  So I won't speculate.  I could
7 say the only guarantee of the shooting not happening
8 would be Foster subjecting himself to a lawful order of
9 a police officer being taken into custody.  That would
10 have prevented the shooting.  I know that.  But the
11 other speculation I'm not one to guess at.
12 BY MR. HADDAD:
13      Q.  What was the only way that you can say for sure
14 this shooting wouldn't have happened?  Your audio went
15 funny.
16      A.  I'm sorry.  If Foster would have submitted to a
17 lawful arrest as directed by the police officer, then we
18 wouldn't be in this situation today.  But the other --
19 assuming that him running away this would never have
20 happened, I don't know how to answer that part of the
21 question.
22      Q.  Okay.  So that's really the only way that you
23 can think of to have prevented the shooting, that being
24 if Foster didn't continue to resist arrest?
25      A.  If he would have submitted to a lawful arrest

Page 38

1      Q.  Why did you send a copy of your memo to
2 Sergeant Jared Jaksch?
3      A.  He's in the training division.
4      Q.  Now, when you were the chief of police making
5 these recommendations as they're called on this memo,
6 were your recommendations optional for the department to
7 carry out?
8      A.  No.
9      Q.  What do you mean by that?
10      A.  My expectation is they would be carried out.
11      Q.  Who was supposed to make sure that your
12 requirements for training at the end of your memo were
13 carried out?
14      A.  Captain Iacono.
15      Q.  Were those training recommendations that you
16 put on your memo ever carried out?
17      A.  You know, I left in November, so I'm not sure
18 what happened after I left other than I saw the memo
19 from Chief Shawny Williams where he changed direction
20 and referred it I believe to internal affairs to review.
21 I don't know if any of the training was done.
22      Q.  Did you ever talk to Officer McMahon about this
23 shooting?
24      A.  No.
25      Q.  Or about the training?

Page 40

1 right at the start, we would not be having this
2 conversation.
3      Q.  You can't think of anything that Officer
4 McMahon should have done that could have prevented this
5 shooting or the need for it?
6      A.  The behavior --
7      MR. KILDAY:  It calls for speculation.
8      You can go ahead and answer, sir.
9      THE WITNESS:  Yeah, I documented my concerns
10 with Officer McMahon in this memo.
11 BY MR. HADDAD:
12      Q.  Those concerns you documented are things that
13 could have prevented the shooting if McMahon had obeyed
14 the policy in those areas, right?
15      MR. ALLEN:  Objection.  Calls for speculation.
16      THE WITNESS:  Yeah.
17      MR. KILDAY:  Join.
18      MR. OSMAN:  Join.
19      THE WITNESS:  Well, I don't know how I could
20 even ever get close to saying that.  We don't know what
21 would have happened if he would have set up a perimeter.
22 There's no way to know how Foster would have reacted to
23 multiple officers or citizens who were put at risk by
24 his behavior.  To guess at this would be inappropriate.
25 BY MR. HADDAD:

Page 39

1      A.  No.
2      Q.  Did you ever talk to Captain Iacono about the
3 issues described in your memo or the training you
4 sought?
5      A.  Yes.
6      Q.  Tell me about that discussion, please.
7      A.  When I presented him the memo, I just described
8 to him what I have documented here and how I wanted him
9 to carry it out.
10      Q.  And what did he say to you in response?
11      A.  I don't recall.
12      Q.  Did he acknowledge?
13      A.  Yes, he acknowledged it.
14      Q.  Did he acknowledge what your order was and then
15 he would carry it out?
16      A.  Yes.
17      Q.  Did you speak with any other member of the
18 critical incident review board concerning the findings
19 in your memo?
20      A.  I don't believe so.  Let me look at the names
21 one more time.  Okay.  I did talk to Captain Horton
22 about the findings, and I believe that's all.
23      Q.  What did you discuss with Captain Horton?
24      A.  Just told him I reviewed the critical incident
25 and that I had some concerns on the foot pursuit and the

