1  BRUCE A. KILDAY, S.B. #66415
       Email:  bkilday@akk-law.com
2  DERICK E. KONZ, S.B. #286902
       Email:  dkonz@akk-law.com
3  **ANGELO, KILDAY & KILDUFF, LLP**
   Attorneys at Law
4  601 University Avenue, Suite 150
5  Sacramento, CA  95825
   Telephone:  (916) 564-6100
6  Telecopier:  (916) 564-6263

7  Attorneys for Defendant RYAN McMAHON

8

9                 **UNITED STATES DISTRICT COURT**

10               **EASTERN DISTRICT OF CALIFORNIA**

11

12  I.F., by and through her guardian ad litem  ) Case No.: 2:18-cv-00673-JAM-CKD
    SHASTA SKINNER, individually and as        )
13  successor-in-interest to Decedent RONELL    ) **MEMORANDUM OF POINTS AND**
    FOSTER; et al.,                            ) **AUTHORITIES IN SUPPORT OF**
14                                             ) **DEFENDANT RYAN McMAHON'S**
15                          Plaintiffs,        ) **MOTION FOR SUMMARY JUDGMENT**
                                               ) **AND OPPOSITION TO PLAINTIFF'S**
16              vs.                            ) **CROSS MOTION FOR SUMMARY**
                                               ) **JUDGMENT**
17  CITY OF VALLEJO, a municipal corporation; )
18  et al.,                                    ) **Date:  August 25, 2020**
                                               ) **Time: 1:30 p.m.**
19                          Defendants.        ) **Courtroom: 6 (14th Floor)**
20                                             )
                                               ) **Honorable John A. Mendez**
21  _____

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

3

4  **I. INTRODUCTION** ........................................................................................................ 1

5  **II. STATEMENT OF FACTS** ....................................................................................... 2

6  **III. CLAIMS FOR RELIEF** .......................................................................................... 7

   **IV. SUMMARY JUDGMENT STANDARD** .............................................................. 8

7  **V. ARGUMENT** ............................................................................................................ 8

8      A.  THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' UNLAWFUL DETENTION AND ARREST CLAIM

9      (COA 1) ........................................................................................................................ 8

10         1.  Foster Was Seized When He Was Tackled. ................................................ 8

11         2.  There Was Probable Cause for Vehicle Code Violations and a Penal Code § 148(a)(1)
           Violation. ....................................................................................................... 9

12         3.  Qualified Immunity ....................................................................................... 11

13     B.  THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' EXCESSIVE FORCE CLAIM (COA 2) BECAUSE

14     FOSTER PRESENTED AN IMMINENT THREAT OF DEATH OR SERIOUS BODILY INJURY WHEN HE
       TOOK OFC. MCMAHON'S FLASHLIGHT AND THREATENED HIM WITH IT. ............................... 12

15         1.  Objective Reasonableness Standard .............................................................. 13

16         1)  Severity of the Crime – Penal Code § 245(c) (Assault). ............................... 13

17         2)  Imminent and Significant Threat ................................................................... 15

           3)  Active Resistance from Start to Finish. ........................................................ 16

18     C.  THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM (COA 3)

19     BECAUSE THERE IS NO EVIDENCE OF A PURPOSE TO HARM UNRELATED TO A LEGITIMATE LAW
       ENFORCEMENT OBJECTIVE. .............................................................................................. 18

20         1.  The "Purpose to Harm" Standard Applies. .................................................... 18

21         2.  There is No Evidence that Ofc. McMahon's Used Deadly Force with a Purpose to Harm

22         Unrelated to a Legitimate Law Enforcement Objective. .................................... 19

23     D.  PLAINTIFFS MCGOWAN AND FOSTER SR. LACK DUE PROCESS PROTECTION TO BRING A

24     FOURTEENTH AMENDMENT CLAIM (COA 3) BECAUSE THEY GAVE UP LEGAL CUSTODY OF
       FOSTER WHEN HE WAS THREE YEARS OLD. ........................................................................ 18

25     E.  THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' BANE ACT CLAIM (COA 5) BECAUSE THERE

       IS NO EVIDENCE OF A SPECIFIC INTENT TO VIOLATE FOSTER'S RIGHTS. ................................ 21

26     F.  THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' ASSAULT AND BATTERY CLAIM (COA 6)

27     BECAUSE OFC. MCMAHON'S USE OF FORCE WAS OBJECTIVE REASONABLE. ........................... 22

28

-i-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

G. THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' NEGLIGENCE CLAIM (COA 7) BECAUSE THERE IS NO EVIDENCE OF OBJECTIVELY UNREASONABLE CONDUCT. ...................................... 22

H. THERE IS NO TRIABLE ISSUE REGARDING PUNITIVE DAMAGES BECAUSE THERE IS NO EVIDENCE AN INTENT TO VIOLATE FOSTER'S RIGHTS OR RECKLESS INDIFFERENCE. ................ 24

**VI. CONCLUSION** ................................................................................................ **24**

**OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

A. PLAINTIFF'S INTERPRETATION OF THE BODY-WORN CAMERA AND AUTOPSY REPORT, THAT FOSTER DROPPED THE FLASHLIGHT AND TRIED TO RUN AWAY *BEFORE* OFC. MCMAHON DECIDED TO FIRE, IS NOT SUPPORTED AND NOT AN INTERPRETATION A REASONABLE FACTFINDER WOULD MAKE. ...................................................................................... 25

B. PLAINTIFF'S INTERPRETATION OF THE HEAD LACERATION, THAT OFC. MCMAHON STRUCK PLAINTIFF IN THE HEAD WITH HIS FLASHLIGHT, IS NOT SUPPORTED AND NOT AN INTERPRETATION A REASONABLE FACTFINDER WOULD MAKE. ................................................ 26

C. USE OF THE TASER AND USE OF THE FLASHLIGHT AS AN IMPACT WEAPON ARE NOT PLED AS FOURTH AMENDMENT VIOLATIONS AND, EVEN IF THEY WERE, THERE IS NO EVIDENCE TO SUPPORT A SUMMARY JUDGMENT FINDING FOR PLAINTIFF. ...................................................... 27

D. OFC. MCMAHON RELIES ON OBJECTIVE EVIDENCE OF AN IMMINENT AND SIGNIFICANT THREAT, NOT ANY SUBJECTIVE FEAR. ...................................................................... 27

E. PLAINTIFF CITES NO CASE FINDING EXCESSIVE FORCE AS A MATTER OF LAW. ................ 28

F. THE EVIDENCE POINTS TO ONE CONCLUSION: FOSTER POSED A SIGNIFICANT AND IMMINENT THREAT AT THE MOMENT THAT OFC. MCMAHON DECIDED TO PROTECT HIMSELF WITH DEADLY FORCE. ............................................................................................... 29

# TABLE OF AUTHORITIES

<u>F</u><span style="font-variant:small-caps">EDERAL</span>

*A.K.H. ex rel Landeros v. City of Tustin,*
  837 F.3d 1005 (9th Cir. 2016).................................................................................. 12

*Billington v. Smith,*
  292 F.3d 1177 (9th Cir. 2002)........................................................................... 11, 26

*Caban v. Mohammed,*
  441 U.S. 380 (1979)........................................................................................... 19

*California v. Hodari D.,*
  499 U.S. 621, (1991)............................................................................................ 9

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)............................................................................................. 7

*Chaudhry v. City of Los Angeles,*
  751 F.3d 1096, (9th Cir. 2014) ........................................................................... 21

*Curnow v. Ridgecrest Police,*
  952 F.2d 321 (9th Cir. 1991) .............................................................................. 27

*Deorle v. Rutherford,*
  272 F.3d 1272 (9th Cir. 2001).............................................................................. 15

*Elliott v. Leavitt,*
  99 F. 3d 640 (4th Cir. 1996)................................................................................. 14

*Espinosa v. City & Cnty. of S.F.,*
  598 F.3d 528 (9th Cir. 2010)............................................................................... 15

*Estate of Lopez v. Gelhaus,*
  149 F.Supp.3d 1154 (9th Cir. 2016) ................................................................... 27

*Florida v. Bostick,*
  501 U.S. 429 (1991)............................................................................................. 8

*Glenn v. Washington County,*
  673 F.3d 864 (9th Cir. 2011)............................................................................... 12

-iii-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

*Graham v. Conner*,
    490 U.S. 396 (1989) ............................................................................................. 12

*Hopkins v. Bonvicino*,
    573 F.3d 752 (9th Cir.2009) ................................................................................ 9

*Illinois v. Wardlaw*,
    528 U.S. 119 (2000) ............................................................................................. 22

*Lehr v. Robertson*,
    463 U.S. 248 ........................................................................................................ 19

*Longoria v. Pinal Cty.*,
    873 F.3d 699 (9th Cir. 2017) ............................................................................. 12

*Losee v. City of Chico*,
    738 F. App'x 398 (9th Cir. 2018) ..................................................................... 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................. 8

