BRUCE A. KILDAY, S.B. #66415
  Email: bkilday@akk-law.com
DERICK E. KONZ, S.B. #286902
  Email: dkonz@akk-law.com
**ANGELO, KILDAY & KILDUFF, LLP**
Attorneys at Law
601 University Avenue, Suite 150
Sacramento, CA  95825
Telephone: (916) 564-6100
Telecopier: (916) 564-6263

Attorneys for Defendant RYAN McMAHON

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.F., by and through her guardian ad litem SHASTA SKINNER, individually and as successor-in-interest to Decedent RONELL FOSTER; et al., <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF VALLEJO, a municipal corporation; et al., <br><br> Defendants. | Case No.: 2:18-cv-00673-JAM-CKD <br><br> **DECLARATION OF RYAN McMAHON** <br><br> Honorable John A. Mendez <br><br> Date:  August 25, 2020 <br> Time:   1:30 p.m. <br> Courtroom: 6 (14th Floor) |

   I RYAN McMAHON declare, if called upon, I can testify competently and from personal knowledge to the following:

   1. On February 13, 2018 at approximately 7:40 p.m. I was working a patrol shift for Vallejo Police Department, in full uniform and was driving a marked police vehicle, equipped with lights and sirens.

   2. It was dark.

   3. I observed a person (who was later identified to Ronell Foster) riding a bicycle without a light, for approximately 30 seconds.  Foster was approaching the intersection of Capitol

1  Street and Sonoma Boulevard in the City of Vallejo, disrupting traffic by swerving in and out of
2  lanes.
3      4.    I was aware of recent incidents in Vallejo involving bicyclist and pedestrians being
4  injured or killed by vehicles.
5      5.    Sonoma Boulevard is a heavily traveled four-lane highway with a posted speed
6  limit of thirty miles per hour.
7      6.    Although I observed Mr. Foster making several vehicle code violations, I had not
8  yet made a decision as to if I was going to issue him a citation or just stop him, investigate further,
9  and counsel him about bicycle safety.
10     7.    I activated my emergency lights and shined my spotlight toward Mr. Foster.
11     8.    Mr. Foster looked at me with a startled expression and fled on his bicycle.
12     9.    I pursued Mr. Foster northbound on Sonoma Boulevard with my emergency lights
13 activated.
14     10.    Mr. Foster rode onto the sidewalk, turned his back to me, then stopped behind a
15 van that was parallel parked on the street approximately fifteen feet from where I was.
16     11.    Mr. Foster's feet were on the ground, he was straddling his bike, and stood in a
17 bladed stance, concealing the right side of his body behind the parked van.
18     12.    I stopped my vehicle, got out, stood in the door frame facing Mr. Foster and
19 identified myself as a Vallejo Police Officer.  I ordered Foster to come and sit in front of my patrol
20 car so that I could speak with him regarding the erratic driving and vehicle safety.
21     13.    Mr. Foster looked at me, looked around, and said something akin to, "stop messing
22 with me," and fled on the bike northbound on Sonoma Boulevard.
23     14.    Foster was riding into oncoming traffic and in and out of marked lanes.
24     15.    I returned to my patrol car, activated my lights and sirens, and pursued.
25     16.    Foster turned left, westbound onto Florida Street, then cut through a church parking
26 lot, southbound toward Carolina Street.
27     17.     I knew I would have difficulty safely pursing through the narrow parking lot, so I
28 continued westbound on Florida Street to southbound Marin Street toward Carolina Street.

18. I updated dispatch to my location at Florida Street and Marin Street and that I had a fleeing suspect on a bicycle.

19. This was a mixed commercial/residential neighborhood.

20. As I drove south on Marin Street, I saw Foster traveling westbound on Carolina Street, then lose control of the bicycle and fall off.

21. I was approximately fifteen yards away when Foster fell.

22. Foster quickly jumped up and fled on foot.

23. I exited my patrol car and pursued on foot, westbound on Carolina Street.

24. I attempted to activate my body-worn-camera, but it would not start.

25. I attempted to update dispatch of my location, but the transmission did not go through.

26. As Foster was fleeing, he reached both hands into the front of his waistband and looked back at me.

27. I shouted commands for Foster to stop and not to reach into his waistband.

28. When I was approximately ten to fifteen feet away from Foster, believing that he may have been armed based on his actions of previously trying to conceal the right side of his body, looking back while running, and grabbing his waistband, I un-holstered my Taser and deployed it toward Foster's back, but it was ineffective.

29. Foster and I became tangled in the Taser wires, but Foster was able to break free and continued running.

30. I holstered my Taser and continued the foot pursuit.

31. Foster abruptly turned south at 415 Carolina Street into a narrow walkway of a multi-unit residential complex.

32. The walkway was approximately three feet wide.

33. As Foster ran deeper into the property at 415 Carolina, he fell.

34. I saw Foster on the ground, pursued down the narrow walkway, and caught up just as Foster started to stand.

1     35.     I pushed Foster back to the ground and onto a small concrete patio in the middle of
2 the multi-unit complex.

3     36.     Foster fell onto his stomach and I straddled his back with my knees on the ground.

4     37.     The patio was dark with only one small light bulb illuminated.

5     38.     I told Foster that he was under arrest and ordered him to stop resisting, show his
6 hands, and not reach for his waistband.

7     39.     Foster did not comply.

8     40.     Instead, Foster grappled with me, pushed me off of him, and tried to get to a
9 standing position.

10     41.     As I attempted to keep Foster on the ground, I drew my Taser with my left hand,
11 pressed it into Foster's back and deployed it in drive-stun mode.

12     42.     The Taser was ineffective.

13     43.     Foster continued to grapple with me and attempted to get to his feet.

14     44.     I issued more commands for Foster to stop resisting and put his hands over his head,
15 but Foster refused.

16     45.     I attempted to use the Taser twice more in drive-stun mode on Foster's arm and
17 side, but Foster knocked it away.

18     46.     The Taser was completely ineffective.

19     47.     Based on my training and experience, Foster appeared to be dangerously under the
20 influence of methamphetamines, based on his level of resistance and being unaffected by the Taser
21 and physical restraint techniques

22     48.     I transitioned to my aluminum Maglite flashlight, approximately thirteen inches
23 long, to try and subdue Foster.

24     49.     I held the flashlight by the bulb-end and used it as an impact weapon by striking
25 Foster in his clavicle and arm as Foster continued to grapple and try to get up.

26     50.     Foster caught the flashlight by the handle and ripped it out of my hand.

27     51.     Foster rose to his feet in a bladed stance, raised the flashlight near his head, and
28 turned to strike me from approximately an arm's length away.

52. As Foster rose with the flashlight, raised it, and turned to strike from approximately an arm's length away, I drew my pistol with my right hand toward Foster's front and fired seven shots in one continuous rapid burst as Foster turned and fell to his right side on the ground.

53. Foster dropped the flashlight as he fell to the ground.

54. I stopped firing when Foster fell.

55. I immediately updated dispatch of shots fired at 415 Carolina Street.

56. I was able to activate his body-worn-camera after the shooting, which buffered back to capture the preceding thirty seconds with no sound.

57. I had no weapon that could combat the flashlight other than my pistol.

58. Prior to this incident, I had no contact with Foster and did not know his identity.

59. Two minutes elapsed from the time that I radioed that I had a fleeing suspect on a bicycle at Florida and Marin to when he radioed shots fired at 415 Carolina.

I declare under penalty of perjury and the laws of the State of California that the foregoing is true and correct.

Executed this day, July 10, 2020, in Vacaville, California.

RYAN McMAHON