# EXHIBIT 1

**SEALED**

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 2 of 18

LETTER FROM CALIFORNIA  NOVEMBER 23, 2020 ISSUE

# HOW A DEADLY POLICE FORCE RULED A CITY

*After years of impunity, the police in Vallejo, California, took over the city's politics and threatened its people.*

**By Shane Bauer**
November 16, 2020



*The sisters of Sean Monterrosa, who was killed by the police, hold his portrait.*  Photograph by Carolyn Drake / Magnum for The New Yorker / Painting by Andrew Durgin-Barnes

▶  0:00 / 48:38

**Audio:** Listen to this article. To hear more, download Audm for iPhone or Android.

T hree police officers in an unmarked pickup truck pulled into the parking lot of a Walgreens in Vallejo, California, responding to a call of looting in progress. It was just after midnight on June 2nd, and a group of people who had gathered around a smashed drive-through window quickly fled in two cars. Sean Monterrosa, a twenty-two-year-old from San Francisco, was left behind. As the police truck closed in on Monterrosa, Jarrett Tonn, a detective who had been with the Vallejo police force for six years, was in the back seat, aiming a rifle. No one told Monterrosa to freeze or to put his hands up, but he fell to his knees anyway. As the truck came to a stop, Tonn fired five rounds at Monterrosa through the windshield.

A week earlier, a police officer in Minneapolis had killed George Floyd. Now the Bay Area was in the throes of an anti-police uprising. People marched, drove in caravans, and painted tributes to Floyd on walls and boarded-up windows. Police in Oakland, about thirty miles from Vallejo, launched tear gas at protesters, who gathered in intersections, blocked traffic on the freeway, looted stores, and lit fires in two banks. A man linked to the far-right Boogaloo movement was charged with killing a security officer outside a federal building. People ransacked malls in San Francisco, San Leandro, and the wealthy suburb of Walnut Creek, stealing from Best Buys, Home Depots, video-game stores, small businesses, and marijuana dispensaries. More than seventy cars were taken from a dealership; a gun shop was robbed of twenty-nine firearms. A curfew was instituted in Vallejo, but many people defied it. When Monterrosa got to the Walgreens, the store had already been looted.

Forty-seven minutes before Monterrosa was killed, he sent a text message to his two sisters, asking them to sign a petition calling for justice for Floyd. Monterrosa, whose parents emigrated from Argentina, had been critical of the police since, at the age of thirteen, he received citations for selling hot dogs outside night clubs. As teen-agers, Monterrosa and his sisters went to protests for people killed by cops in San Francisco: Jessica Williams, Alex Nieto, Mario Woods. In 2017, Monterrosa was arrested on weapons charges, for allegedly shooting into a building; he returned from jail covered in bruises. (The case was dismissed after his death.) He told his family that the police had smacked his head against the concrete in his cell.

When Monterrosa was young, the neighborhood where he grew up, Bernal Heights, was largely Black and brown, but as tech companies moved in San Francisco became richer and whiter. Now, Monterrosa's mother says, their family are the only Latinos on the block. Sean encouraged her to know her rights as a documented immigrant. His mother generally thought that the police were a force for good, but Sean disagreed, saying that they were out to get Black and brown people.

Monterrosa loved San Francisco, but he couldn't afford to live there. Since the age of eighteen, he'd moved back and forth between the suburbs and his parents' place, working a variety of jobs. He got a carpentry position two months before the Bay Area issued shelter-in-place orders in response to the coronavirus, then he was laid off. He moved in with a new girlfriend. A couple of days later, he came to the Walgreens.

After Tonn shot Monterrosa, he got out of the truck and turned his body camera on.

"What did he point at us?" Tonn asked.

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 4 of 18



*When Monterrosa got to the Walgreens, the store had already been looted.* Photograph by Carolyn Drake / Magnum for The New Yorker

"I don't know, man," an officer said.

"He pointed a gun at us!" Tonn shouted.

"Do not move!" the officers yelled, training their weapons on Monterrosa, who lay limp on the pavement in a pool of blood. Two of them reached down and rolled him over, revealing a hammer sticking out of his pocket.

"Oh, fuck," Tonn exclaimed.

"You're good, man," an officer said.

The officers cuffed Monterrosa.

"Fucking stupid!" Tonn shouted. He kicked the truck. "This is not what I fucking needed tonight," he told a captain. "I thought that fucking axe was a gun."

"Calm down," the captain said. "Take some deep breaths."

Tonn inhaled deep and slow.

"You're going to be all right," the captain said. "We've been through this before."

