1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   I.F., et al.,

12                    Plaintiffs,

13        v.

14   CITY OF VALLEJO; RYAN
     MCMAHON,
15
16                    Defendants.

17

No.  2:18–cv–0673–JAM–CKD


ORDER ON MOTIONS FOR SANCTIONS &
REQUEST TO SEAL

18        Despite settling this civil rights and wrongful death case last year, the parties are still

19   before the court with a heated dispute stemming from alleged violations of their court-approved

20   stipulated protective order.  What began as an informal discovery dispute over the confidential

21   designation of a short section of deposition testimony has ballooned into competing motions for

22   extensive sanctions against counsel for three of the plaintiffs and against counsel for both

23   defendants—accompanied by a request to seal the entirety of the surrounding briefing.

24        Defendants the City of Vallejo and Ryan McMahon move for Rule 37 sanctions and an

25   order of civil contempt against Adanté Pointer and Patrick Buelna of the firm Pointer & Buelna,

26   LLP, who are counsel for three of the four plaintiffs.[1]  (ECF No. 80.)  Defendants seek hefty

27   _____

28   [1] The fourth plaintiff, I.F., is represented by separate counsel at Haddad & Sherwin LLP, who are
     not implicated in—and have not participated in—the instant motions.  In this order, unless

1    monetary sanctions for plaintiffs' counsel distributing to the media a portion of McMahon's

2    deposition testimony that was designated confidential under the protective order.  Defendants also

3    request to seal the entirety of the briefing and filings in support of and in opposition to their

4    motion.  (ECF No. 80.4, Request to Seal.)  Plaintiffs oppose both the motion for sanctions and the

5    request to seal (ECF Nos. 81-83), and based on certain discoveries and events since defendants so

6    moved, plaintiffs now cross-move for sanctions (under Rule 11 and Rule 37) and an order of civil

7    contempt against defendants for maintaining the original sanctions motion and request to seal

8    (ECF No. 88).  Plaintiffs seek an award of their own attorney's fees, and referral of several

9    defense counselors for discipline.

10        On January 11, 2021, the undersigned provisionally granted the request to seal, and on

11   January 28, extended that grant to cover plaintiff's cross-motion briefing as well.  (ECF Nos. 79,

12   87.)  Accordingly, all briefs and other filings related to these motions were provisionally filed

13   under seal, with the understanding that after the hearing on the motions the court would revisit

14   whether these documents would remain sealed.  (ECF Nos. 80-86, 88, 90, 92; see ECF Nos. 87,

15   79 at 3.)  The court heard remote arguments on the motions on February 10, 2021.  (ECF No. 91.)

16   Mr. Buelna and Mr. Pointer appeared for plaintiffs, and Bruce Kilday, Katelyn Knight, and Derek

17   Konz appeared for defendants.  For the following reasons, the court GRANTS IN PART and

18   DENIES IN PART defendants' motion for sanctions and their request to seal; and DENIES

19   plaintiffs' motion for sanctions.

20   **BACKGROUND**

21        This case arose from the death of Ronell Foster, an unarmed African American man who

22   was shot and killed in February 2018 by defendant Ryan McMahon, then a police officer for the

23   Vallejo Police Department ("VPD").  (ECF No. 8, First Am. Compl. ¶ 1; ECF No. 57 at 5.)

24   Foster's mother and father, along with Foster's two minor children—R.F. and I.F.—filed this suit

25   in March 2018.  (ECF No. 1.)  In August 2020, the parties settled all claims for a total of

26

27   otherwise noted, all references to "plaintiffs" refer only to the moving plaintiffs R.F., Paula
     McGowan, and Ronell Foster, Sr.; and all references to "plaintiffs' counsel" refer only to

28   counselors Pointer and Buelna.

1    $5,700,000—an unprecedented sum for the City—albeit with no admission of liability by

2    defendants.  (ECF No. 66; ECF No. 81.6 at 4, 7-8.)  In late September 2020, McMahon was fired

3    from the VPD for his conduct during a February 2019 fatal shooting of another person of color,

4    Willie McCoy.  A civil case is ongoing against the City, McMahon, and other officers involved in

5    the McCoy shooting—with the same sets of attorneys representing the parties involved in the

6    instant motions. McCoy et al. v. City of Vallejo et al., No. 2:19-cv-01191-JAM-CKD (E.D. Cal.,

7    case filed June 27, 2019).

8           Significant media attention has surrounded each of these events, and indeed the media has

9    long reported the City of Vallejo's problematic policing of communities of color.  (See, e.g., ECF

10   No. 82.3 (Shane Bauer, *How a Deadly Police Force Ruled a City*, THE NEW YORKER, Nov. 16,

11   2020).)  The instant motions arise against the backdrop of still more news coverage of

12   McMahon's actions while a member of the VPD—and the City's ensuing internal

13   investigations—with defendants arguing that disclosure of the filings surrounding these motions

14   will add to the emotional and reputational harm defendants have already suffered allegedly as a

15   result of one errant media communication by plaintiffs' counsel.

16          Although the claims were settled in August 2020, this case remained active on the court's

17   docket[2] for approval of the settlement as to the minor plaintiffs and pending entry of stipulated

18   orders of dismissal for all plaintiffs' claims.[3]  A series of post-settlement events and discoveries

19   have spawned the present motions alleging breaches of the protective order this court approved

20   early in the litigation.  The following history clarifies the nature of both parties' alleged

21   violations.

22   ////

23   ////

24   _____

25   [2] Notwithstanding an erroneous docketing notation addressed in more detail below.
     [3] The three moving plaintiffs still have not filed their stipulation for dismissal.  Plaintiffs' counsel

26   do not explain why they waited some two months after receiving the settlement money to request
     that defendants sign a stipulation for dismissal.  On January 11, 2021, plaintiffs' counsel

27   circulated the stipulation for dismissal to defendants for signature.  (ECF No. 88.9 at 4-7.)
     Defendants have agreed to sign the stipulation once the instant motions are resolved.  (Id.; ECF

28   No. 84 at 6 n.3.)

1        **Discovery Proceeds under a Protective Order**

2        In February 2019, the court signed the parties' stipulated protective order to limit

3    disclosure of sensitive information obtained in discovery.  (ECF No. 21.)  The Protective Order

4    establishes its scope of protection, sets the grounds and process for designating material as

5    confidential, prescribes how to challenge such designations, and limits how protected confidential

6    material may be used and who can view it.

7        Under the stipulated terms, the Protective Order covers all "Protected Material," and any

8    "testimony" that might reveal Protected Material.  (Id. ¶ 3.)  "Protected Material" is defined as

9    any disclosure or material "that is designated as 'CONFIDENTIAL.'"  (Id. ¶¶ 2.13.)  In turn,

10   "CONFIDENTIAL" information or items are defined to include, among other things, "personnel

11   file records of any peace officer."  (Id. ¶ 2.2.)  However, the Protective Order explicitly "do[es]

12   not cover . . . (a) any information that is in the public domain at the time of disclosure . . . or

13   becomes part of the public domain after its disclosure . . . as a result of publication not involving

14   a violation of this Order."  (Id. ¶ 3.)

15        Once material within the scope of the protective order is designated as

16   "CONFIDENTIAL," it becomes "Protected Material" that can only be disclosed to select

17   categories of people close to the case, and only under specific circumstances.  (Id. ¶¶ 2.13,

18   7.1, 7.2.)  A party may not file in the public record any Protected Material without the written

19   permission of all parties, or a properly noticed court order; instead, to file Protected Material, a

20   party must seek leave to file under seal.  (Id. ¶ 12.3.)  If a party disagrees with another party's

21   designation, the Protective Order lays out a process for challenging the designation.  (Id. ¶ 6.)

22   But, unless there has been a waiver of the designation, all parties must continue to treat the

23   disputed material as confidential until the parties agree to change the designation, or the court

24   rules on the challenge.  (Id. ¶¶ 6.2, 6.3.)

25        During discovery, after the court granted plaintiffs' motion to compel (ECF No. 30), the

26   City produced documents from McMahon's VPD personnel file including a 2019 internal affairs

27   investigation into whether McMahon had made an unauthorized modification to his duty firearm

28   (hereinafter, "the 2019 Internal Investigation").  The firearm displayed a custom endplate (or dust

4

cover) inscribed with the words "Veritas Aequitas"—Latin for "Truth" and "Justice"—arched over a Celtic cross.  (ECF No. 80.3, Konz Decl. ¶ 2.)  In his internal affairs interview, McMahon stated (as he would later testify at deposition) that the inscription was purely motivated by his Irish Catholic faith and not by the movie *The Boondock Saints*, which he had never seen.[4]  (Id.)  Defendants designated this 2019 Internal Investigation material—part of McMahon's personnel file—as confidential under the Protective Order.  Plaintiffs did not challenge that designation.

Defendant McMahon sat for his videotaped deposition on February 27, 2020.  Several portions of the 6-hour deposition were designated as confidential under the Protective Order.  During one 8-minute confidential-designated portion in the middle of the deposition, McMahon answered questions regarding prior sustained complaints against him, and VPD internal affairs investigations involving him.[5]  The final 4 minutes of this portion of testimony discussed the 2019 Internal Investigation.  McMahon testified that a firearms instructor noticed the inscription while testing the firearms "as part of the McCoy thing" (likely referring to the internal affairs investigation of the McCoy shooting, mentioned 3 minutes earlier in the deposition).  The 2019 Internal Investigation was not connected with the Foster shooting from the year prior, although McMahon used the same gun in both shootings.  (ECF No. 80.3, Konz Decl. ¶ 2.)

McMahon testified that the investigation was opened in part because the words Veritas Aequitas feature in the 1999 movie *The Boondock Saints* in which two Irish Catholic brothers tattooed with those words[6] murder gangsters in the name of vigilante justice.[7]  McMahon testified

---

[4] As explained at the end of this order, the court finds that the information discussed in the moving papers and exhibits regarding the 2019 Internal Investigation is now in the public domain, and so does not warrant the protection afforded by the court's provisional order to seal.  Accordingly, this order discusses such information from the 2019 Internal Investigation as necessary to explain the basis for its ruling on these motions.

[5] The relevant portion of the deposition transcript was provided directly to the court for the November 10, 2020 informal discovery conference, but it has not been filed on the docket.

[6] These words appear in the Latin Vulgate Bible: "*et conversum est retrorsum iudicium et iustitia longe stetit quia corruit in platea* **veritas et aequitas** *non potuit ingredi*," which translates to "And judgment is turned away backward, and justice standeth afar off: for truth is fallen in the street, and equity cannot enter."  *Isaiah* 59:14 (King James).