Page 41

11 (Pages 38 - 41)

1 little bit about the video that you reviewed, the
2 body-worn camera video of the incident.  Do you remember
3 that as well?
4     A.  Yes.
5     Q.  And if I understood you correctly, your
6 determination that the use of force was within training
7 and policy was based upon the representations that were
8 made to you that Mr. Foster had retrieved Defendant
9 McMahon's flashlight and had used it or presented in an
10 assaultive way; is that correct?
11     A.  Yes.
12     Q.  Okay.  Now, and that was based upon you
13 reviewing the police reports, Mr. McMahon's -- Defendant
14 McMahon's statements as well as the video, correct?
15     A.  Correct.
16     Q.  So if you were to see enhanced video that
17 showed that -- the presentation of the flashlight and it
18 being grabbed, if you will, from Defendant McMahon
19 didn't happen, that would cause you to change your
20 position, correct?
21     MR. ALLEN:  Objection.  Calls for speculation,
22 improper hypothetical, assumes facts not in evidence.
23     MR. OSMAN:  Join the objection.
24     MR. KILDAY:  I join.
25     THE WITNESS:  So yeah, that's pretty broad.

Page 66

1 I'd have to see the video to make sure.
2 BY MR. POINTER:
3     Q.  Exactly.  The point is though is that your
4 determination that this force was lawful is based upon
5 your review of what you said was a poor quality video,
6 correct?
7     A.  Yes.
8     Q.  And Officer McMahon's statements as it relates
9 to what took place between he and Mr. Foster which he
10 alleges or claims that Mr. Foster took the flashlight
11 and then presented it in an assaultive way, correct?
12     A.  Yeah, those two key pieces and then the one
13 witness who described some sort of struggle and a fight
14 going on also gave some indication to me that supported
15 witness information.
16     Q.  Right.  And you understand in your experience
17 as a police officer that witnesses oftentimes get things
18 wrong, correct?
19     MR. ALLEN:  Objection.  Calls for speculation.
20 BY MR. POINTER:
21     Q.  Correct?
22     A.  Yeah, we all did.
23     Q.  Okay.  Exactly.  So -- and the physical
24 evidence, i.e., the body-worn camera, is objective
25 evidence as it relates to what took place, correct?

Page 67

1     A.  It gives you a view.
2     Q.  But it's not biased, right?
3     A.  Yeah, the view that you get is not biased.
4     Q.  Exactly.  And so if you were to -- looking
5 at -- saw poor quality video, you have the officer's
6 statement and you have a witness statement.  If you were
7 presented with, as we just agreed, objective evidence,
8 i.e., a video, enhanced video that showed what took
9 place, you would defer to that in terms of changing your
10 opinion as to what took place, correct?
11     A.  It might, yeah.
12     MR. POINTER:  Thank you.  No further questions.
13     MR. HADDAD:  Nothing further.
14     MR. ALLEN:  No questions.
15     (The reporter speaks.)
16     MR. KILDAY:  Yes, off the record.
17     MR. HADDAD:  Yes.
18     (Whereupon, the deposition was concluded at
19     2:24 p.m.)
20
21
22
23
24
25

Page 68

1          REPORTER'S CERTIFICATE
2
3
4     I, CATHERINE M. MEYER, a Shorthand Reporter,
5 State of California, do hereby certify:
6     That CHIEF JOSEPH F. ALLIO, in the foregoing
7 deposition named, was present via Zoom virtual meeting,
8 and by me sworn as a witness in the above-entitled
9 action at the time and place therein specified;
10     That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17     That before completion of the proceedings,
18 review of the transcript [ ] was [ X ] was not requested.
19     IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 29th day of April 2020.
21
22     *Catherine M. Meyer*
      CATHERINE M. MEYER, CSR NO. 11596
23      State of California
24
25

Page 69

18 (Pages 66 - 69)