*Miller v. Clark Cty.*,
    340 F.3d 959 (9th Cir. 2003) ....................................................................... 12, 13

*Orin v. Barclay*,
    272 F.3d 1207 (9th Cir.2001) ............................................................................. 9

*Plakas v. Drinski*,
    19 F.3d 1143 (7th Cir.), ..................................................................................... 14

*Porter v. Osborn*,
    546 F.3d 1131 (9th Cir. 2008) ........................................................................... 17

*Price v. Sery*,
    513 F.3d 962 (9th Cir. 2008) ............................................................................. 14

*Reese v. Cty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018) ........................................................................... 20

*Reynolds v. Cty. of San Diego*,
    858 F. Supp. 1064 (S.D. Ca. 1994) ................................................................... 13

*Rosenbaum v. Washoe Cnty.*,
    663 F.3d 1071 WL 5966207 (9th Cir. Nov. 30, 2011) ...................................... 11

*Saucier v. Katz,*
    533 U.S. 194 (2001)..................................................................................... 11

*Scott v. Harris,*
    550 U.S. 372 (2007)..................................................................................... 24

*Smith v. City of Hemet,*
    394 F.3d 689 (9th Cir. 2005) .................................................................. 10, 15

*Smith v. Org. of Foster Families For Equal. & Reform,*
    431 U.S. 816 (1977)..................................................................................... 18

*Smith v. Wade,*
    461 U.S. 30, (1983)...................................................................................... 23

*Stoner v. Cty. of Riverside,*
    No. EDCV1601045JAKPLAX, 2018 WL 7050836, at *11 (C.D. Cal. Mar. 14, 2018) .................. 13

*Tennessee v. Garner,*
    471 U.S. 1 (1985)..................................................................................... 14, 27

*United States v. Conerly,*
    75 F. Supp. 3d 1154 (N.D. Cal. 2014) ............................................................ 9

*United States v. Smith,*
    217 F.3d 746 (9th Cir. 1994) ........................................................................ 8

*United States v. Smith,*
    790 F.2d 789 (9th Cir.1986) .......................................................................... 9

*United States v. Verduzo-Verduzco,*
    No. 117CR00231DADBAM, 2018 WL 4057270, at *6 (E.D. Cal. Aug. 24, 2018) .......................... 22

*Valencia v. Jaime,*
    No. EDCV190374VBFPJW, 2020 WL 2104649 (C.D. Cal. Jan 14, 2020)................................... 13

*Wheeler v. City of Santa Clara,*
    894 F.3d 1046 (9th Cir. 2018)............................................................... 18, 19

*Whitehurst v. Kauffmann,*
    No. 214CV4320JVSGJS, 2017 WL 761254 (C.D. Cal. Jan. 4, 2017) ............................... 13

-v-

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

*Wilkinson v. Torres*,
   610 F.3d 546 (9th Cir. 2010) ................................................................ 17

<u>STATE</u>

*B.B. v. Cty. of Los Angeles*,
   25 Cal. App. 5th 115 (Ct. App. 2018) .................................................... 20

*Brown v. Ransweiler*,
   171 Cal.App.4th 516 (2009) ................................................................. 21

*City of Escondido, Cal. v. Emmons*,
   139 S. Ct. 500 (2019) ......................................................................... 16

*Cty. of Los Angeles, Calif. v. Mendez*,
   137 S. Ct. 1539 (2017) ....................................................................... 12

*D.C. v. Wesby*,
   138 S. Ct. 577 (2018) ......................................................................... 11

*Hayes v. County of San Diego*,
   57 Cal.4th 622 (2013) .................................................................... 21, 22

*Julian v. Mission Community Hospital*,
   11 Cal.App.5th 360 (2017) .................................................................. 20

*People v. Allen*,
   109 Cal.App.3d 981 (1980) .................................................................. 11

<u>STATUTES</u>

Cal. Civ. Code § 52.1 ............................................................................ 7, 20

Cal. Penal Code § 148(a)(1) ..................................................... 10, 11, 13, 21
Cal. Penal Code § 242 ................................................................................ 7
Cal. Penal Code § 245(c) ..................................................................... 13, 21

Vehicle code section § 21200(a)(1) ............................................................ 10

<u>RULES</u>

Fed. R. Civ. P. 56(a) .................................................................................. 8

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's Scheduling Order (ECF No. 14 at p. 3) Ofc. McMahon hereby submits the follow: (1) his memorandum of points and authorities in support of his motion for summary judgment and (2) his memorandum of points and authorities in opposition to Plaintiff's cross motion for summary judgment (ECF No. 57).  The parties have met and conferred by phone and email over the issues raised in these cross motions for summary judgment.

<u>**OFC. MCMAHON'S MOTION FOR SUMMARY JUDGMENT**</u>

**I. INTRODUCTION**

This case arises out of the February 13, 2018, shooting death of 33-year-old Ronell Foster ("Foster") by Vallejo Police Officer Ryan McMahon ("Ofc. McMahon").  Plaintiffs are Foster's parents (Paula McGowan and Ronell Foster, Sr.) and his minor children (IF and RF).  They are proceeding with their First Amended Complaint (ECF No. 8, "FAC") that alleges claims against Ofc. McMahon under the Fourth Amendment for unlawful detention and excessive force, the Fourteenth Amendment for deprivation of rights to familial association, the Bane Act, Assault and Battery, and Negligence.

Although several circumstantial facts provide context for the shooting, there is <u>one</u> undisputed fact that eliminates a triable issue on the deadly force claims: Foster ripped a 13-inch metal flashlight from Ofc. McMahon's hand, "rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc. McMahon from approximately an arm's length away." This is Ofc. McMahon's testimony. Body-worn camera footage does not contradict his account and there is no other witness testimony to contradict it.  The only civilian witness, who Plaintiffs contend "clearly lied" (See Plaintiff's MSJ, ECF No. 57 at fn. 10), testified that Foster refused to comply with commands to surrender, was "scuffling" with Ofc. McMahon, "combative" and "aggressive," and moved toward Ofc. McMahon in anger trying to overpower him" just prior to the gunshots.  There is no evidence to dispute this and therefore no question that Foster presented a significant and imminent threat to Ofc. McMahon, eliminating a triable issue on the deadly force claims.

///

///

## II.  STATEMENT OF FACTS

On February 13, 2018, at approximately 7:40 p.m., Ofc. McMahon was working a patrol shift for the Vallejo Police Department in full uniform and a marked car with lights and sirens. (SUF 1.)  It was dark. (SUF 2.)   He approached the intersection of Capitol Street and Sonoma Boulevard in the City of Vallejo and observed Foster, for approximately thirty seconds, riding a bicycle without a light and disrupting traffic by swerving in and out of lanes in the intersection. (SUF 3.)

Ofc. McMahon was aware of recent incidents in Vallejo involving bicyclists and pedestrians killed or injured by vehicles. (SUF 4.) Sonoma Boulevard is a heavily traveled four-lane highway with a posted speed limit of thirty miles per hour. (SUF 5.)   Although Ofc. McMahon observed the vehicle code violations, he had not yet decided whether he was going to issue Foster a citation or just stop him, investigate further, and counsel him about bicycle safety. (SUF 6.)

Ofc. McMahon activated his emergency lights and shined his spotlight toward Foster. (SUF 7.) Foster looked in Ofc. McMahon's direction and, with a startled expression, fled on the bicycle. (SUF 8.) Ofc. McMahon pursued northbound on Sonoma Boulevard with emergency lights activated. (SUF 9.)

Foster rode onto the sidewalk, turned back toward Ofc. McMahon and stopped behind a van that was parallel parked on the street, approximately fifteen feet from Ofc. McMahon. (SUF 10.)  Foster's feet were on the ground and he was straddling the bike in a bladed stance. (SUF 11.)   He was concealing the right side of his body behind the parked van. (SUF 12.)   Ofc. McMahon stopped his patrol car and stood in the door frame, facing Foster. (SUF 13.) Ofc. McMahon identified himself as a Vallejo Police Officer and ordered Foster to come sit in front of his patrol car so that they could speak about erratic driving and vehicle safety. (SUF 14.) Foster looked at Ofc. McMahon, looked around, said something akin to, "stop messing with me," and fled on the bike northbound on Sonoma Boulevard. (SUF 15.)   Foster was riding into oncoming traffic and in and out of marked lanes. (SUF 16.)

1    Ofc. McMahon returned to his patrol car, activated his lights and sirens, and pursued.

2  (SUF 17.)  Foster turned left, westbound onto Florida Street, then cut through a church parking

3  lot, southbound toward Carolina Street. (SUF 18.)   Ofc. McMahon knew he would have

4  difficulty safely pursing through the narrow parking lot, so continued westbound on Florida

5  Street to southbound Marin Street toward Carolina Street. (SUF 19.) Ofc. McMahon updated

6  dispatch of his location at Florida Street and Marin Street and that he had a fleeing suspect on a

7  bicycle. (SUF 20.) This was a mixed commercial/residential neighborhood. (SUF 21.)