Since the killing of Michael Brown in Ferguson, Missouri, in 2014, protest movements have pushed big cities to reform their policies on when a police officer can use force. According to the database Mapping Police Violence, homicides by police in America's thirty largest cities have declined by about thirty per cent since the year before the Ferguson protests. Yet they have not decreased nationwide. In rural and suburban areas, police killings have been on the rise for years, and roughly three-quarters of police homicides now occur in those areas. The killing of Monterrosa received some national media attention, because of the moment in which it occurred. But in Vallejo it was one more in an ongoing litany of police killings.

Vallejo, a postindustrial city of a hundred and twenty-two thousand people, is best known for its Six Flags amusement park and for its musicians: E-40, Mac Dre, H.E.R. Its per-capita income is less than half that of San Francisco, and its population is more diverse, split among whites, African-Americans, Latinos, and Asians. Its police force, however, consists largely of white men who live elsewhere. Since 2010, members of the Vallejo Police Department have killed nineteen people—a higher rate than that of any of America's hundred largest police forces except St. Louis's. According to data collected by the anti-police-brutality group Campaign Zero, the V.P.D. uses more force per arrest than any other department in California does. Vallejo cops have shot at people running away, fired dozens of rounds at unarmed men, used guns in off-duty arguments, and beaten apparently mentally ill people. The city's police records show that officers who shoot unarmed men aren't punished—in fact, some of the force's most lethal cops have been promoted.

The failure to hold police officers accountable has been an issue in Vallejo for as long as anyone can remember. According to confidential city documents, twenty-five years ago one officer shot another while drinking in a bar, and wasn't fired. A cop with a drug problem kept his job even after he was caught stealing from evidence lockers and was arrested for prescription fraud. Twenty years ago, a lieutenant told a new officer named Joseph Iacono that, when a suspect runs away, the officer should use enough force to put the man in the emergency room. To see if Iacono could fight, he was placed in a holding cell with an uncoöperative suspect. Iacono is now the department's Lead Force Options Instructor and, according to the documents, likes to say, "It can't be awful if it's lawful."

In the past ten years, Vallejo has paid nearly sixteen million dollars in legal settlements involving the police, many thousands of dollars more per officer than America's largest police departments. None of that money has come from officers; it is paid by Vallejo and its insurers. Police violence has cost the city so much money that, in 2018, the statewide insurance pool that helped pay its legal fees took the unprecedented step of raising Vallejo's annual deductible, from five hundred thousand dollars to $2.5 million, prompting the city to find another insurer. Vallejo is currently facing at least twenty-four use-of-force cases, which it estimates could cost some fifty million dollars.

"Vallejo police have been acting as if they own Vallejo for a long time," Stephanie Gomes, a former city-council member, told me. In 1969, two weeks after the Zodiac killer shot a couple in Vallejo, officers staged the first-ever strike by law enforcement in California. They had been receiving "top salary," one newspaper wrote, but, after refusing to work for five days, they won a seven-per-cent wage increase.

At the time, Vallejo was a relatively prosperous city. A naval shipyard provided thousands of jobs, and the median income was on a par with San Francisco's. But, in the mid-nineties, the shipyard closed, and Vallejo lost its main source of revenue. In the following years, the city became less white, and poverty increased. Fearing cuts, the police union, the Vallejo Police Officers' Association,

identified city-council candidates who were friendly to its interests. The V.P.O.A. contributed money to their campaigns and launched attacks against those who opposed them.

The V.P.O.A.'s strategy, Gomes told me, was to try to "elect a majority of people who will vote for lucrative contracts and pretty much whatever they want." When Gomes ran for city council in 2005, she met with representatives of Vallejo's unions, including police and firefighters. She said that one of them asked her, "If you win, will you stay bought?" The V.P.O.A.'s approach seemed successful. Between 2000 and 2007, the police received a fifty-five-per-cent wage increase. Vallejo had one of the lowest per-capita incomes in the Bay Area but the best-paid police force.

After the housing bubble burst in the mid-two-thousands, the city's finances deteriorated further. In 2007, it had an eight-million-dollar deficit, which was projected to double within a year. In the hope of avoiding collapse, Vallejo hired a new city manager, Joe Tanner. To Tanner, the source of Vallejo's financial problems was clear: three-quarters of its general fund was going to police and firefighters. Gomes led an effort to reduce their pay, but the unions defeated the city in arbitration, forcing it to limit street repairs and to eliminate funding for the senior center and the library. "Every citizen of Vallejo works to pay the salaries of the police and fire unions," a resident wrote to the local paper. "All we talk about is cutting services to feed the greed and avarice of the public safety unions."