[7] "Tired of the crime overrunning the streets of Boston, Irish Catholic twin brothers are inspired by their faith to cleanse their hometown of evil with their own brand of zealous vigilante justice.  As they hunt down and kill one notorious gangster after another, they become controversial folk

that he put the endplate on his firearm in 2010 at the start of his law enforcement career, without knowledge of the movie.  He explained that he attached the endplate as a way of practicing his Irish Catholic religion, and that the endplate was removed following the investigation.  The deposition transcript reflects that this portion of the deposition was designated "confidential, attorney's eyes only."  Plaintiffs did not challenge the designation of this portion of the deposition testimony either.  (ECF No. 80.3, Konz Decl. ¶ 3.)

**Plaintiff's Motion for Summary Judgment**

On June 26, 2020, plaintiff R.F. moved for partial summary judgment.  (ECF No. 57.)  In support of the motion, plaintiff lodged with the court as Exhibit 8 a disc that contained, as relevant, 1 hour and 24 minutes of McMahon's deposition testimony. (ECF No. 81 at 8, see ECF Nos. 57.8 ("Exhibit 8"), 58 ("Notice of Lodging Documents").)  Plaintiff's counsel also sent defendants a Dropbox.com link to electronic versions of all four manually filed summary judgment exhibits, including Exhibit 8.  (ECF No. 80.3 at 28, Konz Decl. Ex. C.)  The 8 minutes of confidential-designated testimony was included within that segment of videotaped testimony, but it was not mentioned or cited to in support of the summary judgment motion.  Plaintiffs' counsel admit that this portion of testimony was "inadvertently" included on the disc that was lodged with the court.  (ECF No. 81 at 8.)  Defendants did not object to the unsealed filing of Exhibit 8—which they did not then know contained the confidential-designated segment. Because the disc was physically lodged with the court and not filed electronically, it was not publicly accessible through PACER, however; and because the court has been closed to the public due to COVID-19 since March, no member of the public could access the physical copy of the disc.  (ECF No. 80, Konz Decl. ¶ 7.)

**Settlement**

On August 6, 2020, following a settlement conference with a magistrate judge, the parties settled all claims for a total of $5,700,000.  (ECF Nos. 68 at 2, 81.6 at 4.)  On September 14, 2020, the magistrate judge approved the settlement terms and allocation for minor plaintiff I.F.

---

heroes in the community."  https://g.co/kgs/4vbxmu.

1  (Foster's daughter), who is represented by different counsel than the other three plaintiffs

2  represented by Pointer & Buelna.  (ECF No. 68.)  On September 25, 2020, plaintiff I.F. filed her

3  stipulated proposed order of dismissal of *her* claims against defendants, which the court signed

4  the same day.  (ECF Nos. 69, 70.)  The stipulation stated, in relevant part: "the parties hereby

5  stipulate to the dismissal with prejudice of all claims between *this* Plaintiff and all

6  Defendants . . . ."  (ECF No. 70 at 2 (emphasis added).)  The Clerk of Court then erroneously

7  marked the entire case as Closed.  Nevertheless, on October 5, 2020, the magistrate judge

8  overseeing the settlement issued an order approving the settlement terms and allocation for minor

9  plaintiff R.F. (Foster's son).  (ECF No. 71.)  This order found reasonable plaintiffs' counsel's

10 $627,845.49 in costs and attorney's fees (25% of R.F.'s settlement).  (Id. at 4.)  Plaintiffs R.F.,

11 McGowan, and Foster, Sr., executed their private Release of Claims on October 30, 2020 and

12 received their settlement check from defendants on November 5, 2020.  (ECF No. 81.2, Buelna

13 Decl. ¶ 5; ECF No. 81.6, Buelna Decl. Ex. 4.)

14 **The Disclosure to KTVU**

15 Meanwhile, post-settlement, plaintiffs' counsel had received media requests for the public

16 filings attached to R.F.'s motion for partial summary judgment.  (ECF No. 81.2, Buelna Decl.

17 ¶ 6.)  On October 1, 2020, Mr. Buelna emailed a reporter at KTVU Fox 2 another Dropbox.com

18 link to the electronic versions of the four manually filed exhibits, including Exhibit 8's video

19 deposition testimony.[8]  (Id.; ECF No. 80.3 at 26, Ex. B.)  The reporter replied expressing interest,

20 and on October 20, 2020, KTVU broadcast TV and online stories discussing that testimony.

21 KTVU published an online news article authored by the same reporter (ECF No. 88.4, Ex. 3), and

22 broadcast a TV news story across the Bay Area that discussed and played clips from both the

23 public and confidential-designated portions of McMahon's deposition testimony (ECF No. 80.3,

24 Konz Decl. ¶ 6).  The KTVU article remains accessible online.  Video of the broadcast news story

25 does not accompany the online article on KTVU.com, but the video is still viewable online

26 through another online news source, *The West Australian*, that published it shortly after KTVU.

27

28 _____

[8] Defendants correctly observe that this Dropbox link sent to the reporter is different than the
Dropbox link sent to defense counsel in June 2020 with the summary judgment motion.

1       The 5-minute broadcast story—narrated by the same reporter that Mr. Buelna

2    communicated with—introduces McMahon's taped deposition "exclusively obtained by KTVU."

3    The first several minutes of the story replay footage from McMahon's body camera during the

4    Foster encounter (not in dispute) and portions of McMahon's deposition that were not marked as

5    confidential—discussing how plaintiffs' attorneys believed various "revelations" from these

6    portions of the deposition warranted reopening the criminal case against McMahon.  Beginning at

7    minute-mark 3:21, the narrating reporter shifts to the confidential-designated material, stating:

8                    We are also learning that McMahon has a history of discipline and
                     was the subject of at least 3 other internal affairs investigations. In
9                    one case Vallejo police were investigating a plate on the back of his
                     Glock pistol with a Celtic cross and the Latin words Veritas
10                   Aequitas, or truth and justice. The attorneys point out that the
                     symbols were used in the movie *The Boondock Saints* where two
11                   brothers inflict vigilante justice on criminals.

12   During this narration, the video zooms in on a photograph of McMahon's service weapon

13   displaying the endplate inscription.  The video then shows the cover art for *The Boondock Saints*

14   and plays a short clip from the movie showing the brothers' Veritas and Aequitas hand tattoos.

15       At minute-mark 3:49–4:00, the video returns to McMahon's deposition tape and airs the

16   following exchange from the confidential-designated portion of the deposition:

17                   Q. And were you aware of that movie?
                     A. No.
18                   Q. Why did you put that plate on the back of your gun?
                     A. Because I'm an Irish Catholic and I practice my religion.
19

20   The broadcast then turns to the VPD's and Solano County District Attorney's investigation of the

21   Foster shooting and concludes with a KTVU interview of plaintiffs' counsel Adanté Pointer.

22   During the broadcast interview, Mr. Pointer advocates for reopening the criminal case based on

23   McMahon's deposition statements—but without reference to any of the confidential-designated

24   portions of testimony.

25       The same day the story aired, Mr. Pointer posted on his Facebook account a link to

26   KTVU's online version of the story.  (ECF No. 80.3 at 31, Konz Decl. Ex. D.)  Two days later, on

27   October 22, 2020, Mr. Pointer again posted about the news story on Facebook, including a photo

28   of a television playing the story (depicting McMahon in the deposition), which he captioned "My

8

interview on Channel 2 re Ronell Foster, Vallejo PD and his family's demand that [the DA] criminally charge this killer cop."  (Id. at 32.)

**Efforts to Resolve**

On October 27, 2020, defense counsel learned of the KTVU story and public release of the confidential-designated portion of deposition testimony.  (ECF No. 80 at 5.)  This set off a flurry of action on all sides.  That afternoon, defense counsel Derick Konz emailed plaintiffs' counsel about the story's airing and the apparent Protective Order violation, requesting that they take all possible steps to retrieve and remove the deposition video from public view.  (ECF No. 80.3 at 9, Konz. Decl. Ex. A.)  Mr. Buelna responded the next morning saying that it appeared the displayed deposition clip was obtained from plaintiff R.F.'s Exhibit 8 filing.  (Id. at 10.)  Mr. Buelna explained: "The video clips were not synced to the transcript and not sorted by confidential designations as they typically are but 4 time fragments that included the cited deposition testimony in the motion that was not confidential.  Plaintiffs included time fragment 3 as an exhibit and inadvertently disclosed portions of the confidential testimony in their lodging on the Court's public docket."  (Id.)

Mr. Buelna promised to abide by the Protective Order's provisions to address the inadvertent disclosure.  (Id.)  In addition, Mr. Buelna invoked Rule 26(b)(5)(B) and the Protective Order, stating that plaintiffs were now disputing the designation of the video clip, and he proposed a joint letter to the undersigned to rule on the issue.  (Id.)

Later the same day, October 28, plaintiffs moved the court to withdraw and seal Exhibit 8 on the docket (ECF No. 72; see ECF No. 73 (sealing ECF Nos. 57.8 & 58)), and Mr. Buelna informed defense counsel that the Dropbox link to the exhibit had been removed and that he would ask the media to remove or hold the story.  (ECF No. 80.3 at 14-15, Konz. Decl. Ex. A.)  That evening, Mr. Buelna emailed Mr. Konz again saying that he had contacted KTVU and *The West Australian* to remove the portion of the videos and article that reference or display the confidential-designated portion of the transcript.  (Id. at 15.)  Mr. Buelna assured him that "[w]e have conducted further searches to discover any other media that are displaying/publishing the story, but have not found any. We will diligently continue our efforts."  (Id.)

On Thursday, October 29, Mr. Konz followed up with a series of questions for plaintiffs' counsel about the KTVU story.  In an email response the same day, Mr. Buelna answered each of the questions as follows.

- Regarding defendants' question about the Dropbox links to the exhibits, Mr. Buelna indicated that he was "not sure" if the link sent to defendants in June 2020 was the same as the link sent to KTVU on October 1 but invited Mr. Konz to check the attached email exchange.

- Defendants asked how KTVU got a copy of the photo of McMahon's firearm that was also marked as confidential when produced as part of the 2019 Internal Investigation.  Mr. Buelna stated that plaintiffs' counsel did not provide to the media any exhibits other than the four that were manually filed with the summary judgment motion, which did not contain that image.  Mr. Buelna said he did not know how KTVU got the photo, "but it was not us."

- Mr. Buelna confirmed that those four exhibits were all that he provided to KTVU, and that he did not provide any material to any other media outlet besides KTVU.

- Last, as relevant to this motion, Mr. Buelna stated that he could not say for certain when he or Mr. Pointer first saw the KTVU story.  He stated, "We certainly did not realize that any confidentially designated material was disclosed, and as you can see from the story [Mr. Pointer] was not commenting on that information."

(ECF No. 80.3 at 18-19, Konz. Decl. Ex. A.)