8    As Ofc. McMahon drove south on Marin Street, he saw Foster traveling westbound on

9  Carolina Street, then lose control of the bicycle and fall off. (SUF 22.)  Ofc. McMahon was

10  approximately fifteen yards away. (SUF 23.)  Foster quickly jumped up and fled on foot. (SUF

11  23.) Ofc. McMahon exited his patrol car and pursued on foot, westbound on Carolina Street.

12  (SUF 24.)

13    Ofc. McMahon attempted to activate his body-worn-camera, but it would not start. (SUF

14  25.) McMahon attempted to update dispatch of his location, but the transmission did not go

15  through. (SUF 26.)

16    As Foster fled, he reached both hands into the front of his waistband and looked back at

17  Ofc. McMahon. (SUF 27.) Ofc. McMahon shouted commands for Foster to stop and not to reach

18  into his waistband. (SUF 28.)

19    From approximately ten to fifteen feet away from Foster, believing that he may have

20  been armed based on his actions of previously trying to conceal the right side of his body,

21  looking back while running, and grabbing his waistband, Ofc. McMahon un-holstered his Taser

22  and deployed it toward Foster's back, but it was ineffective. (SUF 29.)  Ofc. McMahon and

23  Foster became tangled in the Taser wires, but Foster broke free and continued running. (SUF 30.)

24  Ofc. McMahon holstered the Taser and continued the foot pursuit. (SUF 31.)

25    Foster abruptly turned south at 415 Carolina Street into a narrow walkway of a multi-unit

26  residential complex. (SUF 32.)  The walkway was approximately three feet wide. (SUF 33.)  As

27  Foster ran deeper into the property at 415 Carolina, he fell. (SUF 34.)  Ofc. McMahon saw

28  Foster on the ground, pursued down the narrow walkway, and caught up just as Foster started to

stand. (SUF 35.)  Ofc. McMahon pushed Foster back to the ground and onto a small concrete patio in the middle of the multi-unit complex. (SUF 36.) The patio was approximately 6.5 feet by 11.6 feet. (SUF 37.)

Foster fell onto his stomach and Ofc. McMahon straddled his back with his knees on the ground. (SUF 38.) The patio was dark with only one small light bulb illuminated. (SUF 39.) Ofc. McMahon told Foster that he was under arrest and ordered him to stop resisting, show his hands, and not reach for his waistband. (SUF 40.)  Foster did not comply. (SUF 41.) Instead, Foster grappled with Ofc. McMahon, pushed Ofc. McMahon off of him, and tried to get to a standing position. (SUF 42.)

As Ofc. McMahon attempted to keep Foster on the ground, he drew his Taser with his left hand, pressed it into Foster's back and deployed it in drive-stun mode for two seconds. (SUF 43.)  The Taser was ineffective. (SUF 44.) Foster continued to grapple with Ofc. McMahon and attempt to get to his feet. (SUF 45.) Ofc. McMahon issued more commands for Foster to stop resisting and put his hands over his head, but Foster refused. (SUF 46.)  Ofc. McMahon attempted to use the Taser twice more in drive-stun mode on Foster's arm and side, but Foster knocked it away. (SUF 47.)  The Taser was completely ineffective. (SUF 48.)

Based on Ofc. McMahon's training and experience, Foster appeared to be dangerously under the influence of methamphetamines, based on his level of resistance and being unaffected by the Taser and physical restraint techniques. (SUF 49.)

Ofc. McMahon transitioned to his aluminum Maglite flashlight, approximately thirteen inches long, to try and subdue Foster. (SUF 50.)  Ofc. McMahon held the flashlight by the bulb-end and used it as an impact weapon by striking Foster in his clavicle and arm as Foster continued to grapple and try to get up. (SUF 51.)

Foster caught the flashlight by the handle and ripped it out of Ofc. McMahon's right hand. (SUF 52.)  Foster rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc. McMahon from approximately an arm's length away.  (SUF 53.) The flashlight was capable of causing significant injury, to include knocking Ofc. McMahon

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

unconscious or death. (SUF 54.)   Ofc. McMahon experienced an acute, albeit normal stress response associated with the tense, uncertain, and rapidly evolving dynamics. (SUF 55.)

As Foster rose with the flashlight, raised it, and turned to strike from approximately an arm's length away, Ofc. McMahon drew his pistol with his right hand toward Foster's front and fired seven shots in one continuous rapid burst as Foster turned and fell to his right side on the ground. (SUF 56.) A minimum appropriate response time for Ofc. McMahon to have observed the stimulus (Foster raising the flashlight), draw his weapon, and fire his first round is 1 second. (SUF 57.)  It is common that officers who react to a stimulus by deciding to fire at a suspect that is facing them, often fire–because of the officer's reaction time–as the suspect turns and falls, resulting in impact locations to the side, back, and head. (SUF 58.)

Foster dropped the flashlight as he fell to the ground. (SUF 59.)  Ofc. McMahon stopped firing when Foster fell. (SUF 60.)  Ofc. McMahon stopped firing within 1.3 seconds of Foster dropping the flashlight. (SUF 61.)   An average officer can draw his firearm and fire seven shots within 2.1 seconds. (SUF 62.)

Ofc. McMahon's judgment and decision-making to use deadly force were based upon the overall context of the event and a rapid pattern recognition associated with his previous training and experience. (SUF 63.)

Ofc. McMahon immediately updated dispatch of shots fired at 415 Carolina Street. (SUF 64.)  Ofc. McMahon was able to activate his body-worn-camera after the shooting, which buffered back to capture the preceding thirty seconds with no sound. (SUF 65.)

Foster suffered seven gunshot wounds, four fatal, that are consistent with the movement patterns and shot timing described above. (SUF 66.)

Ofc. McMahon had no weapon that could combat the flashlight threat except his pistol. (SUF 67.)

Two minutes and one second (2:01) elapsed from the time that Ofc. McMahon radioed that he had a fleeing suspect on a bicycle at Florida and Marin to when he radioed shots fired at 415 Carolina. (SUF 68.)

1    Postmortem toxicology of Foster revealed a blood alcohol content of 0.08%;

2    methamphetamine at 0.70 mg/L; amphetamine at 0.057 mg/L; and THC at 12.4 mg/nl. (SUF

3    69.)   The combined effect of this amount of alcohol, methamphetamine and marijuana

4    intoxication was a potent drug combination that resulted in Foster being physically unaffected by

5    physical restraint techniques, the Taser, and multiple impact strikes from the flashlight. (SUF

6    70.)

7    Ofc. McMahon's use of deadly force was consistent with standard police training and

8    POST learning domains. (SUF 71.)

9    Prior to this incident, Ofc. McMahon had no contact with Foster and did not know his

10   identity. (SUF 72.)

11   A civilian witness (Mr. Wolfe) who lived in the residential complex at 415 Carolina

12   Street came out of his residence and onto his patio when he heard, "Vallejo Police.  Stop." (SUF

13   73.)  According to Mr. Wolfe, "Foster and the officer came down the wooden platform… [T]he

14   officer had reached for him to take him into custody, and he had pulled away from the officer.

15   (SUF 74.) And the officer says, 'Get on the ground. Get on the ground.'  He said it twice and Mr.

16   Foster refused to comply.  So the cop is trying to subdue him to take him into custody, and Mr.

17   Foster starts scuffling with the officer." (SUF 75.)   According to Mr. Wolfe, Foster was

18   "combative" and "aggressive" with Ofc. McMahon, was pushing him, and struggling to keep

19   Ofc. McMahon from gaining control. (SUF 76.)  According to Mr. Wolfe, the Taser "didn't seem

20   to have any effect on [Foster]." (SUF 77.)   Mr. Wolfe described Foster moving toward Ofc.

21   McMahon "in anger trying to overpower" him just prior to the gunshots. (SUF 78.)    According

22   to Mr. Wolfe, Ofc. McMahon stopped firing when Foster fell. (SUF 79.)

23   Foster was survived by his parents, Ronell Foster Sr. and Paula McGowan. (SUF 80.)

24   When Foster was three years old, his parents gave up legal and actual custody of him to

25   his grandmother. (SUF 80.)  Foster lived with his grandmother until he was eighteen. (SUF 81.)

26   Foster's grandmother raised him. (SUF 81.)

27   At the time of Foster's death, Ms. McGowan did not know Foster's level of education,

28   did not know where he went to high school, whether he graduated high school, did not know his

work history or whether he was employed at the time of his death, and did not know whether he had any medical conditions. (SUF 82.)   Ms. McGowan never relied on Foster for financial support. (SUF 83.)  Ronell Foster Sr. did not know where Foster went to high school, whether he graduated, whether he was employed at the time of his death, or anything about his work history. (SUF 84.)   During the times that Foster was incarcerated, Ronell Foster Sr. visited him, "not often," and would not speak with him on the phone. (SUF 85.)  Ronell Foster Sr. never relied on Foster for money. (SUF 86.)