Tanner and Gomes saw no choice for the city but to declare bankruptcy and renegotiate the unions' contracts. The problem, Tanner told me, was that "the cops owned the council." The majority of city-council members were endorsed by the public-safety unions, and they refused to vote in favor of bankruptcy. One day, Tanner said, a Vallejo cop approached him in a restaurant in a nearby town and told him, "You're gonna get yours." An anonymous caller threatened to burn his house down. His Jeep was keyed several times and its tires were slashed. Eventually, Tanner threatened to declare a state of emergency and lay off the entire police and fire departments. The council gave in, and, in May, 2008, Vallejo became the largest city in California ever to declare bankruptcy.

By 2011, owing to retirements and a hiring freeze, the police force had shrunk to ninety officers, around sixty per cent of its pre-bankruptcy size, and the police budget had been cut by about a third. The union had warned that the cuts would lead to an increase in crime—a billboard in the city read "PUBLIC SAFETY IS DISAPPEARING"—but, in the two years following Vallejo's bankruptcy, violent crime decreased by a quarter.

Police in other parts of the country worried that Vallejo's approach could spread. In 2008, the magazine *American Police Beat* published an article, titled "TIME TO CIRCLE THE WAGONS," which warned police departments that, as the country fell into a recession, "highly compensated law enforcement agencies" should be worried. Police unions should be prepared to "identify the vocal critics and make them feel your pain. Somehow this seems to be where the unions get queasy and weak-kneed." The article went on, "It is often difficult to convince yourself or the members to picket some councilman's business, put their home telephone numbers up on billboards, and in general make their lives a living hell. . . . Get dirty and fight to win."

As Vallejo was arguing for bankruptcy in court, Gomes told me, police cars and motorcycles drove by her house multiple times a day, and officers revved their engines and looked into her front window. One officer, Steve Darden, wrote a rap song about Gomes and posted it online. It included these lines:

I'm plain sick and tired of all the trash you're talkin'
When the truth comes out we gonna send you walkin' . . .

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 7 of 18

You're the worst kind-causing all these problems
When it starts heating up you run and hide in your closet . . .
Be careful what you wish for it could come true
As we all watch the plan backfire on you

Darden has produced a number of albums about being a cop in Vallejo. A common theme is the unfair treatment of police. Yet Darden has a long history of disturbing behavior. In 2010, he told a defendant in court that if he didn't stop glaring at him he would knock him out and make him "leave on a gurney." In 2011, Darden responded to a 911 call from a man who said he'd been beaten and robbed by his housemates. The man identified himself as a U.S. soldier and scolded Darden for taking forty-five minutes to arrive. Darden hit him in the face and took him to the ground, shouting, "You are talking to a United States marine!" According to an investigation by Open Vallejo, a nonprofit news Web site, Darden is one of a group of officers who have bent the tips of their badges to commemorate fatal shootings—an accusation that Darden has denied. He has been the primary shooter in two killings, and a recent photograph appears to show two bent tips on his badge. This year, he was promoted to lieutenant.

When Gomes arrived home one day, her neighbor told her, "Something really dirty just happened." The alarm on Gomes's house had been tripped, and two police officers had responded. The neighbor had seen them pry open a window and spend at least twenty minutes inside. Hours later, on the blog of a local newspaper, anonymous accounts posted about her personal items, including a satirical collage made by a friend that depicted Gomes as the mastermind behind the city's bankruptcy and police cuts. Gomes complained to the city, and the police chief ordered the cops to stop driving by her house.

If the police were willing to harass Gomes so persistently, she wondered what they did to people who had no power. After she was reëlected, in 2009, she proposed forming a citizens' advisory committee to review complaints against the police. When she presented her proposal at City Hall, cops filled the chamber and booed. One said that Gomes was "scapegoating" the police. Another said that the force was being "subjected to hate and tyranny."

*The steps outside the Vallejo police station.* Photograph by Carolyn Drake / Magnum for The New Yorker

Although the committee was ultimately approved by the city council, its duties were watered down to producing a report of nonbinding recommendations. Its seven voting members were white, and three of them were former police officers.

Shortly after Sean Monterrosa was killed, the V.P.O.A. issued a statement saying that, before he was shot, he "abruptly pivoted back around toward the officers, crouched into a tactical shooting position, and grabbed an object in his waistband that appeared to be the butt of a handgun." The statement, which neglected to say that Monterrosa had not been armed, asserted that "the officer used deadly force as a last resort because he had no other reasonable option to prevent getting shot." Each week, people marched from City Hall to protest Monterrosa's killing. The V.P.O.A., on its Facebook page, condemned the "screaming angry mob mentality and profound anger directed at the police."

Nationwide, more than eighty per cent of police officers are represented by unions, and a 2006 report by the Bureau of Justice Statistics found that unionized police departments received complaints about their members' use of force at a rate thirty-six per cent higher than that of non-unionized departments. In 2019, a University of Chicago study of sheriff's deputies in Florida found that, when the deputies unionized, their violent misconduct increased by forty per cent.