On October 28 and 29, Mr. Buelna contacted the KTVU reporter to ask about the photograph of McMahon's gun.  The reporter refused to disclose his sources for the story but stated that he had multiple.  When Mr. Buelna asked again on January 11, 2021, the reporter gave the same response.  (ECF No. 81.2, Buelna Decl. ¶ 7.)  On October 30, Mr. Buelna emailed defense counsel that his firm did not release the photograph and wondered whether some of the details in the reporting might have come from the City or from plaintiff I.F.'s counsel.  (ECF No. 81.8 at 13, Buelna Decl. Ex. 6.)  I.F.'s counsel confirmed they knew nothing about the photo.  (Id.)

1   Mr. Buelna also emailed the two media outlets known to have published the offending

2   story.  (ECF No. 81.10, Buelna Decl. Ex. 8.)  On October 28 and 29, he emailed the KTVU

3   reporter and an executive producer requesting that they remove or edit out of the video and online

4   article all references to McMahon's testimony about the 2019 Internal Investigation—or that they

5   suspend the story until the designation was resolved.  KTVU responded that it would not

6   accommodate the request, noting that "the story has already aired on TV and has been live on

7   ktvu.com for two weeks and contains information that is of public interest."  (Id. at 6.)  On

8   October 28 and November 2, Mr. Buelna emailed *The West Australian*'s general Web Editor

9   address requesting the same, but no response appears in the record—and their copy of the video

10  broadcast remains fully accessible.  (Id. at 3-4.)

11                    *Informal Discovery Conference*

12  Mr. Buelna and Mr. Konz then set about preparing a joint letter to the undersigned in

13  advance of an informal discovery conference they had requested regarding plaintiffs' dispute of

14  the confidential designation of the deposition testimony about the 2019 Internal Investigation.

15  There was some disagreement as to whether the letter had to be filed on the docket or whether it

16  could simply be emailed to the undersigned.  Plaintiffs ultimately filed on the docket a Notice of

17  Request and Request to Seal the parties' joint discovery dispute letter, and a supporting

18  declaration.  (ECF Nos. 75, 75.1.)  Both documents referenced a "short clip of deposition

19  testimony from Defendant that described an internal affairs investigation into alterations to his

20  duty firearm."  (Id.)  When defendants objected that this unnecessarily disclosed the at-issue

21  confidential information, the undersigned agreed to strike those filings, as informal joint letters to

22  the undersigned need not be filed on the public docket at all.  (ECF No. 77.)

23  At the informal discovery conference on November 10, 2020, the undersigned declined to

24  re-designate the disputed portion of deposition testimony as non-confidential.  The court did not

25  formally rule on the matter, noting in its minute order that "there is no change to the status of this

26  case or its filings" and that "[t]he parties remain free to file any formal motions they may deem

27  appropriate."  (Id.)

28  ////

11

**<u>Motion for Sanctions and Subsequent Independent Public Disclosures</u>**

Counsel met and conferred regarding defendants' intention to file a Rule 37 sanctions motion for the asserted violations of the Protective Order: plaintiffs' counsel sending the confidential-designated portion of deposition testimony to the KTVU reporter, after filing the same on the public docket.  According to defense counsel's version of the call, plaintiffs' counsel would not admit that they violated the Protective Order, despite admitting that they had transmitted the confidential-designated deposition segment in the October 1 email.  (ECF No. 80.3, Konz Decl. ¶¶ 15-16; ECF No. 80.3 at 23-24, Konz Decl. Ex. A.)  According to plaintiffs' counsel, defense counsel used the call to "berat[e]" them, instead of trying to informally resolve the matter.  (ECF No. 81.2, Buelna Decl. ¶ 14.)  In a follow-up email, plaintiffs' counsel objected that filing a Rule 37 motion would amount to intimidation and harassment—intended to chill their prosecution of other ongoing civil rights cases against the City[9]—and would be improper since the case had settled and was "closed."[10]  (ECF No. 80.3 at 23-24, Konz Decl. Ex. A.)  Plaintiffs' counsel also informed defense counsel that plaintiffs would, themselves, seek Rule 11 sanctions if defendants pursued a Rule 37 sanctions motion.  (<u>Id</u>.)  On December 21, 2020 defendants proceeded to file the instant motion for sanctions, requesting permission to file under seal.  (ECF Nos. 78, 80.)

Through an independent (though somewhat interwoven) chain of events, the very next day the former VPD police captain who allegedly requested the 2019 Internal Investigation, filed a civil whistleblower lawsuit in Solano County Superior Court against the City of Vallejo for firing him after he reported various concerns of wrongdoing within the VPD.  (ECF No. 81.3, <u>John Whitney v. The City of Vallejo, et al.</u>, No. FCS055842 (Cal. Super. Ct. Solano Cty., complaint

---

[9] Plaintiffs' counsel are actively litigating at least three other excessive force cases against the City of Vallejo.  <u>See</u> <u>Monterrosa et al. v. City of Vallejo</u>, No. 2:20-cv-01563-TLN-DB (E.D. Cal., filed Aug. 6, 2020); <u>Burrell et al. v. City of Vallejo et al.</u>, No. 2:19-cv-01898-WBS-KJN (E.D. Cal., filed Sept. 18, 2019); <u>McCoy et al. v. City of Vallejo et al.</u>, No. 2:19-cv-01191-JAM-CKD (E.D. Cal., filed June 27, 2019).

[10] <u>See</u> E.D. Cal. R. 141.1(f) ("Once the Clerk has closed an action, unless otherwise ordered, the Court will not retain jurisdiction over enforcement of the terms of any protective order filed in that action.").

1   filed Dec. 22, 2020).)  Among numerous other whistleblower events described in the complaint,

2   former Captain Whitney alleges that in February 2019, he "discovered that the phrase Veritas

3   Aequitas had been embedded on an officer's firearm end-plate"; and that he reported it up the

4   chain of command and recommended an internal investigation.  (Id. ¶ 27.)  Whitney also alleges

5   that he was later discriminatorily singled out as the source of an alleged media leak that resulted

6   in a journalist submitting two April 2019 Public Records Act ("PRA") requests for

7   (1) information and records that "contain *Aftermarket parts* and/or *Veritas Aequitas*" and (2) a

8   connected internal investigation, identified by its VPD case number.  (Id. ¶¶ 39-41.)

9           On December 24, 2020, ABC7 News published an online article about Whitney's

10   whistleblower suit, based on an interview with Whitney himself, which is still publicly

11   accessible.[11]  The article states:

12              In the complaint, Whitney claims in February of 2019 two
                department firearms instructors alerted him that Officer Ryan
13              McMahon had embedded the words "Veritas Aequitas" on his
                firearm end-plate. The Latin words mean "truth" and "justice."
14

15              "My concern is what could it mean to him? Does he believe he's
                invoking justice upon the community? And that's certainly a
16              concern," said Whitney.

17              In an emailed statement, McMahon's attorney tells the I-Team in
                part, "The inscription is directly related to Officer McMahon's
18              Roman Catholic faith."

19   (ECF No. 83.2 at 3, Buelna Decl. Ex. 1.)  The article goes on to discuss the Whitney complaint's

20   allegations that Whitney reported the endplate modification up the chain of command and

21   requested an internal investigation; and that McMahon was then placed on administrative leave

22   and required to surrender his badge, which led to the discovery of widespread "badge bending"

23   within the VPD.  (Id. at 3-4.)

24           The online article essentially transcribes the reporting and interview statements recorded

25   in a video broadcast that accompanies the article.  Like the article itself, the video begins with a

26   discussion of Whitney's alleged discovery of McMahon's endplate inscription.  The video

27   _____

28   [11] https://abc7news.com/vallejo-police-department-john-whitney-pd-badge-bending-
     whistleblower/9038302/.

                                                      13

displays the words "Veritas" and "Aequitas" alongside a still image of McMahon's deposition



reenactment of his struggle with Foster:

The broadcast then shows Whitney's video interview statement about why he reported his concern over the endplate, followed by a slide showing the text of McMahon's unnamed attorney's response that the inscription relates to McMahon's faith.[12]  The article and broadcast go on to describe Whitney's other whistleblower events, unrelated to this case.  The article and video broadcast were published late on the same day that plaintiffs submitted their opposition to defendants' request to seal (ECF No. 82).

Upon learning of the <u>Whitney</u> suit and the ABC News story, plaintiffs' counsel contacted defendants to urge them to withdraw their request to seal because the information sought to be sealed was now in the public domain, and therefore beyond the scope of the Protective Order.

---

[12] At the hearing, defense counsel informed the court that they did not provide this statement to ABC News and believed it might have come from the attorney representing McMahon in his administrative challenge to his VPD termination.

14

1    (ECF No. 88.5 at 4, Buelna Decl. Ex. 4.)  Defendants declined, and on December 30, 2020,

2    plaintiffs submitted a supplemental opposition brief alerting the court to the recent independent

3    publications of the information at issue.  (ECF No. 83.)

4         **Final Events**

5         On January 4, 2021, in a notation only visible to the court, the Clerk of Court reopened the

6    case, noting that it had been closed in error.  (Dkt. Text 9/25/2020, entered 1/4/2021.)  On

7    January 11, 2021, the court provisionally granted defendants' request that all briefing and

8    supporting filings in the instant motions be filed under seal, and set an extended briefing

9    schedule.  (ECF No. 79.)  The court explained that defendants' initial request to preemptively seal

10   all papers was improper and insufficiently supported; but the court allowed defendants to provide

11   additional support for the request in further briefing, noting that there "may be good cause to seal

12   at least portions of certain materials."  (Id. at 2-3.)

13        On January 12, 2021, plaintiffs' counsel again contacted defendants, this time urging them

14   to withdraw their motion for sanctions, or face a Rule 11 motion from plaintiffs. (ECF No. 88.9

15   at 2-3, Buelna Decl. Ex. 8.)  Plaintiffs' counsel argued that the City's receipt of the April 2019

16   PRA Requests showed that the City had already disclosed to the press information from the 2019

17   Internal Investigation—bringing McMahon's deposition testimony on the same subject outside

18   the scope of the Protective Order.  (Id.)  They further argued that defendants' motion had

19   concealed from the court the PRA Requests in an effort to pin the bad publicity on plaintiffs'

20   counsel when the City "had already leaked the story to the press."  (Id.)

21        Defendants declined to withdraw their motions, and on January 27, 2021, plaintiffs filed

22   the instant cross-motion for sanctions under Rules 11 and 37. (ECF No. 88.)  All motions were

23   fully briefed before the hearing.  (ECF Nos. 80.4, 82, 83, 85, 86 (defendants' request to seal);

24   Nos. 80, 81, 84 (defendants' motion for sanctions); Nos. 88, 90, 92 (plaintiffs' motion for

25   sanctions).)