### III.  CLAIMS FOR RELIEF

The FAC alleges the six claims against Ofc. McMahon:

<u>Cause of Action No. 1</u> – Unlawful Detention and Arrest in violation of the Fourth Amendment because Ofc. McMahon "did not have probable cause to make an arrest and/or detain Mr. Foster." This claim is brought on behalf of Foster as a survival action.  (FAC at ¶¶ 33-38.)

<u>Cause of Action No. 2</u> – Excessive Force in violation of the Fourth Amendment because "[w]hen Defendant McMahon shot Decedent Foster, Mr. Foster had presented no immediate and serious threat or harm to Officer McMahon." This claim is brought on behalf of Foster as a survival action.  (FAC at ¶¶ 39-41.)

<u>Cause of Action No. 3</u> – Deprivation of Rights to Familial Association in violation of the Fourteenth Amendment because the "use of unnecessary and excessive deadly force [was] conscience shocking, and done without a legitimate law enforcement purpose." This claim is brought individually by all four defendants. (FAC at ¶¶ 42-44.)

<u>Cause of Action No. 5</u> – Violation of the Bane Act (Cal. Civ. Code § 52.1) for the "intentional shooting of their father/son without a legitimate law enforcement purpose in a manner that shocks the conscience."  This claim is brought individually by all four defendants and on behalf of Foster as a survival action.  (FAC at ¶¶ 45-63.)

<u>Cause of Action No. 6</u> – Assault and Battery (Cal. Penal Code § 242) because Ofc. McMahon "intentionally struck, grabbed, tased, shot and killed Decedent without a lawful basis."  This claim is brought on behalf of Foster as a survival action.  (FAC at ¶¶ 64-67.)

1    <u>Cause of Action No. 7</u> – Negligence for breaching duties to refrain from "excessive force

2    … unreasonably creating the situation where force, including but not limited to deadly force …

3    abusing authority … [and] violating Plaintiffs' and Decedent's rights guaranteed by the United

4    States and California Constitutions." This claim is brought on behalf of Foster as a survival

5    action.  (FAC at ¶¶ 68-74.)

### IV.  SUMMARY JUDGMENT STANDARD

7         A court shall grant summary judgment when "there is no genuine dispute as to any

8    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

9    *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  One of the principal purposes of

10   summary judgment is to dispose of factually unsupported claims or defenses.  *Celotex,* 477 U.S.

11   at 325.

12        A party seeking summary judgment bears the initial burden of demonstrating the absence

13   of a genuine issue of material fact for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

14   475 U.S. 574, 586-87 (1986).  Once accomplished, the burden shifts to the opposing party to

15   establish that a genuine issue as to any material fact actually does exist.  *Id* at 587.  In doing so,

16   the opposing party must do more than "simply show that there is some metaphysical doubt as to

17   the material facts."  *Id*. at 586.

### V.  ARGUMENT

**A.    THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' UNLAWFUL DETENTION AND ARREST
       CLAIM (COA 1).**

21        Plaintiffs' first cause of action is that Ofc. McMahon unlawfully detained and arrested

22   (i.e. seized) Foster in violation of the Fourth Amendment, requiring probable cause to arrest and

23   reasonable suspicion to detain.  The first step is to determine the point that Foster was seized,

24   and then determine whether probable cause existed.

25        **1.    Foster Was Seized When He Was Tackled.**

26        In analyzing a Fourth Amendment unlawful detention/arrest claim, the first step is to

27   determine whether there has been a "seizure."  See *Florida v. Bostick*, 501 U.S. 429, 434 (1991).

28   A seizure only occurs when an officer, by means of physical force or a show of authority,

restrains a citizen's freedom of movement. *Id.* However, mere exertion of lawful authority is not enough to effect a seizure if the suspect does not submit to the authority. *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991); see also *United States v. Smith*, 217 F.3d 746, 750 (9th Cir. 1994) (no seizure where plaintiff did not respond to police officer activating police car's flashing lights and instead backed his van toward the police car). For example, if the suspect flees from the officer who is exerting his lawful authority, no seizure has occurred unless and until the officer either physically seizes the suspect or the suspect submits to the officer's authority by abandoning his flight. See *Hodari D.*, 499 U.S. at 626-67; *Smith*, 217 F.3d at 750; see also *United States v. Conerly*, 75 F. Supp. 3d 1154, 1159 (N.D. Cal. 2014) ("because Conerly continued to flee and did not submit to Officer Flores' show of authority, he was not seized by Officer Flores' order that he stop").

Here, it is undisputed that Ofc. McMahon attempted to seize Foster for vehicle code violations, but Foster fled on his bike and did not submit to Ofc. McMahon's authority. No seizure occurred until Ofc. McMahon physically pushed Foster down in the courtyard of 415 Carolina Street; i.e., by physical force, restrained Foster's freedom of movement. *Florida*, 501 U.S. at 434. The next question is whether Ofc. McMahon had, at that point, probable cause.

### 2. There Was Probable Cause for Vehicle Code Violations and a Penal Code § 148(a)(1) Violation.

"[T]he federal Constitution requires police officers to have independent probable cause when effectuating a citizen's arrest." *Hopkins v. Bonvicino*, 573 F.3d 752, 774 (9th Cir.2009). Probable cause exists when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir.1986). "A police officer has probable cause to effect an arrest if 'at the moment the arrest was made ... the facts and circumstances within [his] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that the suspect had violated a criminal law." *Orin v. Barclay*, 272 F.3d 1207, 1218 (9th Cir.2001).

1    At the point of seizure, Ofc. McMahon had observed Foster ride his bike in an out of

2    lanes at the intersection of Capitol Street and Sonoma Boulevard and without a light at night.

3    There is no dispute about this. These observations provided probable cause (or reasonable

4    suspicion at the least[1]) that Foster had violated multiple vehicle code sections, namely, §

5    21200(a)(1) ("A person riding a bicycle upon a highway … is subject to all the provisions

6    applicable to the driver of a vehicle"); § 22400(a) (prohibiting disrupting the normal flow of

7    traffic); § 21201(d)(1) (requiring a "lamp emitting a white light that, while the bicycle is in

8    motion, illuminates the highway, sidewalk, or bikeway in front of the bicyclist and is visible

9    from a distance of 300 feet in front and from the sides of the bicycle") and § 21658 (failing to

10   safely maintain lane). Accordingly, there is no triable issue that Ofc. McMahon had lawful

11   authority to seize Foster (at least briefly detain him) for vehicle code violations.

12   Ofc. McMahon attempted to exercise this lawful authority by activating his emergency

13   lights, shining his spotlight on Foster, identifying himself as a Vallejo Police Officer in full

14   uniform, and ordering Foster to sit in front of the patrol car so that they could speak.  Foster,

15   however, fled on his bike.  There is no evidence to dispute this and it created probable cause for

16   another crime, a Cal. Penal Code § 148(a)(1) violation.  See *Smith v. City of Hemet*, 394 F.3d

17   689, 695 (9th Cir. 2005) ("[t]he legal elements of a violation...are as follows: (1) the defendant

18   willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the

19   performance of his or her duties, and (3) the defendant knew or reasonably should have known

20   that the other person was a peace officer engaged in the performance of his or her duties");

21   *People v. Allen*, 109 Cal.App.3d 981, 987 (1980), (a defendant violates § 148 when he flees with

22   "the clear knowledge that the officer wanted to detain and talk with him").

23

24

---

25   [1] See *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (An investigative *Terry* stop is justified

26   when there is "reasonable suspicion to believe that criminal activity 'may be afoot.'" An officer
     may form a reasonable suspicion through "specific, articulable facts which, together with

27   objective and reasonable inferences, form the basis for suspecting that the particular person
     detained is engaged in criminal activity." *United States v. Dorais*, 241 F.3d 1124, 1130 (9th

28   Cir.2001) (citation and quotation marks omitted). Only "a minimal level of objective
     justification" is required. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citation omitted).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

1    Accordingly, the undisputed evidence shows that Ofc. McMahon had probable cause for

2    Vehicle Code violations and a § 148(a)(1) violation at the time Foster was seized therefore there

3    is no issue for trial on Plaintiff's Fourth Amendment claim of unlawful detention and arrest.

4         **3.        Qualified Immunity**

5    "Even if the arrest is made without ... probable cause, ... the officer may still be immune

6    from suit if it was objectively reasonable for him to believe that he had probable cause."

7    *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 2011 WL 5966207, at *5 (9th Cir. Nov. 30, 2011)

8    ("the question in determining whether qualified immunity applies is whether <u>all</u> reasonable

9    officers would agree that there was no probable cause in this instance"); *Saucier v. Katz*, 533

10   U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ("The relevant, dispositive inquiry ... is

11   whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

12   confronted"). The Supreme Court "has repeatedly told courts—and the Ninth Circuit in

13   particular—not to define clearly established law at a high level of generality." *Kisela v. Hughes*,

14   ——— U.S. ———, 138 S. Ct. 1148, 1152 (2018). In the warrantless-arrest context, the Supreme

15   Court has "stressed the need to 'identify a case where an officer acting under similar

16   circumstances ... was held to have violated the Fourth Amendment.'" *D.C. v. Wesby*, 138 S. Ct.