Strong police unions also make it harder for cops to be punished. Officers can appeal sanctions through multiple reviews, and most departments allow appeals to be heard by an arbiter selected in part by the police union. According to a 2017 examination by the Washington *Post*, among departments that coöperated with its survey, roughly a quarter of cops fired for misconduct since 2006 were reinstated after an appeal. (In San Antonio, the share was seventy per cent.)

Five months before Monterrosa was killed, the V.P.O.A. had replaced its president, Detective Mat Mustard, who had run the union for ten years. Mustard was notorious in Vallejo for the investigation he led into the kidnapping of a woman named Denise Huskins, in 2015. Someone broke into the house where she and her boyfriend were sleeping, blindfolded and drugged them, and put her in the trunk of a car. When the boyfriend reported the crime, Mustard suspected that he had killed Huskins and invented the kidnapping story. At the police station, the boyfriend said, officers dressed him in jail clothes, then Mustard and others interrogated him for eighteen hours, calling him a murderer. Huskins, who was being held a hundred and sixty miles away, was raped repeatedly. After she was released, the Vallejo police publicly accused her and her boyfriend of faking the kidnapping, comparing the situation to the movie "Gone Girl." The police threatened to press charges against the couple, and after the rapist e-mailed the San Francisco *Chronicle*, confessing to the kidnapping, the police accused Huskins and her boyfriend of writing the e-mail. Soon, the rapist was arrested in South Lake Tahoe, after trying to repeat the crime. Even then, the Vallejo police insisted that Huskins and her boyfriend were lying. The couple sued Mustard and the city, eventually winning a $2.5-million settlement. In a show of defiance, the police department named Mustard officer of the year.

The new president of the V.P.O.A., Michael Nichelini, had been on the police force in Oakland before he joined the Vallejo P.D., in 2006. In 2003, he participated in the suppression of an antiwar demonstration, in which police shot wooden dowels and rubber bullets at people who were blocking traffic in the city's industrial port. Nichelini, along with other traffic officers, used his motorcycle to push back the protesters, striking at least one person.

According to an article in the Berkeley *Daily Planet*, youth of color in Oakland called Nichelini "Mussolini," because of his reputation for racism. At least four civil-rights complaints were filed against him to the Oakland Citizens' Police Review Board. In 2004, the board found that he had used excessive force after stopping a seventeen-year-old boy driving a truck on a suspended license. The boy claimed that Nichelini asked, "Are you a nigga or *ese*?," and the board found that he used his knees to hit the back of the teen-ager's head against the pavement.

Nichelini's father, Robert, was Vallejo's chief of police when his son joined the force. Robert Nichelini, who had also come from the Oakland Police Department, assured the Vallejo *Times-Herald* that his son had a "perfect record." Vallejo is "such a family oriented city," he told the paper. "What is wrong with a son following a father's footsteps in the Vallejo Police Department?"

In 2019, eighteen-year-old Carlos Yescas and his twelve-year-old brother drove to a food market in a car with no license plate. According to a complaint that Yescas filed with the city, Michael Nichelini, who was in plain clothes, approached them and told Yescas, "You know you fucked up, right?" Yescas said that Nichelini didn't identify himself as a police officer but insisted on seeing Yescas's I.D. Nichelini then told him that "he was going to take his car and keep it." He reached into the car, grabbed the keys,

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 10 of 18

and cuffed Yescas. As Yescas's brother filmed, Nichelini pulled Yescas from the vehicle, even though he was wearing a seat belt. Yescas called Nichelini a "white piece of shit," and Nichelini threw him to the ground and knelt on his back as Yescas repeatedly said, "I can't breathe." Yescas's car was confiscated, and the police department told his family that it couldn't be located. Then the department auctioned it off.

Melissa Nold, an attorney who specializes in police use-of-force cases, filed the complaint. Two months later, she and Nichelini were at a city-council meeting in which the police were requesting a change to their contract. They wanted a clause deleted that allowed the city to order an officer to be drug-tested after firing his weapon. The clause had not been enforced for years, but Vallejo's first Black police chief, Shawny Williams, was about to take office, and there was a presumption that he would be a reformer. Nichelini stood at the back of the room and filmed Nold. The clause was deleted and, two months later, Nichelini became the president of the V.P.O.A.

A few days after Monterrosa was killed, police replaced the windshield that Tonn had fired through. For possible involvement in the destruction of evidence, Nichelini was suspended by Williams. He maintains that he had nothing to do with the windshield replacement.