26        In terms of relief, defendants are requesting an order of civil contempt and sanctions of:

27   (1) return of plaintiffs' counsel's settlement fee from this case (more than $600,000) as a punitive

28   sanction, (2) $250,000 as a compensatory sanction to defendant McMahon, and (3) approximately

1    $25,000 in attorney's fees.  (ECF No. 80 at 17-21.)  On the other side, plaintiffs are requesting an

2    order of civil contempt and sanctions of: (1) referring defense counsel for discipline, and

3    (2) award of their own attorney's fees and costs related to these motions.  (ECF No. 88 at 14, 17.)

4    **DISCUSSION**

5         For all the gravity of the underlying suit, the court concludes that the protective order

6    violations alleged in these motions do not warrant the magnitude of the sanctions sought.  In the

7    court's estimation, all that has happened is: (A) plaintiffs' counsel mistakenly sent to one reporter

8    a piece of publicly filed evidence that neither side had realized contained protected information,

9    and (B) defendants justifiably wish to hold them accountable for that mistake—although, as

10   discussed below, to a far more extreme degree than the court is prepared to authorize.  Without

11   minimizing what defendant McMahon has experienced since the news story, the court does not

12   find plaintiffs' counsel's actions egregious enough to award all—or indeed, most—of the

13   sanctions defendants request.

14        **A. Defendants' Motion for Sanctions and Civil Contempt**

15        Both parties seek orders of civil contempt and sanctions under Federal Rule of Civil

16   Procedure 37.  Initially, as all parties have not consented to magistrate judge jurisdiction in this

17   case, the most the undersigned can do as far as contempt is concerned is investigate whether

18   further contempt proceedings are warranted and certify such facts to a district judge.  See

19   28 U.S.C. § 636(e)(6)(B)(iii); Grimes v. City & Cty. of San Francisco, 951 F.2d 236, 240 (9th

20   Cir. 1991) ("28 U.S.C. § 636, which governs the jurisdiction and powers of magistrates, requires

21   a magistrate to refer contempt charges to a district court judge."); Lakes v. Bath & Body Works,

22   LLC, 2020 WL 4350243, at *3 (E.D. Cal. July 29, 2020) ("A magistrate judge may not . . .

23   conduct a contempt hearing in a civil case absent consent jurisdiction.").  The parties have not

24   identified a reason for needing a civil contempt finding where Rule 37 itself authorizes the

25   sanctions sought in these motions.  In any event, the court does not view the alleged violations of

26   the Protective Order as warranting contempt proceedings.  Accordingly, the court addresses the

27   alleged violations in the context of Rule 37 alone.

28   ////

1

### 1. Legal Standard

When a party violates a discovery order like the Protective Order here, Rule 37 authorizes district courts to issue "further just orders" as sanctions. Fed R. Civ. P. 37(b)(2)(A). This authority includes imposing a "sanction of reasonable expenses, including attorney's fees, caused by the failure to obey a discovery order." Falstaff Brewing Corp. v. Miller Brewing Co., 702 F.2d 770, 784 (9th Cir. 1983). "Rule 37(b) sanctions may serve either remedial and compensatory purposes or punitive and deterrent purposes," but ultimately, "[t]he imposition and selection of particular sanctions are matters left to the sound discretion of the trial court." Id. at 783–84; see Grimes, 951 F.2d at 241 (noting the great flexibility of Rule 37 allowing the court to "use as many and as varied sanctions as are necessary").

Before proceeding to analyze the asserted violations, the court notes that it is still proper to rule on these disputed Protective Order violations, even at this late stage of the litigation, because this case is not yet closed. From September 25, 2020 until January 4, 2021, the docket contained a clerk's notation that the case was closed, due to a misinterpretation of the stipulation for dismissal of I.F.'s claims (ECF No. 70). However, orders continued to be issued thereafter, and most importantly, the claims of the other three plaintiffs were never dismissed by order of the court—no stipulation of dismissal having been filed for them. Under Local Rule 141.1(f), this court "will not retain jurisdiction over enforcement of the terms of any protective order" after the Clerk of Court has closed the action. A technical reading of Rule 141.1(f) supports plaintiffs' initial argument that the court should strike defendants' motion on the basis of the case's apparent closure.[13] But the court declines to so elevate form over substance in this case. With plaintiffs' claims remaining live on the court's docket absent a dismissal order, and with the erroneous case closure having been corrected by the Clerk's office, the court finds it appropriate to continue to enforce the terms of its protective order.[14] Accordingly, the court denies plaintiffs' motion

---

[13] Plaintiffs have since abandoned this argument by filing their own motion for Rule 37 sanctions based on purported Protective Order violations.

[14] Of course, once there are no longer any live claims in an action, the court will not hesitate to decline jurisdiction over protective order disputes so as to avoid endless entanglement in what are, post-litigation, essentially private contract disputes.

1    contained within their opposition brief (ECF No. 82) to strike defendants' sanctions motion.

2                    ***2.   Plaintiffs' Counsel Violated the Protective Order***

3            Defendants argue that plaintiffs' counsel violated the Protective Order by publicly filing

4    confidential-designated material on the docket in June 2020 and then sending that material to a

5    reporter on October 1, 2020.[15]  Plaintiffs' counsel admit to having "inadvertently" done both.

6    (ECF No. 81 at 8, 10-11, 18, 26.)  They even concede that this violated the Protective Order.  (Id.

7    at 27 (characterizing their conduct as "a single, inadvertent breach of the protective order").)

8    Nevertheless, plaintiffs advance several arguments for not imposing sanctions.

9            First, plaintiffs argue that it is "improper" and "disingenuous" for defendants to seek

10   sanctions for the Protective Order violations because defendants did not object to plaintiffs'

11   original filing of Exhibit 8 on the public record.  (ECF No. 81 at 16-20.)  Plaintiffs argue

12   extensively that, by failing to so object, defendants waived the right to seek to seal Exhibit 8.  But

13   that is not the question at issue in this motion.  Indeed, Exhibit 8 is currently under seal by

14   plaintiffs' own remedial request.  (ECF No. 73 (sealing ECF Nos. 57.8 & 58).)  Defendants'

15   sanctions motion is not based on plaintiffs forwarding *sealed* material to the media, but on their

16   sending *confidential-designated* material in violation of the Protective Order.  Whether

17   defendants waived their right to have Exhibit 8 sealed is irrelevant to whether some of its contents

18   were designated confidential at the time of plaintiffs' media disclosure.  This argument pertains

19   more to defendants' present request to seal the current motions briefing, though plaintiffs do not

20   raise this argument in opposing the request to seal.  It appears that this argument also attempts to

21   shift the blame for the KTVU story onto defendants.  (See ECF No. 81 at 19 ("Indeed, the

22   primary reason that Exhibit 8 is in the public domain is that Defendants' counsel made a strategic

23   decision to waive their right to move to seal it.").)  While this argument somewhat pertains to the

24   degree of sanctions warranted, it does not make defendants' request for sanctions "improper."

25           Second, plaintiffs briefly argue that defendants cannot seek sanctions because they settled

26

27   _____
     [15] To a lesser extent, they also argue that plaintiffs violated the Protective Order again by
     referring to the firearm modification in their November 2020 Request to Seal the joint discovery
28   dispute letter.

                                                    18

the case despite knowing of the asserted Protective Order violations, thereby releasing the present

sanctions claims.  (ECF No. 81 at 20-22.)  Plaintiffs cite no authority that settlement of the

substantive claims in an action precludes the parties from asserting protective order violations that

occurred during the litigation; and they point to no language in the executed Release of Claims in

support of their position.  As previously noted, this case remained active on the court's docket

(lacking an order dismissing all plaintiffs' claims) at the time defendants moved for sanctions.

The court therefore maintained an interest in enforcing the terms of its orders, separate and apart

from the parties' private agreement to settle their dispute.  The parties' settlement does not

preclude this sanctions motion.[16]

Third, plaintiffs argue that defendants themselves violated the Protective Order by

designating the 2019 Internal Investigation documents and deposition testimony confidential in

the first place.  (ECF No. 81 at 22-23.)  This sort of finger-pointing is utterly unhelpful.  Whether

defendants *also* violated the Protective Order has no bearing on whether *plaintiffs* committed the

asserted violations.  See Harmston v. City & Cty. of San Francisco, 2007 WL 3306526, at *6

(N.D. Cal. Nov. 6, 2007) (in holding that counsel violated protective order by providing

confidential-designated deposition testimony to the media and filing it on the public record,

noting that propriety of original confidential designation is "beside the point"; under the terms of

the protective order—similar to the Protective Order here—a confidential designation, "even if

later determined to be improper, remains in place until the Court orders otherwise after a

properly-presented challenge").

Still, the court addresses here a related argument suggested throughout plaintiffs'

opposition (only substantively argued in their opposition to the request to seal): that the material

sent to KTVU was not within the scope of the Protective Order in the first place, and therefore its

transmission did not violate the Protective Order.  Plaintiffs repeatedly emphasize that the

information at issue—that is, the entire 8-minute confidential-designated portion of McMahon's

testimony—had already been placed in the public domain by others before plaintiffs' June 2020

---

[16] The court addresses plaintiffs' allegations of defense counsel's bad faith dealing in the
subsequent section resolving plaintiffs' cross-motion for sanctions.

1   summary judgment filing and their October 1, 2020 email to KTVU.  The Protective Order

2   expressly states that its "protections . . . do not cover . . . (a) any information that is in the public

3   domain at the time of disclosure."  (ECF No. 21 ¶ 3.)  Accordingly, any information about the

4   2019 Internal Investigation already public by June 26, 2020, would not be covered—so plaintiffs'

5   filing or sharing of that information would not be actionable under the Protective Order, despite

6   the confidential designation.

7           While this argument is partially compelling in the context of resolving the request to seal

8   (discussed below), it does not absolve plaintiffs of their Protective Order violations.  Plaintiffs'

9   only basis for arguing that the information McMahon shared in his confidential-designated

10  testimony was publicly known before June 2020 is the existence of the two PRA Requests

11  received by the City in April 2019.  Plaintiffs first learned of the PRA Requests through the

12  allegations in the December 2020 <u>Whitney</u> complaint.  In opposing plaintiffs' cross-motion for

13  sanctions, defendants provide a copy of one April 15, 2019 online PRA Request from a journalist

14  requesting all records that "contain 'Aftermarket parts' and/or 'Veritas Aequitas'" from between

15  February 1 and April 15, 2019.  (ECF No. 90.1 at 4, Brown Decl. Ex. A.)  The <u>Whitney</u> complaint

16  also describes another PRA Request from the same journalist on or around the same date

17  (April 15, 2019) seeking information regarding a VPD internal investigation—identified by

18  investigation case number—regarding "whether the incident was properly handled by the

19  involved officers."  (ECF No. 81.3 at 14-15, Buena Decl. Ex. 1.)  The court has not received a

20  copy of that second PRA Request.