17   577, 590 (2018).

18   Even if the Court finds that a reasonable juror could conclude that an unlawful seizure

19   occurred, Ofc. McMahon is entitled to qualified immunity on the first cause of action because

20   there is no case where an officer acting under similar circumstances was found to have

21   unlawfully seized a suspect.

22   **B.        THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' EXCESSIVE FORCE CLAIM (COA 2)**

23   **BECAUSE FOSTER PRESENTED AN IMMINENT THREAT OF DEATH OR SERIOUS BODILY**
     **INJURY WHEN HE TOOK OFC. MCMAHON'S FLASHLIGHT AND THREATENED HIM**

24   **WITH IT.**

25   The way Plaintiffs plead the excessive force claim, it is limited to the use of deadly force

26   "[w]hen Defendant McMahon shot Decedent Foster." (FAC at ¶ 40.) Accordingly, the focus

27   must be "on the very moment when the officer makes the split-second judgment" to use deadly

28   force. See *Billington v. Smith,* 292 F.3d 1177, 1190 (9th Cir. 2002) (holding that "the fact that an

officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself … even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation") (emphasis added); *Cty. of Los Angeles, Calif. v. Mendez*, 137 S. Ct. 1539, 1547, (2017) (holding that excessive force is not a claim that an officer used reasonable force after committing a distinct unreasonable act).

### 1.    Objective Reasonableness Standard

Force claims are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Conner*, 490 U.S. 396, 395-396 (1989).  The crucial inquiry is whether the force was objectively reasonable in light of the facts and circumstances confronting [the officer at the moment of the shooting], without regard to their underlying intent or motivation." *Id.* at 397.  This "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake [and] must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396; *Glenn v. Washington County,* 673 F.3d 864, 871 (9th Cir. 2011); *Miller v. Clark County,* 340 F.3d 959, 964 (9th Cir. 2003).  The calculus must embody allowance for the fact that police officers are forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force necessary in a particular situation. *Graham* at 396-97.

### a.    Nature and Quality of the Intrusion

Lethal force implicates the highest level of Fourth Amendment interests. *A.K.H. ex rel Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016). The issue therefore is whether the governmental interest at stake justified Ofc. McMahon's use of deadly force.

### b.    Governmental Interests

The strength of the governmental interest turns on: (1) the severity of the crime at issue; (2) whether Foster posed an immediate threat; and (3) whether Foster actively resisted arrest. *Graham*, supra, at 396. The most important factor is number two, whether Foster posed an immediate threat. *Longoria v. Pinal Cty.*, 873 F.3d 699, 705 (9th Cir. 2017).

---

-12-
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

1             **1)**       **Severity of the Crime – Penal Code § 245(c) (Assault).**

2       Foster was initially suspected of vehicle code violations and a Penal Code § 148(a)(1)

3 violation for fleeing Ofc. McMahon's lawful authority to detain him. However, the situation

4 escalated when Ofc. McMahon caught up with Foster in the courtyard of 415 Carolina Street

5 where a life-threatening crime occurred–a Penal Code § 245(c) violation (assault upon a police

6 officer with a weapon or instrument likely to produce great bodily injury) when Foster ripped the

7 flashlight from Ofc. McMahon's hand,[2] rose to his feet in a bladed stance, raised the flashlight

8 near his head, and turned to strike Ofc. McMahon from approximately an arm's length away. See

9 *Valencia v. Jaime*, No. EDCV190374VBFPJW, 2020 WL 2104649, at *6 (C.D. Cal. Jan. 14,

10 2020) (12-inch metal Mag-Lite flashlight knocked the victim unconscious).

11       A Penal Code § 245(c) violation is a felony and conviction is punishable in state prison

12 for three, four, or five years. See *Whitehurst*, 2017 WL 761254 at *6 (holding that § 245(c) was

13 "relatively severe"); *Stoner v. Cty. of Riverside*, No. EDCV1601045JAKPLAX, 2018 WL

14 7050836, at *11 (C.D. Cal. Mar. 14, 2018) ("Assault with a deadly weapon is a crime that

15 presents an inherent risk of violence"); *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)

16 ("The government has an undeniable legitimate interest in apprehending criminal suspects ... and

17 that interest is even stronger when the criminal is ... suspected of a felony, which is by definition

18 a crime deemed serious by the state"); *Reynolds v. Cty. of San Diego*, 858 F. Supp. 1064, 1071

19 (S.D. Cal. 1994) ("Particularly where the suspect is armed and in close proximity to the officer,

20 courts have found that officers may use deadly force to defend themselves").

21       Here, the crime–assault upon an officer with a weapon likely to produce great bodily

22 injury–was severe and life-threatening.

23             **2)**       **Imminent and Significant Threat of Being Bludgeoned.**

24       This is the most important factor and essentially the crux of this case – that Foster

25 presented a significant and imminent threat when he ripped the flashlight from Ofc. McMahon

26 

---

27 [2] Plaintiffs concede in their own summary judgment motion that the body-worn camera indisputably shows that Foster grabbed the flashlight from Ofc. McMahon. See ECF No. 57 at p.

28 12 of 26.

---

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

and raised it to strike him.

Deadly force is "reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others"); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) (requiring a "threat of serious physical harm" for deadly force to be reasonable); *Price v. Sery*, 513 F.3d 962, 969 (9th Cir. 2008) ("to justify deadly force, an objective belief that an imminent threat of death or serious physical harm is required").

Foster ripped the flashlight from Ofc. McMahon's hand, rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc. McMahon from approximately an arm's length away.   At that moment, Ofc. McMahon was confronted by a suspect wielding a deadly-weapon and was forced to make a split-second decision that neither he, nor anybody, wants to make–either resort to deadly force or *hope* that he is not immediately bludgeoned by a suspect who has shown no intent to surrender.   Deadly force under these circumstances is objectively reasonable as a matter of law. See *Reynolds*, 858 at 1071 ("an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack. In these circumstances, the Courts cannot ask an officer to hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer. The high numbers of officer mortalities in recent years illustrate the unreasonableness of such a notion"); see also *Elliott v. Leavitt*, 99 F. 3d 640, 644 (4th Cir. 1996) (the Fourth Amendment does not require omniscience. Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others. Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self-protection"); see also *Plakas v. Drinski*, 19 F.3d 1143 (7th Cir.), cert. denied, 513 U.S. 820 (1994) (granting summary judgment where deputy sheriff shot and killed suspect after he threatened the sheriff with a fireplace poker).

The threat posed by Foster was imminent and significant. Ofc. McMahon's response with deadly force was objectively reasonable as a matter of law.

### 3)   Active Resistance from Start to Finish.

The next governmental interest is whether Foster actively resisted arrest or attempted to evade arrest by flight. *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001).

It is undisputed that Foster fled initial attempts to stop him for the vehicle code violations, first on his bike and then on foot when the bike failed him. It is undisputed that Ofc. McMahon gave Foster repeated warnings to stop and surrender throughout the encounter, right up until the very end. See *Glenn*, 673 F.3d at 872 (whether warnings were given is a factor). It is undisputed that Foster wrestled, grappled, and fought Ofc. McMahon's attempts to take him into custody in the courtyard of 415 Carolina, despite warnings to surrender and multiple attempts with less-lethal instruments. It is undisputed that Foster ripped the flashlight from Ofc. McMahon's hand. These are all instances of complete and active resistance. See *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (relative culpability of the parties; i.e., which party created the dangerous situation may be considered).

Ofc. McMahon attempted to take Foster into custody using several less-lethal techniques (hands-on, Taser, impact weapon), but each time Foster combatted and actively resisted those attempts, demonstrating that these less-lethal techniques were ineffective and thus no longer available. See *Smith v. Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (availability of alternative methods of capturing or subduing a suspect may be a factor to consider). Mr. Wolfe, the only civilian witness, concurs: the officer had reached for him to take him into custody, and he had pulled away from the officer … the officer says, "'Get on the ground. Get on the ground.' He said it twice and Mr. Foster refused to comply. So the cop is trying to subdue him to take him into custody, and Mr. Foster starts scuffling with the officer" … Foster was "combative" and "aggressive" was pushing and struggling to keep Ofc. McMahon from gaining control … the Taser "didn't seem to have any effect on [Foster]" … Foster was moving toward Ofc. McMahon "in anger trying to overpower" him just prior to the gunshots. The body-worn camera confirms that Foster was resisting and refusing lawful commands to surrender right up to the shooting. Toxicology confirms that Foster was physically unaffected by Ofc. McMahon's attempts to use less lethal restraint techniques (i.e., physical restraint, Taser, impact strikes) and thus was

physically able to actively resist throughout the encounter. *See Scott*, 39 F.3d at 915, fn. 2 (finding it relevant that the suspect's alcohol level was consistent with the officers' account that he was acting "crazy").