One spate of killings by police in Vallejo can be traced back to 2011, when an officer named Jim Capoot was shot and killed while chasing a suspected bank robber. He was the first cop to be killed in Vallejo in eleven years. The following year, police killed six people, accounting for nearly a third of the homicides in the city. Half the killings were committed by an officer named Sean Kenney.

Early on the morning of May 28, 2012, a forty-one-year-old Black man named Anton Barrett, Sr., whose nineteen-year-old son was also in the car, pulled out of a parking lot with his headlights off and ran a red light. He was drunk, and when cops tried to stop him he drove off. Then his car got a flat tire, and he and his son jumped out and ran in different directions through an apartment complex. Kenney began chasing Barrett, and, though he was carrying pepper spray and a Taser, he chose to draw his gun. Seconds later, he saw Barrett running toward him and fired five times. Kenney claimed that Barrett had started to pull a black object out of his pocket—it turned out to be a wallet. As Barrett lay on the ground dying, another officer Tased him. Barrett's family sued, and the city eventually paid a settlement of two hundred and thirty-five thousand dollars.

Three months later, Kenney shot Mario Romero, a twenty-three-year-old Black man, who was returning home after a night out with his sister's boyfriend, Joseph Johnson. When the men pulled up to the house, Johnson called Romero's sister and asked her to let him in. Kenney and Dustin Joseph, who were responding to a call about a burglary in the neighborhood, shone a spotlight on the men.

Kenney said that Romero got out of the car and reached for his waistband. Then, he said, when the officers yelled for the men to put their hands up Romero crouched "into a firing position," prompting Kenney and his partner to begin shooting. Johnson, however, said that the cops began firing at him and Romero while they sat in the car.

Romero's sisters were watching from their living-room window, and said that they saw Kenney jump onto the hood of the car and unload his clip through the windshield into Romero, who was sitting in the driver's seat. Johnson corroborated this account. Kenney admitted that he'd stood on the hood but insisted that he hadn't fired from there. Romero was shot thirty times. After his body was removed, Kenney searched the car. He said that he found an airsoft gun on the floor, wedged between the driver's seat and the center console.

Seven weeks later, an autistic man named Jeremiah Moore and his boyfriend were smashing car windows and trying to set their home on fire during a psychotic episode. When the police arrived, Moore grabbed an antique rifle and Kenney shot and killed him. Moore's family sued, and won a two-hundred-and-fifty-thousand-dollar settlement.

The Romero family, along with other community members, attended sessions of the newly created citizens' advisory committee, which met for several hours every couple of weeks. But the issues the committee debated were modest: a small reduction in wages, requiring cops to use body cameras, creating a position for a civilian auditor who would respond to complaints of police misconduct. The former officers who sat on the committee regularly objected to these proposals, raising the spectre of lawsuits by the V.P.O.A. should the city try to interfere with police work.

In the end, the committee's recommendations included installing more surveillance cameras, establishing a daytime curfew for youths, increasing enforcement of parking violations, and using money from a new public-services tax to hire more cops.

Three years after the death of Romero, his family won a two-million-dollar settlement. Later that year, the police department completed its review of the case and declared that the shooting was justified. Officers told Open Vallejo that Kenney was initiated into the badge-bending group. In 2011, he was made a detective. One of his new duties was to investigate officer-involved shootings.

Reformers who have succeeded in getting rogue cops censured or fired often come up against a frustrating reality: because there are no national and few statewide indexes that track police terminations and disciplinary infractions, tainted officers often find new jobs in different jurisdictions. A recent study published in the *Yale Law Journal* found that about three per cent of officers serving in Florida had been fired from other state agencies. These cops, who typically moved to smaller forces that were desperate for experienced officers, were more likely than others to be charged with misconduct in their new departments. Sometimes a cop will resign before he is fired, thus avoiding any consequences. Before Timothy Loehmann, the officer who killed twelve-year-old Tamir Rice, in Cleveland, joined the city's police force, he had resigned from his previous job, in Independence, Ohio, where supervisors noted his insubordination, lying, and emotional immaturity.

Officers can also transfer in order to escape reforms. In the past year, large numbers of cops in Seattle, Buffalo, Atlanta, and San Francisco have left. After four cops were charged with killing George Floyd, about two hundred officers in Minneapolis filed to quit the department, citing "post-traumatic stress." Law Enforcement Move, a company founded in the wake of the recent protests, says that it helps officers "escape anti-police cities, and live in America, again!" Since June, its founder told me, the company has been contacted by more than a thousand cops, or their spouses, who are interested in relocating to more "police-friendly" communities.

Some of Vallejo's most notorious officers transferred from Oakland, where a lawsuit brought on behalf of a hundred and nineteen plaintiffs claimed that police had routinely kidnapped, beaten, and planted evidence on people. In 2014, a court-appointed overseer announced that he would be tightening oversight on uses of force, and punishing officers who didn't report misconduct by their colleagues. Within four months, six officers had left for Vallejo. Three of them were eventually involved in lethal shootings. All six were sued for excessive use of force.