21          Plaintiffs argue that the submission of these rather detailed PRA Requests demonstrates

22  that the information contained in McMahon's confidential-designated testimony was publicly

23  known over a year before they supposedly leaked it to KTVU.  There are several reasons why this

24  argument does not preclude imposing sanctions.

25          First, although the PRA Requests indicate some knowledge of the firearm engraving and

26  the existence of an internal investigation, there is no way for the court to establish on this record

27  how much information about these subjects was disclosed to the journalist, prompting the request.

28  The court would need this information in order to assess the degree of overlap between what

1   plaintiffs revealed and what was already publicly known.  Cf. Economus v. City & Cty. of San

2   Francisco, 2019 WL 3842008, at *4 (N.D. Cal. Aug. 15, 2019) (granting defendants' motion to

3   retain confidentiality of investigatory material despite certain findings and disciplinary decisions

4   already being public, in part because the "information contained in the recordings is far more

5   detailed than the publicly available information cited by [plaintiff].").  Defendants did not release

6   any information in response to the documented PRA Request.  (ECF No. 90.1 at 4, Brown Decl.

7   Ex. A. (VPD responding that "[t]here are no publicly available records responsive to your

8   request," citing Cal. Penal Code § 832.7(a), inter alia).)  And a custodian of records avers that the

9   City has always maintained the confidentiality of the 2019 Internal Investigation.  (ECF No. 90.1,

10  Brown Decl. ¶ 4.)

11          Moreover, even assuming public knowledge of all the information contained in

12  McMahon's 4-minute testimony regarding the 2019 Internal Investigation, Exhibit 8 also contains

13  an *additional* preceding 4 minutes of confidential-designated testimony regarding *other* internal

14  investigations and complaints.  There is no suggestion that the public already knew this other

15  information at the time of plaintiffs' filing and subsequent media email, so the Protective Order

16  plainly covers at least that portion of McMahon's testimony.  Under the Protective Order, once

17  material is designated confidential, it cannot be disclosed to the public unless and until the

18  designation is altered by the court (or mutually by the parties).  (ECF No. 21 ¶¶ 2,13, 6.3, 7.)

19  Thus, at the very least, plaintiffs' counsel's disclosure of the first 4 minutes of the confidential-

20  designated testimony—by filing the Exhibit 8 disc without an attempt to seal, and by sending the

21  link to the reporter (regardless whether the story published all the information)—violated the

22  Protective Order.[17]  The material was covered by the Protective Order, designated confidential,

23  and was never re-designated before it was filed in June 2020 or disclosed to the reporter on

24  October 1, 2020.  See Harmon v. City of Santa Clara, 323 F.R.D. 617, 625, 627 (N.D. Cal. 2018)

25  (finding that initial confidential designation of body-camera footage was improper but still

26  finding a protective order violation and imposing sanctions because the material was protected at

27  ─────────────────────

28  [17] The court need not analyze whether plaintiffs' counsel "substantially complied" with the
Protective Order, as sanctions are being imposed under Rule 37, not as an order of civil contempt.

1  the time of public disclosure).

2  ### 3.  *Type of Sanctions Warranted*

3  Rule 37(b) authorizes "a wide range of sanctions" for violating a discovery order, such as

4  the Protective Order here.  United States v. Nat'l Med. Enterprises, Inc., 792 F.2d 906, 910 (9th

5  Cir. 1986).  But any sanctions imposed "must be just" and "must specifically relate to the

6  particular claim at issue."  Id.  Further, "a compensatory award is limited to the actual losses

7  sustained as a result of the contumacy."  Id. (cleaned up).

8  Defendants acknowledge the "unusual nature" of their motion and the hefty sanctions

9  proposed.  (ECF No. 80 at 22.)  They argue that it is necessary following plaintiffs' "unusual

10  violation" to compensate the impacted parties, discourage future protective order violations, and

11  restore confidence in court-approved protective orders.  (Id. at 5.)  On the other hand, plaintiffs

12  characterize their media disclosure as "a small technical error."  (ECF No. 81 at 25.)  The court

13  finds plaintiffs' counsel's missteps neither as unusual and egregious as defendants characterize

14  them, nor quite as minimal as plaintiffs paint them.

15  Both parties analogize primarily to Harmon v. City of Santa Clara, 323 F.R.D. 617 (N.D.

16  Cal. 2018), where the plaintiff's post-settlement public release of confidential-designated video

17  footage also was found to have violated the parties' protective order.  In Harmon, the parties

18  settled an excessive force claim arising from officers breaking into the plaintiff's home to arrest

19  her daughter.  Id. at 619.  After the City Council approved the $6.7 million settlement, the

20  plaintiff's counsel sent his client the 19-minute video of the body camera footage from the police

21  encounter—which defendants had produced in discovery and designated as confidential under

22  their protective order.  Id. at 620.  The plaintiff uploaded the video to YouTube, and counsel sent

23  out "a media advisory to several outlets" that provided a link to the YouTube video.  Id.  Media

24  outlets around the Bay Area then re-posted the video online and ran stories based on its "upsetting

25  and graphic" footage.  Id. at 620-21.  The day after his client posted the video, plaintiff's counsel

26  checked the physical copy of the DVD and saw that it was labeled as "CONFIDENTIAL."  He

27  immediately notified the court and defendants of the unintentional protective order violation,

28  instructed his client to remove the video, which she did, and then moved to challenge the video's

1  confidential designation.  Id. at 621.  The City and the individual defendant officers separately

2  moved for sanctions, seeking many of the same types of relief defendants seek here:  large

3  compensatory sanctions, forfeiture of plaintiff's counsel's settlement fee, and attorney's fees.  Id.

4  at 621-22.

5          The court ultimately awarded defendants $69,756.31 for attorney's fees and costs in

6  litigating the protective order violation.  Id. at 627-28.  The court first ruled in plaintiff's favor

7  that the body camera video did not warrant the confidential designation defendants had given it,

8  but it found sanctions nonetheless appropriate because the disclosure occurred while the material

9  was still designated as confidential.  Id. at 622-26.  In fashioning sanctions, the court noted that

10  plaintiff's counsel were "woefully inadequate to the point of negligence" in checking the

11  confidentiality status of the video before disseminating it.  Id. at 626.  The court took issue with

12  counsel's "minimal efforts to keep the video off the internet" after discovering the violation, as

13  they "seemingly did little else" besides instruct their client to remove the video from YouTube.

14  Id. at 621, 627.  But given that the video was being de-classified as confidential, and that counsel

15  had "rightly met with embarrassment and strife from their imprudent behavior," the court

16  declined to find civil contempt, or to order forfeiture of the settlement fee.  Id. at 627.  The court

17  also denied defendants' request for compensatory sanctions, because it was "impossible to

18  disambiguate between harm caused to the defendants because of the video, versus harm that

19  befell them as a result of public awareness of the lawsuit and settlement more generally."  Id.

20  (noting that "there are consequences when police violate constitutional rights and a city drains its

21  coffers to atone for it").  Thus, the court imposed only the (still weighty) attorney's fees and costs

22  of litigating the violation.  Id. at 627-28.

23          In this case, plaintiffs no longer seek to re-designate the 8 minutes of videotaped

24  deposition testimony improperly filed on the public docket (albeit in physically inaccessible

25  form) and sent to the media.[18]  Accordingly, there is no court ordered re-designation to lessen

26

27  [18] Plaintiffs did request its reclassification at the November 2020 informal discovery conference,
   but the court declined to grant the request, believing at the time that the case was settled and

28  closed.  (ECF No. 77.)

23

plaintiffs' counsel's culpability here, as there was in <u>Harmon</u>.  Additional weights against
plaintiffs' counsel on the sanctions scale are that Mr. Buelna provided the video deposition
directly to a member of the media without confirming that its contents were disclosable, that the
resulting news coverage went unaddressed for over a week before the confidential disclosure was
noticed, and that plaintiffs' counsel did not catch their error themselves.

As in <u>Harmon</u>, plaintiffs' counsel's handling of the confidential-designated portion of
testimony was negligent.  Although all this could have been avoided if defendants had objected to
the public filing of the entirety of Exhibit 8 back in June 2020, defendants were under no
obligation to watch the entire hour-and-a-half video to ensure that it did not contain confidential-
designated portions of testimony.  Contrary to plaintiffs' counsel's brazen assertion, the "primary
reason" that Exhibit 8 was publicly filed is not that defense counsel strategically waived their
right to seal it (ECF No. 81 at 19), but that plaintiffs *neglected* their duty under the Protective
Order to check that the tape omitted all confidential-designated portions of McMahon's
testimony.

Still, the court finds that the public filing and subsequent media disclosure was only
negligent, not more.  As for the initial filing, Mr. Buelna satisfactorily explains how this small
portion of confidential-designated testimony was overlooked in the middle of the otherwise non-
protected testimony on the third video file; whereas, most of the other confidential-designated
testimony was captured in the fourth segment.  As for the subsequent media disclosure, Mr.
Buelna's quick email to the KTVU reporter providing a link to the same exhibits he had
previously publicly filed—and sent to defense counsel—when moving for summary judgment
suggests no greater knowledge of the exhibits' contents than when they were physically lodged
with the court.  Although plaintiffs' counsel should have exercised greater caution when sending
materials directly to the media, it is understandable that Mr. Buelna believed the exhibits were all
already public-ready—having been publicly filed with the court for months.  The court does not
read anything into the fact that the Dropbox link sent to the KTVU reporter displayed a different
URL than that sent to defense counsel some three months prior.  Electronic file organization can
change easily, resulting in different shareable links to files stored on the Cloud, without changing

24

1   the stored documents themselves.

2        It is clear to the court that—in contrast to <u>Harmon</u>—Mr. Buelna did not know exactly

3   what he was sending to the media when he sent it.  The plaintiff's attorney in <u>Harmon</u> knew that

4   the 19 minutes of footage he sent to his client, and then advertised to the media at large, was all

5   never-before-seen body camera footage from the night of the underlying incident.  Aware that the

6   transmitted footage had not previously been made public, for instance through filing on the

7   court's public docket, plaintiff's counsel in <u>Harmon</u> first asked an associate to check its

8   confidentiality status before sending it to the client (although the confidential designation was at

9   first overlooked because neither checked the physical DVD).  323 F.R.D. at 621.  Here, although

10  Mr. Buelna knew that he was sending the KTVU reporter an exhibit containing McMahon's

11  deposition testimony, there is no indication that he knew the video—much longer than the

12  <u>Harmon</u> video, at 1 hour and 24 minutes—contained a segment that might not be proper for

13  public consumption.