Foster actively resisted arrest throughout the encounter and thus repetitively limited Ofc. McMahon's options to take him into custody.

### c.    Balancing – Objectively Reasonable Use of Force as a Matter of Law.

Balancing the use of deadly force against the severity of the crime, the immediacy of the threat posed, and Foster's active resistance leads to a finding that Ofc. McMahon's use of force at the moment of the shooting was objectively reasonable as a matter of law.

### d.    Ofc. McMahon is Entitled to Qualified Immunity.

If the Court finds that Ofc. McMahon's use of force was not objectively reasonable, this claim still fails because he is entitled to qualified immunity.

Qualified immunity attaches when an officer's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (citations omitted).  The clearly established right must be defined with specificity, not at a high level of generality.  *Id.*  That is particularly important in excessive force cases where "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.*  "It does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*

Here, it is undisputed that Foster refused repeated commands to surrender, continually grappled with Ofc. McMahon, that Ofc. McMahon's use of less lethal instruments were all ineffective, that Foster ripped the flashlight from Ofc. McMahon's hand, rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc. McMahon from approximately an arm's length away.  It is undisputed that the flashlight was capable of causing

serious bodily harm or death.  There was no body of relevant case law at the time of the shooting establishing that the use of deadly force under these circumstances was unreasonable.  See *Escondido,* 139 S. Ct. at 504 ("a body of relevant case law is usually necessary to clearly establish the answer").  Ofc. McMahon is entitled to qualified immunity.

**C.   THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM (COA 3) BECAUSE THERE IS NO EVIDENCE OF A PURPOSE TO HARM UNRELATED TO A LEGITIMATE LAW ENFORCEMENT OBJECTIVE.**

Fourteenth Amendment due process claims are subject to a higher standard than Fourth Amendment excessive force claims–only conduct that "shocks the conscience" is cognizable as a due process violation.  *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir.2008).  If deliberation is practical, then an officer's "deliberate indifference" may be sufficient to shock the conscience. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir.2010).  If deliberation is impractical, however, then the officer's conduct "may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.*

**1.    The "Purpose to Harm" Standard Applies.**

Our situation involved a "split-second" decision to shoot immediately upon seeing Foster grab the flashlight, rise to a bladed stance and raise the flashlight in a threatening manner.  This occurred within a second and forced Ofc. McMahon to make an <u>immediate decision</u> to draw and fire. Defendant's Human Factors expert opines that at that moment, Ofc. McMahon experienced an acute, albeit normal stress response associated with the tense, uncertain, and rapidly evolving dynamics.  Accordingly, this is not a case for which deliberation was possible once Foster grabbed the flashlight and assaulted Ofc. McMahon.  This is a situation involving an officer's need to make a split-second decision to either respond with deadly force or *hope* that he is not bludgeoned.  Accordingly, the heightened "purpose to harm" standard applies.

**2.    There is No Evidence that Ofc. McMahon's Used Deadly Force with a Purpose to Harm Unrelated to a Legitimate Law Enforcement Objective.**

Ofc. McMahon had never met Foster before February 13, 2018, and when he first encountered him–riding dangerously in an intersection without a light–he attempted to carry out legitimate law enforcement objectives (public safety and enforcement of laws) by stopping him.

There is no evidence that he had any other objective. When Foster suspiciously fled, stopped and appeared to conceal the right side of his body, refused verbal commands, and fled again, this raised additional suspicion (based on Ofc. McMahon's training and experience) of something more sinister and more dangerous to the public and thus, a legitimate law enforcement objective to detain.  Again, there is no evidence of any other objective. When Foster fled on foot and reached for his waistband, additional public safety concerns were reasonably raised and, from all of these circumstances, the only objective Ofc. McMahon had was to stop Foster and prevent what appeared to be an armed and fleeing suspect from escape.  There is no evidence of any other objective. When Ofc. McMahon eventually caught up with Foster in the courtyard of 415 Carolina, he continued to give repeated commands to surrender, a clear indication of Ofc. McMahon's legitimate objective to take Foster into custody.  Foster continued to refuse, fought off attempts to subdue with him less-lethal means, and eventually ripped the flashlight from Ofc. McMahon's hand.  Again, up to this point, there is no evidence of any objective other than Ofc. McMahon trying to capture what reasonably appeared to be a dangerous suspect for legitimate public safety reasons.

When Foster raised the flashlight, he put Ofc. McMahon's life at risk and Ofc. McMahon was quickly forced to protect himself from an imminent threat of serious physical harm.  This is a legitimate law enforcement objective.   There is no evidence of any other objective and accordingly no triable issue on the Fourteenth Amendment claim.

**D.    PLAINTIFFS MCGOWAN AND FOSTER SR. LACK DUE PROCESS PROTECTION TO BRING A FOURTEENTH AMENDMENT CLAIM (COA 3) BECAUSE THEY GAVE UP LEGAL CUSTODY OF FOSTER WHEN HE WAS THREE YEARS OLD.**

For this claim, each of Foster's parents must prove at trial, by a preponderance of the evidence, that they had a sufficiently intimate relationship with their son at the time of death to warrant Due Process protection against government interference with a parents' right to intimate association. See *Wheeler v. City of Santa Clara*, 894 F.3d 1046, 1060 (9th Cir. 2018), citing *Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 844 (1977) ("the importance of the familial relationship, to the individuals involved and to the society, stems from

1    the emotional attachments that derive from the intimacy of daily association, and from the role it

2    plays in promoting a way of life through the instruction of children, as well as from the fact of

3    blood relationship."). The mere existence of blood relationship does not establish an intimate

4    relationship that warrants Due Process protection. *Wheeler*, 894 F.3d at 1058 (finding no Due

5    Process protection between biological parent and child where the parent gave up custody of the

6    child at a young age); see also *Lehr v. Robertson*, 463 U.S. 248, 256-62 (holding that biological

7    father's failure to have significant custodial, personal, or financial relationship with his daughter

8    and to pursue legal ties to her until she reached age two meant that he was not entitled to full

9    Fourteenth Amendment protection of his relationship with her); see also *Caban v. Mohammed*,

10   441 U.S. 380, 397, (1979) ("Parental rights do not spring full-blown from the biological

11   connection between parent and child. They require relationships more enduring").

12        Here, when Foster was three years old, his parents (Plaintiffs Mr. Foster and Ms.

13   McGowan) gave up legal and actual custody of him to his grandmother who raised him and who

14   he lived with until he was eighteen.  Under *Wheeler,* this precludes Due Process protection.

15        Moreover, at the time of Foster's death, Ms. McGowan did not know her son's level of

16   education, did not know where he went to high school, whether he graduated high school, did not

17   know his work history or whether he was employed at the time of his death, and did not know

18   whether he had any medical conditions.  This provides additional indicia that their relationship

19   lacked the prominent hallmarks of a life-long relationship that generates Due Process protection.

20   Mr. Foster's situation is similar–he did not know where his son went to high school, whether he

21   graduated, whether he was employed at the time of his death, or anything about his work history.

22   During the times that Foster was incarcerated, his father visited him, "not often," and would not

23   speak with him on the phone. Again, these are not hallmarks of an enduring relationship that

24   warrants Due Process protection.  Biology alone is insufficient and accordingly Ofc. McMahon

25   requests dismissal of Mr. Foster and Ms. McGowan's Fourteenth Amendment claim.

26   ///

27   ///

28   ///

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

**E.   THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' BANE ACT CLAIM (COA 5) BECAUSE THERE IS NO EVIDENCE OF A SPECIFIC INTENT TO VIOLATE FOSTER'S RIGHTS.**

Section 52.1 of the California Civil Code, also known as the Bane Act, creates a right of action against any person who "interferes by threat, intimidation, or coercion . . . with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or . . . of this state." Cal. Civ. Code § 52.1(a). A Bane Act claim requires a showing of "specific intent" on the part of the officer to violate the constitutional right at issue. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) ("[T]he specific intent requirement . . . is consistent with the language of Section 52.1, which requires interference with rights by 'threat, intimidation or coercion,' words which connote an element of intent."); *B.B. v. Cty. of Los Angeles*, 25 Cal. App. 5th 115, 133 (Ct. App. 2018) ("Like . . . *Reese*, we conclude that, to establish liability under the Bane Act, a plaintiff must prove the defendant acted with a specific intent to violate the plaintiff's civil rights."). "The act of interference with a constitutional right must itself be deliberate or spiteful." *Julian v. Mission Community Hospital*, 11 Cal.App.5th 360, 395 (2017) (citation omitted). "Evidence simply showing that an officer's conduct amounts to a constitutional violation under an 'objectively reasonable' standard is insufficient to satisfy the additional intent requirement under the Bane Act." *Losee v. City of Chico*, 738 F. App'x 398, 401 (9th Cir. 2018) (internal quotation and citation omitted). "The act of interference with a constitutional right must itself be deliberate or spiteful." *Julian v. Mission Community Hospital* (2017) 11 Cal.App.5th 360, 395.