Two of the former Oakland officers were the twin brothers Ryan and David McLaughlin, who often searched men of color in Vallejo on the ground that they smelled marijuana, even after it had been legalized. The brothers justified these searches as

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 12 of 18

"compliance checks," meant to make sure that people weren't carrying more than the legal limit. "That's maybe how they roll in certain other nations," a judge later said in court. "But that is not probable cause."

In 2018, David McLaughlin, while off duty, got into a heated confrontation with a man celebrating his son's birthday at a pizzeria in Walnut Creek. He pointed his service gun at the man, then tackled him and punched and elbowed him until his face was bloody. (McLaughlin maintains that he acted within professional boundaries.) Five months later, McLaughlin pulled over a man on a motorcycle for speeding, then drew his gun on him. The man's cousin, an African-American marine veteran named Adrian Burrell, filmed the encounter from his front porch. McLaughlin ordered Burrell to retreat. Burrell refused, resulting in a struggle that, he alleges, gave him a concussion. McLaughlin faces lawsuits in both cases.

Jarrett Tonn, Monterrosa's shooter, joined the Vallejo force the same year as the Oakland cops. Tonn had been an officer in Galt, California, where he worked with his cousin, Kevin Tonn. One day in 2013, Kevin confronted a man who he thought, incorrectly, was a suspect in a robbery. The man pulled out a gun and shot Kevin, then shot himself. Jarrett rushed to the scene, but his cousin was dying.

*A memorial for Sean Monterrosa in San Francisco, where he was from.*   Photograph by Carolyn Drake / Magnum for The New Yorker

Transferring to Vallejo might have seemed like an unlikely career move. Crime was high, the city was just a few years out of bankruptcy, and the school system had recently emerged from state receivership. But Tonn wasn't going to live there. Even after the bankruptcy, Vallejo officers were some of the highest paid in California. Tonn's base pay during his first full year in Vallejo was a hundred thousand dollars—thirty-six thousand dollars more than he made in Galt. This didn't account for overtime and benefits. In 2018, he made twenty-seven thousand dollars in overtime and thirty-one thousand dollars in "other pay," and received twenty-two thousand dollars' worth of benefits. In addition, his pension was funded with fifty-eight thousand dollars.

The year after Tonn started working in Vallejo, he chased an unarmed man who was driving a stolen car. The man crashed into someone's front yard, then reversed into Tonn's car. Tonn doesn't remember feeling the impact, but in two seconds he shot eighteen rounds from his Glock into the car, injuring the man.

The officer who wrote the police review of the shooting was Kent Tribble, who once, when responding to a domestic dispute, went to the house of a Black man by mistake, Tased him through his bedroom window after the man shouted profanities at him, and later charged him with resisting arrest. On another occasion, when he was off duty, he pulled a gun on two men in Bend, Oregon, during a drunken confrontation after leaving a bar. (Tribble did not respond to a request for comment.) A couple of years later, Tribble was promoted to lieutenant. When he reviewed Tonn's shooting, he wrote that Tonn had acted in accordance with his training.

In 2017, Tonn was paired with Sean Kenney, the officer who killed three people in 2012. One day, Tonn and Kenney were pursuing Kevin DeCarlo, a suspect in a pawnshop robbery that had ended in a homicide. (He was never charged in connection with the crime.) When DeCarlo stopped at a stop sign, Kenney rammed his car. DeCarlo rammed Kenney back, then got stuck in a ditch. Tonn fired at least eight rounds with a rifle at DeCarlo; other officers, including Kenney, fired at him as well. A witness told police that the scene resembled an execution. DeCarlo suffered four broken ribs, a collapsed lung, and the loss of two fingers. Tonn told investigators that he thought DeCarlo was reaching for a firearm, but DeCarlo had no weapon. (Tonn did not respond to a request for comment.)

According to the Pew Research Center, only a quarter of cops ever fire their weapon on duty, but this was Kenney's fifth shooting in five years. A year and a half later, he retired. He started a consulting firm called Line Driven Strategies, which conducts training courses for police departments on the use of force and on how to investigate shootings by the police. Kenney declined an interview, saying that there was "too much negativity and hate in this climate."

Five weeks after shooting DeCarlo with Kenney, Tonn chased a carjacking suspect down an alley, then fired at him from half a block away. Tonn claimed that the man was carrying a gun, but no weapon was found. The policeman who wrote the internal report of the shooting, Jared Jaksch, was one of the officers who had shot at DeCarlo. Jaksch is also on the board of the V.P.O.A. He wrote that Tonn had done nothing wrong, but recommended that adjustments be made to training "to ensure officers know that they must react in self defense without consideration for potential future civil unrest."