14       Defendants argue that heavy sanctions are warranted here in part because plaintiffs'

15  counsel failed to recognize on their own, and self-report, their Protective Order violation after the

16  KTVU story and broadcast aired.  <u>Cf.</u> <u>Harmon</u>, 323 F.R.D. at 620-21 (after one day, plaintiff's

17  attorney realized the DVD was confidential and reported the protective order violation to the

18  court and defendants).  But the nature of McMahon's deposition testimony itself somewhat

19  undercuts this argument.  His deposition testimony about a tiny custom engraving on the back of

20  a gun pales in comparison to the "upsetting and graphic" video disclosed in <u>Harmon</u>.  <u>See</u> <u>id.</u>

21  at 620.  Yes, being compared to a fictional vigilante movie characters should be offensive to a

22  police officer, but it would not necessarily jump out to a plaintiff's attorney—focused on other

23  aspects of the story's deposition coverage—that the 11-second clip of deposition dialogue, or the

24  30 seconds displaying the gun and the motto, might be protected.

25       Moreover, the court finds credible plaintiffs' counsel's representations to the court that,

26  although they knew the KTVU story had aired and the online article had published, they were not

27  aware that the story contained confidential-designated information until defense counsel alerted

28  them.  The information from the 2019 Internal Investigation airs for 40 seconds in the middle of

1    the 5-minute TV broadcast story, and it is discussed almost at the end of the online article that

2    spans 5 pages when printed.  (ECF No. 88.4, Buelna Decl. Ex. 3.)  The court credits Mr. Pointer's

3    on-record statements at the hearing that he did not discuss the gun engraving in his interview with

4    KTVU or link it to the movie.[19]  Mr. Pointer's social media marketing of his firm's work by

5    posting links to the story shortly after it aired—one of which shows that he did watch at least

6    some of the TV broadcast—do not conclusively establish that he knew the 2019 Internal

7    Investigation was discussed in the story.  The court gets the distinct impression that plaintiffs'

8    counsel are busy running their new small firm, formed while this litigation was ongoing, juggling

9    multiple ongoing cases, and would easily opt to watch or read only a portion of a story about one

10   of their cases—pausing only to make sure the public hears about their successes.  Thus, plaintiffs'

11   counsel's failure to self-correct their the Protective Order violation does not require stiff

12   sanctions.

13         The court also finds that plaintiffs' counsel acted much more responsibly than counsel in

14   Harmon in their efforts to mitigate the disclosure once they did realize it.  Once defense counsel

15   brought the matter to their attention, plaintiffs' counsel responded rapidly and within 24 hours

16   had emailed both media outlets known to have published the confidential-designated information

17   to request immediate retractions or edits to the story.  Mr. Buelna followed the process outlined in

18   the Protective Order for remedying inadvertent disclosures, albeit with some prompting from

19   defense counsel as to certain technicalities, like sending the media outlets the Agreement to be

20   Bound.  (See ECF No. 81.10 at 3-6, Buelna Decl. Ex. 8; ECF No. 81.8 at 13, Buelna Decl. Ex. 6.)

21   Mr. Buelna took his request up to KTVU management, which ultimately turned him down, and he

22   followed up with another email to *The West Australian* when he received no response.  Plaintiffs'

23   counsel searched for other media outlets that might have picked up the story as well but found

24   none.  The court's own internet searches reveal no other currently available coverage of the 2019

25   Internal Investigation (aside from the ABC News article inspired by the Whitney suit).  All these

26   efforts place plaintiffs' counsel in significantly better standing than plaintiff's counsel in Harmon

27   _____

28   [19] The court cannot credit the statements in the declaration filed at ECF No. 81.1, which is signed by Mr. Buelna, but clearly refers to the conduct and knowledge of Mr. Pointer.

who apparently made *no* attempts to have news outlets take their stories down.  See 323 F.R.D. at 621, 627 (noting that, aside from having their client take down the YouTube video, plaintiffs' counsel "seemingly did little else to adhere to the protective order's terms" after noticing the disclosure).

All that said, the court agrees with defendants that plaintiffs' counsel have not appeared particularly remorseful in their communications with opposing counsel or in their briefing to the court, after learning of their Protective Order violations.  Despite acknowledging that much of the information in the KTVU story—including actual footage of confidential-designated testimony— came directly from them, plaintiffs' counsel primarily have looked to deflect blame and accuse defendants of wrongdoing, in turn.  The court understands some degree of defensiveness when met with a motion for such staggering sanctions, especially between counsel who regularly oppose each other in highly charged civil rights cases.  All counsel would be better served, however, by lowering the temperature when possible by acknowledging their own wrongdoing, even if accidental.  To their credit, plaintiffs' counsel do apologize for not initially filing the confidential-designated testimony under seal.  (ECF No. 81 at 18.)  At the hearing, Mr. Pointer and Mr. Buelna fully acknowledged that they made a significant mistake.  And the court does not see fit to increase plaintiffs' counsels' sanctions in this case just because their communications with opposing counsel did not strike quite the right tone.

### *i. Return of Settlement Fee*

In that vein, the court finds that ordering plaintiffs' counsel to return their settlement fee would be disproportionate under the circumstances.  As the court has concluded that the instant violations were unwitting, there is little need for such a significant deterrent sanction.  It is not as though plaintiffs' counsel have flouted the Protective Order in some flagrant fashion.  The court is convinced that Mr. Buelna believed he was simply passing along to the media information that was already publicly available.  That does not evince a disregard for the court's Protective Order necessitating swift deterrence against repetition.  The court cannot agree with defendants' characterization that plaintiffs "appear to have attempted to profit off of" the violation.  (See ECF No. 80 at 20-21.)  As discussed, Mr. Pointer's social media posts advertise his work on the case

1   generally, and do not in any way highlight the confidential-designated testimony about the 2019

2   Internal Investigation specifically.  And the court feels confident that, with this being Mr.

3   Pointer's first enforced violation of a protective order in his 15 years of practice, he and his firm

4   are unlikely to repeat their mistake.

5                    *ii.  Compensatory Sanctions to Defendant McMahon*

6           Defendant McMahon seeks $250,000 in monetary sanctions to compensate for the

7   emotional damage he has suffered following the KTVU story's publication of the 2019 Internal

8   Investigation details.  The court has considered the one-page supporting declaration provided by

9   McMahon, the details of which are not discussed here, as the document will remain under seal.

10   (ECF No. 80.2.)  In addition to McMahon's personal averments, defense counsel declares that

11   there have been "numerous" social media posts "threatening Officer McMahon's life" since the

12   KTVU story aired.  (ECF No. 80.3, Konz Decl. ¶ 17.)  Defendants provide one example of such a

13   post:  a comment on Mr. Pointer's first Facebook post sharing the KTVU article, in which the

14   author writes "CELL OR CASKET!," followed by 100% emojis.  (ECF No. 80.3 at 36, Ex. E.)

15           The court does not doubt that McMahon has experienced the difficult things described in

16   his declaration.  However, there is insufficient evidence that it was plaintiffs' counsel's sharing of

17   the confidential-designated testimony that caused these harms.  Aside from that one Facebook

18   comment—which does not strike the court as a death threat, per se—and the general timing of

19   McMahon's other emotional harms, there is nothing linking the KTVU story to his present

20   difficulties.  Only weeks before the KTVU story was published, McMahon was fired from the

21   VPD, spurring a resurgence of unfavorable reporting about him.  Before that, the media

22   scrutinized his actions in the shootings of Foster and McCoy while covering the City's agreement

23   to settle this case for a record-setting sum.  And since the KTVU article, the independent

24   reporting of the Whitney suit has brought attention back to those events, and the 2019 Internal

25   Investigation specifically.  Under these circumstances, it is impossible for the court to quantify

26   how much of McMahon's emotional harm stems from the overall public awareness of this

27   multimillion-dollar settlement and his history of shootings, versus plaintiffs' counsel's media

28   disclosure.  See Harmon, 323 F.R.D. at 627.

Even assuming McMahon's emotional harm did stem entirely from the KTVU story, it is unclear that the contents of the story were entirely drawn from plaintiffs' counsel's disclosure. The court finds credible plaintiffs' counsel's representations to the court that the photograph of McMahon's gun engraving included in the KTVU story did not come from them. That KTVU had multiple sources for its October 20th story further detracts from requiring plaintiffs' counsel to compensate for whatever harm the story may have caused McMahon. Accordingly, the court will not award the requested compensatory sanctions. See Nat'l Med. Enterprises, Inc., 792 F.2d at 910 ("a compensatory award is limited to the actual losses sustained *as a result of* the contumacy") (emphasis added).

### iii. Attorney's Fees

This leaves defendants' request for an award of some $27,275 for their attorney's fees incurred in bringing this sanctions motion. (ECF No. 80.3, Konz Decl., Ex. G.) Although sanctions are warranted for plaintiffs' counsel's admitted negligence in violating the Protective Order on two occasions, the court finds it more proportionate under the circumstances of the violations to award defendants the reduced amount of $14,000—approximately half of the requested fees (the rates and hours for which the court finds reasonable).

As explained above, plaintiffs' counsel breached the Protective Order with far less awareness of what they were disclosing than was true of the violators in cases where greater attorney's fees have been awarded. See Harmston v. City & Cty. of San Francisco, 2007 WL 3306526, at *5-7 (N.D. Cal. Nov. 6, 2007) (awarding $24,407 where plaintiff's counsel provided deposition to media one day after deposition where the parties debated the confidential designation); Harmon, 323 F.R.D. at 627 (awarding $69,756). Moreover, both before and after the Protective Order violations, much of the same disclosed information was already known to parties outside of this litigation. Because plaintiffs' counsel were not particularly culpable in disclosing the information, and because the impact of their disclosure cannot be fairly assessed amidst the surrounding public awareness of the 2019 Internal Investigation, the court finds a reduced attorney's fees award appropriate. An award of $14,000 is still significant enough to serve as a reminder of counselors' duty to exercise the utmost caution in handling sensitive

1    discovery material with a protective order in place, especially when that material is being

2    provided to the media.  And the undersigned is confident that such an award will also convey to

3    these and other litigants how seriously the court takes any breach of a court-approved protective

4    order.

5              **B. Plaintiffs' Motion for Sanctions**

6              Plaintiffs ask the court to sanction defendants under Rule 37 for their own purported

7    Protective Order violations, and under Rule 11 for bringing what plaintiffs deem to be

8    unmeritorious and bad faith motions for sanctions and sealing.  (ECF No. 88.)  Plaintiffs ask the

9    court to (1) hold defendants in civil contempt, (2) refer defense counsel for discipline, and

10   (3) award attorney's fees and costs incurred in opposing defendants' motions and bringing their

11   own sanctions motion.  (Id. at 14, 17.)  Plaintiffs accuse defendants of "hijack[ing]" the court's

12   discovery enforcement mechanism to malevolently intimidate and harass them for bringing civil

13   rights suits against the City and its police officers—and of concealing evidence and defrauding

14   the court in the process.  (Id. at 3.)  As with defendants' motion, the court finds these assertions

15   overblown.