There is no triable issue that Ofc. McMahon was forced to make a very quick decision to either use deadly force or hope that Foster did not bludgeon him with the flashlight.  There is no evidence that Ofc. McMahon used deadly force for any reason other than to protect his own life (see arguments above in regard to the Fourteenth Amendment "purpose to harm" analysis). Accordingly, there is no evidence that Ofc. McMahon acted with a specific intent to violate Foster's rights and therefore no issue for trial on Plaintiffs' Bane Act claim.

///

///

**F.    THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' ASSAULT AND BATTERY CLAIM (COA 6) BECAUSE OFC. MCMAHON'S USE OF FORCE WAS OBJECTIVE REASONABLE.**

Assault and battery claims are resolved through the objective reasonableness standard of the Fourth Amendment. See *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105-06 (9th Cir. 2014).   Unlike the Fourth Amendment claim, Plaintiffs plead this claim as pertaining to the shooting *and* when Ofc. McMahon "struck, grabbed, [and] tased" Foster.   As to the shooting, Ofc. McMahon's use of deadly force was objectively reasonable (see argument regarding Fourth Amendment claim).

In regard to the other uses of force, they would be considered non-lethal intermediate uses of force.   There is no evidence that Foster was Tased for an unreasonably prolonged period or that he was wantonly struck in the head with the flashlight. In regard to the severity of the crime, the evidence shows that there was probable cause to arrest Foster for a Penal Code § 148(a)(1) violation when he fled and then a § 245(c) violation when he assaulted Ofc. McMahon. In regard to the significance of the threat Foster posed, he fled on his bike, then on foot, concealed part of his body, reached for his waistband as he fled, physically wrestled, grappled, and fought Ofc. McMahon's attempts to take him into custody, was extremely intoxicated, ripped the flashlight from Ofc. McMahon and assaulted him. The potential threat was significant. Finally, there is no dispute that Foster actively resisted from start to finish.   On balance, Ofc. McMahon's grabbing, Tasing, and striking Foster with the flashlight were reasonable.

**G.    THERE IS NO TRIABLE ISSUE ON PLAINTIFFS' NEGLIGENCE CLAIM (COA 7) BECAUSE THERE IS NO EVIDENCE OF OBJECTIVELY UNREASONABLE CONDUCT.**

"Police officers have a duty to use reasonable care in deciding to use and in fact using deadly force. An officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 534 (2009) (internal quotation marks and citations omitted).   The California Supreme Court in *Hayes v. County of San Diego*, 57 Cal.4th 622 (2013) held that liability can arise from pre-shooting decisions and conduct by the officer before deadly force is used. *Id*. at 630. "The reasonableness of the deputies' pre-shooting conduct should not be considered in isolation, however; rather, it should

1  be considered as *part of the totality of circumstances* surrounding the [use of deadly force]."

2  *Hayes*, at 637 (emphasis in the original).

3  Ofc. McMahon had legal justification to detain Foster for vehicle code violations, but

4  Foster fled, raising additional suspicion of illegal activity.  See *Illinois v. Wardlaw*, 528 U.S.

5  119, 124 (2000) (nervous, evasive behavior is relevant to reasonable suspicion of additional

6  criminal activity); *United States v. Verduzo-Verduzc*o, No. 117CR00231DADBAM, 2018 WL

7  4057270, at *6 (E.D. Cal. Aug. 24, 2018). Foster stopped momentarily while concealing the right

8  side of his body, raising suspicion that he was armed, and then took off again.  Ofc. McMahon's

9  decision to pursue him in his patrol car was objectively reasonable, based on his observations,

10  training and experience that Foster posed a danger to the public.

11  When Foster crashed the bike and fled on foot, he reached for his waistband, raising

12  additional concerns that he was armed. Ofc. McMahon's decision to pursue on foot and then

13  attempt to detain Foster with the less-lethal Taser was reasonable based on the totality of these

14  circumstances.  When the Taser was ineffective and Foster continued to flee, it was reasonable to

15  believe that he was armed, dangerous and willing to do anything to avoid detention.  When

16  Foster entered the housing complex of 415 Carolina, additional public safety concerns were

17  reasonable, and when Foster fell in the narrow walkway, Ofc. McMahon saw an opportunity to

18  apprehend him by tackling him. This was an objectively reasonable response. Foster resisted

19  arrest, grappled with Ofc. McMahon, appeared to be high on methamphetamine, was within 415

20  Carolina, and refused to surrender. Ofc. McMahon's use of a less-lethal Taser was again

21  objectively reasonable to try and subdue Foster, but was again ineffective.  Ofc. McMahon's

22  transition to the flashlight as an impact weapon was a reasonable response but, again, nothing

23  seemed to be affecting Foster or helping to gain compliance.  Ofc. McMahon's final transition to

24  his handgun was only as a last resort–after every other weapon had failed him–and when Foster

25  presented an imminent threat of serious bodily injury.  As explained above, the shooting, at that

26  moment, was reasonable.

27  Ofc. McMahon's uses of force and pre-shooting tactics were what a reasonable officer,

28  legitimately concerned about personal and public safety, would have done.

**H.     THERE IS NO TRIABLE ISSUE REGARDING PUNITIVE DAMAGES BECAUSE THERE IS NO EVIDENCE AN INTENT TO VIOLATE FOSTER'S RIGHTS OR RECKLESS INDIFFERENCE.**

In a section 1983 action, a plaintiff may recover punitive damages where the officer's conduct is "shown to be motivated by evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). As discussed with respect to Plaintiffs' due process and Bane Act claims, there is no evidence that Ofc. McMahon acted with intent, nor is there evidence of culpability that rises to the level of reckless indifference. Ofc. McMahon requests dismissal of the punitive damages component of this case.

## VI.  CONCLUSION

Ofc. McMahon respectfully requests that the Court grant this motion and dismiss all claims against him.

ANGELO, KILDAY & KILDUFF, LLP

Dated:  July 10, 2020

*/s/ Derick E. Konz*

By:_____
    DERICK E. KONZ
    BRUCE A. KILDAY
    Attorneys for RYAN McMAHON

///

///

///

///

///

///

///

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

1   **OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

2   A.   **PLAINTIFF'S INTERPRETATION OF THE BODY-WORN CAMERA AND AUTOPSY REPORT,**
3   **THAT FOSTER DROPPED THE FLASHLIGHT AND TRIED TO RUN AWAY *BEFORE* OFC.**
4   **MCMAHON DECIDED TO FIRE, IS NOT SUPPORTED BY THE EVIDENCE AND NOT AN**
    **INTERPRETATION A REASONABLE FACTFINDER WOULD MAKE.**

5        Plaintiff's summary judgment motion asserts that the body-worn camera footage and

6   autopsy report "plainly shows" that Foster was unarmed and shot in the back and back of the

7   head "as he ran away," such that summary judgment on the Fourth Amendment claim is proper.

8   See ECF No. 57 at 11:14-17:7, citing *Scott v. Harris*, 550 U.S. 372 at 380 (2007).

9        Plaintiff interprets the video to show that Foster (a) dropped the flashlight and (b) turned

10  away from Ofc. McMahon to run away *before* Ofc. McMahon decided to fire. However, there is

11  no support for this interpretation.  The video shows, and Plaintiff admits (See Plaintiff's SUF

12  Nos. 48-50), that Foster ripped the flashlight from Ofc. McMahon's hand, rose to his feet, and

13  lifted the flashlight in an attack position within approximately arm's length distance.  Ofc.

14  McMahon testified that he drew his firearm toward Foster's front, at that moment, and fired.

15  The video does not contradict this because it cannot be seen or heard when Ofc. McMahon fired

16  the first shot.  The fact that the video shows Foster drop the flashlight and turn away is not

17  evidence that he did so before Ofc. McMahon fired.  In fact, the video supports Ofc. McMahon's

18  account that he drew his pistol with his right hand toward Foster's front and fired seven shots in

19  one continuous rapid burst *as Foster turned, dropped the flashlight, and fell to his right side on*

20  *the ground*.  Plaintiff's interpretation that this occurred before the shooting is unsupported and

21  not a basis to grant summary judgment.

22       Plaintiff likewise points to the autopsy report that Foster sustained gunshot entry wounds

23  that had a "back-to-front, and up upward trajectory" to conclude that Foster was running away

24  from Ofc. McMahon when Ofc. McMahon decided to shoot.  ECF No. 57 at 11:25-27.  Again,

25  this interpretation is not one a reasonable factfinder would make because it fails to take timing

26  and sequence into account.  Ofc. McMahon testified that he made the decision to draw his

27  firearm and shoot when Foster raised the flashlight and came at him.  Defendant's experts opine

28  that it likely took Ofc. McMahon approximately 1 second to fire the first shot from the holstered

position (when he observed the threat of Foster rising up toward him with the flashlight) and that it is common for a subject to turn and fall away from a shooter as shots are fired, resulting in impact locations to the side, back, and head. Ofc. McMahon testified that he fired seven shots in one continuous rapid burst as Foster dropped the flashlight, turned, and fell to his right side. The fact that Foster sustained entry wounds with a "back-to-front, and up upward trajectory" is not evidence that he was running away and was shot in the back *before* Ofc. McMahon decided to draw his weapon and fire. This evidence actually supports Ofc. McMahon's account.