I wanted to learn how Vallejo police officers viewed the perception that they act with impunity. Though no one on the police force agreed to talk to me on the record, I did find a body-camera recording in which an officer revealed his thoughts. On July 7, 2016, Josh Coleman and a partner were on patrol in Vallejo when they saw some twenty Black people standing in an intersection. For a documentary about Bay Area hip-hop, a Viceland reporter was interviewing Nef the Pharaoh, a protégé of E-40. Coleman assumed that they were shooting a rap video. He later told a court that, since he had seen guns used in rap videos, he thought this was sufficient cause to detain and search as many of the men as he could.

As an officer began to arrest a man with a handgun, Coleman ordered a group of onlookers to move across the street. (A judge later dismissed the charges, saying that there was no probable cause for a search.) A twenty-one-year-old woman, whom I'll call Aliya, ignored him, so Coleman threw her against his car and arrested her.

Coleman spotted a rapper known as Cousin Fik, with whom he went to high school. Coleman believes that the main reason for street violence is "the music, plain and simple." He admonished Cousin Fik for delivering a detrimental message. "Until men like

Case 2:18-cv-00673-JAM-CKD   Document 82-3   Filed 01/14/21   Page 14 of 18

you and people like I start delivering the same exact message, we are not going to be able to do anything," Coleman said. "People are still going to get killed."

At the police station, Coleman put Aliya in an interrogation room and asked her why she had refused to cross the street.

"Because that's my baby daddy, and I don't want nothing to happen to him," she said. "All these police officers want to shoot a Black person. If you're going to shoot him, I'm going to be right with him."

"In the political climate today, do you think any police officer really wants to shoot a Black person?" Coleman asked.

"So why do they?"

"We're protecting our lives."

"O.K., you're cool today, but another officer would have had his gun out and automatically just shot him."

"No, that doesn't happen. Seriously, think about it logically. You think a police officer is willing to risk his one-hundred-thousand-a-year job, all of his medical benefits, because he wants to shoot somebody who's Black and be on the news, and be accused of being a murderer, and now he has to live the rest of his life being a UPS driver because he can't be a cop anymore?"

"I'm not saying you do, but you never know what these—"

"You're not processing," Coleman said.

"I'm just telling you I'm scared for him."

"You're processing this emotion out of an unrealistic fear."

Coleman once shot a man at a bar when he mistook a can of Steel Reserve 211 beer tucked into the man's waistband for a gun. On another occasion, he wrote in a police report that he had stopped a Black man when the man turned to look at his patrol car after Coleman drove past. "In some circumstances," Coleman wrote, he found such behavior "to be an indicator of wrong doing." "You've got to stop swallowing dope," Coleman said he shouted after the man appeared to put something in his mouth. "It's going to give you a tummy ache." The man yelled back at him. Coleman then pulled across several lanes of traffic, got out of the patrol car, and tackled the man. Coleman noted in the report that, although the man was not carrying drugs, he had cash denominations "consistent with street level sales." The man was carrying forty-eight dollars.

"I understand what you think," Coleman said to Aliya. "I went to college. I remember being in my twenties and thinking that all these things are examples of police brutality, 'cause I didn't understand what it's like to be a police officer."

"The fact that you just pull your guns out scares people," she said.

"I wish we didn't have to have firearms," Coleman responded. He said that he wished there were an iPhone app that enabled him to make people freeze without endangering their lives.

"Ain't that what y'all have the Tasers for?" Aliya asked.

"Tasers don't work."

*Police officers in Vallejo are largely white men who live elsewhere.*  Photograph by Carolyn Drake / Magnum for The New Yorker

Months earlier, Coleman had been dispatched to a post office to deal with a homeless man who had threatened to harm himself. Coleman wrote in a police report that, as he was approaching, he wondered if the man might have a "more sinister purpose," such as launching a terrorist attack. In order to disrupt the man's ability to "secure the location" or take hostages, Coleman rushed in and Tased him.

"The crux of the issue is that there is a lack of respect for law now in this young culture," Coleman told Aliya. "The young culture believes that they can do whatever they want. . . . Martin Luther King wasn't smoking weed. Martin Luther King wasn't hanging out at a rap-video shoot with a bunch of people with guns talking about how the police are killing Black people. . . . What

happened to Malcolm X? What happened to Marcus Garvey? What happened to real men who stood for real values? What happened to Oprah Winfrey? I would say Bill Cosby, but he messed that up."

Soon, Coleman said, "Do you want to go home today?"

"Yeah."

"I want you to apologize to me," he said.