16             Plaintiffs seek sanctions under Rule 37 for four purported Protective Order violations by

17   defendants—many of which overlap with their arguments asserted in opposition to defendants'

18   sanctions motion.  (Id. at 10-14.)  First, plaintiffs argue that defendants violated the Protective

19   Order by improperly designating as confidential *all* of the 2019 Internal Investigation material

20   when it was produced/disclosed during discovery.  The Protective Order requires "restraint and

21   care" in designating material for protection, requiring the designator to "limit any such

22   designation to specific material that qualifies" as protected.  (ECF No. 21 ¶ 5.1.)  The designator

23   "must designate for protection only those parts of material, documents, items, or oral or written

24   communications that qualify – so that other portions of the material, documents, items, or

25   communications for which protection is not warranted are not swept unjustifiably within the

26   ambit of this Order."  (Id.)  Designations "shown to be clearly unjustified or that have been made

27   for an improper purpose . . . expose the Designating Party to sanctions."  (Id.)  If the designator

28   learns that confidential-designated material does not qualify for protection, the party must

1   promptly "withdraw[] the mistaken designation."  (Id.)

2          Plaintiffs argue that, when producing the material in mid-2019, and certainly by the time

3   of the February 2020 deposition, defendants knew certain facts underlying the 2019 Internal

4   Investigation were already known by at least the journalist who submitted the April 2019 PRA

5   Requests:  namely, that (1) McMahon's gun displayed a Veritas Aequitas etching, and (2) there

6   was an internal affairs investigation into it.  (ECF No. 92 at 3-4.)  They argue that these facts

7   were in the public domain and beyond the scope of the Protective Order, and that defendants

8   violated the Protective Order by designating the entire 2019 Internal Investigation file (and

9   ensuing deposition testimony) confidential—rather than designating only the portions not already

10   in the public domain.  The court finds the PRA Requests' existence too flimsy a basis to establish

11   that these facts were publicly known or that their confidential designation was therefore

12   sanctionable under the Protective Order.  Moreover, there is no evidence that defense counsel,

13   defendant McMahon, or a City representative affirmatively knew, when the designation was

14   being asserted, that this information was public knowledge.  The designation was not "clearly

15   unjustified" or asserted for an "improper purpose," so even assuming a Protective Order violation,

16   the initial designation was not sanctionable.  (See ECF No. 21 ¶ 5.1.)

17          Nor was it a sanctionable violation of the Protective Order for defendants to refuse to

18   withdraw their instant motions after plaintiffs' counsel informed them of the PRA Requests

19   discussed in the Whitney complaint—what plaintiffs assert as the fourth violation of the

20   Protective Order.  Although by that point defendants and counsel certainly knew about the PRA

21   Requests, the court still does not find it unjustifiable or improper for defendants to maintain their

22   instant motions to seal and for sanctions based on plaintiffs' undisputed disclosure of the

23   surrounding confidential-designated information.

24          As a second ground for sanctions, plaintiffs argue that it also violated the Protective Order

25   for defendants to maintain and defend the confidential designation through the instant motions,

26   without acknowledging their failure to object to the public filing of Exhibit 8.  This essentially

27   reasserts the waiver argument advanced in plaintiffs' sanctions opposition brief, which the court

28   again rejects.  Failing to object to the public filing of an exhibit that contains, buried within it,

uncited-to confidential-designated video footage does not waive a party's right to challenge that conduct as violating the protective order upon discovery of the disclosure.  And defendants' motion addressed above is precisely the way to enforce the terms of a court-approved protective order while the case is open.  As defendants aptly put it, "[f]iling a Rule 37 motion because protected discovery material was released to the media is not a Rule 37 violation."  (ECF No. 90 at 12.)

Plaintiffs' third and best argument for a Protective Order violation is based on defendants' refusal to withdraw the instant motions after the <u>Whitney</u> complaint was filed and after the December 24, 2020 ABC News article discussed the complaint and the 2019 Internal Investigation.  Like the argument about the PRA Requests, plaintiffs contend that these public documents "placed the entirety of information [defendants] asserted confidential independently into the public domain." (ECF No. 88 at 12.)  The Protective Order not only exempts from its scope information *already* in the public domain at the time of disclosure, but also any information that "becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order."  (ECF No. 21 ¶ 3.)  The <u>Whitney</u> suit, while covering certain events also implicated in this case, is an independent legal action in which plaintiffs' counsel are not involved.  And plaintiffs' counsel had nothing to do with the ABC News coverage of Whitney's complaint and his interview statements.

The court finds these December 2020 <u>Whitney</u> publications highly probative in resolving the request to seal, but less so in establishing a Protective Order violation.  Contrary to plaintiffs' assertion—and as discussed several times now with plaintiffs' other claims of pre-existing public awareness—these publications did not place "the entirety" of the 2019 Internal Investigation in the public domain.  They contain several details from that investigation—some apparently disclosed by one of McMahon's own attorneys—but there remain other aspects of McMahon's confidential-designated testimony not announced in the <u>Whitney</u> complaint or article.  And, in any event, these recent publications would not erase plaintiffs' counsel's original Protective Order violations, providing defendants a legitimate basis for seeking Rule 37 sanctions—no matter the present state of the information at issue.

32

Perhaps acknowledging this limitation, plaintiffs' same motion also requests sanctions under Rule 11, contending that defendants' instant motions are unmeritorious, were filed for an improper purpose, and that defendants are withholding contradictory evidence to the court in pursuing them.  (ECF No. 88 at 14-17.)  However, Rule 11 does not apply to discovery matters, such as enforcing the terms of a protective order via a Rule 37 motion.  See Fed. R. Civ. P. 11(d) ("This rule does not apply to disclosures and discovery requests, responses, objections, *and motions* under Rules 26 through 37.") (emphasis added).  Even assuming Rule 11 applies to requests to seal discovery-related motions, the court finds defendants' request to seal nonfrivolous and not presented for an improper purpose—although the court is not prepared to grant that request in full.[20]  Accordingly, the court finds no sanctions warranted against defendants, under either Rule 37 or Rule 11.

In their opposition to plaintiffs' cross-motion for sanctions, defendants request that the court award them $6,472.00 in attorney's fees, as the prevailing party in plaintiffs' fruitless Rule 11 motion.  (ECF No. 90 at 19-20.)  See Fed. R. Civ. P. 11(c)(2) ("If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion.").  Because the court finds Rule 11 inapplicable to the subject motions regarding a discovery violation, Rule 11(c)(2) is not an available basis for awarding further attorney's fees. See Fed. R. Civ. P. 11(d).

## C. Defendants' Request to Seal

Finally, the court turns to defendants' request to seal the entire briefing of their motion for sanctions.  On January 11, 2021, the undersigned provisionally granted defendants' request to seal—and subsequently extended that grant to cover the briefing of plaintiffs' cross-motion for sanctions as well.  (ECF Nos. 79, 80.4, 87.)  The court explained that defendants' initial request to preemptively seal all papers was improper and insufficiently supported; but the court allowed defendants to provide additional support for the request in further briefing, noting that there "may

---

[20] Plaintiffs also did not comply with Rule 11's procedural requirements that a Rule 11 sanctions motion be "made separately from any other motion," and "be served" on the party to be sanctioned.  See Fed. R. Civ. P. 11(c)(2).

1  be good cause to seal at least portions of certain materials." (ECF No. 79 at 2-3.) The court

2  urged defendants to "tailor their request to seal to the specific documents, exhibits, and portions

3  of the briefing that reveal the information they maintain is entitled to protection from public

4  view," and ordered defendants to "address why good cause exists with respect to sealing each

5  specific document" sought to be sealed. (Id. at 3.)

6          Defendants filed their further briefing in support of their request to seal (ECF No. 85), to

7  which plaintiffs have filed a surreply (ECF No. 86), in addition to their briefs opposing the initial

8  request to seal (ECF Nos. 82-83). In light of the quantity of information from the contested

9  deposition testimony that is now publicly available, and the incomplete nature of defendants'

10  request to seal, the court finds that only one of the currently sealed documents should remain

11  under seal.

12              *1.  Legal Standard*

13          "[T]here is a 'strong presumption in favor of access' to information filed with a court." In

14  re Roman Catholic Archbishop of Portland in Oregon, 661 F.3d 417, 429 (9th Cir. 2011) (quoting

15  Kamakana v. City and Cty. of Honolulu, 447 F.3d 1172, 1178 (9th Cir. 2006)). In general, to

16  overcome the presumption, a party seeking to seal judicial records must demonstrate not just

17  "good cause," but "compelling reasons." Id. (citations omitted). "Despite this strong preference

18  for public access," the Ninth Circuit has "carved out an exception for sealed materials attached to

19  a discovery motion unrelated to the merits of a case." Ctr. for Auto Safety v. Chrysler Grp., LLC,

20  809 F.3d 1092, 1097 (9th Cir. 2016) (cleaned up). When this exception applies, a party seeking

21  to file under seal "need only satisfy the less exacting 'good cause' standard" found in Rule 26(c).

22  Id.; see Fed. R. Civ. P. 26(c)(1) (stating that a court "may, for good cause, issue an order to

23  protect a party or person from annoyance, embarrassment, oppression, or undue burden or

24  expense"). The documents defendants wish to remain filed under seal are all offered as part of, or

25  in support of, the instant non-dispositive, post-settlement motions for sanctions for violating the

26  Protective Order approved by this court. Thus, as determined in the court's provisional grant

27  ////

28  ////

34

1  order, defendants must demonstrate good cause for filing these documents under seal.[21]  See

2  Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978) (decisions on public access are "best

3  left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant

4  facts and circumstances of the particular case).

5          To establish good cause, first, the party seeking protection (here, defendants, seeking

6  permission to keep these filings under seal) must show that "specific prejudice or harm will

7  result," absent sealing.  See Foltz v. State Farm Mut. Auto. Ins. Co., 331 F.3d 1122, 1130 (9th

8  Cir. 2003).  "Broad allegations of harm, unsubstantiated by specific examples or articulated

9  reasoning, do not satisfy the Rule 26(c) test."  Beckman Industries, Inc. v. International Ins. Co.,

10  966 F.2d 470, 476 (9th Cir. 1992).  "A party asserting good cause bears the burden, for each

11  particular document it seeks to protect, of showing that specific prejudice or harm will result if no

12  protective order is granted."  Foltz, 331 F.3d at 1130.  This court's local rules echo these

13  principles by requiring requests to seal to "describe generally the documents sought to be sealed,

14  the basis for sealing," and the "statutory or other authority for sealing," among other things.  E.D.