Moreover, the only civilian witness, Mr. Wolfe, describes Foster moving toward Ofc. McMahon "in anger trying to overpower" him, just prior to the gunshots, and that Ofc. McMahon stopped firing when Foster fell.

This account is supported by the video and the autopsy report. Those pieces of evidence do not create a basis to grant Plaintiff's summary judgment motion.

**B. PLAINTIFF'S INTERPRETATION OF THE HEAD LACERATION, THAT OFC. MCMAHON STRUCK PLAINTIFF IN THE HEAD WITH HIS FLASHLIGHT, IS NOT SUPPORTED BY EVIDENCE AND NOT AN INTERPRETATION A REASONABLE FACTFINDER WOULD MAKE.**

Plaintiff argues that Ofc. McMahon struck Foster in the head with the flashlight and asserts that this was a use of deadly force.[3]  See ECF No. 57 at 15:7-8.  Two points should be drawn from this.

First, Plaintiff concedes that the flashlight was capable of causing death or serious physical injury, which supports Ofc. McMahon's argument that he reasonably resorted to deadly force because Foster threatened him with the flashlight.

Second, although Foster had a laceration on this head, there is no evidence that it was caused by a strike with the flashlight (Foster also fell off a bike, fell down while running, and fell down stairs). The pathologist who performed the autopsy did not draw that conclusion. Plaintiff's police practices expert (Mr. Ryan) opines that the laceration is "consistent" with a

---

[3] Plaintiffs' complaint does not allege that a flashlight strike or any use of force other than the shooting was a Fourth Amendment violation.  See ECF No. 8 at 10:12-20 (asserting that the Fourth Amendment violation occurred "[w]hen Defendant McMahon shot Decedent Foster").

1    strike, but (a) he does not have the medical background that qualifies him to make such an

2    opinion and (b) he does <u>not conclude</u> that the flashlight caused the laceration.  Ofc. McMahon

3    testified that he did not strike Foster in the head with the flashlight and that is the only non-

4    speculative evidence on the matter. Plaintiff cannot point to the head laceration and his own

5    unsupported interpretation of it as a basis to grant him summary judgment.

6    **C.    USE OF THE TASER AND USE OF THE FLASHLIGHT AS AN IMPACT WEAPON ARE NOT
7            PLED AS FOURTH AMENDMENT VIOLATIONS AND, EVEN IF THEY WERE, THERE IS NO
             EVIDENCE TO SUPPORT A SUMMARY JUDGMENT FINDING BASED ON THEM.**
8

9            Plaintiff argues that Ofc. McMahon used excessive force throughout the incident

10   including Tasing Foster in the back and beating him over the head with a flashlight for fleeing.

11   ECF No. 57 at 17:8-18:3. Plaintiff's complaint does not allege that Tasing or use of the flashlight

12   were Fourth Amendment violations; it specifically alleges that the violation occurred "when

13   Defendant McMahon shot Decedent Foster."  ECF No. 8 at 10:14-15.  Accordingly, these pre-

14   shooting tactics are immaterial on the Fourth Amendment claim because the inquiry must focus

15   "on the very moment when the officer makes the split-second judgment." *Billington v.*

16   *Smith,* 292 F.3d 1177, 1190 (9th Cir. 2002).

17           To the extent that Plaintiff is now allowed to raise these additional claims after discovery

18   has closed, the evidence shows that Foster was fleeing from a lawful detention, suspiciously

19   appeared to conceal part of his body, reached for his waistband, and wrestled to keep Ofc.

20   McMahon from taking him into custody once Ofc. McMahon was able to catch up with him at

21   415 Carolina.  There is no evidence to dispute these facts and accordingly, summary judgment

22   on a phantom Fourth Amendment claim for Ofc. McMahon's use of a Taser and flashlight strikes

23   is not supported by the evidence.

24   **D.    OFC. MCMAHON RELIES ON OBJECTIVE EVIDENCE OF AN IMMINENT AND SIGNIFICANT
25           THREAT, NOT ANY SUBJECTIVE FEAR.**

26           Plaintiff argues that Ofc. McMahon will "rely on subjective, unreasonable fear" to

27   support his use of deadly force, which no reasonable jury would believe.  ECF No. 57 at 18:4-

28   19:7. This is untrue.  As explained in Ofc. McMahon's motion for summary judgment, there is

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT

evidence that Foster grabbed the flashlight, rose up from the ground and raised the flashlight within arm's length as if he were about to strike.  Plaintiff admits that the flashlight was capable of causing serious physical injury or death.  From an objective standpoint, this created an imminent and significant threat to Ofc. McMahon; i.e., a reasonable officer would have perceived a need to make the impossible decision between: (a) hoping that Foster did not bludgeon him with a deadly weapon; or (b) defend himself with deadly force.  This is based on an objective analysis of the evidence, not Ofc. McMahon's alleged "subjective, unreasonable fear."

**E.    PLAINTIFF CITES NO CASE FINDING EXCESSIVE FORCE AS A MATTER OF LAW.**

Finally, Plaintiff cases in which he contends that "the Supreme Court and Ninth Circuit have found officers' use of deadly force unconstitutional as a matter of law in much more dangerous situations than this one."  ECF No. 57 at 19:8-22:8.  Two points should be made here.

First, there is <u>no evidence</u> to support Plaintiff's version of events that Foster was unarmed and running away when Ofc. McMahon decided to shoot.  As stated above, the video is not evidence of this and neither is the autopsy report.  There is no evidence to dispute that Foster ripped a 13-inch metal flashlight from Ofc. McMahon's hand, rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc. McMahon from approximately an arm's length away.

Second, the cases Plaintiff cites are inapposite. In *Tennessee v. Garner*, 471 U.S. 1 (1985) the Court did not find a Fourth Amendment violation as a matter of law.  Moreover, the facts are easily distinguishable: Garner was shot while trying to climb over a fence to escape.  Here, Foster was not shot because he was fleeing, he was shot because he ripped the flashlight from Ofc. McMahon's hand and threatened to bludgeon him with it.

In *Curnow v. Ridgecrest Police*, 952 F.2d 321 (9th Cir. 1991), again the court did not find excessive force as a matter of law; the court denied qualified immunity because there was a dispute of fact over whether the decedent pointed a gun at the officers when they shot him because a witness testified under oath that a gun was <u>not</u> pointed at the officers.  Here, Plaintiff has no witness testimony that Foster did not rip the flashlight from Ofc. McMahon's hand, raise

1   it near his head, and turn to strike Ofc. McMahon.   The only civilian witness actually

2   corroborates Ofc. McMahon's account that Foster was aggressively coming at him.

3           In *Estate of Lopez v. Gelhaus*, 149 F.Supp.3d 1154 (9th Cir. 2016), again, the court did

4   not find excessive force as a matter of law.   There, the court denied qualified immunity because

5   there was a dispute of fact as to whether the decedent turned toward the officers with a replica

6   gun before he was shot -- because of inconsistent accounts by multiple officers. Here, there are

7   no eye-witness accounts.

8           These cases do not set any type of precedent to grant Plaintiff's summary judgment in

9   this case.

10  **F.    THE EVIDENCE POINTS TO ONE CONCLUSION: FOSTER POSED A SIGNIFICANT AND
        IMMINENT THREAT AT THE MOMENT THAT OFC. MCMAHON DECIDED TO PROTECT**

11  **HIMSELF WITH DEADLY FORCE.**

12          The evidence in this case leads to one conclusion: Foster actively resisted Ofc.

13  McMahon's attempt to lawfully detain him, ripped the flashlight from Ofc. McMahon's hand,

14  rose to his feet in a bladed stance, raised the flashlight near his head, and turned to strike Ofc.

15  McMahon from approximately an arm's length away as if to bludgeon him.   Ofc. McMahon

16  quickly reacted by drawing his gun from the holster and firing.   As Ofc McMahon fired seven

17  shots within approximately two seconds, Foster dropped the flashlight, turned, and fell away.

18  The body-worn camera video does not contradict this, the autopsy report does not, and no eye-

19  witnesses do. Ofc. McMahon respectfully requests that the Court deny Plaintiff's summary

20  judgment motion.

21

22   Dated:  July 10, 2020                         ANGELO, KILDAY & KILDUFF, LLP

23                                                         */s/ Derick E. Konz*

24                                               By:_____
                                                    DERICK E. KONZ
25                                                  BRUCE A. KILDAY
                                                    Attorneys for RYAN McMAHON
26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT RYAN McMAHON'S
MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S CROSS MOTION FOR
SUMMARY JUDGMENT