"Sorry," Aliya said, sounding surprised.

"That is a bad apology. I want you to really apologize."

"Sorry."

"That's the best you have? One word?"

"Sorry for being in your scene."

Willie McCoy, a twenty-year-old rapper, was the last person to be killed by Vallejo police before Sean Monterrosa. In February, 2019, the police got a call from a Taco Bell, saying that a man was unconscious in his car. A group of officers arrived and saw McCoy asleep in the driver's seat. One officer noticed that he had a gun in his lap, with the magazine removed. Another officer said that he was going to open the door and grab the gun. "If he reaches for it, you know what to do," he said. But the door was locked. The police had been standing around the car for more than four minutes when McCoy scratched his shoulder and leaned forward, seeming dazed. Suddenly, six cops fired fifty-five bullets at him.

One of the officers, Ryan McMahon, had stopped a Black man a year earlier for bicycling without lights. McMahon beat the man, Ronell Foster, with his flashlight until Foster wrested it from him and attempted to run. McMahon shot him in the head and the back from several feet away, killing him. The V.P.O.A. posted on its Facebook page that killings like this could be avoided "if those that come into contact with the police follow their commands." McMahon was cleared of wrongdoing by prosecutors, but Foster's family sued the city and won a $5.7-million settlement, the largest that Vallejo has paid.

Since June, activists in Vallejo have been calling for the city to "fire the fatal fourteen," referring to officers on the force who have been involved in multiple shootings. In September, Williams, the department chief, broke with precedent and fired McMahon. Williams didn't claim that the shooting of McCoy was unjustified; instead, he said that McMahon had violated "safety norms" by shooting while his partner was standing near the line of fire.

In a closed city-council meeting in October, Williams said that he is also pursuing disciplinary action against officers who recently kicked in the door of a house and Tased a man who they wrongly believed was suspected of domestic violence. In addition, Williams vowed to punish an officer who held his foot on a man's head for at least a minute and a half while the man was handcuffed. Recent confidential city documents suggest that Williams is unpopular within the department. Officers have accused him of getting the job because he's Black. "He thinks he is Black Jesus," one said. Nichelini, the head of the V.P.O.A., has said that Williams "can't speak English," and that he won't follow the chief's orders if he doesn't like them, according to the documents. "Chiefs come and go," Nick Filloy, a public defender for fourteen years who works in Vallejo, told me. "It's the sergeants and the shift lieutenants and the captains that really control the tenor of the department and that resist change."

If Vallejo is an example of what can happen in a small city with a strong police union, it may also prove to be a test case of a city attempting to break the union's power. In another closed city-council meeting in October, the mayor, Bob Sampayan, a former police officer, said, "I'm just absolutely done with the V.P.O.A. running the show. We need to show V.P.O.A. that they are not in control." The city has created a position for a civilian auditor to review police investigations and complaints against officers. The council, including its union-endorsed members, unanimously approved a proposal by the mayor, the chief, and the city manager to declare a public-safety emergency. This will allow them to implement police reforms without consulting the V.P.O.A., and to create non-union positions for assistant chiefs, who they hope will help rein in the police department. In response, the union said that the city was trying to "create a dictatorship . . . to circumvent state and local laws and regulations."

The fight to break the union could go on for years, or it could fade away. In the meantime, the Monterrosa and McCoy families have sued the city. If these cases end in large payouts, insurance providers could refuse to continue the city's coverage, which would force it to disband its police department, as has happened in a few other small cities, including Lincoln Heights, Ohio, and Maywood, California.

Monterrosa's sisters and local activists recently put up a billboard facing the police station, where Jarrett Tonn is back at work. It shows Monterrosa, a slight smile on his lips. "We wanted to remind the police that Sean can't be forgotten," Ashley, one of Monterrosa's sisters, told me. "We want to make sure Jarrett Tonn sees the person he killed every single day." ♦

## RACE, POLICING, AND BLACK LIVES MATTER PROTESTS

- The death of George Floyd, in context.
- The civil-rights lawyer Bryan Stevenson examines the frustration and despair behind the protests.
- Who, David Remnick asks, is the true agitator behind the racial unrest?
- A sociologist examines the so-called pillars of whiteness that prevent white Americans from confronting racism.
- The Black Lives Matter co-founder Opal Tometi on what it would mean to defund police departments, and what comes next.
- The quest to transform the United States cannot be limited to challenging its brutal police.

*Published in the print edition of the November 23, 2020, issue, with the headline "An Unstoppable Force."*

*Shane Bauer, the author of "American Prison," is at work on a book about Americans who fought in Syria.*

More:   Police Brutality   Police   California   Racial Discrimination   Racism   Latinos   Police Shootings   Unions   Politics   Activists