15  Cal. R. 141(b).

16          Second, if the court concludes that denying protection will cause particularized harm, it

17  must balance "the public and private interests" to decide whether protection is necessary.  Roman

18  Catholic, 661 F.3d at 424.  The Ninth Circuit has instructed district courts to conduct this

19  balancing under the factors identified in Glenmede Trust Co. v. Thompson, 56 F.3d 476, 483 (3d

20  Cir. 1995).  See Roman Catholic, 661 F.3d at 424.  But even when both analytical steps weigh in

21  favor of protecting the material "a court must still consider whether redacting portions of the

22  discovery material will nevertheless allow disclosure."  Id. at 425.

23          *2.  Analysis*

24          Given the dual layers of confidentiality asserted across the three motions, the court first

25  _____

26  [21] Although there may be some basis for viewing these motions as "more than tangentially related
to the underlying cause of action," Ctr. for Auto Safety, 809 F.3d at 1099, plaintiffs have not

27  argued that the more stringent "compelling reasons" standard applies, and given that no live
causes of action remain in this case (all claims having been settled), the court only applies the

28  "good cause" standard.

1    clarifies that its analysis here is limited to whether the filings surrounding the instant motions

2    should remain under seal—not the filing status of the original Exhibit 8 video testimony

3    supporting the summary judgment motion.  This distinction is important because the information

4    defendants wish to keep off the public record in these motions is narrower in scope (though more

5    broadly scattered) than the information disclosed in the full 8 minutes of confidential-designated

6    testimony in Exhibit 8.  Defendants are now concerned only with preventing additional public

7    awareness of the details of the 2019 Internal Investigation.

8                        *i.  No Specific Prejudice or Harm from Public Filing*

9            Defendants' further briefing in support of their request to seal spans a total of five pages

10   and does not address all of the 50-plus documents currently filed under seal in connection with

11   the instant motions.  (ECF No. 85.)  Defendants assert the same prejudice or harm for almost all

12   the documents addressed:  that the original Protective Order violations discussed above already

13   caused McMahon the emotional damage described in his Rule 37 sanctions declaration, and

14   harmed the City by undercutting its promises of confidentiality in conducting internal

15   investigations.  They argue that public filing of these motions and supporting papers will cause

16   additional harm "because it will draw more public attention to the protected material and create

17   an additional conduit for public access to the protected material."  (Id. at 3.)

18           The first problem for defendants is that almost all—if not all—of the 2019 Internal

19   Investigation details they claim should still be protected are now firmly in the public domain.  Not

20   only have the original KTVU video broadcast and article remained accessible on the original two

21   media outlets since October 2020, but the Whitney complaint and ABC News article have since

22   come out with the same information about the 2019 Internal Investigation—which is front and

23   center in the ABC News article and video (ECF No. 83.2).  Most recently, in the separate McCoy

24   litigation, plaintiffs—also represented by Pointer & Buelna—publicly filed an opposition brief

25   again discussing the engraving and other facts from the 2019 Internal Investigation and attaching

26   the Whitney complaint and ABC News article.[22]  (No. 2:19-cv-01191, ECF No. 55, filed Jan. 26,

27   _____

28   [22] The City and McMahon, who are also represented by the same counsel as in this case,
     acknowledged that discussion in their reply brief, and have not moved to seal plaintiffs'

1    2021.)  Against the backdrop of these public discussions of the same information sought to be

2    sealed here, the court is unconvinced of the need to block an "additional conduit" for public

3    access.

4         This raises the related problem that defendants' request to seal is aimed at protecting

5    general categories of information originating from the 2019 Internal Investigation—as well as

6    attorney argument *about* that information—as opposed to protecting specific documents or

7    portions of documents.  It will take much more than the fear of ongoing media coverage,

8    especially of information already publicly available, for the court to seal from public view an

9    entire course of civil motions briefing.  See Does I thru XXIII v. Advanced Textile Corp., 214

10   F.3d 1058, 1067 (9th Cir. 2000) (acknowledging "public's common law right of access to judicial

11   proceedings").

12        Nevertheless, in granting provisional filing under seal, the court remained open to the

13   possibility that while briefing the nature of the alleged Protective Order violations, certain

14   documents might be filed or discussed that would reveal sensitive information deserving of

15   protection.  (ECF No. 79.)  Defendant McMahon's declaration turns out to be one such document.

16   (ECF No. 80.2.)  Unsealing the one-page personal declaration would expose highly private

17   matters—such as McMahon's health, medical treatment, and religious views—without serving

18   any arguable public interest.  That document shall remain under seal.

19        The court also was open to the idea that "portions of the briefing" might warrant

20   protection.  (ECF No. 79 at 3.)  Defendants have never proposed redacting any parts of the

21   briefs—as opposed to sealing them in toto—nor have they explained why redaction is not a

22   satisfactory option.  Cf. Roman Catholic, 661 F.3d at 425 (courts must "consider whether

23   redacting portions of the discovery material will nevertheless allow disclosure").  The court will

24   not take it upon itself to review and redact the 50-plus documents now filed in these motions.

25        Moreover, defendants fail to assert any argument for keeping under seal multiple filings

26   that contain or reference the same information identified as harmful in the filings that they do

27   _____

28   opposition there.  (No. 2:19-cv-01191, ECF No. 56 at 2, 7, filed Feb. 2, 2021.)

address in their further briefing.   For instance, defendants do not assert any argument for sealing

(a) plaintiffs' opposition to their request to seal or its attachments (ECF Nos. 82, 82.1-82.3);

(b) plaintiffs' supplemental brief opposing the request to seal or its attachments (ECF Nos. 83-

83.3); or (c) defendants' further brief itself (ECF No. 85).   All these briefs, and several of the

attachments, contain references and information that defendants cite as objectionable in other

filings.   Plaintiffs' opposition to defendants' request to seal (ECF No. 82) refers to McMahon's

"vigilante motto" throughout and asserts that it was based on a problematic movie reference;

plaintiffs' supplemental opposition alerting the court to the Whitney complaint attaches the ABC

News article as an exhibit along with an email exchange referencing McMahon's emotional

distress and highlighting the most relevant quotes from the article (ECF Nos. 83, 83.2, 83.3); and

defendants' own further brief refers to an internal investigation of whether McMahon "had

violated policy by engraving a religious symbol on his firearm" and discusses the KTVU

broadcast "liken[ing] Officer McMahon to a vigilante murderer akin to characters from a

Hollywood movie (Boondock Saints)" (ECF No. 85 at 2).

The court specifically directed defendants to "address why good cause exists with respect

to sealing each specific document."  (ECF No. 79 at 3.)  Defendants have not done so.  Without

any argument that the above filings should be sealed, the court cannot keep them under seal.  See

Foltz, 331 F.3d at 1130 ("A party asserting good cause bears the burden, *for each particular*

*document* it seeks to protect, of showing that specific prejudice or harm will result if no protective

order is granted.") (emphasis added); E.D. Cal. R. 141(b) (requiring requests to seal to include,

inter alia, description of "the documents sought to be sealed, [and] the basis for sealing").  The

court will not give defendants yet another opportunity to show good cause for the unaddressed

documents.  See Bangert v. Cty. of Placer, 2019 WL 358518, at *14 (E.D. Cal. Jan. 29, 2019) (no

good cause for granting defendants another opportunity to adequately plead their case for sealing

or redaction, after initial order directing further briefing set forth the relevant legal standards).

The forthcoming unsealing of these unaddressed documents provides another reason to unseal the

remaining documents (which defendants do address) that contain and discuss the same

information.  Defendants presented the court with a sweeping request to seal all papers connected

with their motion.  They have not carried their burden to justify sealing the many, many documents ultimately filed.

The court notes that the filings about to be unsealed do not contain any new information not already publicly available, nor do they contain actual documents from McMahon's personnel file.  For the most part, these filings consist of (1) online articles commentary and (2) legal arguments about the information at issue—whether found in the briefs themselves, or in the attorneys' informal communications to each other.  Of course, by ordering these documents unsealed, the court takes no position on the accuracy of any party's representations as to the endplate's meaning.  The point is, the debate about the consequences of its disclosure should be public.

**CONCLUSION**

For these reasons, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion to strike defendants' motion for sanctions (ECF No. 82) is DENIED;

2. Defendants' motion for sanctions (ECF No. 80) is GRANTED IN PART and DENIED IN PART:

   a. Patrick Buelna, Adanté Pointer, and Pointer & Buelna LLP are jointly and severally ORDERED to pay $14,000 in defendants' attorney's fees;

   b. These sanctions must be paid within 30 days of the entry of this order;

3. Plaintiffs' motion for sanctions (ECF No. 88) is DENIED; and

4. Defendants' request to seal (ECF Nos. 78, 80.4) is GRANTED IN PART and DENIED IN PART:

   a. The Clerk of Court shall UNSEAL all documents filed in connection with the request to seal and the cross-motions for sanctions, **except for** the Declaration of Ryan McMahon submitted in support of defendants' motion for sanctions (ECF No. 80.2);

   b. The Clerk is directed to modify the docket titles of the following documents as:

      i. ECF No. 80, Motion for Sanctions and Civil Contempt by All Defendants;

      ii. ECF No. 80.4, Request to Seal by All Defendants;

iii.   ECF No. 81, Opposition to Defendants' Motion for Sanctions [80] by R.F., Paula McGowan, and Ronell Foster, Sr.;

iv.   ECF No. 82, Opposition to Defendants' Request to Seal [80.4] and Motion to Strike Defendants' Motion for Sanctions [80] by R.F., Paula McGowan, and Ronell Foster, Sr.;

v.   ECF No. 83, Supplemental Brief in Opposition to Defendants' Request to Seal [80.4] by R.F., Paula McGowan, and Ronell Foster, Sr.;

vi.   ECF No. 84, Reply in Support of Defendants' Motion for Sanctions [80] by All Defendants;

vii.   ECF No. 85, Further Briefing in Support of Defendants' Request to Seal [80.4] by All Defendants;

viii.   ECF No. 86, Surreply in Opposition to Defendants' Request to Seal [80.4] by R.F., Paula McGowan, and Ronell Foster, Sr.;

ix.   ECF No. 88, Motion for Sanctions and Civil Contempt by R.F., Paula McGowan, and Ronell Foster, Sr.;

x.   ECF No. 90, Opposition to Plaintiffs' Motion for Sanctions [88] by All Defendants;

xi.   ECF No. 92, Reply in Support of Plaintiffs' Motion for Sanctions [88] by R.F., Paula McGowan, and Ronell Foster, Sr.

IT IS SO ORDERED.

Dated:  February 16, 2021

CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

19.if.0673

40